# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

STATE OF MARYLAND,
    200 Saint Paul Place
    Baltimore, MD  21202

STATE OF DELAWARE,
    820 North French Street
    Wilmington, DE  19801

STATE OF CALIFORNIA,
    300 South Spring Street, Suite 1702
    Los Angeles, CA  90013

STATE OF COLORADO,
    1300 Broadway
    Denver, CO  80203

STATE OF ARIZONA,
    2005 North Central Avenue
    Phoenix, AZ  85004

STATE OF CONNECTICUT,
    165 Capitol Avenue
    Hartford, CT  06106

DISTRICT OF COLUMBIA,
    400 6th Street NW
    Washington, DC  20001

STATE OF HAWAI'I,
    425 Queen Street
    Honolulu, HI  96813

STATE OF ILLINOIS,
    115 South LaSalle Street, 35th Floor
    Chicago, IL  60603

OFFICE OF THE GOVERNOR *ex rel. Andy Beshear, in his official capacity as Governor of the* COMMONWEALTH OF KENTUCKY,
    700 Capitol Avenue, Suite 106
    Frankfort, KY  40601

Civ. No. _____

STATE OF MAINE,
    6 State House Station
    Augusta, ME  04333

COMMONWEALTH OF MASSACHUSETTS,
    1 Ashburton Place
    Boston, MA  02108

PEOPLE OF THE STATE OF MICHIGAN,
    3030 West Grand Boulevard, Suite 9-600
    Detroit, MI  48202

STATE OF MINNESOTA,
    445 Minnesota Street, Suite 1400
    Saint Paul, MN  55101

STATE OF NEVADA,
    555 East Washington Avenue,
    Las Vegas, NV  89101

STATE OF NEW JERSEY,
    25 Market Street
    Trenton, NJ  08625

STATE OF NEW MEXICO,
    P.O. Drawer 1508
    Santa Fe, NM  87504

STATE OF NEW YORK,
    28 Liberty Street
    New York, NY  10005

STATE OF NORTH CAROLINA,
    P.O. Box 629
    Raleigh, NC 27602

STATE OF OREGON,
    100 Southwest Market Street
    Portland, OR  97201

JOSH SHAPIRO, *in his official capacity as
Governor of* the COMMONWEALTH OF
PENNSYLVANIA,
    30 North 3rd Street, Suite 200

2

Harrisburg, PA  17101

STATE OF RHODE ISLAND,
   150 South Main Street
   Providence, RI  02903

STATE OF VERMONT,
   109 State Street
   Montpelier, VT  05609

STATE OF WASHINGTON,
   2425 Bristol Court SW, Second Floor
   P.O. Box 40117
   Olympia, WA  98504

STATE OF WISCONSIN,
   P.O. Box 7857
   Madison, WI  53707

               Plaintiffs,

   v.

CORPORATION FOR NATIONAL AND
COMMUNITY SERVICE, *operating as*
AMERICORPS,
   250 E Street SW
   Washington, DC  20525

JENNIFER BASTRESS TAHMASEBI, *in her*
*official capacity as Interim Head of the Corporation*
*for National and Community Service*,
   250 E Street SW
   Washington, DC  20525

               Defendants.

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

1.      Since January 20, 2025, the Trump Administration has engaged in unprecedented efforts to unilaterally dismantle federal programs, spending, and personnel without Congressional

approval.  Now this campaign has reached AmeriCorps, the federal agency for national service and volunteerism.

2.    AmeriCorps—officially, the Corporation for National and Community Service[1]—has operated as an independent agency of the federal government since 1993.  AmeriCorps members volunteer in the areas of disaster relief, economic opportunity, education, environmental stewardship, community health, and veteran services.[2]  Until the events described in this complaint, AmeriCorps supported more than 200,000 members and volunteers with living stipends and benefits each year and was managed by a staff of approximately 700 employees.[3]

3.    The Administration has begun efforts to dismantle AmeriCorps by releasing members and volunteers, placing most agency staff on administrative leave in anticipation of terminations, and cancelling contracts and grants.  On April 15, at the behest of the so-called Department of Government Efficiency (DOGE), AmeriCorps leadership placed all members serving in the National Civilian Community Corps (NCCC) on administrative leave and notified them that their participation in the program "w[ould] terminate" on April 30.  *See* Memorandum from Ken Goodson, NCCC National Director, AmeriCorps (Apr. 15, 2025), attached as Ex. A.

4.    A cover email to the Goodson Memorandum stated:  "In alignment with the Trump-Vance Administration priorities and Executive Order 14222, 'Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative,' AmeriCorps NCCC is

---

[1] By regulation, "[t]he Corporation for National and Community Service has adopted AmeriCorps as its official agency operating name."  45 C.F.R. § 2500.2(a).

[2] AmeriCorps, *FY 2024 Annual Management Report* 9, https://www.americorps.gov/sites/default/files/document/AmeriCorps-FY24-Annual-Management-Report.pdf.

[3] *See id.* at 8.

working within new operational parameters that impact the program's ability to sustain program operations." *See* Letter to All Members on Demobilization (Apr. 15, 2025), attached as Ex. B.

5.      The following day, AmeriCorps placed 85% of its paid staff on administrative leave. *See* Email from Jennifer Bastress Tahmasebi to AmeriCorps Board (Apr. 17, 2025), attached as Ex. C; Memorandum from Jennifer Bastress Tahmasebi, Interim Agency Head, AmeriCorps (Apr. 16, 2025), attached as Ex. D.

6.      On April 24, AmeriCorps began to issue Reduction in Force (RIF) notices to employees on administrative leave. *See* RIF Notice, attached as Ex. E.  News reports indicate that these RIFs will result in cuts to AmeriCorps' workforce of "up to 50 percent or more."[4]

7.      The following day, after business hours, Defendants began notifying State Service Commissions that nearly $400 million worth of AmeriCorps programs were immediately terminated.[5] *See* Cancelled Programs Workbook, attached as Ex. F.  Defendants' notices informed recipients that their programs "no longer effectuate[d] agency priorities"; that they "must immediately cease all award activities"; that "[a]ll member activities should cease immediately"; and that they "should document that [each] member was exited for compelling personal circumstances due to the agency's termination of the grant and program closure." *E.g.*, Del. Termination Notice (AmeriCorps State and National), attached as Ex. G; Del. Termination Notice (VISTA), attached as Ex. H.

---

[4] Tobi Raji, *AmeriCorps staff members placed on leave after DOGE visit*, Wash. Post, Apr. 16, 2025, https://www.washingtonpost.com/nation/2025/04/16/americorps-cuts-doge-trump/.

[5] Tobi Rajj, *DOGE orders major cut to AmeriCorps funding, imperiling agency's work*, Wash. Post, April 25, 2025,  https://www.washingtonpost.com/nation/2025/04/25/americorps-grant-cuts-doge/.

8.      These terminations have received bipartisan criticism.  U.S. Senator Bill Cassidy (R-La.), for example, "object[ed] to cutting AmeriCorps grants like those that support Louisiana's veterans and organizations that provide crucial support after hurricanes and natural disasters."[6] U.S. Senator Chris Coons (D-Del.), co-chair of the bipartisan National Service Caucus, wrote a letter joined by 148 congressional colleagues that "urge[d] the administration to continue implementing the statutory requirements of the national service laws" and expressed "grave concerns that significant reductions in force will prevent AmeriCorps from being able to effectively and efficiently award appropriated funding to programs operating in communities across the country."[7]

9.      Defendants' actions reflect and embody an unauthorized decision by the Administration to dismantle AmeriCorps.

10.     The Administration's abrupt decision to dismantle AmeriCorps flouts Congress's creation of AmeriCorps and assignment of agency duties; usurps Congress's power of the purse and thereby violates the Constitution's separation of powers; and arbitrarily and capriciously—without any reasoned analysis—vitiates the agency's ability to function consistent with its statutory mission and purpose.  It also violates a provision of AmeriCorps' statutory appropriation that requires the agency to make "significant changes to program requirements, service delivery or policy only through public notice and comment rulemaking."  *E.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, § 401, 138 Stat. 460, 695 (Mar. 23, 2024).

---

[6]   https://x.com/SenBillCassidy/status/1915886202651349128.

[7]   Letter from U.S. Senator Christopher A. Coons, et al., to President Donald J. Trump (Apr. 23, 2025), https://www.coons.senate.gov/imo/media/doc/americorps_rif_letter.pdf.

11.     If the Defendants' actions are permitted to stand despite their statutory and constitutional defects, then the gutting of AmeriCorps will inflict immediate and irreparable harms on the Plaintiff States, their residents, and the public at large.

12.     The Administration is free to ask Congress to abolish AmeriCorps, but it cannot simply terminate the agency's functions by fiat or defund the agency in defiance of administrative procedures, Congressional appropriations, and the Constitutional separation of powers. Accordingly, the Defendants' actions should be declared unlawful and vacated.

## JURISDICTION AND VENUE

13.     The Court has jurisdiction over this Complaint under 28 U.S.C. § 1331, 28 U.S.C. § 1361, and 5 U.S.C. § 702.

14.     There is a controversy under 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 1361, 2201–2202, 5 U.S.C. §§ 704–706 and the Court's equitable powers.

15.     Venue is proper in this District because Plaintiff State of Maryland and its Attorney General reside in this District and the other Plaintiffs consent to adjudication of these issues here. Moreover, a substantial part of the acts or omissions giving rise to this action occurred in this District, and this action seeks relief affecting AmeriCorps members and employees who reside in this District.

## PARTIES

### I.     Plaintiffs

16.     The State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown.

17.     The State of Delaware, represented by and through its Attorney General, Kathleen Jennings, is a sovereign state of the United States of America. The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to 29 Del. C. § 2504.

18.     The State of California is a sovereign state of the United States of America.  California is represented by Attorney General Rob Bonta, who is the chief law enforcement officer of California.

19.     The State of Colorado is a sovereign state in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado.  The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

20.     The State of Arizona is a sovereign state in the United States of America.  Arizona is represented by Attorney General Kris Mayes, who is the chief law enforcement officer of Arizona.

21.     The State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

22.     The District of Columbia is a municipal corporation organized under the Constitution of the United States.  It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government.  The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all

suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

23.    The State of Hawai'i is a sovereign state of the United States of America.  Hawai'i is represented by Attorney General Anne E. Lopez, Hawai'i chief legal officer, who is authorized by Hawai'i Rev. Statutes sec. 28-1 to pursue this action.

24.    The State of Illinois is a sovereign state of the United States of America.  Illinois is represented by Attorney General Kwame Raoul, who is the chief law enforcement officer of Illinois and is authorized to pursue this action under Illinois law.  *See* 15 ILCS 205/4.

25.    Office of the Governor, *ex rel.* Andy Beshear, brings this suit in his official capacity as the Governor of the Commonwealth of Kentucky.  The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," Ky. Const. § 81.  In fulfilling his constitutional duties, the Governor has authority to bring this action.

26.    The State of Maine is a sovereign state of the United States of America.  Maine is represented by Aaron M. Frey, the Attorney General of Maine.  The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. § 191.

27.    The Commonwealth of Massachusetts is a sovereign state of the United States of America.  Massachusetts is represented by Andrea Joy Campbell, the Attorney General of Massachusetts, who is the chief law officer of Massachusetts and authorized to pursue this action.

28.    The People of the State of Michigan is represented by Attorney General Dana Nessel.  The Attorney General is Michigan's chief law enforcement officer and is authorized to

bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

29.    The State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

30.    The State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State of the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

31.    The State of New Jersey is a sovereign state of the United States of America. New Jersey is represented by Matthew Platkin, the Attorney General of New Jersey, who is the chief law enforcement officer of New Jersey and authorized to sue on the State's behalf.

32.    The State of New Mexico is a sovereign state of the United States of America. New Mexico is represented by Attorney General Raúl Torrez who is the chief law enforcement officer of New Mexico.

33.    The State of New York is a sovereign state of the United States of America. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

34. The State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson who is the chief law enforcement officer of North Carolina.

35. The State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action. ORS 180.060.

36. Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania.

37. The State of Rhode Island is a sovereign state of the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

38. The State of Vermont is a sovereign state of the United States of America. Vermont is represented by Attorney General Charity Clark. Attorney General Clark is authorized to initiate litigation on Vermont's behalf.

39. The State of Washington is a sovereign state of the United States of America. Washington is represented by Attorney General Nicholas W. Brown. The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern. Chapter 43.10 RCW.

40. The State of Wisconsin is a sovereign state of the United States of America. Wisconsin is represented by Attorney General Josh Kaul, who is the chief law enforcement officer of Wisconsin.

## II.    Defendants

41.    Defendant Corporation for National and Community Service, operating as AmeriCorps, is an executive agency of the United States pursuant to 5 U.S.C. § 105.  As such, it engages in agency action and is named as a defendant in this action pursuant to 5 U.S.C. § 702.

42.    Defendant Jennifer Bastress Tahmasebi is the interim agency head of AmeriCorps. She is named in her official capacity.

## FACTUAL ALLEGATIONS

## III.    AmeriCorps' History, Structure, and Programs

### a.    Statutory History

43.    The Corporation for National and Community Service (AmeriCorps) traces its origins back to the Domestic and Volunteer Service Act of 1973, Pub. L. 93-113, § 401, 87 Stat. 394, 405 (Oct. 1, 1973) (the 1973 Act).  The 1973 Act created Volunteers in Service to America (VISTA), a "program of full-time volunteer service" designed "to strengthen and supplement efforts to eliminate poverty and poverty-related human, social, and environmental problems in the United States."  *Id.* § 101, 87 Stat. at 396.  The 1973 Act also created several National Older American Volunteer Programs, including the Retired Senior Volunteer Program (RSVP), *id.* § 201, 87 Stat. at 401, and the Foster Grandparent Program, *id.* §§ 211–212, 87 Stat. at 402–03. Congress established an entity known as the ACTION Agency to operate these programs.  *Id.* § 401, 87 Stat. at 405.

44.    Later, Congress enacted the National and Community Service Act of 1990, Pub. L. 101-610, § 190, 104 Stat. 3127, 3168 (Nov. 16, 1990) (the 1990 Act), to establish a Commission on National and Community Service.  The Commission administered grant programs authorized by the 1990 Act to support, among other things, school-aged service, *id.* § 111, 104 Stat. at 3132;

youth conservation and human service corps, *id.* § 121, 104 Stat. at 3140; and full- and part-time national and community service, *id.* § 141, 104 Stat. at 3150.

45.    Congress then formed AmeriCorps by merging the Commission and the ACTION Agency under the National and Community Service Trust Act of 1993, Pub. L. 103-82, §§ 191 & 203(c)(2), 107 Stat. 785, 873, 892 (Sept. 21, 1993) (the 1993 Act) (codified at 42 U.S.C. §§ 12501 et seq.); 42 U.S.C. § 12651.

46.    Congress created AmeriCorps and its predecessors in order to (among other things) "renew the ethic of civic responsibility and the spirit of community and service throughout the varied and diverse communities of the United States," 42 U.S.C. § 12501(b)(2); "build on the existing organizational service infrastructure of Federal, State, and local programs, agencies, and communities to expand full-time and part-time service opportunities for all citizens," *id.* § 12501(b)(7); "leverage Federal investments to increase State, local, business, and philanthropic resources to address national and local challenges," *id.* § 12501(b)(17); and "support institutions of higher education that engage students in community service activities and provide high-quality service-learning opportunities." *Id.* § 12501(b)(18).

b.    *Agency Structure*

47.    AmeriCorps is a Government corporation, 42 U.S.C. § 12651, led by a Board of Directors, *id.* § 12651a, and a Chief Executive Officer (CEO). *Id.* § 12651c.

48.    Members of AmeriCorps' Board and its CEO both are appointed by the President with the advice and consent of the Senate. *Id.* §§ 12651a(a)(1) & 12651c(a).

49.    By statute, AmeriCorps' Board is at least bipartisan: "To the maximum extent practicable, the President shall appoint members . . . so that no more than 50 percent of the

appointed members of the Board, plus 1 additional appointed member, are from a single political party." *Id.* § 12651a(a)(2)(E).

50.    AmeriCorps' Board "set[s] overall policy for the Corporation" and "review[s] and advise[s] the Chief Executive Officer regarding, the actions of the Chief Executive Officer with respect to the personnel of the Corporation, and with respect to such standards, policies, procedures, programs, and initiatives as are necessary or appropriate to carry out the national service laws." *Id.* § 12651b(g)(5)(A).

51.    AmeriCorps' CEO is "responsible for the exercise of the powers and the discharge of the duties of the Corporation that are not reserved to the Board," and "ha[s] authority and control over all personnel of the Corporation." *Id.* § 12651d(a).

52.    The CEO also "may . . . generally perform such functions and take such steps consistent with the objectives and provisions of the national service laws, as the Chief Executive Officer determines to be necessary or appropriate to carry out such provisions." *Id.* § 12651d(c)(11).

c.    *Agency Programs*

53.    AmeriCorps directly operates several service programs—notably, the National Civilian Community Corps—but most of its funding goes to support programs independently operated by State and local governments, nonprofit organizations, and universities.

54.    AmeriCorps supports service programs through direct grants; pass-through grants, which are awarded to State Service Commissions[8] for the purpose of distributing to subgrantees; and education awards.

---

[8] To receive AmeriCorps funding, the 1993 Act requires each State either to (a) create a State Commission on National and Community Service, or (b) obtain approval from AmeriCorps

55.    AmeriCorps education awards are provided to volunteers (rather than to programs), *id.* § 12602(a), in an amount "equal to the maximum amount of a Federal Pell Grant," *id.* § 12603(a), and may be used to, among other things, "repay student loans" or "pay all or part of the cost of attendance or other educational expenses at an institution of higher education."  *Id.* § 12604(a)(1)–(2).

56.    AmeriCorps education awards are paid out of the National Service Trust, a Treasury account that consists of, among other things, appropriated funds that have been designated for that purpose. *Id.* § 12601(a).

57.    In addition to education awards, AmeriCorps also funds benefits such as living allowances, health coverage, and childcare for full-time members to enable their uncompensated volunteer work. *See id.* § 4955; *id.* § 12594(a), (d), & (e).

58.    Programs directly operated by AmeriCorps include:

a.    National Civilian Community Corps (Title I-E of the 1993 Act), a full-time residential program for young adults (aged 18–26) who live together for 10–11 months while working on service projects such as maintaining trails, constructing homes, and disaster relief.  *Id.* § 12612; *see also* National Defense Authorization Act for FY 1993, PL 102-484, § 1092, 106 Stat. 2315, 2522 (Oct. 23, 1992)

---

"to use an alternative administrative entity to carry out the duties otherwise entrusted to a State Commission."   42 U.S.C. § 12638(a)(1)–(2).   In Plaintiff State Maryland, for example, AmeriCorps pass-through grants are allocated by the Governor's Office on Service and Volunteerism within the Department of Service and Civic Innovation.

    Certain Plaintiff States—Massachusetts, Minnesota, and Nevada—have designated private nonprofit groups to serve as their State Service Commissions under 42 U.S.C. § 12638(a)(2).  *See* AmeriCorps, *State Service Commissions*, https://www.americorps.gov/contact/state-service-commissions (last accessed Apr. 21, 2025).  Notwithstanding that the administrative entities for those States are private nonprofits, competitive and formula grants administered by those entities are "ma[de] . . . to each of the several States."  *See* 42 U.S.C. § 12581(d)(1) & (e)(1).

(creating NCCC's predecessor, the Civilian Community Corps, to "combine the best practices of civilian service with the best aspects of military service").

b. Volunteers in Service to America (Title I-A of the 1973 Act), the "program of full-time volunteer service" formerly administered by the ACTION Agency. 42 U.S.C. § 4951. Members "perform . . . volunteer service" to "assist in the solution of poverty and poverty-related problems and secure and increase opportunities for self-advancement by persons affected by such problems." *Id.*

59. Grant programs through which AmeriCorps provides funding include:

a. AmeriCorps State and National Grants (Title I-C of the 1993 Act; Title I-D of the 1990 Act), which "make grants to States, subdivisions of States, territories, Indian tribes, public or private nonprofit organizations, and institutions of higher education for the purpose of assisting the recipients of the grants—(1) to carry out full- or part-time national service programs, including summer programs . . . ; and (2) to make grants in support of other national service programs . . . that are carried out by other entities." *Id.* § 12571(a). 35.3% of State and National Grants are awarded to State Service Commissions on a formula basis to provide pass-through funding to service programs, *id.* § 12581(e)(2); most of the remainder are awarded "on a competitive basis" to States as well as "to nonprofit organizations seeking to operate a national service program in 2 or more of those States, and to Indian tribes." *Id.* § 12581(d)(1). Types of programs supported include Education Corps, Veterans Corps, and Opportunity Corps. *Id.* § 12572(b)–(c).

b. Innovation and Demonstration Programs (Title I-H of the 1993 Act; Title I-E of the 1990 Act; Title I-C of the 1973 Act), which support various pilot programs, *see, e.g.*, *id.* § 12653k, and "demonstration programs." *See, e.g.*, *id.* § 4992(a).

c. National Older American Volunteer Programs (Title II of the 1973 Act):

    i. Retired and Senior Volunteer Program (Title II-A of the 1973 Act), which "make[s] grants to State agencies . . . or grants to or contracts with other public and nonprofit private agencies and organizations to pay part or all of the costs for the development or operation, or both, of volunteer service projects" for "retired individuals and working older individuals . . . 55 years of age or older." *Id.* § 5001(a).

    ii. AmeriCorps Seniors' Foster Grandparent Program (Title II-B of the 1973 Act), through which "foster grandparents" provide one-on-one tutoring and mentorship "to children who are individuals with disabilities, who have chronic health conditions, who are receiving care in hospitals, who are residing in homes for dependent and neglected children, or who are receiving services provided . . . for children having special or exceptional needs or circumstances identified as limiting their academic, social, or emotional development." *Id.* § 5011(a).

    iii. AmeriCorps Seniors' Senior Companion Program (Title II-C of the 1973 Act), through which volunteers "provide services designed to help older persons requiring long-term care, including services to persons receiving home health care, nursing care, home-delivered meals or other nutrition services; services designed to help persons deinstitutionalized from mental

17

hospitals, nursing homes, and other institutions; and services designed to assist persons having developmental disabilities and other special needs for companionship." *Id.* § 5013(a).

60.    Each year, AmeriCorps is responsible for drafting Notices of Funding Opportunities (NOFO) that provide public notice of each grant it plans to award, including funds that AmeriCorps is statutorily required to allocate to the Plaintiff States. 2 C.F.R. § 2205.100; *id.* § 200.204 (requiring NOFOs for competitive awards and setting minimum content.)

61.    For FY 2024, Congress appropriated AmeriCorps $975,525,000 "to carry out" the 1990 and 1973 Acts (including $37,735,000 for NCCC); $180,000,000 "[f]or payment to the National Service Trust"; $99,686,000 "[f]or necessary expenses of administration" (i.e., employee salaries); and $7,595,000 "[f]or necessary expenses of [AmeriCorps'] Office of Inspector General," for a total of $1,262,806,000. Further Consolidated Appropriations Act, 2024, div. D, tit. IV, 138 Stat. at 694–95.

62.    For FY 2024, Congress directed that AmeriCorps allocate the funds appropriated "to carry out" the 1990 and 1973 Acts as follows, 170 Cong. Rec. H2060–61 (Mar. 22, 2024):

| Program | Amount | Percentage |
|---|---|---|
| | | |
| *Directly Operated Programs* | | |
| National Civilian Community Corps | $37,735,000 | 3.87% |
| Volunteers in Service to America | $103,285,000 | 10.59% |
| **Subtotal** | **$141,020,000** | **14.46%** |
| | | |
| *Grant Programs* | | |
| AmeriCorps State and National Grants | $557,094,000 | 57.11% |
| National Older American Volunteer Programs | $236,917,000 | 24.29% |
| *Retired Senior Volunteer Program* | *$55,105,000* | *5.65%* |
| *Foster Grandparents Program* | *$125,363,000* | *12.85%* |
| *Senior Companion Program* | *$56,449,000* | *5.79%* |
| Innovation, Assistance, and Other Activities | $14,706,000 | 1.51% |

| | | |
|---|---|---|
| State Commission Support Grants | $19,538,000 | 2.00% |
| **Subtotal** | **$828,255,000** | **84.90%** |
| | | |
| *Other* | | |
| Evaluation | $6,250,000 | 0.64% |
| | | |
| **Total** | **$975,525,000** | |

63.    Congress also provided that AmeriCorps "shall make any significant changes to program requirements, service delivery or policy only through public notice and comment rulemaking." Further Consolidated Appropriations Act, 2024 § 401, 138 Stat. at 695.

64.    For FY 2025, Congress reappropriated the amounts from the FY 2024 appropriations act, "under the authority and conditions provided in" that Act.   Full-Year Continuing Appropriations Act, 2025, Pub. L. 119-4, § 1101(a)(8), 139 Stat. 9, 11 (Mar. 15, 2025).

65.    The only material basis identified by statute for which AmeriCorps may cancel a grant it has awarded to a State is if it determines "there is a material failure to comply with this subchapter or the applicable terms and conditions of any such grant or contract issued pursuant to this subchapter."  42 U.S.C. § 12636(a).  Furthermore, by statute, grants "shall not be terminated or revoked for failure to comply with applicable terms and conditions of this subchapter unless the recipient of such assistance has been afforded reasonable notice and opportunity for a full and fair hearing" at a location convenient to the grantee, and the opportunity to demonstrate.  *Id.* § 12636(a)–(b).

66.    Under applicable regulations, AmeriCorps must give a grantee 7 days' notice of proposed cuts, during which it may submit "written material in opposition to the proposed action" that shows "good cause why such assistance should not be terminated or revoked."  45 C.F.R. § 2540.400 ("Under what circumstances will the Corporation suspend or terminate a grant or contract?").

19

d.    *Other Statutory Duties*

67.    In addition to authorizing AmeriCorps' programs, the statutes impose various affirmative duties upon the agency and its officials:

a.    AmeriCorps' CEO "shall establish and maintain a decentralized field structure that provides for an office of the Corporation for each State."[9]  42 U.S.C. § 12651h.

b.    AmeriCorps "shall establish a Nonprofit Capacity Building Program to make grants to intermediary nonprofit organizations to serve as intermediary nonprofit grantees."  *Id.* § 12653s(b).

c.    AmeriCorps "shall, directly or through grants, contracts, or cooperative agreements (including through State Commissions), conduct appropriate training for and provide technical assistance to—(1) programs receiving assistance under the national service laws; and (2) entities (particularly entities in rural areas and underserved communities) that desire to—(A) carry out or establish national service programs; or (B) apply for assistance (including subgrants) under the national service laws."  *Id.* § 12657.

d.    AmeriCorps "shall provide assistance, by grant, contract, or cooperative agreement, to entities with expertise in the dissemination of information through clearinghouses to establish 1 or more clearinghouses for information regarding the

---

[9]  Although Congress directed that AmeriCorps maintain an office "for each State," and that the office must be "located in, or in reasonable proximity to," the state, 42 U.S.C. § 12651h, during the first Trump Administration AmeriCorps closed the state offices and replaced them with eight regional offices.  AmeriCorps, *Transformation and Sustainability Plan* 6 (June 6, 2018), https://americorps.gov/sites/default/files/documents/20180606CNCSTransformationandSustainabilityFinal.pdf; 45 C.F.R. § 2500.12.  These offices were subsequently made fully remote, virtual offices.    AmeriCorps,    *Region    Offices*    (accessed    Apr.    22,    2025), https://americorps.gov/contact/region-offices.

national service laws, which shall include information on service-learning and on service through other programs receiving assistance under the national service laws." *Id.* § 12653o.

e. AmeriCorps "shall establish a Social Innovation Funds grant program to make grants on a competitive basis to eligible entities for Social Innovation Funds." *Id.* § 12653k(d).

68. With respect to the VISTA program, specifically, the 1973 Act requires AmeriCorps to "grant assistance . . . on the basis of merit and to accomplish the goals of the VISTA program." *Id.* § 4960.

69. Finally, when Congress merged the Commission and the ACTION Agency into AmeriCorps, it required the new entity to "expend at least the level of effort on recruitment and public awareness activities related to the programs carried out under the Domestic Volunteer Service Act of 1973 (42 U.S.C. [§] 4950 et seq.) as ACTION expended on recruitment and public awareness activities related to programs under the Domestic Volunteer Service Act of 1973 during fiscal year 1993." *Id.* § 12651d(g)(1).

*e.    Current Competitive Grant Process*

70. AmeriCorps issued its NOFO for Fiscal Year 2025 AmeriCorps State and National Competitive Grants on or about August 19, 2024. NOFO, FY 2025 AmeriCorps State and National Grants, *available                                  at* https://americorps.gov/sites/default/files/document/2025_ASNCompetitveNOFO_August19.508

_0.pdf.  This NOFO concerned the approximately 62.7% of AmeriCorps State and National Grants that are awarded on a competitive basis.[10]  *See* 42 U.S.C. § 12581(d)(1).

71.    Plaintiff States' Service Commissions submitted their applications for competitive grants on or before January 23, 2025.  The state applications consist of hundreds of sub-applications from nonprofit organizations and local government agencies that were themselves selected by the States through a competitive process.

72.    The NOFO outlines a comprehensive application review procedure whereby:

a.    AmeriCorps does an initial compliance and eligibility check for each application.  *Id.* at 23.

b.    A team of external reviewers substantively evaluates each application using 11 weighted criteria, including an explanation of the community problem and how the proposed intervention will result in measurable outputs; documented evidence to support the program design; member experience; host organization capability,

---

[10]    Other competitive AmeriCorps grants, such as Seniors RSVP grants and Volunteer Generation Fund grants, are awarded through a similar process.  *See, e.g.*, NOFO, FY 2025 AmeriCorps         Seniors         RSVP         Competition, https://americorps.gov/sites/default/files/document/FY25RSVPNOFO_508_9.5.24_0.pdf; NOFO,         FY         2023         Volunteer         Generation         Fund, https://americorps.gov/sites/default/files/document/AmeriCorps_FY2023_VGF_NOFO_508.pdf.

For formula-based grants such as State Commission Support Grants and 35.3% of State and National Grants, AmeriCorps allocates an amount equivalent to the ratio that "the population of the State bears to the total population of the several States, the District of Columbia, and the Commonwealth of Puerto Rico." 42 U.S.C. § 12581(e)(2); *see, e.g.*, Memorandum re Instructions for Being Awarded Fiscal Year 2024 Commission Support Grant and Commission Investment Fund         Grants         Allocations         via         Round         Two         (June         21,         2024), https://americorps.gov/sites/default/files/document/FY%202024%20CSG-CIF%20Round2%20Commission%20Guidance.508.pdf; Memorandum re Fiscal Year 2024 Formula         Guidance         for         State         Commissions         (Mar.         1,         2024), https://americorps.gov/sites/default/files/document/FY%202024%20Formula%20Guidance.pdf. South Dakota does not receive formula-based grants because it lacks a State Service Commission.

staffing, supervision, and "commitment to diversity, equity, inclusion, and accessibility"; and program budget and cost effectiveness. *Id.* at 18–24.

c. AmeriCorps internally reviews each application, consults with State Service Commissions, and checks for budget compliance and the presence of prohibited activities. *Id.* at 24.

d. AmeriCorps conducts a post-review quality control that evaluates the initial results for fairness and consistency. *Id.*

e. Prior to awarding a grant, AmeriCorps performs a risk assessment of each organization, which considers financial compliance and past performance indicators. *Id.* at 24–25.

f. AmeriCorps engages interactively with applicants to request additional information or resolve problems with the applications. *Id.* at 26.

73. In the NOFO, AmeriCorps announced that it would complete this process for State and National Competitive Grants applications and notify successful applicants by "mid-April 2025." *Id.* at 1.

74. AmeriCorps has not yet notified the Plaintiff States of the results of their competitive grant applications.

75. Plaintiff States need to know the results of the competitive grant awards so that they can determine which projects will need funding from their formula-based AmeriCorps State and National Grants.

76. Plaintiff States consistently competed for and won competitive State and National Grants in the past, relied upon the resulting awards, and intended to apply again in the future.

77.    AmeriCorps requires States to submit their complete formula applications by June 13 or July 11 (depending on projects' start dates).[11]

IV.    **AmeriCorps' Presence in Plaintiff States**

78.    As noted above, much of AmeriCorps' funding goes toward AmeriCorps State and National, which provides grants to many agencies and instrumentalities of Plaintiff States. Members and volunteers under AmeriCorps' other programs also serve on projects and programs in each of Plaintiff States.

<em>a.    Maryland</em>

79.    In Plaintiff State of Maryland, the State Service Commission that manages AmeriCorps grants is the Governor's Commission on Service and Volunteerism (Maryland Governor's Commission).  The Maryland Governor's Commission was created in 1994 to review and approve all AmeriCorps State funding and to serve as a body of ambassadors for service and volunteerism in local communities.  The Maryland Governor's Commission is administered by the Governor's Office on Service and Volunteerism, which is itself part of the Maryland Department of Service and Civic Innovation (DSCI).

80.    In FY 2024, the Maryland Governor's Commission managed more than $6.2 million in federal funding from AmeriCorps: $4.2 million in AmeriCorps State Grants, $1.1 million in AmeriCorps State Planning Grants (which assist Maryland-based entities in developing national service programs),[12] $389,181 in State Commission Operations Support Grants (which

---

[11] AmeriCorps, Fiscal Year 2025 Formula Guidance for State Commissions (Mar. 7, 2025), https://americorps.gov/sites/default/files/document/2025-03/FY%202025%20Commission%20Formula%20Guidance%201.pdf.

[12] *See* 2024 Terms and Conditions for AmeriCorps State and National Grants 2, https://americorps.gov/sites/default/files/document/2024ASNProgram508TC.pdf.

support the Governor's Commission in performing its duties under 45 C.F.R. § 2550.80),[13] and $530,759 in State Commission Investment Fund Grants (which cover training and technical assistance).[14]

81.     That year, AmeriCorps State and National Planning Grants supported 25 service programs across Maryland, such as Civic Works Service Corps, Maryland Refugee Corps (operated by the International Rescue Committee), Maryland Reading Corps, Teach for America Maryland, City Teaching Alliance–Baltimore, and HabiCorps (operated by Habitat for Humanity of the Chesapeake).  These programs worked across 174 locations and involved 672 participants. Federal funding partially or fully supported more than 80 program staff members.

82.     In total, in FY 2024, AmeriCorps provided more than $21 million in funding and education awards to support all projects and programs within Maryland.[15]

83.     That year, 4,949 AmeriCorps members and volunteers served on all projects and programs within Maryland.[16]

84.     AmeriCorps supports numerous service programs that are directly operated by Maryland public entities.  Several State universities in Maryland operate AmeriCorps programs, which place hundreds of members at local schools and organizations.  The Maryland Park Service

---

[13]     *See* FY 2024 Commission Support Grant Terms and Conditions 1, https://americorps.gov/sites/default/files/document/2024-TC-CSG-508-112723.pdf.

[14]     *See* 2024 Terms and Conditions for Training and Technical Assistance Commission Investment Fund Grants 1, https://americorps.gov/sites/default/files/document/2024-TC-CIF-508-112723.pdf.

[15]     AmeriCorps, *2024 Year in Review—Maryland*, https://americorps.gov/sites/default/files/upload/state_profiles/pdf_2025/MD_Combined.pdf.

[16]     *Id.*

also collaborates with AmeriCorps to operate the Maryland Conservation Corps, which supports public parks and natural resource management across the State.

85.    For example, Salisbury University (located on Maryland's Eastern Shore) runs a robust AmeriCorps program known as ShoreCorps.  During the current service year (August 2024–August 2025), ShoreCorps enrolled 178 members, who as of April 2025 have collectively provided approximately 53,000 hours of service at 57 government and nonprofit entities across the rural Eastern Shore.  ShoreCorps members collectively have managed 1,164 volunteers and provided services for 517 youths and 1,557 adults.

86.    This year, Salisbury was awarded $490,538 by AmeriCorps to operate ShoreCorps. The federal funding covers salaries for ShoreCorps' full-time staff; stipends and benefits for members; and other program costs.

87.    In addition, Salisbury relies on ShoreCorps in several other ways:

    a.  Many ShoreCorps members serve at the university itself, by volunteering at Food for the Flock (the campus food pantry), the Office of Student Support Services (which mentors first-generation and vulnerable students), or Sammy's Stash (which provides professional attire to students for interviews, internships, and jobs), or by participating in the Presidential Citizen Scholars Program (which partners with local government to research and act on community needs).

    b.  Many ShoreCorps members pay university tuition with AmeriCorps education awards supported by the National Service Trust.  In 2024, $118,061 in Salisbury University tuition was paid using AmeriCorps education awards.

    c.  Salisbury relies on ShoreCorps to expand its presence in and partnership with the community.  By placing ShoreCorps members with organizations in the area, the

university creates lasting partnerships and fosters positive marketing that helps to recruit future students.

    d.   The ShoreCorps program is a key element of Salisbury's overall identity, mission, and strategic plan. ShoreCorps is the largest AmeriCorps program in Maryland, and has received multiple awards recognizing its enormous service contribution on the eastern shore of Maryland. Indeed, the current University strategic plan has an explicit focus on increased engagement with the community, relying on ShoreCorps as a cornerstone of that effort.

88.   Frostburg State University in Western Maryland also operates an AmeriCorps program, Appalachian Service Through Action and Resources (ASTAR), which has existed since 1994.

89.   This year, ASTAR recruited and enrolled 59 AmeriCorps members to serve in western Maryland. ASTAR placed members at ten organizations this year, including food banks, an educational farm, and Special Olympics Maryland. ASTAR also placed members at over 15 elementary, middle, and high schools through Frostburg's Education Department. ASTAR members assist their organizations with such diverse tasks as developing and implementing new and engaging lesson plans in schools, developing engaging experiential learning trips, providing food to the local community, expanding programming for special needs athletes, and providing resources for marginalized communities in Western Maryland.

90.   Like Salisbury, Frostburg relies on AmeriCorps support in several ways:

    a.   ASTAR members routinely serve at the university. Currently, ASTAR has enrolled members serving at Frostburg's Center for Literary Arts, the Children's Literature Center, the PAWS Pantry (a student food bank), and the Biology Department.

b.  Many ASTAR members use their education awards to pay university tuition. Of the current ASTAR members who are expected to receive education awards, 11 are enrolled Frostburg students; they are expected to use most or all of their $20,000 in education awards to pay tuition at Frostburg.

c.  By placing ASTAR members with local organizations, Frostburg fosters partnerships and develops a positive public image within the community. These efforts, in turn, assist Frostburg with marketing and recruiting.

91.  A third public university, the University of Maryland, Baltimore County (UMBC), operates The Choice Program, a mentoring, diversion, and workforce development program for young people under the supervision and care of the Maryland Department of Juvenile Services.

92.  The Choice Program directly receives a small amount of federal AmeriCorps funding—just over $12,000 this year—that allows it to obtain a far larger grant from Maryland's Department of Juvenile Services. The Choice Program also relies on AmeriCorps' education awards, in conjunction with State grant money, to attract members without the need for federally-provided stipends. Through this combination of funding, the Choice Program can advance the education of at-risk youth at lower cost to both the State and federal governments.

93.  In this fiscal year, the Choice Program's ten members provided 2,241 hours of service to 252 young people. The Choice Program's members provide in-person support to youths and their families across Maryland, including by accompanying children to sporting events, museums, and community service activities.

94.  Many of the Choice Program's members are UMBC students, who apply their AmeriCorps education awards to pay tuition at UMBC or other Maryland public universities.

95.    Along with the State universities, the Maryland Park Service (MPS) receives support from AmeriCorps.  MPS operates the Maryland Conservation Corps (MCC), which was established in 1984 to mobilize young adults in intensive environmental conservation efforts that preserve, protect, enhance, and restore Maryland's natural resources.

96.    In the 2023–2024 service year alone, MCC members improved thousands of acres of public lands; restored hundreds of miles of trails and waterways across Maryland; provided environmental education programs to more than 28,000 students, youth, and park visitors; and helped respond to wildfires and clean up park facilities and trails after major storms.

97.    This year, MCC received $922,079 from AmeriCorps to support 42 full-time members who serve in state parks and natural resource management areas across Maryland.

98.    Finally, along with funding, AmeriCorps provides members and programmatic support to assist service programs operated by State instrumentalities in Maryland.

99.    For example, five VISTA members currently are placed with DSCI and provide critical capacity to support DSCI's mission of promoting service and volunteerism in Maryland. Their living stipends are paid directly by AmeriCorps.

                                    b.    *Delaware*

100.    In Plaintiff State of Delaware, the State Service Commission is the Governor's Commission on Community and Volunteer Service (Delaware Governor's Commission). Established in 1994, the Delaware Governor's Commission is charged with administering federally sponsored national service programs.

101.    The Delaware Governor's Commission receives and manages Prime Grants from AmeriCorps, awards and disburses subgrants from the Primes, monitors subgrantees for

performance and compliance with grant requirements, provides training and technical assistance for subgrantees, and functions as liaison between AmeriCorps and subgrantees.

102.    In FY 2024, the Delaware Governor's Commission administered nearly $1.5 million in federal funding from AmeriCorps: $837,187 million in AmeriCorps State Grants, $103,140 in AmeriCorps State Planning Grants, and $507,086 in State Commission Operations Support and State Commission Investment Fund Grants.

103.    The Delaware Governor's Commission manages two separate types of AmeriCorps State Grants:

   a.    *Competitive grants* (approximately two-thirds of AmeriCorps State Grants):  The Delaware Governor's Commission issues Requests for Proposals (RFPs) that are based on federal Notices of Funding Opportunity issued by AmeriCorps.  Grant applicants submit application materials in response to the RFPs, and AmeriCorps exercises its discretion in approving grant applications.

   b.    *Formula grants* (approximately one-third of AmeriCorps State Grants):  The Delaware Governor's Commission receives Congressionally appropriated money from AmeriCorps and itself selects the subgrantees for this money.  The Delaware Governor's Commission issues RFPs, but these are not based on federal NOFOs.

104.    Currently, the Delaware Governor's Commission manages grants for ten subgrantees, namely, the Children's Beach House, West End Neighborhood House, Leading Youth Through Empowerment, Literacy Delaware, Reading Assist Institute, TeenSHARP, SummerCollab, Family Promise, Spur Impact, and We Prosper Family Organization.

105.    Subgrantees use the funds they receive from AmeriCorps Delaware to run programs to benefit Delawareans. The money is used to recruit, manage, pay, and train AmeriCorps

members and handle program operations and costs, monitor and support host sites to ensure compliant and effective service.

106.    Many subgrantees then post AmeriCorps members at partner organizations called host sites. The host sites typically pay a fee to a subgrantee for member placement, provide service sites for members and supervise regular service, and verify hours and performance measures.

107.    Through this arrangement, AmeriCorps Delaware currently funds 119 AmeriCorps volunteers throughout Delaware.

108.    In total, in FY 2024, AmeriCorps provided more than $6.6 million in funding and education awards to support all projects and programs within Delaware.[17]

109.    That year, 1,322 AmeriCorps members and volunteers served on all projects and programs within Delaware.[18]

110.    AmeriCorps also supports service programs that are directly operated by Delaware public entities.

111.    For example, the State of Delaware's Department of Health and Social Services sponsors and funds the Delaware Foster Grandparent Program under an AmeriCorps Seniors Grant.  This program funds and organizes over 50 volunteers in Delaware who help children gain skills and confidence to succeed in school, tutor students in literacy or math, and support improvement in social and emotional skills.

c.    *California*

---

[17]    AmeriCorps, *2024    Year    in    Review—Delaware*, https://americorps.gov/sites/default/files/upload/state_profiles/pdf_2025/DE_Combined.pdf.

[18]    *Id.*

112.    California Volunteers—part of the Governor's Office of Service and Community Engagement—is the State Service Commission that manages AmeriCorps grants on behalf of Plaintiff State of California.  Reflecting California's population, it is the largest State Service Commission both in terms of volunteer numbers and financial awards.

113.    For the current cycle, California Volunteers manages 90 programs supported by AmeriCorps State and National Grants, involving 6,902 participants at over 1,800 locations. AmeriCorps provides over $62 million in funding for these projects.

114.    One such program is Prevent Child Abuse California, which hosts 65 AmeriCorps members who provide academic assistance, life skills, and financial literacy to hundreds of foster youths across 15 counties.  This program is supported by $1.16 million in AmeriCorps funding and $886,000 in matching funds.

115.    Another program managed by California Volunteers is the Partnership for Veterans and People Experiencing Homeless, which hosts 25 AmeriCorps members that provide housing services, job placement, and case management to veterans and homeless individuals in Santa Barbara County.  This program is supported by $675,000 in AmeriCorps funding and $812,000 in matching funds.

116.    A third program managed by California Volunteers is Reading Partners California, which hosts 80 AmeriCorps members who recruit and manage approximately 1400 volunteers to provide one-on-one literacy tutoring to students at 58 low-income elementary schools.  This program is supported by $2 million in AmeriCorps funding and $2.4 million in matching funds.

117.    California communities also benefit from the services provided by members in other AmeriCorps programs, such as VISTA, RSVP, Foster Grandparents, and—until recently—NCCC.  In fiscal year 2024, AmeriCorps funded 254 additional service projects in California

through these programs, covering 12,173 participants at 1,352 locations. AmeriCorps members participating under these programs provide incalculable services to California communities, from education to environmental stewardship, disaster relief to tax preparation.

118.    The NCCC Pacific Region campus is located in Sacramento, California.  In 2024, the campus hosted 142 AmeriCorps members.  An additional 388 AmeriCorps members from across the country were deployed to 47 service locations in California.

119.    In total, in FY 2024, AmeriCorps provided nearly $133 million in funding and education awards to support all projects and programs within California.[19]

120.    One of eight AmeriCorps regional offices is located in Los Angeles, California.

121.    For the coming grant cycle (FY 2025), California Volunteers held its own competitive application process in the fall to select programs for its AmeriCorps State and National competitive grants application, which it then submitted to AmeriCorps in January. In this application, California Volunteers requested funding up to $42 million to support 35 programs covering 2,758 proposed AmeriCorps members, plus an additional $6,471,487 in continuation grant funds to support 5 programs and 293 AmeriCorps members.

122.    Once California Volunteers receives its competitive awards, it will allocate funds from California's formula grant to support projects that were not funded under the competitive grant. California also has grant funds allocated for Commission Support and a Commission Investment Fund.

123.    The majority of California Volunteers' AmeriCorps projects are school-based, either providing services to K–12 students or utilizing AmeriCorps members who are in college

---

[19]    AmeriCorps, *2024 Year in Review—California*, https://www.americorps.gov/sites/default/files/upload/state_profiles/pdf_2025/CA_Combined.pdf.

(College Corps). These programs must begin by mid-August, prior to the school year. However, members cannot be enrolled or funded until the final award is approved by AmeriCorps and fully executed. In past years, California has had to submit its formula grant application by mid-June to ensure timely processing by AmeriCorps.

*d.     Colorado*

124.    In Plaintiff State of Colorado, AmeriCorps grants are managed by Serve Colorado, a state government office housed within the Office of the Lieutenant Governor.

125.    Serve Colorado receives and manages grant funds from AmeriCorps, awards and disburses subgrants, monitors subgrantees for performance and compliance with grant requirements, provides training and technical assistance for subgrantees, and functions as a liaison between AmeriCorps and subgrantees.

126.    Serve Colorado currently manages 34 grants for AmeriCorps State and National subgrantees, including nonprofit organizations, local governments, and institutions of higher education in urban, rural, and mountain towns across Colorado.  Subgrantees use the funds they receive from Serve Colorado to run programs to benefit Coloradans by recruiting, managing, paying, and training AmeriCorps members, handling program operations and costs, and monitoring and supporting subgrantees.

127.    In 2024 alone, Serve Colorado's subgrants supported nearly 1,400 AmeriCorps members who contributed over one million hours of service across all 64 Colorado counties.  Those members supported nearly 20,000 students, treated over 2,100 acres of public land, restored over 800 miles of trail, and provided human services to 27,000 people.

128.    Since 2015, Serve Colorado has awarded nearly $102 million in AmeriCorps grants and has enlisted nearly 12,000 AmeriCorps members in service to the State of Colorado.

e.    *Other States*

129.    Other Plaintiff states similarly rely on AmeriCorps funds to support community-oriented projects and initiatives.  Except for South Dakota, all fifty states (as well as Puerto Rico and the U.S. Virgin Islands) have established State Service Commissions to administer AmeriCorps funds for the benefit of their citizens and communities.[20]

130.    In Arizona, for example, the Governor's Office of Youth, Faith, and Family's Commission on Service & Volunteerism administers AmeriCorps grants. In FY 2024, the Commission administered federal grants funding over 1,500 AmeriCorps members providing services in the State.  AmeriCorps also directly funded an additional 3,280 members and volunteers in Arizona.  In total, the federal investment was $18.3 million.  The Commission manages seven Prime Grants.  Three are through competitive funding, while four are formula Primes.  Across these grants, the Commission manages grants for 26 subgrantees.  Since 1994, more than 28,000 Arizona residents have contributed nearly 30 million hours of service and earned education awards totaling more than $78.5 million.

131.    The Serve Illinois Commission on Volunteerism and Community Service (Serve Illinois), which is administered by the Illinois Department of Human Services, manages grants for 33 subgrantees, which in turn serve 33 programs.  In Program Year 2024, Serve Illinois received and managed $28,992,935 in federal funding through these grants.  For these grants managed by Serve Illinois, there are approximately 714 members.  These members serve in areas that seek to expand economic opportunity, in education, in areas designed to improve health futures, in areas designed to aid in environmental stewardship, and in areas to aid veterans and military families

---

[20]    *See* AmeriCorps, *State Service Commissions*, https://www.americorps.gov/contact/state-service-commissions (last accessed Apr. 21, 2025).

throughout State of Illinois.  For example, these members serve at the Boys and Girls Clubs of Chicago, Dundee Township, Elgin, and Livingston County; at the Greater Chicago Food Depository; at the Association House of Chicago; at Youth and Opportunity United; and at Literacy Volunteers of Illinois, among others.  AmeriCorps' impact on Illinois is substantial and wide-ranging—in total, in 2024 there were 9,447 members and volunteers at 1,111 service locations.[21]

132.    In Kentucky, the Serve Kentucky Commission—attached to the Cabinet for Health and Family Services—awards and manages between $10 million and $15 million in AmeriCorps funds each year.  Serve Kentucky disburses AmeriCorps funds to such programs as the Christian Appalachian Project, through which members provide housing development and repair, emergency utility and crisis assistance, hunger relief, affordable clothing, infant and toddler care, and pre-school, afterschool and summer education; Family Resource and Youth Services Centers, which employ 73 people who tutor students in literacy and provide basic needs support to kids; and Kentucky Health Corps, which provides healthcare support in the area of memory care, skilled nursing, and assisted living to seniors and people with disabilities in healthcare facilities.

133.    The Maine Commission for Community Service manages grants for 8 subgrantees, including Maine Conservation Corps, Alpha Legal Foundation, Main Street Skowhegan, White Pine Programs, Greater Portland Council of Governments, Food for All, and Hospice Volunteers of Somerset County.

---

[21]    See AmeriCorps, *2024 Year in Review—Illinois,* https://americorps.gov/sites/default/files/upload/state_profiles/pdf_2025/IL_Combined.pdf    (last accessed April 25, 2025).

134.    In Massachusetts, the State Service Commission that manages AmeriCorps grants is the Massachusetts Service Alliance.  Its predecessor was the Massachusetts National and Community Service Commission, established by Governor William F. Weld in 1994.  In 2006, Governor Mitt Romney designated a charitable corporation, the Massachusetts Service Alliance, Inc., as an "alternative administrative entity" for purposes of 42 U.S.C. § 12638(a)(2) and subject to the requirements of 42 U.S.C. § 12638.  This designation as an alternative administrative entity may be revoked at any time by the Governor of Massachusetts by further Executive Order. Massachusetts's State Service Commission monitors and evaluates the implementation of AmeriCorps state programs in Massachusetts.  In FY 2024, Massachusetts's State Service Commission was awarded more than $23 million in AmeriCorps funding to support programs across the state.  The AmeriCorps programs in Massachusetts include programs for the City of Boston and the City of Lawrence, and a program at Framingham State University, a public state university in Massachusetts.  The Framingham State University program supported by AmeriCorps is the Framingham Teacher Residency program, which provides a residency model for those looking to begin their careers in teaching, and supports residents who commit to teaching in Framingham Public Schools for a minimum of three years.

135.    The Michigan Community Service Commission (MCSC) manages grants for 32 subgrantees funded with AmeriCorps grants engaged in the areas of disaster services, public safety, public health, education, economic mobility, workforce development, youth services, and climate resiliency across Michigan.  For fiscal year 2024, MCSC had over $30 million dollars available in AmeriCorps grant funding.

136.    In Minnesota, the State Legislature established the Minnesota Commission on National and Community Service ("MCNCS") in 1994 to administer, inter alia, the federal

AmeriCorps Program in Minnesota. In 2002, the Minnesota Legislature approved MCNCS becoming a 501(c)(3) nonprofit organization known as ServeMinnesota, with the broader mission of advancing national service and volunteerism across Minnesota. As such, ServeMinnesota is responsible for administering federal AmeriCorps funds to programs throughout Minnesota. ServeMinnesota disburses allocated AmeriCorps funds through a competitive grantmaking process to eligible entities to provide critical support such as environmental, education, and community building resources for Minnesota and its residents.

137.    Nevada Volunteers is the State Service Commission that administers AmeriCorps State and National Grants on behalf of Nevada. An independent nonprofit corporation designated by the Nevada Governor's Office to implement the AmeriCorps program in Nevada consistent with the 1993 Act, Nevada Volunteers receives and manages State and National Grants from AmeriCorps, awards and disburses subgrants, monitors subgrantees for performance and compliance with grant requirements, provides training and technical assistance, and functions as liaison between AmeriCorps and subgrantees. From February 2024 to February 2025, Nevada Volunteers administered 12 programs supported by AmeriCorps State Grants, involving 345 members who completed service at 41 service locations across the state. AmeriCorps provided $4,350,957 in funding for these projects, plus an additional $500,605 in State Commission Operations Support. The AmeriCorps program in Nevada includes local programs for the City of Las Vegas and the City of Henderson. For example, the City of Las Vegas AmeriCorps Program provides educational support and resources (e.g., K-12 tutoring) for children throughout the city. The City of Las Vegas AmeriCorps Program supports over 60 servicemember positions.

138.    The New Jersey Commission on National and Community Service administers AmeriCorps funding for the State of New Jersey and supports the growth and development of

national service and volunteerism throughout New Jersey.  In FY 2024, the New Jersey Commission received at least $6 million in federal formula funding from AmeriCorps, and managed awards for 23 subgrantees.  Grant recipients run projects that—among other things— promote ecological stewardship, assist individuals in addiction recovery, advance disaster preparedness, and support vulnerable populations including children and the elderly.

139.    The New York State Commission on National and Community Service administers AmeriCorps funding to improve lives, strengthen communities, and foster civic engagement through service and volunteering across New York.  Supported by the State Commission, AmeriCorps members in New York provide tutoring to elementary school students, serve in soup kitchens and homeless shelters, help New Yorkers access public benefits, and provide education on health issues and disaster preparedness to impoverished communities.

140.    OregonServes disburses allocated AmeriCorps funds through a competitive grantmaking process to eligible entities to run AmeriCorps programs and hire AmeriCorps members to provide services in their community. Grantees selected by OregonServes for 2024– 2025 include the Ethos Rural Outreach Program, which provides K-12 education support in areas with limited education budgets, and the Salvation Army–Grants Pass Corps, which provides critical support such as housing, education, and employment resources for homeless individuals.

141.    Operating within the Pennsylvania Department of Labor and Industry, PennSERVE is Pennsylvania's designated state service commission for AmeriCorps.  During the 2024–2025 grant year (since July 1, 2024) PennSERVE has managed a total of $17,938,078 from four different federal grant awards which fund 28 AmeriCorps programs across Pennsylvania.  PennSERVE's programs currently have nearly 900 AmeriCorps members serving in Pennsylvania at over 250 active host sites spread across 41 counties.  Some of the Pennsylvanians benefiting from these

AmeriCorps/PennSERVE programs include 90 veterans who are currently receiving peer support and assistance with mental illness and addiction problems in Butler, PA; 2,483 students in rural northwestern PA currently receiving academic and social-emotion support before, during, and after school; over 7,700 K–12 students who have an AmeriCorps teacher in their Greater Philadelphia-area classrooms; approximately 1,000 low-income residents in southern-central Pennsylvania receiving access to financial education, free tax preparation, and workforce readiness training; individuals and families in the Lehigh Valley where AmeriCorps members improve community stabilization by increasing access to food, housing, income, and health resources; and elementary school students in Pittsburgh receiving support to improve academic engagement and academic performance.

142.    In Vermont, AmeriCorps grants are managed by SerVermont, a state government office within the Agency of Human Services.  SerVermont currently manages 5 grants for AmeriCorps State and National: the Lyndon Economic Opportunity AmeriCorps Program, Vermont Housing and Conservation Board, EveryBody Works, Vermont Environmental Careers and Opportunities; and Vermont Youth Conservation Corps.  Subgrantees use the funds they receive from SerVermont to run programs to benefit Vermonters by recruiting, managing, paying, and training AmeriCorps members, handling program operations and costs, and monitoring and supporting subgrantees.   In 2024, SerVermont's subgrants supported roughly 300 AmeriCorps members who contributed service across the State of Vermont.  Those members supported 7,339 children and youth, treated over 1,800 acres of public land, improved over 130 miles of trail, and recruited or managed over 22,000 volunteers, among other accomplishments.  Since 1994 more than 6,600 Vermont residents have serviced approximately 9.8 million hours.

143. In Washington, ServeWashington, part of the State's Office of Financial Management, awards and disburses subgrants from both competitive and formula funding. Until April 25, ServeWashington managed grants for 22 subgrantees, including the Washington State Department of Veterans' Affairs, the Washington State Department of Employment Security, Chelan-Douglas County Community Action Council, Girl Scouts of Western Washington, United Way of King County, United Way of Benton and Franklin Counties, College Possible, and Washington Association of Child Advocate Programs, among others. These grants funded AmeriCorps volunteers to work at food banks, help communities build climate resilience and prepare for disasters, tutor children in reading, rehabilitate low-income housing, plant trees, mentor at-risk youth, provide services to home-bound seniors, provide services to at risk veterans and those transitioning from the military, and reduce gang involvement in schools and neighborhoods, among many other things.

## V. The Administration's Prior Efforts to Dismantle Federal Agencies

144. This case presents only the latest chapter in an ongoing saga, as the Administration attempts to dismantle federal agencies without Congressional approval.

145. On the first day of his second term in office, President Trump issued an Executive Order creating a so-called "Department of Government Efficiency"—in reality, a redesignation of the preexisting United States Digital Service—to "improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." Exec. Order No. 14,158, *Establishing and Implementing the President's "Department of Government Efficiency,"* § 4(a) (Jan. 20, 2025).

146.    The Executive Order directed agency heads to "establish within their respective Agencies a DOGE Team of at least four employees, which may include Special Government Employees, hired or assigned within thirty days of the date of this Order." *Id.* § 3(c).

147.    Notwithstanding DOGE's nominal focus on information technology, DOGE Teams have "swe[pt] through government departments looking for spending and staff cuts."[22]

148.    In particular, DOGE and the Administration have targeted politically disfavored agencies—such as the U.S. Agency for International Development (USAID),[23] the Consumer Financial Protection Bureau (CFPB),[24] the U.S. Institute of Peace,[25] the Institute of Museum and

---

[22]   Tim Reid, *Explainer: What is Musk's DOGE, the secretive unit operating in the public eye?*, Reuters, Mar. 24, 2025, https://www.reuters.com/world/us/what-is-elon-musks-doge-how-much-money-has-it-saved-us-taxpayers-2025-03-04/.

[23]   Ellen Knickmeyer, *The Trump administration is putting USAID staffers on leave worldwide and firing at least 1,600*, AP, Feb. 23, 2025, https://apnews.com/article/usaid-trump-musk-foreign-aid-firings-a3af8ce6ef17878b718c8e2ed3bf98e4; Fatma Tanis, *USAID terminates nearly all its remaining employees*, NPR, Mar. 28, 2025, https://www.npr.org/sections/goats-and-soda/2025/03/28/g-s1-56968/usaid-terminates-nearly-all-its-remaining-employees; *see also* Exec. Order No. 14,169, *Reevaluating and Realigning United States Foreign Aid* § 3(a) (imposing a 90-day pause in United States foreign development assistance).

[24]   Chris Megerian, *Nearly 90% of Consumer Financial Protection Bureau cut as Trump's government downsizing continues*, AP, Apr. 17, 2025, https://apnews.com/article/donald-trump-doge-cfpb-elon-musk-456b747c367fccbcf3b74d2893cd1a35.

[25]   Gary Fields & Chris Megerian, *Most US Institute of Peace workers get late-night word of their mass firing*, AP, Mar. 29, 2025, https://apnews.com/article/us-institute-peace-trump-doge-mass-firing-746aa4fce9ad35fe17e8e22ce29417e3; *see* Exec. Order No. 14,217, *Commencing the Reduction of the Federal Bureaucracy* § 2 (Feb. 19, 2025) (directing the U.S. Institute of Peace and three other federal agencies to "eliminate[]" their "non-statutory components and functions . . . to the maximum extent consistent with applicable law," and to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law").

Library Services (IMLS),[26] and the Department of Education[27]—by terminating their grants and contracts, firing their personnel, and eliminating their programs.

149.    In several instances, the Administration first placed employees on administrative leave and later conducted RIFs to terminate those employees.[28]

150.    Congress did not authorize any of those reductions.  To the contrary, on March 15, Congress passed—and President Trump signed—an appropriations act that reappropriated funding for nearly all of these agencies at their 2024 levels.[29]  Full-Year Continuing Appropriations Act, 2025, § 1101(a)(8) & (11), 139 Stat. at 10–12 (reauthorizing appropriations from Further

---

[26]  Andrew Limbong, *Entire staff at federal agency that funds libraries and museums put on leave*, NPR, Mar. 31, 2025, https://www.npr.org/2025/03/31/nx-s1-5334415/doge-institute-of-museum-and-library-services; *see* Exec. Order No. 14,238, *Continuing the Reduction of the Federal Bureaucracy* § 2(a) (Mar. 14, 2025) (directing the IMLS and six other federal agencies to "eliminate[]" their "non-statutory components and functions . . . to the maximum extent consistent with applicable law," and to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law").

[27]  Jodi S. Cohen & Jennifer Smith Richards, *Elon Musk's Team Decimates Education Department Arm That Tracks National School Performance*, ProPublica, Feb. 11, 2025, https://www.propublica.org/article/department-of-education-institute-education-science-contracts-doge; *see* Exec. Order No. 14,242, *Improving Education Outcomes by Empowering Parents, States, and Communities* (ordering the Secretary of Education to "take all necessary steps to facilitate the closure of the Department of Education and return authority over education to the States and local communities").

[28]  *E.g.*, Audrey Fahlberg, *Commerce Department Lays Off Dozens of Minority Business Development Agency Employees*, National Review, Apr. 10, 2025, https://www.nationalreview.com/news/exclusive-commerce-department-lays-off-32-minority-business-development-agency-employees/ ("The Commerce Department sent reduction in force (RIF) notices to 32 employees working in the Minority Business Development Agency (MBDA) this week in accordance with the White House's directive to shutter the agency . . . .  Wednesday's layoffs came after dozens of employees working at the agency were placed on administrative leave in late March.").

[29]  The appropriations act did not cover the CFPB, which is funded by quarterly transfers from the Federal Reserve rather than annual appropriations.  *See* Cong. Research Serv., *The Consumer Financial Protection Bureau Budget:  Background, Trends, and Policy Options* (2025), https://www.congress.gov/crs-product/R48295.

Consolidated Appropriations Act, 2024, div. D, tits. III (Department of Education) & IV (IMLS); div. F, tits. I (U.S. Institute of Peace) & II (USAID), 138 Stat. at 681–93, 697, 736, 739–40).

151.    Simultaneously, the Administration has tried unilaterally to reduce the size of the federal workforce.  Barely one week after President Trump's inauguration, the Office of Personnel Management (OPM) sent a government-wide email that purported to extend "deferred resignation offers," under which federal employees who agreed to resign would be placed on paid administrative leave with no work responsibilities through the end of September.[30]

152.    After fewer federal workers than expected took the "deferred resignation" offer, the Administration began firing employees en masse.  In mid-February, OPM directed agencies to terminate workers in probationary status, leading to at least 24,000 layoffs.[31]  *See Maryland v. U.S. Dep't of Agric.*, — F. Supp. 3d —, 2025 WL 973159, at *3 (D. Md. Apr. 1, 2025).

153.    The Administration's wave of cuts has been challenged in numerous lawsuits, including by the Plaintiff States.  *See, e.g.*, *Maryland v. U.S. Dep't of Agriculture*, No. 1:25-cv-00748 (D. Md.) (mass firing of probationary employees); *New York v. McMahon*, No. 1:25-cv-10601 (D. Mass.) (Department of Education); *Rhode Island v. Trump*, No. 25-cv-00128 (D.R.I.) (IMLS).

---

[30]  Chris Cameron et al., *Trump Administration Entices Millions of Federal Workers to Resign*, N.Y. Times, Jan. 28, 2025, https://www.nytimes.com/2025/01/28/us/politics/trump-buyouts-federal-workers.html.  The email cited no authority that would permit eight months of administrative leave when, by statute, employees may be placed on administrative leave for "not more than a total of 10 work days" per year.  5 U.S.C. § 6329a(b)(1).

[31]  Madeleine Ngo et al., *Trump Officials Escalate Layoffs, Targeting Most of 200,000 Workers on Probation*, N.Y. Times (Feb. 13, 2025), https://www.nytimes.com/2025/02/13/us/politics/trump-federal-personnel-layoffs.html.

154.    Already, two district courts have enjoined in whole or in part the Administration's attempts to gut federal agencies (specifically, USAID and the CFPB).[32]  *See AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, — F. Supp. 3d —, 2025 WL 752378, at *10–*11, *14–*17 (D.D.C. Mar. 10, 2025) (plaintiffs were likely to succeed on claims that the Administration (a) lacked a reasoned basis for categorically suspending foreign aid programs, and (b) violated the separation of powers by refusing to spend the funds that Congress appropriated); *Nat'l Treasury Emps. Union v. Vought*, — F. Supp. 3d —, 2025 WL 942772, at *20, *40 (D.D.C. Mar. 28, 2025) (attempts to shut down the CFPB were likely unconstitutional and contrary to law).

155.    Nevertheless, the Administration remains intent on continuing—and expanding— its assault on the federal government.  On February 11, the President issued an executive order directing every federal agency to "submit a plan to reduce the size of the Federal Government's workforce," and to "promptly undertake preparations to initiate large-scale reductions in force (RIFs)."  Exec. Order No. 14,210, *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, § 3(a), (c) (Feb. 11, 2025).  The President required these RIFs to prioritize the elimination of "[a]ll offices that perform functions not mandated by statute or other law."  *Id.* § 3(c).  The Office of Management and Budget (OMB) and OPM issued

---

[32]  Two other district court enjoined the Administration's efforts to fire tens of thousands of probationary employees.  *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. OPM*, — F. Supp. 3d —, 2025 WL 820782 (N.D. Cal. Mar. 14, 2025); *Maryland v. U.S. Dep't of Agric.*, — F. Supp. 3d —, 2025 WL 973159, at *3 (D. Md. Apr. 1, 2025).  Both decisions have been stayed pending appeal for procedural reasons.  *OPM v. AFGE*, No. 24A904, 2025 WL 1035208, at *1 (U.S. Apr. 8, 2025) (per curiam); *Maryland v. U.S. Dep't of Agric.*, No. 25-1248, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025) (per curiam).

a companion memorandum emphasizing that agencies should "focus on the maximum elimination of functions that are not statutorily mandated."[33]

156.    On February 26, the President issued an executive order "commenc[ing] a transformation in Federal spending on contracts, grants, and loans," which required each agency head ("in consultation with the agency's DOGE Team Lead") to "review all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration."    Exec. Order No. 14,222, *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative* §§ 1 & 3(b) (Feb. 26, 2025).  The order directed agencies to "prioritize the review of funds disbursed under covered contracts and grants to educational institutions and foreign entities for waste, fraud, and abuse."  *Id.* § 3(b).

## VI.    The Administration's Unlawful Effort to Dismantle AmeriCorps

157.    The Administration made a decision to dismantle AmeriCorps.  This decision is a final agency action, and is being effectuated, among other ways, by releasing more than 750 NCCC members, placing most agency staff on administrative leave in anticipation of terminations, and cancelling contracts and grants.

158.    As described by AmeriCorps' Interim Agency Head, Jennifer Bastress Tahmasebi, in an email to AmeriCorps' Board: "A team from DOGE arrived last Tuesday [April 8].  Since

---

[33]  *See* Memorandum for Heads of Executive Agencies and Departments, from Russell T. Vought, Director, OMB, and Charles Ezell, Acting Director, OPM, *Guidance on Agency RIFs and Reorganization Plans Requested by "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative,"* at 2 (Feb. 26, 2025), https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-agency-rif-and-reorganization-plans-requested-by-implementing-the-president-s-department-of-government-efficiency-workforce-optimization-initiative.pdf.

they arrived[,] myself, the acting Chief Operating Officer (Jill Graham), the acting General Counsel (Jana Maser), the acting Deputy General Counsel (Liz Appel) have worked with them around Administration goals to cut staff, contracts, contractors, and agency deliverables." A true and correct copy of the Bastress Tahmasebi Email is attached as Ex. C.

159.    "The DOGE team requested and we have granted access to all our systems including email." *Id.*

160.    Bastress Tahmasebi further explained that AmeriCorps' leadership "engaged in conversations with the DOGE team on what the staffing structure should look like consistent with Administration goals." *Id.*

161.    Subsequent to those conversations, on April 15, all members of AmeriCorps NCCC received a memorandum from Ken Goodson, NCCC National Director, that provided "official notification that you are being released from the AmeriCorps NCCC program effective April 30th, 2025. Effective April 30th, 2025, your status as an AmeriCorps NCCC Corps Member will terminate and your NCCC provided benefits will be discontinued." A true and correct copy of the Goodson Memorandum is attached as Ex. A.

162.    Because AmeriCorps regulations do not provide for termination of NCCC members by AmeriCorps, without cause, before the end of their term of service, AmeriCorps described this termination as "approving your early release . . . for compelling personal circumstances." Ex. A; 45 C.F.R. § 2522.230(a).

163.    The Goodson Memorandum continued: "Your early departure is considered compelling as it results from program circumstances beyond your control." Ex. A.

164.    An email, sent from the general AmeriCorps NCCC mailbox, accompanying the Goodson Memorandum stated that: "In alignment with the Trump-Vance administration priorities

47

and Executive Order 14,222 'Implementing the President's Department of Government Efficiency Cost Efficiency Initiative,' AmeriCorps NCCC is working within new operational parameters that impact the program's ability to sustain program operations."[34] A true and correct copy of this email is attached as Exhibit B.

165.    Similarly, Defendant Bastress Tahmasebi attributed the decision to shut down NCCC to a "shift in the staff footprint" resulting from DOGE's deferred resignation program "combined with additional efforts to downsize the agency through reductions in force."  Ex. C.

166.    As a result of the Goodson Memorandum, more than 750 AmeriCorps NCCC members were placed on administrative leave.  *Id.*

167.    The next day, Bastress Tahmasebi issued a memorandum that "put 85% of [AmeriCorps'] staff on administrative leave."  *Id.*  A true and exact copy of the Bastress Tahmasebi Memorandum is attached as Ex. D.

168.    The Bastress Tahmasebi Memorandum stated:  "During the period that you are on administrative leave you are not to enter AmeriCorps premises, access AmeriCorps systems, or attempt to use your position or authority with AmeriCorps in any way without . . . prior permission of a supervisor in your chain of command."  *Id.*

169.    In conjunction with the acceptance of "deferred resignation" offers, the Bastress Tahmasebi Memorandum reduced AmeriCorps' active workforce to 115 employees (106 core staff and 9 employees of AmeriCorps' Office of General Counsel).  Ex. C.  That is less than one-fifth as many personnel as AmeriCorps had on January 20.

---

[34] Holly Taft, *Doge Cuts Pull AmeriCorps Volunteers Off of Disaster Relief Jobs*, WIRED, Apr. 16, 2025, https://www.wired.com/story/doge-cuts-americorps-volunteers-disaster-relief-jobs/.

170.    On April 24, AmeriCorps began to issue RIF notices to employees on administrative leave.  A true and correct copy of one RIF notice is attached as Exhibit E.

171.    According to news reports, and as has been the case at other agencies targeted by DOGE, the intent is to "cut [AmeriCorps'] workforce by 'up to 50 percent or more.'"[35] Indeed, upon information and belief, the vast majority of those AmeriCorps employees who had been placed on administrative leave either accepted deferred resignation offers or received a RIF notice.

172.    AmeriCorps has thus terminated or barred from work the vast majority of its members and employees—including those responsible for allocating federal funds and performing AmeriCorps' statutorily mandated duties.  *See, e.g.*, 42 U.S.C. § 12657.

173.    At the same time, AmeriCorps, at the behest of DOGE, has terminated "almost all" of its outside contractors, who performed functions including information technology, human resources, and financial services. Ex. C, at 2. These functions are now supposedly being "transfer[ed]" to the few remaining staff.  *Id.*

174.    In reality, immediately placing nearly 85% of AmeriCorps' core staff on administrative leave has disabled AmeriCorps from performing its statutory and regulatory obligations.

175.    For example, AmeriCorps' Office of Grant Management is responsible for reviewing all grant applications and components (including national competitive and state formula packages) for eligibility and compliance.  Yet, upon information and belief, Defendants' actions have reduced the Office of Grant Management's staff from 25 employees to only one.  The level of staffing that remains at AmeriCorps following the Defendants' actions is inadequate to permit

---

[35] Tobi Raji, *AmeriCorps staff members placed on leave after DOGE visit*, Wash. Post, Apr. 16, 2025, https://www.washingtonpost.com/nation/2025/04/16/americorps-cuts-doge-trump/.

AmeriCorps to timely or accurately review applications for grants of funds that are statutorily allocated to Plaintiff States.

176.    As one other example of how the cuts in AmeriCorps staffing disable it from performing required duties, AmeriCorps is responsible for drafting annual NOFOs that provide public notice of each grant it plans to award, including funds the AmeriCorps is statutorily required to allocate to the Plaintiff States.  2 C.F.R. § 2205.100; *id.* § 200.204 (requiring NOFOs for competitive awards and setting their minimum content.).  Upon information and belief, the staff responsible for drafting the annual NOFOs has been cut from 10 to 3. The level of staffing that remains at AmeriCorps following the Defendants' actions is inadequate to enable AmeriCorps to perform its obligation to timely draft the required NOFOs.

177.    Next, after business hours on Friday, April 25, Defendants continued executing their decision to dismantle AmeriCorps by notifying grantees that their programs—collectively funded by nearly $400 million in AmeriCorps grants, or approximately 41% of AmeriCorps' budget—were immediately terminated.[36]

178.    According to the Summary worksheet of an Excel workbook that was last modified by Defendant Bastress Tahmasebi on April 21, of at least 1,031 programs the Defendants cut, 838 (more than four-fifths) were AmeriCorps State and National programs funded by subgrants awarded and administered by State Service Commissions.  A true and correct PDF copy of the Excel workbook, including a printout of metadata showing that Defendant Bastress Tahmasebi last edited the file, is attached as Exhibit F.

---

[36] Tobi Rajj, *DOGE orders major cut to AmeriCorps funding, imperiling agency's work*, Wash. Post, April 25, 2025, https://www.washingtonpost.com/nation/2025/04/25/americorps-grant-cuts-doge/.

179.    By dollar value, of the $396,509,896 in grant-supported programs that were terminated, more than 93% ($371,129,870) were administered by the AmeriCorps State and National Office.  *Id.*  That constitutes two-thirds of the $557,094,000 that Congress directed AmeriCorps to assign to its State and National Grants for FY 2024.  *See* 170 Cong. Rec. H2060–61 (Mar. 22, 2024).

180.    Defendants have cited no authority that permits them to terminate programs funded as subgrants to grants awarded to State Service Commissions.

181.    The Data worksheet of the Excel workbook provides details on each of at least 1,031 programs that the Defendants cut, revealing that every state and several territories were impacted.  Ex. F.

182.    Defendants' notices not only terminated, collectively, nearly $400 million of funding to service programs, they also directed the immediate cessation of all volunteer service performed in connection with those programs.

183.    For example, the notice received by the Delaware Governor's Commission with respect to AmeriCorps State and National Grants stated in pertinent part:

> Effective immediately, the AmeriCorps award subrecipient(s) included in the attached spreadsheet is/are being terminated per 2 CFR 200.340(a)(4) because it has been determined that the award no longer effectuates agency priorities.  You must immediately cease all award activities.  This is a final agency action and is not administratively appealable.
>
> . . .
>
> State commissions and prime grantees should immediately notify subgrantees, operating sites, and members and follow grant close-out procedures.  All member activities should cease immediately.  Members should be exited for compelling personal circumstances (CPC).  The program should document that the member was exited for compelling personal circumstances due to the agency's termination of the grant and program closure.

A true and correct copy of that notice is attached as Ex. G.

184.    Delaware also received a notice from Defendants that terminated the VISTA program in Delaware.  A true and correct version of that is attached as Ex. H.

185.    The notice terminating the VISTA program duplicated the language of the notice terminating AmeriCorps State and National Grants, and added:  "If you have [VISTA] members active on your award/agreement, all members will be removed from your project effective immediately."  Ex. H.

186.    The regulation cited by Defendants, 2 C.F.R. § 200.340(a)(4), does not permit Defendants to change the priorities applicable to grants by AmeriCorps on a whim during a given fiscal year.  *See* 42 U.S.C. § 12572(f) (requiring AmeriCorps to give notice of priorities for competitive grants that will be in effect "for a fiscal year," and providing that the *States, not AmeriCorps*, set the priorities for formula grants under 42 U.S.C. § 12638(e)(1)); *see also* 45 C.F.R. § 2522.460(b) ("A State may apply priorities different than those of AmeriCorps in selecting its formula programs.").  Rather, during a fiscal year, AmeriCorps only "may . . . suspend or terminate payments under a contract or grant providing assistance under this subchapter, or revoke the designation of positions . . . as approved national service positions," when AmeriCorps "determines there is a material failure to comply with this subchapter or the applicable terms and conditions of any such grant or contract issued pursuant to this subchapter."  42 U.S.C. § 12636(a)(1).

187.    Even upon finding "a material failure," AmeriCorps "must provide the recipient reasonable notice and opportunity for a full and fair hearing."  45 C.F.R. § 2540.400(b); *see* 42 U.S.C. § 12636(a)(2)(B).  AmeriCorps must afford notice that it "intends to terminate or revoke assistance," describe "the grounds and the effective date for the proposed termination or

revocation," and allow the recipient "at least 7 calendar days" to "show[] good cause why such assistance should not be terminated or revoked."   45 C.F.R. § 2540.400(b)(1).   None of that occurred here.  Defendants did not even bother to explain why—under an inapposite regulation — "the award[s] no longer effectuate[d] agency priorities."  *Cf.* 2 C.F.R.  200.340(a)(4).

188.    These program closures, conducted without the required notice and opportunity to be heard, are part and parcel of the Administration's attempt to dismantle AmeriCorps.

**VII.        Harms to the Plaintiff States**

189.    Plaintiff States will be directly and irreparably harmed by the decision to dismantle AmeriCorps and the actions taken to implement that decision.  Indeed, irreparable harms already are being felt by the Plaintiff States.

190.    As of April 25, Defendants immediately closed a majority of AmeriCorps programs in many Plaintiff States.  In Delaware, for example, Defendants eliminated nine out of ten programs that had been awarded more than $1.2 million in funding for FY 2025.  Ex. G.  Without notice, Defendants terminated all but one State-supported program in Washington and every State-supported program in Michigan.

191.    In Nevada, Defendants shut down 8 AmeriCorps programs.  In Illinois, they eliminated 28 programs and impacted 632 members.  In Kentucky, they closed 21 programs, ended service for 691 members, and caused the loss of more than $9 million in federal funds.  And in New York, Defendants terminated 40 programs operating at more than 300 locations across the State and prematurely ended the service of over 1,200 AmeriCorps members.

192.    Defendants also demanded that "[a]ll member activities should cease immediately." *Id.*  Plaintiff States have been forced to issue immediate stop-work orders to their service projects or direct those projects to take steps to wind down their efforts.

193.    Under the Terms and Conditions for AmeriCorps State and National Grants, "[m]embers must be exited within 30 days of the end of their term of service."[37]  Defendants' April 25 notices direct that "[m]embers should be exited for compelling personal circumstances (CPC)," Ex. G; therefore, Plaintiff States have until May 25, at latest, to exit members from their terminated programs, after which it will be impracticable to return them to service.

194.    In addition to the wave of terminations, Plaintiff States have been and will continue to be harmed by the other manifestations of Defendants' decision to dismantle AmeriCorps.

195.    An 85% reduction in AmeriCorps' personnel will leave the agency incapable of fulfilling its mission or carrying out its statutorily mandated purposes.  In the opinion of state employees who interact with AmeriCorps, the agency's few remaining staff members will not be able to administer existing grants or timely process requests for new ones.  Indeed, AmeriCorps already has felt the need to terminate just under half of its grant funding.  Following the same pattern, for previous agencies targeted by the Administration, employees' placement on administrative leave has been followed quickly by waves of grant terminations.[38]

196.    AmeriCorps' Office of Grant Administration (which, upon information and belief, has been reduced to one employee) and AmeriCorps State/National (which, upon information and belief, has been reduced to three employees) will not be able to process grant applications, conduct

---

[37]  AmeriCorps, 2024 Terms and Conditions for AmeriCorps State and National Grants 5, https://www.americorps.gov/sites/default/files/document/2024ASNProgram508TC.pdf (last accessed Apr. 28, 2025).

[38]  E.g., Melissa Angell, *Trump Severs Funding for Minority Business Centers as He Dismantles the MBDA*, Inc., Apr. 21, 2025 ("Numerous MBDA business centers received emails last Thursday notifying them that the agency was axing their federal grants immediately, explaining that the funding doled out was 'no longer consistent with the agency's priorities and no longer serves the interest of the United States and the MBDA program.'"), https://www.inc.com/melissa-angell/trump-severs-funding-for-minority-business-centers-as-he-dismantles-the-mbda/91178803.

quality reviews, or award funds quickly enough to support existing service programs. Already, the Plaintiff States have experienced unusual delays in the application process for next fiscal year's State and National Competitive Grants: AmeriCorps has not notified successful applicants by "mid-April 2025" as promised in the NOFO.

197. Further delays in the State and National Competitive Grant awards also will impact Plaintiff States' ability to submit timely applications for formula-based funds. Because most AmeriCorps projects follow the academic calendar, States need to submit complete grant packages by June 13 to ensure that final awards are executed, members enrolled, and programs funded in time for the coming school year. The ongoing delays in finalizing formula awards as a result of the dismantling of AmeriCorps will jeopardize school-based projects entirely.

198. Simultaneously, AmeriCorps' remaining staff must complete the process for awarding support and investment grants to State Service Commissions. Plaintiff States rely on these funds being available on July 1 to support their Service Commissions' day-to-day operations. Defendants' chaotic dismantling of the agency risks delaying those funds.

199. Upon information and belief, AmeriCorps' National Service Trust put all but three employees on administrative leave. Those employees will struggle to certify members' eligibility for education awards, process enrollments and exits, track members' hours, or ensure proper disbursement of federal funds. Delays in or loss of members' education awards will harm State universities whose tuition is paid using those awards.

200. AmeriCorps also terminated its contract with the developer that maintains its eGrants grant management portal. Any technical issues with that portal that arise will go unresolved, causing further delays to grant awards or amendments.

201.    Already, AmeriCorps regional offices have gone silent, cutting off support and communication that the Plaintiff States rely on for matters such as member enrollment issues, member complaints and grievances, and correcting exit records.  AmeriCorps staff who formerly communicated with Plaintiff States' State Service Commissions on a daily basis have been unreachable since Defendants began their efforts to dismantle AmeriCorps.

202.    AmeriCorps' national office has abruptly curtailed regular meetings and coordination around recruitment, branding, and communications strategy for the coming cycle, as well as the ongoing development of the new grants management technology system scheduled to be rolled out in the coming year.

203.    Likewise, AmeriCorps' remaining staff will not be able to fulfill statutory directives such as "conduct[ing] appropriate training for and provid[ing] technical assistance to . . . programs receiving assistance under the national service laws."  42 U.S.C. § 12657(a)(1).

204.    These harms will be felt in each of the Plaintiff States.  For instance, State agencies and universities at which AmeriCorps members are currently enrolled will lose that valuable service.  States either will need to contribute their own funds to fill the gap or, more often, shutter the programs entirely.  Partner organizations that rely on AmeriCorps members will be similarly limited or closed, and the vulnerable populations served by these organizations—such as immigrants, refugees, students, and the elderly—will place increased demand on State services.

205.    States and their universities will also receive less tuition in the form of education awards paid to AmeriCorps members.  The sudden termination of AmeriCorps programs will harm universities' reputations and impede their outreach to local communities.  So too, universities' mission to engage with and serve their regions will irreparably suffer without AmeriCorps support.

206.     Finally, the abrupt and chaotic dismantling of AmeriCorps will discourage participation in national service and dissuade local organizations from partnering with AmeriCorps programs in the future.  Defendants' arbitrary termination of millions of dollars' worth of programs during National Volunteer Week—even as President Trump "call[ed] upon all Americans to observe this week by volunteering in service projects across our country and pledging to make service a part of their daily lives"[39]—makes a mockery of AmeriCorps' statutory mission to "renew the ethic of civic responsibility and the spirit of community and service throughout the varied and diverse communities of the United States."  42 U.S.C. § 12501(b)(2).

## CLAIMS FOR RELIEF

### COUNT I
### Administrative Procedure Act
### Contrary to Law

207.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

208.     Defendants include an "agency" under the APA.  5 U.S.C. §§ 551(1), 701.

209.     Defendants took final agency actions subject to judicial review when they made the decision to dismantle AmeriCorps and implemented that decision by, among other things, placing nearly all AmeriCorps staff and all NCCC members on administrative leave or hold pending termination, and closing more than 1,000 AmeriCorps programs.

210.     The APA requires courts to "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2).

---

[39]  Presidential Proclamation of National Volunteer Week, 2025 (Apr. 23, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/national-volunteer-week-2025/.

211.    Defendants have acted contrary to law by closing AmeriCorps programs en masse and terminating the staff and resources AmeriCorps needs to carry out its mission.

212.    Specifically, the drastic reductions to AmeriCorps staffing, operations, and programs defy statutory directives requiring AmeriCorps to spend $975,525,000 "to carry out" the 1990 and 1973 Acts, Further Consolidated Appropriations Act, 2024, 138 Stat. at 694; to spend $99,686,000 on employee salaries and other "necessary expenses of administration," *id.*, 138 Stat. at 695; to "provide[] for an office of the Corporation for each State," 42 U.S.C. § 12651h; to "conduct appropriate training for and provide technical assistance to . . . programs receiving assistance under the national service laws," *id.* § 12657(a)(1); and to "grant assistance . . . to accomplish the goals of the VISTA program." *Id.* § 4960.

213.    Defendants also acted contrary to law by closing approximately $400 million worth of AmeriCorps programs without providing Plaintiff States with notice or an opportunity to be heard. *See* 42 U.S.C. § 12636; 45 C.F.R. § 2540.400.

214.    Defendants also acted contrary to law by closing approximately $400 million worth of AmeriCorps programs without a legitimate or legal basis.

215.    Finally, Defendants acted contrary to law by defying Congress's directive that AmeriCorps "make any significant changes to program requirements, service delivery or policy only through public notice and comment rulemaking." Further Consolidated Appropriations Act, 2024 § 401, 138 Stat. at 695 (amounts reappropriated "under the authority and conditions provided in" FY 2024 by Full-Year Continuing Appropriations Act, 2025, § 1101(a)(8), 139 Stat. at 11).

216.    Under the appropriations acts, Congress "explicitly required use of notice and comment" when AmeriCorps makes any significant changes to program requirements, service

delivery or policy, and AmeriCorps' attempt to make such changes here without "notice and comment is contrary to law." *See Michigan v. EPA*, 268 F.3d 1075, 1088 (D.C. Cir. 2001).

217.    Accordingly, Plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and setting aside the decision to dismantle AmeriCorps and enjoining any action taken to enforce or implement it.

**COUNT II**
**Administrative Procedure Act**
**Notice and Comment**

218.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

219.    The APA requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

220.    In the FY 2024 appropriations act, Congress explicitly required that Defendants "shall make any significant changes to program requirements, service delivery or policy only through public notice and comment rulemaking." Further Consolidated Appropriations Act, 2024 § 401, 138 Stat. at 695.

221.    In the FY 2025 appropriations act, Congress reappropriated the amounts from the FY 2024 appropriations act, "under the authority and conditions provided in" that Act. Full-Year Continuing Appropriations Act, 2025, § 1101(a)(8), 139 Stat. at 11.

222.    In effectuating the decision to dismantle AmeriCorps by placing nearly all AmeriCorps staff and all NCCC members on administrative leave or hold pending termination, and by closing nearly $400 million worth of AmeriCorps programs, Defendants made "significant changes to program requirements, service delivery or policy."

223.    Defendants' actions could lawfully be issued only following public notice and comment rulemaking.

224.    Without having proceeded through notice-and-comment procedures, Defendants' actions are procedurally invalid under the APA.

225.    Accordingly, plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and setting aside the decision to dismantle AmeriCorps and enjoining any action taken to enforce or implement it.

**COUNT III**
**Administrative Procedure Act**
**Arbitrary and Capricious**

226.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

227.    Defendants include an "agency" under the APA.  5 U.S.C. §§ 551(1), 701.

228.    The APA requires courts to "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2).

229.    The decision to dismantle AmeriCorps and Defendants' actions to drastically curtail or terminate AmeriCorps' statutorily mandated activities—including by placing 85% of AmeriCorps staff on leave, placing all AmeriCorps NCCC members on administrative hold pending termination effective April 30, 2025, commencing large-scale RIFs, and terminating approximately $400 million worth of AmeriCorps programs—constitute final agency actions under the APA.

230.    The decision to dismantle AmeriCorps was arbitrary and capricious because Defendants provided no reasoned explanation for their decision; failed to consider the legitimate

reliance interests of States, grantees, the public, and other interested entities; failed to conduct statutorily mandated hearings during which those interests may have been presented, failed to consider reasonable alternatives; and failed to weigh the purported benefits against the costs.

231.    Accordingly, plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and setting aside the decision to dismantle AmeriCorps and enjoining any action taken to enforce or implement it.

**COUNT IV**
**U.S. Constitution**
**Separation of Powers**

232.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

233.    Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress." U.S. Const. art. I, § 1. The Constitution also "exclusively grants the power of the purse to Congress, not the President." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

234.    The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no power "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

235.    The Constitution further provides that the executive must "take Care that the laws be faithfully executed." U.S. Const. Art. II, Sec. 3. The Executive Branch violates the Take Care Clause where it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without

authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution"). Given these principles, where the Executive Branch overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine.

236.    Here, where Congress has created AmeriCorps and the programs it administers, the Executive cannot incapacitate AmeriCorps from carrying out statutorily assigned duties by terminating the staff AmeriCorps needs to accomplish its mission and by cutting approximately $400 million worth of AmeriCorps programs funded by Congressional appropriations.  The dismantling of AmeriCorps thus violates Constitutional and statutory mandates, contravenes Congressional intent, and is unlawful.

237.    Accordingly, plaintiffs are entitled to a preliminary and permanent injunction, and to a declaration pursuant to 28 U.S.C. § 2201, declaring unlawful and setting aside the decision to dismantle AmeriCorps and enjoining any action taken to enforce or implement it.

## COUNT V
### *Ultra Vires* Executive Action

238.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

239.    Neither the President nor an agency can take any action that exceeds the scope of their constitutional and/or statutory authority.

240.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27. Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond

th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com Corp.*, 337 U.S. 682, 689 (1949).

241.    The dismantling of AmeriCorps is contrary to law and outside of Defendants' authority because Defendants cannot effectively incapacitate AmeriCorps by eliminating the staff and resources AmeriCorps requires to meet its statutory obligations.

242.    Accordingly, plaintiffs are entitled to preliminary and permanent injunctive relief barring the dismantling of AmeriCorps. Pursuant to 28 U.S.C. § 2201, plaintiffs are also entitled to a declaration that the dismantling of AmeriCorps is contrary to law and outside Defendants' authority.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

i.    Declare that the decision to dismantle AmeriCorps and actions taken to effectuate it are unlawful and/or unconstitutional because they violate the APA and/or the United States Constitution;

ii.    Pursuant to 5 U.S.C. § 705, postpone the effective date of the decision to dismantle AmeriCorps and actions taken to effectuate it;

iii.    Pursuant to 5 U.S.C. § 706, vacate the decision to dismantle AmeriCorps and actions taken to effectuate it;

iv.    Preliminarily and permanently enjoin the Defendants from effectuating the decision to dismantle AmeriCorps;

v.    Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

vi.    Grant other such relief as this Court may deem proper.

Respectfully submitted,

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

By: */s/ Keith M. Jamieson*
Keith M. Jamieson (D. Md. Bar. No. 31543)
Virginia Williamson (D. Md. Bar. No. 31472)
  *Assistant Attorneys General*
Federal Accountability Unit
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-6960
kjamieson@oag.state.md.us

*Counsel for the State of Maryland*

**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

By: */s/ Ezra Kautz*
Ezra Kautz*
  *Deputy Attorney General*
Joel Marrero*
William H. Downer*
  *Supervising Deputy Attorneys General*
Brian Bilford*
  *Deputy Attorney General*
Michael L. Newman*
  *Senior Assistant Attorney General*
1300 I Street
Sacramento, CA 95814
(916) 210-6346
Joel.Marrero@doj.ca.gov
William.Downer@doj.ca.gov
Ezra.Kautz@doj.ca.gov
Brian.Bilford@doj.ca.gov
Michael.Newman@doj.ca.gov

*Counsel for the State of California*

**KRISTIN K. MAYES**
ATTORNEY GENERAL OF ARIZONA

**KATHLEEN JENNINGS**
ATTORNEY GENERAL OF DELAWARE

By: */s/ Ian R. Liston*
Ian R. Liston*
  *Director of Impact Litigation*
Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Ian.Liston@delaware.gov

*Counsel for the State of Delaware*

**PHILIP J. WEISER**
ATTORNEY GENERAL OF COLORADO

By: */s/ Kyle M. Holter*
David Moskowitz*
  *Deputy Solicitor General*
Sarah H. Weiss*
  *Senior Assistant Attorney General*
Kyle M. Holter*
Sam Wolter*
  *Assistant Attorneys General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
sarah.weiss@coag.gov
kyle.holter@coag.gov
samuel.wolter@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
ATTORNEY GENERAL OF CONNECTICUT

By */s/ Joshua A. Katz*
Joshua A. Katz*
   *Assistant Attorney General*
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Katz@azag.gov

*Counsel for the State of Arizona*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF
   COLUMBIA

By: */s/ Andrew C. Mendrala*
Andrew C. Mendrala*
   *Assistant Attorney General*
Public Advocacy Division
Office of the Attorney General for the District
   of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726
Andrew.mendrala@dc.gov

*Counsel for the District of Columbia*

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

By: */s/ Abigail R. Durkin*
Abigail R. Durkin*
   *Assistant Attorney General II, Special
   Litigation Bureau*
Cara Hendrickson*
   *Assistant Chief Deputy Attorney General*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
Tel. (312) 814-3000
Abigail.Durkin@ilag.gov

By: */s/ Andrew Ammirati*
Andrew Ammirati*
   *Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5090
Andrew.Ammirati@ct.gov

*Counsel for the State of Connecticut*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
   *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
   *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**OFFICE OF THE GOVERNOR** *ex rel.*
**ANDY BESHEAR**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
THE COMMONWEALTH OF KENTUCKY

By: */s/ S. Travis Mayo*
S. Travis Mayo*
   *General Counsel*
Taylor Payne*
   *Chief Deputy General Counsel*
Laura C. Tipton*
   *Deputy General Counsel*
Office of the Governor
700 Capitol Avenue, Suite 106

Cara.Hendrickson@ilag.gov

*Counsel for the State of Illinois*

**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

By: */s/ Sarah A. Forster*
Sarah A. Forster*
   *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  (207) 626-8800
Fax:  (207) 287-3145
Sarah.Forster@maine.gov

*Counsel for the State of Maine*

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

By: */s/ Neil Giovanatti*
Neil Giovanatti*
Alexus Ringstad*
   *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
RingstadA@michigan.gov

*Counsel for the People of the State of Michigan*

**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA

Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

By: */s/ Katherine Dirks*
Katherine Dirks*
   *Chief State Trial Counsel*
1 Ashburton Pl. Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

By: */s/ Liz Kramer*
Liz Kramer*
   *Solicitor General*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

*Counsel for the State of Minnesota*

**MATTHEW J. PLATKIN**
ATTORNEY GENERAL OF NEW JERSEY

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
  *Solicitor General*
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**RAÚL TORREZ**
ATTORNEY GENERAL OF NEW MEXICO

By: */s/ James W. Grayson*
James W. Grayson*
  *Chief Deputy Attorney General*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM  87504-1508
(505) 490-4060
jgrayson@nmdoj.gov

*Counsel for the State of New Mexico*

**JEFF JACKSON**
ATTORNEY GENERAL OF NORTH CAROLINA

**LAURA HOWARD**
CHIEF DEPUTY ATTORNEY GENERAL

By */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
  *Associate Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov

*/s/ Jessica L. Palmer*
Jessica L. Palmer*
Lauren E. Van Driesen*
  *Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-4607
Jessica.Palmer@law.njoag.gov

*Counsel for the State of New Jersey*

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

By: */s/ Jessica Ranucci*
Jessica Ranucci*
  *Special Counsel, Federal Initiatives*
Rabia Muqaddam*
  *Special Counsel for Federal Initiatives*
28 Liberty St.
New York, NY 10005
(929) 638-0447
Jessica.ranucci@ag.ny.gov
rabia.muqaddam@ag.ny.gov

*Counsel for the State of New York*

**DAN RAYFIELD**
ATTORNEY GENERAL OF OREGON

By: */s Sadie Forzley*
Sadie Forzley*
  *Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
sadie.forzley@doj.oregon.gov

*Counsel for the State of Oregon*

*Counsel for the State of North Carolina*

**JOSH SHAPIRO**

IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA

By: */s/ Michael J. Fischer*
Jennifer Selber*
  *General Counsel*
Michael J. Fischer*
  *Executive Deputy General Counsel*
Governor's Office of General Counsel
30 N. 3rd St., Suite 200
Harrisburg, PA  17101
(717) 831-2847
mjfischer@pa.gov

*Counsel for Governor Josh Shapiro*

**PETER F. NERONHA**

ATTORNEY GENERAL OF RHODE ISLAND

By: */s/ Kyla Duffy*
Kyla Duffy*
  *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2809
kduffy@riag.ri.gov

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**

ATTORNEY GENERAL OF VERMONT

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
  *Solicitor General*
109 State Street
Montpelier, VT  05609
(802) 828-3171
Jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

**NICHOLAS W. BROWN**

ATTORNEY GENERAL OF WASHINGTON

By: */s/ Abby Kahl*
Abigail Kahl*
Andrew R.W. Hughes*
  *Assistant Attorneys General*
2425 Bristol Court SW
Second Floor
PO Box 40117
Olympia, WA 98504
360-534-4864
Abigail.Kahl@atg.wa.gov
Andrew.Hughes@atg.wa.gov

*Counsel for the State of Washington*

**JOSHUA L. KAUL**

ATTORNEY GENERAL OF WISCONSIN

By: */s/ Charlotte Gibson*
Charlotte Gibson*

*Assistant Attorney General*
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI  53707
(608) 957-5218 (phone)
(608) 294-2907 (fax)

*Counsel for the State of Wisconsin*

*\* Pro hac vice application forthcoming*