# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

STATE OF MARYLAND; STATE OF
DELAWARE; STATE OF CALIFORNIA; STATE
OF COLORADO; STATE OF ARIZONA; STATE
OF CONNECTICUT; DISTRICT OF COLUMBIA,
STATE OF HAWAI'I; STATE OF ILLINOIS;
OFFICE OF THE GOVERNOR *ex rel.* Andy
Beshear, in his official capacity as Governor of the
COMMONWEALTH OF KENTUCKY; STATE OF
MAINE; COMMONWEALTH OF
MASSACHUSETTS; PEOPLE OF THE STATE OF
MICHIGAN; STATE OF MINNESOTA; STATE OF
NEVADA; STATE OF NEW JERSEY; STATE OF
NEW MEXICO; STATE OF NEW YORK; STATE
OF NORTH CAROLINA; STATE OF OREGON;
JOSH SHAPIRO, in his official capacity as
Governor of the COMMONWEALTH OF
PENNSYLVANIA; STATE OF RHODE ISLAND;
STATE OF VERMONT; STATE OF
WASHINGTON; STATE OF WISCONSIN;

        Plaintiffs,

   v.

CORPORATION FOR NATIONAL AND
COMMUNITY SERVICE, operating as
AmeriCorps; and JENNIFER BASTRESS
TAHMASEBI, in her official capacity as Interim
Head of the Corporation for National and
Community Service;

        Defendants.

Civ. No. 25-cv-01363 (DLB)

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
## <u>FOR PRELIMINARY INJUNCTION</u>

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

    I.    AmeriCorps' History, Structure, and Programs ..................................................... 2

    II.   The Decision to Dismantle AmeriCorps ................................................................ 4

STANDARD OF REVIEW ............................................................................................ 6

ARGUMENT ................................................................................................................. 7

    I.    Plaintiff States are Likely to Succeed on the Merits. ............................................ 7

        A. …Defendants' Refusal to Spend AmeriCorps Appropriations Violates the Separation of Powers ................................................................................................................... 7

    B.   Defendants' Decision to Dismantle AmeriCorps Programs Violates the Administrative Procedure Act ................................................................................................................. 10

        1.   The Dismantling of AmeriCorps is Final Agency Action ............................................. 10

        2.   Defendants' Dismantling of AmeriCorps is Contrary to Law ....................................... 11

    C.   Defendants Cannot Avoid the Merits by Relying on Jurisdictional Arguments. .............. 16

    II.   Plaintiff States are Irreparably Harmed by Defendants' Dismantling of AmeriCorps. .... 18

    III.  The Balance of Equities and the Public Interest Weigh in Plaintiffs' Favor ................. 26

    IV.  The Court Should Enjoin the Actions Taken to Dismantle AmeriCorps ..................... 29

CONCLUSION ................................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Case Law**

*ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489 (6th Cir. 2022) ......................... 21

*Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355 (4th Cir. 2012) .................................................... 7

*Am. Library Ass'n v. Sonderling*, — F. Supp. 3d —, 2025 WL 1262054 (D.D.C. May 1, 2025)... 9

*Amerijet Int'l v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014) ............................................................. 14

*Arizona v. Biden*, 40 F.4th 375 (6th Cir. 2022) ............................................................................. 25

*Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482 (D. Md. 2020) ................................... 25

*Aviel v. Gor*, No. CV 25-778 (LLA), 2025 WL 1009035 (D.D.C. Apr. 4, 2025)......................... 29

*Bennett v. Spear*, 520 U.S. 154 (1997) .......................................................................................... 10

*Biden v. Texas*, 597 U.S. 785 (2022) ..............................................................................................11

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ....................................................................... 16, 17

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .................................................................................. 30

*Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103 (1948) .............................................. 10

*City & Cnty. of San Francisco v. USCIS*, 408 F.Supp.3d 1057 (N.D. Cal. 2019)......................... 22

*Climate United Fund v. Citibank, N.A.*, No. 25-CV-698, 2025 WL 842360 (D.D.C. Mar. 18,

  2025)............................................................................................................................................ 14

*Clinton v. City of New York*, 524 U.S. 417 (1998) ........................................................................... 7

*Cmty. Nutrition Inst. v. Butz*, 420 F. Supp. 751 (D.D.C. 1976).................................................... 25

*Department of Education v. California*, 145 S. Ct. 966 (2025) .................................................... 17

*Department of State v. AIDS Vaccine Advocacy Coalition*, 145 S. Ct. 753 (2025)...................... 17

*Doe v. Trump*, — F. Supp. 3d —, 2025 WL 485070 (D. Mass. Feb. 13, 2025)......................... 27

*Encino Motorcars v. Navarro*, 579 U.S.211 (2016) ............................................................... 14, 15

*FDA v. Wages & White Lion Inv'ts*, 145 S.Ct. 898 (2025) ........................................................... 14

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010)............................ 8

*Guadamuz v. Ash*, 368 F. Supp. 1233 (D.D.C. 1973)....................................................... 9

*He v. Noem*, No. 25-CV-05333-DGE, 2025 WL 1208254 (W.D. Wash. Apr. 25, 2025) .............. 28

*HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) .................................................... 7, 27

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013)...................................................... 8, 13

*INS v. Chadha*, 462 U.S. 919 (1983)...................................................................... 8

*Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Lab.*, 358 F.3d 40 (D.C. Cir. 2004).... 14

*Kentucky v. Biden*, 57 F. 4th 545 (6th Cir. 2023) .........................................................

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016).................................... 27

*Maine Comm. Health Options v. United States*, 590 U.S. 296 (2020)........................................ 17

*Michigan v. EPA*, 576 U.S. 743 (2015) ............................................................. 14, 16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ..................... 14

*Mountain Valley Pipeline v. 6. 56 Acres of Land*, 915 F.3d 197 (4th Cir. 2019).......................... 18

*Mountain Valley Pipeline v. W. Pocahontas Props.*, 918 F.3d 353 (4th Cir. 2019)....................... 23

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F. 3d 546 (4th

    Cir. 1994)..................................................................................................

*N. Mariana Islands v. United States*, 686 F. Supp. 2d 7 (D.D.C. 2009) ...................................... 25

*Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022) ............................................. 7

*Nat'l Treasury Emps. Union v. Newman*, 768 F. Supp. 8 (D.D.C. 1991)..................................... 25

*New Jersey v. Trump*, 131 F.4th 27 (1st Cir. 2025)....................................................... 28

*New York v. Trump*, 133 F.4th 51 (1st Cir. 2025)........................................................ 10

*Nken v. Holder*, 556 U.S.  418 (2009)................................................................... 7, 27

*North Carolina v. Covington*, 581 U.S. 486 (2017) ..................................................... 30

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004) ....................................................11

*Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017)................................................ 27

*Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62 (1970) ... 10

*Purpose Built Fams. Found. v. United States*, 634 F. Supp. 3d 1118 (S.D. Fla. 2022) .............. 10

*Randall v. United States*, 95 F. 3d 339 (4th Cir. 1996) .......................................................

*RFE/RL, Inc. v. Lake*, — F. Supp. 3d —, 2025 WL 1232863 (D.D.C. Apr. 29, 2025).................. 9

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020)............................................................

*See TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) .............................................. 16

*Stemple v. Bd. of Educ.*, 623 F.2d 893 (4th Cir.1980) .................................................... 7

*Tennessee v. Dep't of Educ.*, 104 F.4th 577 (6th Cir. 2024) ............................................

*Washington v. Trump*, No. 2:25-CV-00244-LK, 2025 WL 659057 (W.D. Wash. Feb. 28, 2025). 18

*Widakuswara v. Lake*, — F.Supp. 3d —, 2025 WL 945869 (S.D.N.Y. Mar. 28, 2025)................. 9

*Winter v. NRDC*, 555 U.S. 7 (2008) ........................................................................

## Statutes and Regulations

2 C.F.R. §§ 200.204 ....................................................................................... 3

2 C.F.R. § 200.340(a)(4) ............................................................................... 6, 24

2 U. S. C. § 683(b) ........................................................................................ 8

42 U. S. C. §§ 12572(f)(1)–(2) ......................................................................11

42 U.S.C. § 12572(f)(1)(A) ........................................................................... 12

42 U.S.C. § 12501......................................................................................... 26

42 U.S.C. § 12571......................................................................................... 7

42 U.S.C. § 12572(f)(1)(A)............................................................................. 3

42 U.S.C. § 12572(f)(1)(B)....................................................................... 3, 12, 24

42 U.S.C. § 12572(f)(2) ........................................................................................... 25

42 U.S.C. § 12572(f)(2) ........................................................................................ 3, 12

42 U.S.C. § 12572(f)(2)(a) ........................................................................................ 12

42 U.S.C. § 12581(e) .................................................................................................11

42 U.S.C. § 12581(e)(2)–(3) ................................................................................... , 13

42 U.S.C. § 12612 ...................................................................................................... 2

42 U.S.C. § 12636(a)(2)(B) ...............................................................................11, 13

42 U.S.C. § 12637(a)(1) ........................................................................................... 3,

42 U.S.C. § 12651 ................................................................................................... 2, 7

42 U.S.C. § 5052(a)(4) ............................................................................................. 13

42 U.S.C. §§ 12651a, 12651c, 12651e ...................................................................... 7

45 C.F.R. § 12581(d)(1) ............................................................................................. 3

45 C.F.R. § 12653k .................................................................................................... 3

45 C.F.R. § 2500.2(a) ................................................................................................. 2

45 C.F.R. § 2522.100(a) ........................................................................................... 15

45 C.F.R. § 2522.460(b) .................................................................................... 3, , 24

45 C.F.R. § 2540.400(b) ........................................................................................... 13

45 C.F.R. §§ 5001(a), 5011(a), 5013(a) .................................................................... 3

45 U.S.C. § 12594(a) ................................................................................................. 4

45 U.S.C. § 12603(a) ................................................................................................. 3

45 U.S.C. § 12604(a)(1)–(2) ...................................................................................... 3

45 U.S.C. § 12637(b)(1) ............................................................................................. 3

45 U.S.C. § 4955 ....................................................................................................... 4

5 U.S.C. § 704 .................................................................................................................. 10

Domestic and Volunteer Service Act of 1973, Pub. L. 93-113, 87 Stat. 394 (Oct. 1, 1973) ........... 2

Full-Year Continuing Appropriations Act, 2025, P.L. 119-4, § 1101(a)(8), 139 Stat. 9, 11 (2025)..

........................................................................................................................... 4, 8, 12

Further Consolidated Appropriations Act, P.L. 118-47, div. D, tit. IV, 138 Stat. 460 (2024) ...........

..........................................................................................................................4, 11, 12

National and Community Service Act of 1990, Pub. L. 101-610, 104 Stat. 3127 (Nov. 16, 1990) 2

National Older American Volunteer Programs.  170 Cong. Rec. H2060–61 (Mar. 22, 2024) ....... 4

**Other Authorities**

AmeriCorps, *Return on Investment (ROI) Studies* (last accessed May 4, 2025) ......................... 26

Clive Belfield, *The Economic Value of National Service*, Voices for Nat'l Serv. (2013) ............. 26

**Executive Orders**

Exec. Order 14,210, § 3(c) (Feb. 11, 2025) ...................................................................... 4

Exec. Order 14,158, § 3(c) (Jan. 20, 2025) ...................................................................... 4

Exec. Order 14,222 § 3(b) (Feb. 26, 2025) ...................................................................... 4

**Constitutional Provisions**

U.S. Const. art. I, § 9, cl.7 ............................................................................................ 8

## INTRODUCTION

AmeriCorps—the federal agency for national service and volunteerism—has been an integral partner to States and service organizations for decades, as they work to improve the lives of millions of Americans across the country.  This collaboration came to a crashing halt within a ten-day span in April 2025, after the current Administration decided to dismantle the agency. Without any clear explanation or authority, Defendants—AmeriCorps[1] and its interim agency head—suddenly put the overwhelming majority of AmeriCorps' staff on leave and terminated over 1,000 service programs nationwide (representing nearly 40% of the entire agency budget).  Not only have Defendants' actions wreaked havoc on individuals and organizations that rely on AmeriCorps' support, but they have also irreparably injured Plaintiff States.  Among other things, Defendants closed numerous State-run AmeriCorps programs, deprived States and their institutions of service members, and undermined well-established State partnerships with their local communities.

Defendants' attempt to dismantle AmeriCorps is illegal many times over.  Under the Constitution's separation of powers, the Executive may not refuse to spend funds appropriated by Congress.  Yet Defendants have done precisely that by unilaterally rescinding programs worth over $400 million in appropriated funds.  Further, in their dismantling efforts, Defendants violated a host of statutes governing AmeriCorps' mission and activities.  Specifically, federal law mandates notice and comment before significant changes are made to AmeriCorps' policies or services; forbids AmeriCorps from changing its priorities mid-year and without advance notice; commands specific allocations of funds among States; and requires that programs be given an opportunity to

---

[1] The agency's formal name is the Corporation for National and Community Service, but it "has adopted AmeriCorps as its official agency operating name."  45 C.F.R. § 2500.2(a).

contest any termination of funds. Defendants ignored every one of these statutory mandates. Finally, Defendants' actions are also arbitrary and capricious because Defendants failed to provide any clear justification for their conduct. Given the clear lawlessness of Defendants' actions, the irreparable harm to the States, and the public interest in preserving service programs, Plaintiffs request a preliminary injunction to prevent the dismantling of AmeriCorps.

## **BACKGROUND**

### I.    **AmeriCorps' History, Structure, and Programs**

AmeriCorps is the federal agency responsible for supporting domestic volunteer service throughout the United States. 42 U.S.C. § 12651; 45 C.F.R. § 2500.2(a). Pursuant to the Domestic and Volunteer Service Act of 1973, Pub. L. 93-113, 87 Stat. 394 (Oct. 1, 1973), and the National and Community Service Act of 1990, Pub. L. 101-610, 104 Stat. 3127 (Nov. 16, 1990), AmeriCorps operates national volunteer programs and disburses appropriated funds to support programs managed by State and local governments, nonprofit organizations, and universities.

National programs run directly by AmeriCorps include Volunteers in Service to America (VISTA) and the National Civilian Community Corps (NCCC), a full-time residential program for young adults (ages 18 to 26). 42 U.S.C. § 12612. AmeriCorps also supports independently managed service programs through (1) direct grants to the operating entities, (2) indirect grants to State Service Commissions which are passed through to subgrantees, and (3) education awards to AmeriCorps members. AmeriCorps State and National, the agency's largest grant program, provides funds to States, local governments, and others to either carry out their own programs or— in the case of State Service Commissions—"to make grants in support of other national service programs . . . that are carried out by other entities." 42 U.S.C. § 12571(a).

2

Of State and National funds, 35.3% are awarded as formula grants to State Service Commissions based on population. *Id.* § 12581(e)(2)–(3) (AmeriCorps "shall allot" 35.3% of such funds to States on a formula basis, with the minimum being the greater of $600,000 or 0.5% of all formula funds). The Service Commissions' subgrantees are selected pursuant to *State* priorities, not AmeriCorps priorities. 42 U.S.C. § 12572(f)(1)(B); 45 C.F.R. § 2522.460(b) ("A State may apply priorities different than those of AmeriCorps in selecting its formula programs."). Most other State and National funds are awarded "on a competitive basis" to States, "to nonprofit organizations seeking to operate a national service program in 2 or more of those States, and to Indian tribes." 42 U.S.C. § 12581(d)(1). AmeriCorps also funds various pilot programs, *see, e.g.*, *id.* § 12653k, and the National Older American Volunteer Programs, which support projects for persons at least 55 years old, *id.* §§ 5001(a), 5011(a), 5013(a).

Each year, AmeriCorps issues Notices of Funding Opportunities (NOFO) for all grants it plans to award, including for funds that must statutorily be allocated to the Plaintiff States. 2 C.F.R. §§ 200.204 & 2205.100. By statute, AmeriCorps may "periodically alter" its "priorities regarding the types of national service programs and corps" that may receive competitive funding, 42 U.S.C. § 12572(f)(1)(A), but it "shall provide advance notice to potential applicants of any national service priorities to be in effect . . . for a fiscal year." *Id.* § 12572(f)(2).

All AmeriCorps assistance is intended to supplement, "not duplicate," preexisting service resources. *See id.* § 12637(a)(1). And employers who make use of AmeriCorps members "shall not displace [their] employee[s]. . . as a result." *Id.* § 12637(b)(1).

For all AmeriCorps-supported programs, the agency provides benefits and education awards to service members. Education awards are provided in an amount "equal to the maximum amount of a Federal Pell Grant," *id.* § 12603(a), and may be used to, among other things, "repay

3

student loans" or "pay all or part of the cost of attendance or other educational expenses at an institution of higher education." *Id.* § 12604(a)(1)–(2).  AmeriCorps also funds benefits such as living allowances, health coverage, and childcare for full-time members to facilitate their uncompensated volunteer work.  *See id.* § 4955; *id.* § 12594(a), (d), & (e).

For FY 2024, Congress appropriated AmeriCorps $975,525,000 to "carry out" the national service laws, of which $37,735,000 was to support NCCC.  *See* Further Consolidated Appropriations Act, P.L. 118-47, div. D, tit. IV, 138 Stat. 460, 694 (2024) (the "2024 Appropriations Act").  The accompanying Joint Explanatory Statement directed AmeriCorps to allocate $557,094,000 to State and National Grants and $236,917,000 to the National Older American Volunteer Programs.  170 Cong. Rec. H2060–61 (Mar. 22, 2024).  Congress also appropriated $180,000,000 for education awards, $99,686,000 for "necessary expenses of administration," and $7,595,000 for AmeriCorps' Inspector General—in total, $1,262,806,000.  2024 Appropriations Act.  Congress specifically provided in Section 401 of the FY 2024 act that AmeriCorps "shall make any significant changes to program requirements, service delivery, or policy only through public notice and comment rulemaking."  *Id.* For FY 2025, Congress reappropriated those amounts "under the authority and conditions provided in" the FY 2024 act. Full-Year Continuing Appropriations Act, 2025, P.L. 119-4, § 1101(a)(8), 139 Stat. 9, 11 (2025) (the "2025 Continuing Appropriations Act").

Prior to the events described in the Complaint, AmeriCorps was administered by a staff of approximately 700 people and supported more than 200,000 members and volunteers.

## II.    The Decision to Dismantle AmeriCorps

Shortly after assuming office, President Trump directed all federal agencies to work with the so-called Department of Government Efficiency (DOGE) to maximize terminations of staff,

contracts, and grants. *See* Exec. Order 14,158, § 3(c) (Jan. 20, 2025) (creation of DOGE), Exec. Order 14,210, § 3(c) (Feb. 11, 2025) ("large-scale reductions in force"), Exec. Order 14,222 § 3(b) (Feb. 26, 2025) (termination of grants and contracts). On April 8, 2025, a DOGE Team arrived at AmeriCorps and agency leadership—including Defendant Jennifer Bastress Tahmasebi, the Interim Agency Head—began "work[ing] with them around Administration goals to cut staff, contracts, contractors, and agency deliverables." Compl. Ex. C at 1. AmeriCorps' leadership "engaged in conversations with the DOGE team on what the staffing structure should look like consistent with Administration goals." *Id.* As evidenced by their subsequent actions, Defendants embraced DOGE's demands to "downsize"—in effect, dismantle—AmeriCorps. *Id.* at 2.

On April 15, all AmeriCorps NCCC members (more than 750 people) received "official notification" that they were "being released from the AmeriCorps NCCC program effective April 30th, 2025." Compl. Exs. A, B. A cover email explained: "In alignment with the Trump-Vance administration priorities and Executive Order 14,222 . . . AmeriCorps NCCC is working within new operational parameters that impact the program's ability to sustain program operations." Compl. Ex. B. Defendant Bastress Tahmasebi attributed the shutdown of NCCC to a "shift in the staff footprint" resulting from DOGE's deferred resignation program "combined with additional efforts to downsize the agency through reductions in force." Compl. Ex. C.

The following day, Defendant Bastress Tahmasebi "put 85% of [AmeriCorps'] staff on administrative leave" pending further notice. Compl. Exs. C, D. That reduced AmeriCorps' workforce of more than 700 to only 116 employees (107 core staff and 9 lawyers). Compl. Ex. C. Eight days later, on April 24, Defendants sent many employees on administrative leave notices of termination pursuant to a reduction in force (RIF). *See* Compl. Ex. E; Tobi Raji, *DOGE orders*

*major cut to AmeriCorps funding, imperiling agency's work*, Wash. Post, Apr. 25, 2025, https://www.washingtonpost.com/nation/2025/04/25/americorps-grant-cuts-doge/.

Defendants simultaneously implemented their dismantling of the agency by cutting vast swaths of its programs and funding. The day after beginning to lay off up to 85% of staff, Defendants immediately terminated more than 1,000 service programs, representing nearly $400 million in associated grants. Compl. Exs. G–H. State Service Commissions received largely identical notices that stated: "Effective immediately, the AmeriCorps award subrecipient(s) included in the attached spreadsheet is/are being terminated per 2 C.F.R. § 200.340(a)(4) because it has been determined that the award no longer effectuates agency priorities. You must immediately cease all award activities. This is a final agency action and is not administratively appealable." *E.g.*, Compl. Ex. G. The notices continued: "All member activities should cease immediately. . . . The program should document that the member was exited for compelling personal circumstances due to the agency's termination of the grant and program closure." *Id.*

Of approximately 1,031 programs terminated, 838 (more than four-fifths) were State and National programs funded by subgrants awarded and administered by State Service Commissions. Compl. Ex. F. By dollar value, State and National programs comprised more than 93% of the nearly $400 million cut. *Id.* Defendants eliminated programs in every State and several territories, Compl. Ex. F, and sent each State individual notices informing them of which programs had been affected, Compl. Ex. G. Of California's 90 State and National grants, for example, Defendants terminated all but three that are subject to an injunction. Moua Decl. ¶ 21. In at least seven

Plaintiff States, Defendants terminated *all* programs supported with state formula funds.[2]

## STANDARD OF REVIEW

A preliminary injunction is designed to preserve the status quo—specifically, "the 'last uncontested status between the parties which preceded the controversy'"—during the pendency of litigation. *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012) (quoting *Stemple v. Bd. of Educ.*, 623 F.2d 893, 898 (4th Cir.1980). A preliminary injunction is warranted when (1) "the plaintiffs are likely to succeed on the merits" (2) "plaintiffs are likely to suffer irreparable harm in the absence of an injunction," (3) "the balance of hardships weighs in their favor," and (4) "an injunction serves the public interest." *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021). The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT[3]

### I.     Plaintiff States are Likely to Succeed on the Merits.

#### A.     Defendants' Refusal to Spend AmeriCorps Appropriations Violates the Separation of Powers

Unless enjoined, the dismantling of AmeriCorps will preclude the agency from disbursing its appropriated funding. The deliberate decision to flout Congressional command and refuse to

---

[2] Plaintiff States Connecticut, Delaware, Michigan, Oregon, Rhode Island, Vermont, and Wisconsin had all of their formula subgrants cut. Lucier Decl. (Conn.) at ¶ 16, Sullivan Decl. (Del.) at ¶¶ 9, 26, Trent Decl. (Mich.) at ¶ 15, Bauer Decl. (Or.) at ¶ 11, Darrow Decl. (R.I.) at ¶ 15, Kolling Decl. (Vt.) at ¶ 10(a), Duffy Decl. (Wis.) at ¶ 11.

[3] Earlier today, the District Court for the District of Rhode Island issued a memorandum and order enjoining the Administration's attempts to dismantle the Institute of Museum and Library Services, the Minority Business Development Agency, and the Federal Mediation and Conciliation Service. *Rhode Island v. Trump*, No. 1:25-cv-128-JJM-LDA (May 6, 2025). Chief Judge McConnell's opinion supports Plaintiff States' arguments throughout this brief and is attached as Exhibit A for the Court's consideration.

spend appropriated funds violates the constitutional separation of powers.

AmeriCorps, like all administrative agencies, is a "creature[] of statute." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). By statute, Congress established AmeriCorps, 42 U.S.C. § 12651, defined its officers, *e.g.*, *id.* §§ 12651a, 12651c, & 12651e, and authorized programs for it to administer, *e.g.*, *id.* § 12571. Because "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes," *Clinton v. City of New York*, 524 U.S. 417, 438 (1998), the Administration could not abolish AmeriCorps directly. *Id. at 453* ("[R]epeal of statutes, no less than enactment, must conform with Art. I.") (quoting *INS v. Chadha*, 462 U.S. 919, 954 (1983) (Scalia, J., concurring in part)). Nor can it lawfully do so indirectly by withholding the agency's funds, terminating its programs, and eliminating most of its personnel.

AmeriCorps' budget, no less than its formal existence, is subject to Congress's "plenary control." *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 500 (2010). Indeed, AmeriCorps may not "spend less than the full amount appropriated by Congress for a particular project or program." *See In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.). This foundational separation-of-powers principle is embodied in the Appropriations Clause, which provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl.7. And it has been codified in the Impoundment Control Act, which provides that all funds appropriated by Congress "shall be made available for obligation" unless Congress itself has rescinded the appropriation, 2 U. S. C. § 683(b), and that "[n]o officer or employee of the United States may defer any budget authority" except in exceedingly narrow circumstances, *id.* § 684(b). Accordingly, Defendants must adhere to the spending decisions enacted by Congress for AmeriCorps programs.

Current appropriations laws specify the amounts that Defendants must spend. For FYs

2024 and 2025, Congress appropriated $975,525,000 for AmeriCorps to expend on financial assistance to states, non-profits, and volunteers under its statutory programs.  2024 Appropriations Act, 138 Stat. at 694 (continued for FY 2025 by the 2025 Continuing Appropriations Act, §1101(a)(8)).    Congress also appropriated $99,686,000 "[f]or necessary expenses of administration . . . including payment of salaries." *Id.* at 695 (continued for FY 2025 by the 2025 Continuing Appropriations Act, § 1101(a)(8)).

Defendants' decision to dismantle AmeriCorps contravenes these appropriations laws and Congressional authority.  For example, Defendants ordered the termination of approximately 1,031 AmeriCorps programs, representing nearly $400 million in total funding.  Although some portion of these AmeriCorps has already been reimbursed to grant programs over the course of this service year, much of the funding has not, meaning that AmeriCorps will not disburse anywhere near the $975,525,000 Congress appropriated to support its grants and programs.  *See, e.g.,* Anderson Decl. (Pa.) at ¶ 15 ("[T]he estimated remaining value of the [Pennsylvania] terminated awards . . . was approximately $6,300,000.").  Likewise, by eliminating the NCCC program in the middle of the year, AmeriCorps will not disburse much of the $37 million that Congress specifically appropriated for NCCC.  Similarly, by firing large number of staff *en masse*, Defendants have defied Congress's appropriation of $99,686,000 for AmeriCorps' administrative expenses.

In sum, Defendants have refused to disburse funds in the manner required by Congress, violating the separation of powers.  When this Administration has tried in recent months to dismantle other federal agencies by withholding appropriated funds, courts repeatedly and correctly enjoined such unconstitutional acts. *See, e.g.*, *Widakuswara v. Lake*, — F.Supp. 3d —, 2025 WL 945869, *7 (S.D.N.Y. Mar. 28, 2025) (granting TRO to prevent the termination of much of an agency and its grants, because the Administration "usurp[ed] Congress's power of the purse

and its legislative supremacy" when it "with[eld] the funds statutorily appropriated to fully administer" the agency); *RFE/RL, Inc. v. Lake*, — F. Supp. 3d —, 2025 WL 1232863, at *8 (D.D.C. Apr. 29, 2025) ("When money has been appropriated by Congress, 'the Executive has no residual constitutional power to refuse to spend these appropriations.'") (quoting *Guadamuz v. Ash*, 368 F. Supp. 1233, 1243–44 (D.D.C. 1973)); *Am. Library Ass'n v. Sonderling*, — F. Supp. 3d —, 2025 WL 1262054, at *2 (D.D.C. May 1, 2025) ("The wholesale termination of grants and services and the mass layoffs . . . contravenes Congress's appropriation of almost $300 million to [the Institute of Museum and Library Services].").  This Court should similarly hold here that Defendants' dismantling of AmeriCorps likely violated the separation of powers.

**B.  Defendants' Decision to Dismantle AmeriCorps Programs Violates the Administrative Procedure Act**

1.  *The Dismantling of AmeriCorps is Final Agency Action*

The decision to dismantle AmeriCorps, and the measures taken to implement that decision, constitute "final agency action" reviewable under the Administrative Procedure Act (APA). 5 U.S.C. § 704.  An action is "final" if it (1) "'consummat[es]' [] the agency's decisionmaking process" and (2) determines "'rights or obligations'" or imposes "'legal consequences.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948), and *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).  Here, Defendants consummated their decision to tear apart AmeriCorps in ten short days by ending its existing NCCC service program, placing approximately 85% of its staff on administrative leave prior to their firing, and terminating over 1,000 AmeriCorps programs worth approximately $400 million.  As discussed below in the context of irreparable harm, these actions have had a devastating impact on the States.  Accordingly, the decision to dismantle

AmeriCorps is plainly final.  *See, e.g.*, *New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025) ("broad, categorical freezes on obligated funds" were "discrete final agency actions").

Moreover, here, Defendants made clear that the actions taken in furtherance of the decision to dismantle AmeriCorps were final and "not . . . merely tentative or interlocutory." *Bennett*, 520 U.S. at 178.  Among other things, Defendants laid off large numbers of agency staff, and cancelled nearly all external contracts such as those supporting AmeriCorps members.  Compl. Ex. C. Further, in their notices to the State Service Commissions, Defendants explicitly stated that each termination of an AmeriCorps program was "a final agency action and is not administratively appealable." Compl. Exs. G, H; *see Purpose Built Fams.  Found. v. United States*, 634 F. Supp. 3d 1118, 1125 (S.D.  Fla. 2022) ("letter stat[ing] that the agency ha[d] decided to terminate . . . grants" was "final agency action" because it "ma[de] clear that legal consequences w[ould] follow from the letter" and "d[id] not state or even suggest that any further proceedings w[ould] take place prior to termination"), *aff'd*, 95 F. 4th 1346 (11th Cir. 2024).  That these programs were cut *en masse*, with identical language, leaves no doubt that the terminations were done pursuant to a final, categorical decision.  *See New York v. Trump*, 133 F.4th at 68–69 (concluding that "numerous notices and emails authored by Agency Defendants [ ] support[ed] the finding that their funding freezes were categorical in nature," and that the "pauses, freezes, and sudden terminations of obligated funds [ ] suggested that these actions were taken pursuant to such categorical decisions," distinguishing *Norton v. S. Utah Wilderness Alliance*, 542 U.S.55, 64 (2004)).  Defendants' decision to dismantle AmeriCorps thus is final and subject to APA review.  *See Biden v. Texas*, 597 U.S. 785, 807 (2022) ("attempt[] to terminate" programming constituted "final agency action").

2.  *Defendants' Dismantling of AmeriCorps is Contrary to Law*

In their rush to tear apart AmeriCorps, Defendants failed to abide by numerous federal

11

laws. Specifically, in contravention of statute, Defendants (a) failed to conduct public notice and comment to effectuate their purported change in priorities, 2024 Appropriations Act, § 401, 138 Stat. 695; (b) shifted AmeriCorps priorities without advance notice and in the middle of a fiscal year, and imposed those priorities on State-awarded formula grants, 42 U.S.C. §§ 12572(f)(1)–(2); (c) cut funding required to be provided to states on population basis, 42 U.S.C. § 12581(e); and (d) failed to provide grantees notice and opportunity for a hearing to contest the termination of AmeriCorps programs, *id.* § 12636(a)(2)(B). Each violation is an independent basis that supports an injunction to prevent the dismantling of AmeriCorps.

*First*, Defendants violated section 401 of the 2024 Appropriations Act, which requires AmeriCorps to conduct notice-and-comment rulemaking prior to "*any* significant changes to [AmeriCorps] program requirements, service delivery or policy." 138 Stat. 695 (emphasis added). The 2025 Appropriations Act—signed by President Trump one month before Defendants began to dismantle the agency—extended this restriction to fiscal year 2025 as well. 2025 Appropriations Act § 1101(a)(8). The wholesale dismantling of AmeriCorps is a "significant change" to "policy" and "service delivery." Indeed, Defendants repeatedly noted that they were imposing changes to agency "policy," stating, for instance, that "AmeriCorps NCCC is working within new operational parameters," Compl. Ex. C, and that over 1,000 programs were being terminating because they "no longer effectuate[] agency priorities." Compl. Ex. G. Despite the obvious and significant change in policy, Defendants failed to provide the public and regulated entities with notice and an opportunity to comment, as Congress required.

*Second*, Defendants also improperly ambushed States and other AmeriCorps partners with a change of agency policy without providing the required advance notice, and in the middle of a service year. Although 42 U.S.C. § 12572(f)(1)(A) permits AmeriCorps to "periodically alter" its

"priorities regarding the types of national service programs and corps" that it will fund, the agency "shall provide *advance* notice to potential applicants of any national service priorities to be in effect under this subsection for a fiscal year." *Id*. § 12572(f)(2) (emphasis added). And this notice must "specifically include" a "description of any alteration made in the priorities since the previous notice." *Id*. § 12572(f)(2)(a). Defendants, however, claimed to adopt new priorities mid-year *sub silentio* and then terminated huge swaths of AmeriCorps staff and programs with immediate effect. Defendants applied their new priorities to terminate many formula subgrants, even though it is the States—not AmeriCorps—that establish the priorities for such grants, *see id*. § 12572(f)(1)(B), and "[a] State may apply priorities different than those of AmeriCorps in selecting its formula programs." 45 C.F.R. § 2522.460(b). Defendants' unannounced and untimely shift in priorities, and their application of such priorities to programs selected by States, is accordingly unlawful.

*Third*, Defendants violated federal law regarding the specific allocation of AmeriCorps funds. As explained in Part A, *supra*, AmeriCorps may not "spend less than the full amount appropriated by Congress for a particular project or program." *Aiken Cnty.*, 725 F.3d at 261 n.1. By statute, 35.3% of AmeriCorps State and National Grants "shall" be provided to States on a population basis, with each State's minimum being the larger of $600,000.00 or 0.5% of all such grants. *See* 42 U.S.C. § 12581(e)(2)–(3). Defendants, however, directed over 90% of program terminations to State and National funded programs. In fact, Plaintiff States Connecticut, Delaware, Michigan, Oregon, Rhode Island, Vermont, and Wisconsin lost *all* programs supported with formula funding. *See supra* note 2. Such cuts necessarily reduced certain States' formula funds well below the amount required to be allocated by statute. Defendants' cuts thus violate Congress's command to allocate specific amounts of formula funds to each State.

*Fourth* and finally, Defendants violated federal statutes requiring that AmeriCorps

13

programs be given notice and an opportunity to be heard before any funds are terminated. By statute—except in emergencies—AmeriCorps funding "shall not be terminated or revoked . . . unless the recipient of such assistance has been afforded reasonable notice and opportunity for a full and fair hearing." 42 U.S.C. § 5052(a)(4); *id.* § 12636(a)(2)(B) (same). AmeriCorps' regulations also require the agency to provide written notice of the intent to terminate, which must set forth the grounds and effective date of the "proposed termination." 45 C.F.R. § 2540.400(b). The recipient has seven calendar days to submit an opposition and may also request a hearing, which AmeriCorps must schedule on no fewer than five days' notice. *Id.* Defendants again ignored their own statutes and regulations by failing to provide *any* notice of program terminations or any opportunity for a hearing. Instead, they terminated programs "effective immediately," Compl. Ex. G, at 1, and declared that the decisions were "not administratively appealable." *Id.*

Because AmeriCorps' dismantling violated federal law, Plaintiffs are likely to succeed on their APA claim. *See Climate United Fund v. Citibank, N.A.*, No. 25-CV-698, 2025 WL 842360, at *9 (D.D.C. Mar. 18, 2025) ("[A]gencies can decide to re-evaluate their programs, or they may decide to end agreements or federal awards. But those decisions must be made lawfully and in accordance with established procedures and relevant rules and regulations.").

### 3. Defendants' Dismantling of AmeriCorps is Arbitrary and Capricious

Defendants' decision to terminate AmeriCorps programs is also likely unlawful because Defendants failed to engage in "reasoned decisionmaking" as required by the APA. *Michigan v. EPA*, 576 U.S. 743, 750 (2015). Defendants neither "articulate[d] a satisfactory explanation for [their] action[s]," *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), nor did they "consider 'serious reliance interests'" that would be impacted by the agency's sudden and drastic dismantling. *See FDA v. Wages & White Lion Inv'ts*, 145 S.Ct. 898,

14

917 (2025) (quoting *Encino Motorcars v. Navarro*, 579 U.S. 211, 221–22 (2016)).

Defendants have offered only meaningless and boilerplate explanations as to why they decided to cripple the nation's most significant source of support for community service. For example, the notices of program terminations state only that "the award no longer effectuates agency priorities." Compl. Ex. G. And in an internal email, agency leadership stated only that they had placed 85% of staff on administrative leave to be "consistent with Administration goals." Compl. Ex. C. These vague, "conclusory statements will not do" to explain the agency action. *Amerijet Int'l v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014); *Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Lab.*, 358 F.3d 40, 44 (D.C. Cir. 2004) ("[A] statement that there was a 'change in agency priorities,' without explanation, is not informative in the least[.]").

Nor did AmeriCorps provide any advance notice that it was executing a major change in policy. As the Supreme Court reiterated just last month, "[t]he change-in-position doctrine" prevents agencies from "mislead[ing] regulated entities." *Wages & White Lion Inv'ts*, 145 S. Ct. at 917." Under that doctrine, '[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change,' 'display awareness that [they are] changing position,' and 'consider serious reliance interests.'" *Id.* (quoting *Encino Motorcars*, 579 U.S. at 221–22). Here, Defendants issued no public-facing statements and provided no advance notice that they were radically changing agency policy via a significant reduction in staffing levels and support to members and programs.

Lastly, there is no indication that Defendants considered "serious reliance interests" on the part of States, AmeriCorps members, service organization, and the public, all of which have depended on steady AmeriCorps support for decades. *See Wages & White Lion Inv'ts*, 145 S. Ct. at 917 (quoting *Encino Motorcars*, 579 U.S. at 221–22). By design, "[a]ll AmeriCorps programs

15

must . . . provide a *direct and demonstrable benefit* that is valued by the community in which the service is performed." 45 C.F.R. § 2522.100(a) (emphasis added). Plaintiff States and partner organizations have reliance interests in planning and budgeting programs based on Congressional appropriations and the agency's signed commitment to support programs for a specific award period under the rules in place at the time the award is made. And States rely on the ability of AmeriCorps members to make a sustained commitment to a term of volunteer service, often foregoing employment opportunities and relocating great distances.

Defendants did not consider any of these reliance interests, much less weigh them against competing policy concerns (if any), or consider any alternatives (such as honoring existing program commitments and reserving any drastic policy changes for future programs). In sum, Defendants failed to engage in any "reasoned decisionmaking" whatsoever, *see Michigan*, 576 U.S. at 750, and the dismantling of AmeriCorps therefore is arbitrary and capricious. *See Encino Motorcars*, 579 U.S. at 222 ("[A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.").

### C. Defendants Cannot Avoid the Merits by Relying on Jurisdictional Arguments.

Defendants cannot escape a likely loss on the merits by relying on the same jurisdictional arguments they have raised elsewhere. First, Plaintiffs have standing to bring their claims. As detailed in Part II, Defendants' actions to dismantle AmeriCorps are causing irreparable harm to Plaintiffs. Those harms are directly traceable to Defendants' unlawful conduct and will be redressed by the requested injunctive and declaratory relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (standing requires injury-in-fact, causation, and redressability).

Second, this Court—not the Court of Federal Claims under the Tucker Act—has jurisdiction over Plaintiffs' claims. As in *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988), none

of the issues here involve the sorts of contractual obligations that are appropriately dealt with by the Court of Federal Claims.  Rather, this case challenges Defendants' decision to dismantle an entire agency by, among other things, laying off employees, terminating service members, and cancelling more than 1,000 AmeriCorps programs worth nearly $400 million.  The claims are founded in the Constitution and federal statutes and regulations, and the relief sought is purely equitable—to enjoin the closure of those programs and the associated shuttering of the agency.  Even though federal payments may be "engend[ered]" as a "by-product" of the "court's primary function of reviewing the [administration's] interpretation of federal law," that does not turn this APA case into a contractual suit for damages.  *Id.* at 910; *see also id.* at 895 (distinguishing "money damages," i.e., compensatory relief as "a *substitute* for a suffered loss," from equitable relief that seeks "the very thing to which [plaintiff] was entitled"); *see also Maine Comm. Health Options v. United States*, 590 U.S. 296, 323–24 (2020) ("[W]hen the [APA] provides an avenue for relief," "[t]he Tucker Act yields."); *Randall v. United States*, 95 F. 3d 339, 347 (4th Cir. 1996) (injunctive relief was essence of complaint because "Plaintiff's claim for back pay would only arise if Plaintiff's request for retroactive promotion were granted").

For that reason, Defendants cannot rely on the Supreme Court's decision granting a stay in *Department of Education v. California*, 145 S. Ct. 966, 968 (2025), because the Court there characterized the plaintiffs as seeking "orders 'to enforce a contractual obligation to pay money.'"  *Id.*  Indeed, the Court reiterated in that very case that district court jurisdiction "'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of

17

funds." *Id.* (quoting *Bowen*, 487 U.S. at 910).[4]  If any recent Supreme Court stay decision is on point, it is *Department of State v. AIDS Vaccine Advocacy Coalition*, which declined to stay a "restraining order enjoining the Government from enforcing directives pausing disbursements of foreign development assistance funds." 145 S. Ct. 753 (2025).

## II.    Plaintiff States are Irreparably Harmed by Defendants' Dismantling of AmeriCorps.

Plaintiff States satisfy the second requirement for a preliminary injunction, irreparable harm.  *Roe v. Dep't of Def.*, 947 F.3d 207, 229 (4th Cir. 2020).  Irreparable harm "is suffered when monetary damages are difficult to ascertain or are inadequate." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F. 3d 546, 551 (4th Cir. 1994), *abrogated in part on other grounds by Winter v. NRDC*, 555 U.S. 7 (2008).   "[T]he harm must be irreparable, meaning that it 'cannot be fully rectified by the final judgment after trial.'" *Mountain Valley Pipeline v. 6. 56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019).   For Plaintiff States, their AmeriCorps programs and those providing critical support have been closed; those programs' reputations have been irreparably damaged; they have incurred unrecoverable damages and administrative costs; their State services have been strained; and they have suffered immediate injuries to their ability to protect their interests.  All of these harms are imminent, not speculative,

---

[4] District courts have distinguished *California* on like grounds.  *E.g.*, *New York v. Trump*, No. 1:25-CV-39-JJM-PAS, 2025 WL 1098966, at *1–2 (D.R.I. Apr.14, 2025) (unlike in *California*, "the terms and conditions of each grant" were "*not at issue*," the claims focused on "process, not damages," and the case was "not an action to enforce a contract"); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157, at *14 (D.R.I. Apr. 15, 2025) (APA jurisdiction was proper because the "source of . . . rights is federal statute and regulations" and "the relief sought is injunctive in nature").  Although a split D.C. Circuit panel recently stayed a similar order enjoining the dismantling of the United States Agency for Global Media, *Widakuswara v. Abramowitz*, Case No.  25-5144, slip. op. (D.C. Cir. May 3, 2025) (per curiam) (Kastas and Rao, JJ.), Judge Pillard cogently explained in dissent why *California* does not require that challenges to agency dismantling be brought under the Tucker Act. *Id.* at 24–34.

and cannot be remedied by a future damages award.

*First*, absent temporary relief, Plaintiff States face current and impending irreparable harm as their AmeriCorps programs are terminated, and AmeriCorps resources are pulled from state governments.  *See, e.g.*, *Washington v. Trump*, No. 2:25-CV-00244-LK, 2025 WL 659057, at *26 (W.D. Wash. Feb. 28, 2025) (finding irreparable harm from funding cuts that led research programs to be closed and staff terminated).

The notices are clear: "All member activities should cease immediately . . . . The program should document that the member was exited for compelling personal circumstances due to the agency's termination of the grant and program closure." Compl. Ex. G.  Defendants not only cut grants to Plaintiff States, but they also ordered the associated programs to be closed.  Those State-run programs no longer can operate at all as AmeriCorps programs, and in many instances have been shuttered.

To take one example, in Maryland, Defendants' actions caused Frostburg State University to immediately lose all AmeriCorps members serving through the university's ASTAR program. ASTAR has a decades-long history and ran several service programs on Frostburg's campus, including a food pantry for students in need, activities at the Children's Literature Center, and a Center for Literary Arts, all of which were terminated.[5] Clark Decl. (Md.) at ¶¶ 6, 9.  Defendants

---

[5] Because Plaintiff States have lost so many AmeriCorps programs due to Defendants' actions, a complete recounting is not feasible in this briefing.  As shown in the attached declarations, however, harms similar to Frostburg's have been suffered in Massachusetts (Framingham State University); New York (the State University of New York); North Carolina (East Carolina University), Oregon (University of Oregon) and Washington State (Western Washington University).  Matthews Decl. (Mass.) at ¶¶ 6, 11, 12, 14–17; Blake Decl. (N.Y.) at ¶¶ 5, 8, 10-11; Johnson Decl. (N.C.) at ¶ 18; Bauer Decl. (Or.) at ¶¶ 6, 11, Ex. 2; Patrick Decl. (Wash.) at ¶¶ 4–6, 15.  Elsewhere, Defendants' actions have harmed university programs that serve young children and K–12 students.  *See, e.g.*, Moua Decl. (Cal.) at ¶¶ 12–14 (California's College

also closed programs and dismissed members engaged in important disaster relief efforts with state Governments.  For instance, Defendants terminated NCCC members serving at a warehouse operated by the North Carolina Department of Public Safey, who had been helping to organize and distribute donations for Hurricane Helene recovery efforts.  Johnson Decl. (N.C.) at ¶ 8.  Indeed, *all* AmeriCorps grants designated for Hurricane Helene response in Western North Carolina were cut.  *Id.* at ¶¶ 20–21.  Defendants also terminated state-run programs aimed at preventing and responding to wildfires in California, Munger Decl. (Cal.) at ¶¶ 4–6, 12(b)–(c), and supporting climate change mitigation in Michigan.  Connolly Decl. (Mich.) at ¶¶ 3, 11.  Defendants also issued RIF notices to AmeriCorps' entire national disaster service unit, a "key partner" in State preparedness planning.  Kelly Decl. (Colo.) at ¶ 33(d).

*Second*, Defendants' closure of these programs has caused, and will continue to cause, substantial injury to State programs' reputations that cannot be rectified through a later judgment.  As the declarations detail, State service programs' success depends substantially on recruiting motivated volunteers, attracting quality grant applicants, and encouraging follow-on investment from outside benefactors.  Over decades, States have relied on AmeriCorps to support the consistency and reputation of their own service programs.  *See, e.g.,* Madden Decl. (N.J.) at ¶ 27; Bringardner Decl. (Ky.) at ¶ 22.  By dismantling AmeriCorps in less than two weeks, Defendants have thrown State programs into chaos and badly damaged trust among their community partners. *See, e.g.*, Hotz Decl. (Minn.) at ¶ 9(b)(ii) (chilling effect on recruitment); Lorenz Decl. (Md.) at ¶ 11(b)(v) (describing how recent events have put all Maryland AmeriCorps programs in jeopardy); Temby Decl. (Md.) at ¶ 25; Moua Decl. (Cal.) at ¶¶ 31, 51 (providing a list of programs

---

Corps program); Litchfield Decl. (Ariz.) at ¶ 31 (noting harms to Title I students through termination of one of its programs); Johnson Decl. (N.C.) at ¶ 22.

that have notified California's commission that they will not be able to proceed in 2025 given recent events); Bauer Decl. (Or.) ¶ 19 (shaken confidence in AmeriCorps stability and reliability is impacting recruitment efforts).

In many States, Service Commissions already have been compelled to issue stop-work orders and have halted future recruitment. *See, e.g.*, Moua Decl. (Cal.) at ¶ 50; Almond Decl. (Wash.) at ¶ 19; Lorenz Dec. (Md.) at ¶ 10(c).  In others, Service Commissions have rushed to assess whether and for how long programs can continue with State support alone, absent any association with AmeriCorps. *See, e.g.,* Kelly Decl. (Colo.) at ¶¶ 40–41; *see also*, Porterfield Decl. (Del.) at ¶¶ 19, 22 (Delaware Division of Libraries unable to determine which of its programs previously supported by AmeriCorps can continue).  In the meantime, harms are underway and—especially for programs that operate on a seasonal calendar or have specialized considerations—not easily undone. *See, e.g.*, Munger Decl. (Cal.) at ¶¶ 4–5, 8 (GrizzlyCorps fire management operations); Kelly Decl. (Colo.) at ¶¶ 48, 52 (seasonal land stewardship activities and meal-to-meal obligations of programs combatting food insecurity in rural counties); Latuch Decl. (Penn.) at ¶¶ 11–12 (classroom support during academic year and seasonal conservation projects); Trent Decl. (Mich.) at ¶ 23 (interruption of recovery resources addressing Flint water crisis); Darrow Decl. (R.I.) at ¶¶ 23–24 (disruption of summer education opportunities and seasonal local food programs); Sullivan Decl. (Del.) at ¶ 24 (dismissal of VISTA members with executive talent and industry-specific expertise that would be financially prohibitive outside AmeriCorps); Matthews Decl. (Mass.) at ¶ 15 (dismissal of foreign-language speakers essential for teacher residency); Bauer Decl. (Or.) ¶¶ 15–16 (program termination and exiting members will disrupt, perhaps irrevocably, programs that revolve around school schedules and other time-bound commitments).

Within the last week, at least one private funder notified Serve Colorado that it would not provide $500,000 in support for a proposed project. The funder cited AmeriCorps' ongoing instability and termination of two specific programs of import in Colorado. Kelly Decl. (Colo.) at ¶ 50(f). The law recognizes such "interference with customer relationships and damage to reputation" as irreparable harms.[6] *See, e.g.*, *ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 503-04 (6th Cir. 2022).

*Third*, Plaintiff States and their service programs are forced to divert resources and incur "unrecoverable compliance costs in the absence of a preliminary injunction,' and the federal government's 'sovereign immunity typically makes' such losses irreparable." *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (quoting *Kentucky v. Biden*, 57 F. 4th 545, 556 (6th Cir. 2023)); *see also City & Cnty. of San Francisco v. USCIS*, 408 F.Supp.3d 1057, 1123 (N.D. Cal. 2019) (recognizing that irreparable harm may consist of "burdens on . . . ongoing operations" for public entities, including administrative costs caused by changes in federal policy). For example, Plaintiff States' service programs have been forced to verify hours for dismissed members and close grants rather than engaging in normal service activities. Kelly Decl. (Colo.) at ¶¶ 35–36; Moua Decl. (Cal.) at ¶¶ 35–36; Johnson Decl. (N.C.) at ¶¶ 29–34 (distraction of core Service Commission functions); Latuch Decl. (Penn.) ¶ 13 (disruption to annual 9/11 memorial

---

[6] Because dismissed service members do not even qualify for unemployment, many will need to quickly seek other employment or return home from their assignments. They are thus less likely to be available to resume service, and revive Plaintiffs' programs, the longer Defendants' closures remain in effect. *See, e.g.*, Sullivan Decl. (Del.) at ¶¶ 24–25, 36, 40; Miller Decl. (Del.) at ¶ 25; Porterfield Decl. (Del.) at ¶ 20; Calistro Decl. (Del.) at ¶ 8(a); Munger Decl. (Cal.) at ¶¶ 10, 13(b)(ii) (summarizing concerns of members and staff members employed by GrizzlyCorps and chilling effects to recruitment); Johnson Decl. (N.C.) at ¶ 36 (noting economic hardship to affected volunteers, who are not eligible for unemployment benefits); McGerr Decl. (Wash.) at ¶ 20 (same); Lengert Decl. (Me.) at ¶ 12(d) (impacts to VISTA members assigned to rural Maine's Ending Hunger initiatives); Cohen Decl. (N.Y.) at ¶ 15.

day of service).  State Service Commissions also have had to communicate "around-the-clock" with affected stakeholders.  *See, e.g.*, Anderson Decl. (Penn.) at ¶ 23; Johnson Decl. (N.C.) at ¶¶ 29–34; Kelly Decl. (Colo.) at ¶ 35. Sullivan Decl. (Del.) at ¶¶ 29–34; Moua Decl. (Cal.) at ¶¶ 35–36; McGuinness Decl. (Mass.) at ¶ 17; Nair Decl (N.M.) at ¶ 17; Darrow Decl. (R.I.) at ¶¶ 40–42; Nair Decl (N.M.) at ¶¶ 19–21; Bauer Decl. (Or.) at ¶¶ 18–19.

Plaintiff States also are incurring significant administrative expenses due to Defendants' abrupt actions.  These burdens have been exacerbated by the announced RIFs, which have impeded Service Commissions' normal communications with their federal counterparts.  *See, e.g.*, Kelly Decl. (Colo.) at ¶ 20 (federal website maintaining NCCC deployment historical data apparently taken down on April 22); *id.* ¶ 35(b)-(c) (Serve Colorado staff have been unable to reach AmeriCorps following RIFs); Blissett Decl. (Ill.) at ¶¶ 19–20, 25–26 25 (explaining all communications with the "federal portfolio manager who monitors and manages all of our federal grants was abruptly cut off"); Lorenz Decl. (Md) at ¶ 9; Sullivan Decl. (Del.), Ex. 1 at ¶¶ 16–18, 32, 35;  Litchfield Decl. (Ariz.) at ¶ 27; Anderson Decl. (Penn.) at ¶ 24; McGuinness Decl. (Mass.) at ¶ 12; Darrow Decl. (R.I.) at ¶¶ 43–47 (AmeriCorps cancelling meetings); Kolling Decl. (Vt.) at ¶ 11; Bauer Decl. (Or.) at ¶ 10 (describing operational impacts of lack of response from federal portfolio managers).  Some State Service Commissions also have been asked to offer guidance and support to AmeriCorps programs outside of their authority, such as AmeriCorps VISTA and AmeriCorps Seniors RSVP programs, due to unresponsiveness from AmeriCorps national and regional offices.  Darrow Decl. (RI) at ¶¶ 47–49. In sum, Plaintiff States and their programs are being forced to divert and expend resources in response to Defendants' actions that they will not be able to recover from the federal government. *See Mountain Valley Pipeline v. W. Pocahontas Props.*, 918 F.3d 353, 366 (4th Cir. 2019).

In addition, State universities will suffer from lost tuition because prematurely dismissed AmeriCorps members are entitled only to prorated education awards.  Especially for programs run by State universities such as Frostburg's ASTAR program, the absence or diminution of education awards "will have a significant impact on the University's budget" because former AmeriCorps members will not have access to their full education awards, which they could then use for tuition at the University. Clark Decl. (Md.) at ¶ 17; *see also* Kelly Decl. (CO) at ¶ 34(f) (describing Colorado's tax incentives for use of education awards in State); Lucier Decl. (Conn.) at ¶ 8; Blake Decl. (N.Y.) at ¶ 6; Moua Decl. (Cal.) at ¶¶ 13–14, 24; Bringardner Decl. (Ky.) at ¶ 14; Shorty Decl. (Me.) at ¶¶ 9, 13; Almond Decl. (Wash.) at ¶ 14; McGerr Decl. (Wash.) at ¶¶ 20–21.

*Fourth*, Defendants' shuttering of AmeriCorps programs will create an immediate and substantial demand for additional State services.  There are too many service-gaps created by Defendants to describe in full here.  But even a partial list underscores the immense burdens foisted upon states because of AmeriCorps program closures.  In California, Defendants closed the 27-year-old Borderlands program that provides services to high needs and special education students, Moua Decl. (Cal.) at ¶ 34, as well as the GrizzlyCorps program that supports State emission reduction efforts, *id.* at ¶ 13; in Illinois, they dismissed more than 250 members providing direct classroom teaching in to more than 16,000 students, Blissett Decl. (Ill.) at ¶ 23; in Oregon, they dismissed seven VISTA members assigned to Oregon Health Authority, providing public health-focused service, Bauer Decl. (Or.) at ¶¶ 21–24; in Hawai'i, they dismissed ten VISTA members assigned to the Department of Land and Natural Resources, Laramee Decl. (Haw.) at ¶¶ 8, 16, and ended VISTA service in low-income schools, Hallett Decl. (Haw.) at ¶¶ 7, 11; in Maine, they disrupted the Ending Hunger Initiative launched in the wake of the COVID-19 pandemic, Lengert Decl. (Me.) at ¶¶ 7–9; and in Washington, Defendants shuttered the Vet Corps program, which is

24

particularly crucial to a State with a higher number of veterans.  Almond Decl. (Wash.) at ¶ 13.

Plaintiff States will need to provide additional services themselves to make up these losses.

*Fifth,* and finally, Plaintiff States are suffering continued irreparable harm to their ability

to protect their interests, such as their interest in selecting subgrant recipients, and their interest in

commenting on any proposed change in AmeriCorps priorities.  As to subgrant selections, the

States, not AmeriCorps, are entitled to set policy for their formula grants, 42 U.S.C.

§ 12572(f)(1)(B), and "[a] State may apply priorities different than those of AmeriCorps in

selecting its formula programs." 45 C.F.R. § 2522.460(b). Yet Defendants wrongly terminated

hundreds of State subgrants on the basis that they "no longer effectuated agency priorities." *See* 2

C.F.R. § 200.340(a)(4). Defendants' usurpation of Plaintiffs' authority to set policy for formula

grants within their State thus constitutes irreparable harm.  *See* Anderson Decl. (Penn.) at ¶ 29

(Pennsylvania's grant decisions reflect particular needs of State's communities, from rural

Appalachia to inner-city Philadelphia); Laramee Decl. (Haw.) at ¶ 9 (AmeriCorp VISTA

partnership with Department of Land and Natural Resources reflects "unique challenges" that face

"Hawai'i as an island state, including its vulnerability to natural disasters, high energy costs, and

transportation issues"); Kelly Decl. (Colo.) at ¶¶ 447–55 (detailing Colorado's prioritization of,

among other issues, youth mental health and early childhood education); *cf. Arizona v. Biden*, 40

F.4th 375, 393–94 (6th Cir. 2022) (finding "irreparable harm" when injunction "interfer[ed] with

[federal government's] authority to . . . allocate resources toward this administration's priorities").

Plaintiff States also have been harmed by Defendants' failure to abide by 42 U.S.C.

§ 12572(f)(2) and the relevant appropriations acts, which entitle States to advance notice,

explanation, and the ability to comment on any change in AmeriCorps' priorities.  Numerous States

attest that they would have advocated for their programs had they been given the opportunity.

25

Lorenz Decl. (Md.) at ¶ 13; Moua Decl. (Cal.) at ¶¶ 52–54; Sullivan Decl. (Del.) at ¶¶ 41–42;

Kelly Decl. (Colo.) at ¶¶ 42–43; Litchfield Decl. (Ariz.) at ¶ 29; Johnson Decl. (N.C.) at ¶ 28;

Latuch Decl. (Penn.) at ¶ 14; Anderson Decl. (Penn.) at ¶ 25; Blissett Decl. (Ill.) at ¶ 21; Darrow

Decl. (R.I.) at ¶ 50–51.  The loss of that opportunity constitutes irreparable harm because it "cannot

be fully cured by later remedial action." *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482,

501 (D. Md. 2020); *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17 (D.D.C. 2009);

*Nat'l Treasury Emps. Union v. Newman*, 768 F. Supp. 8, 10 (D.D.C. 1991) ("[T]he harm suffered

by those who would otherwise participate in agency rulemaking under the APA is to be considered

irreparable when the agency fails to afford them their rights to such participation." (quoting *Cmty.

Nutrition Inst. v. Butz*, 420 F. Supp. 751, 757 (D.D.C. 1976))).

Taken together, the irreparable harms faced by the Plaintiff States and other interested

stakeholders are a direct and predictable consequence of the unique mandate of AmeriCorps

mission and its statutory and enabling regulations.  Congress directed AmeriCorps to *expand* civic

and volunteer service, and to *supplement,* rather than replace, existing workforce opportunities.

42 U.S.C. § 12501; 42 U.S.C. § 12637(a)(1).  Congress expressly encouraged the states to integrate

their Service Commissions, resources, and programming with AmeriCorps.  And they did so.  As

put by the Program Director of Pennsylvania Mountain Service Corps (PMSC):

> This type of abrupt halt was never contemplated, as we relied on AmeriCorps to
> honor its commitments to us.  PMSC celebrated 30 years as an AmeriCorps
> program this year and [we] have never experienced anything like the current
> situation in our program's history.

Latuch Decl. (Penn.) at ¶ 15; *see also* Lorenz Decl. (Md.) at ¶¶ 11, 14 (harms to programs serving

Maryland); Sullivan Decl. (Del.) at ¶ 40; Miller Decl. (Del.) at ¶¶ 14, 20–24, 26, Anderson Decl.

(Penn.) at ¶¶ 30–32; Lengert Decl. (Me.) at ¶¶ 12(e), 13, 16; Seelig Decl. (Vt.) at ¶ 19.

For more than 30 years, AmeriCorps programming has improved Plaintiff States' economic and social well-being through programs that invested in their workforces, enriched their educational outcomes, provided health services, and maintained public lands. AmeriCorps' own statistics shows that the return on investment is significant. *See, e.g.*, AmeriCorps, *Return on Investment (ROI) Studies*, https://www.americorps.gov/evidence-exchange/return-investment-roi-studies (last accessed May 4, 2025); Clive Belfield, *The Economic Value of National Service*, Voices for Nat'l Serv. (2013). Yet Plaintiffs' programs have been shuttered; they are being denied non-recoverable monetary damages; they were deprived of the ability to advocate for themselves prior to federal action; and their missions have been critically undermined. Defendants took only ten days to wipe out much of an agency with a thirty-year history and broad support. As shown by the over forty declarations submitted in support of this motion, Plaintiff States satisfy the irreparable harm factor for preliminary relief.

## III.    The Balance of Equities and the Public Interest Weigh in Plaintiffs' Favor

The final two factors—balance of the equities and weighing the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, those factors overwhelmingly support maintaining AmeriCorps during the pendency of this case.

The public "undoubtedly has an interest in seeing its governmental institutions follow the law," *Roe*, 947 F.3d at 230–31, whereas Defendants suffer no harm from an injunction that merely ends unlawful action. *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). Indeed, "'there is a substantial public interest in having governmental agencies abide by the federal laws' . . . 'that govern their existence and operations.'" *Id.* (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). Moreover, the ongoing harm to Plaintiff States outweighs any inconvenience to Defendants. Plaintiff States are faced with the immediate

and unanticipated termination of longstanding State-administered programs in the middle of a service-year.  Plaintiff States will lose AmeriCorps service members who work directly for State institutions; their State universities will lose tuition dollars because AmeriCorps members will not receive full education awards; and their State-provided services will be strained as students are suddenly left without tutors, elderly persons left without care providers, and service members left without benefits are forced by necessity to look elsewhere for support.

By contrast, the only burden on Defendants is that they will be required to maintain AmeriCorps as the law requires, and support programs and grants that they previously approved. As in *HIAS, Inc. v. Trump*, Plaintiff States face "enormous burdens" due to Defendants' unlawful actions that will likely cause AmeriCorps programs to "clos[e] entirely in [their] jurisdictions," whereas Defendants only would be enjoined to preserve agency functions according to "well-established processes refined over several decades." 985 F.3d at 326.  Under these circumstances, "the public interest is served by maintaining the status quo during the pendency of this litigation." *Id*.; *see also Doe v. Trump*, — F. Supp. 3d —, 2025 WL 485070, at *14 (D.  Mass.  Feb. 13, 2025) (equities favored injunction that "will do no more than maintain a status quo that has been in place for well over a century"), *aff'd sub nom.*, *New Jersey v. Trump*, 131 F.4th 27, 2 (1st Cir. 2025).

The equities also weigh in Plaintiff States' favor due to the shocking callousness with which Defendants dismantled AmeriCorps.  According to the agency's website, AmeriCorps is committed to "Bringing Out the Best of America," enrolling "more than 200,000 individuals to serve organizations making a difference in communities across America."    AmeriCorps, https://www.americorps.gov/ (last accessed May 5, 2025).  President Trump in fact recently proclaimed National Volunteer Week and "call[ed] upon all Americans to . . . volunteer[] in service projects across our country and pledg[e] to make service a part of their daily lives."  Presidential

28

Proclamation of National Volunteer Week, 2025 (Apr. 23, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/national-volunteer-week-2025/.   Yet despite the Administration's proclamation that "[v]olunteerism is central to the American way of life," *id.*, Defendants eviscerated huge swaths of America's national agency for service and volunteerism—during National Volunteer Week—without warning or explanation.   By terminating long-running AmeriCorps programs with no notice, Defendants fired service members, ripped support away from vulnerable populations, and left States and organizations that depended on AmeriCorps to deal with the chaos.  By cutting much of AmeriCorps' staff, Defendants also have made it virtually impossible for Plaintiff States to mitigate the damage by requesting funding for subsequent years.

Faced with other recent examples of such lawless and destructive federal action, courts have not hesitated to hold that the public interest favors an immediate injunction to preserve the status quo.  *See, e.g.*, *He v. Noem*, No. 25-CV-05333-DGE, 2025 WL 1208254, at *10 (W.D. Wash. Apr. 25, 2025) (granting injunction where "Defendants have provided *no indication* that they complied with the relevant statutory scheme") (emphasis in original); *Aviel v. Gor*, No. CV 25-778 (LLA), 2025 WL 1009035, at *12 (D.D.C. Apr. 4, 2025) (holding that public interest favored injunction where federal government "exhibited a callous disregard" of statutory requirements, as "[t]hey cannot flout Congress's mandate while simultaneously pretending to act in the public interest").  Here, too, this Court should find that the public interest favors an immediate injunction against Defendants' destruction of AmeriCorps in Plaintiff States.

## IV.     The Court Should Enjoin the Actions Taken to Dismantle AmeriCorps

Based on the foregoing violations and harms, Plaintiff States respectfully request that the Court enter a preliminary injunction that enjoins Defendants from implementing or enforcing through any means Defendants' actions to dismantle AmeriCorps, including:

A. the decision on or around April 15, 2025, to release all NCCC members from the AmeriCorps program effective April 30, 2025, limited to NCCC members assigned to placements in Plaintiff States;

B. the decision on or around April 15, 2025, to place approximately 85% of AmeriCorps staff on administrative leave;

C. the decision on or around April 24, 2025, to institute a reduction in force for AmeriCorps staff;

D. the decision on or around April 25, 2025, to terminate 1,031 AmeriCorps programs and associated funding, limited to programs located in Plaintiff States.

The injunction should further direct that any action taken to implement or enforce these actions be treated as null and void and rescinded and should prohibit Defendants from reinstituting these actions based on the same or similar reasons.

This requested injunction is narrowly tailored to provide complete relief for the specific harms suffered by Plaintiff States. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (injunction "should be no more burdensome to the defendant than to provide *complete relief* to the plaintiffs before the court" (emphasis added)). In crafting equitable relief, courts must consider "what is necessary, what is fair, and what is workable." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (quotation omitted). Based on these principles, Plaintiff States have limited the requested relief, wherever workable, to remedy their harm suffered.

## **CONCLUSION**

For the foregoing reasons, Plaintiff States' motion should be granted, and the Court should issue the accompanying proposed order.

Dated:  May 6, 2025

Respectfully submitted,


**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

By: */s/ Keith M. Jamieson*
Keith M. Jamieson (D. Md. Bar. No. 31543)
Virginia Williamson (D. Md. Bar. No. 31472)
  *Assistant Attorneys General*
Federal Accountability Unit
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland  21202
(410) 576-6960
kjamieson@oag.state.md.us

*Counsel for the State of Maryland*

**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

By: */s/ Ezra Kautz*
Ezra Kautz*
  *Deputy Attorney General*
Joel Marrero*
William H. Downer*
  *Supervising Deputy Attorneys General*
Brian Bilford*
  *Deputy Attorney General*
Michael L. Newman*
  *Senior Assistant Attorney General*
California Department of Justice
1300 I Street
Sacramento, CA  95814
(916) 210-6346
Joel.Marrero@doj.ca.gov
William.Downer@doj.ca.gov
Ezra.Kautz@doj.ca.gov
Brian.Bilford@doj.ca.gov
Michael.Newman@doj.ca.gov

*Counsel for the State of California*

**KATHLEEN JENNINGS**
ATTORNEY GENERAL OF DELAWARE

By: */s/ Ian R. Liston*
Ian R. Liston*
  *Director of Impact Litigation*
Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE  19801
(302) 683-8899
Ian.Liston@delaware.gov

*Counsel for the State of Delaware*

**PHILIP J. WEISER**
ATTORNEY GENERAL OF COLORADO

By: */s/ Kyle M. Holter*
David Moskowitz*
  *Deputy Solicitor General*
Sarah H. Weiss*
  *Senior Assistant Attorney General*
Kyle M. Holter*
Sam Wolter*
  *Assistant Attorneys General*
Colorado Office of the Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
sarah.weiss@coag.gov
kyle.holter@coag.gov
samuel.wolter@coag.gov

*Counsel for the State of Colorado*

**KRISTIN K. MAYES**
ATTORNEY GENERAL OF ARIZONA

By  */s/ Joshua A. Katz*
Joshua A. Katz*
   *Assistant Attorney General*
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Katz@azag.gov

*Counsel for the State of Arizona*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF
   COLUMBIA

By: */s/ Andrew C. Mendrala*
Andrew C. Mendrala*
   *Assistant Attorney General*
Public Advocacy Division
Office of the Attorney General for the District
   of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726
Andrew.mendrala@dc.gov

*Counsel for the District of Columbia*

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

By: */s/ Abigail R. Durkin*
Abigail R. Durkin*
   *Assistant Attorney General II, Special
   Litigation Bureau*
Cara Hendrickson*
   *Assistant Chief Deputy Attorney General*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
Tel. (312) 814-3000
Abigail.Durkin@ilag.gov

**WILLIAM TONG**
ATTORNEY GENERAL OF CONNECTICUT

By: */s/ Andrew Ammirati*
Andrew Ammirati*
   *Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5090
Andrew.Ammirati@ct.gov

*Counsel for the State of Connecticut*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
   *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
   *Solicitor General*
Hawaiʻi Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**OFFICE OF THE GOVERNOR** *ex rel.*
**ANDY BESHEAR**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
THE COMMONWEALTH OF KENTUCKY

By:  */s/ S. Travis Mayo*
S. Travis Mayo*
   *General Counsel*
Taylor Payne*
   *Chief Deputy General Counsel*
Laura C. Tipton*
   *Deputy General Counsel*
Office of the Governor
700 Capitol Avenue, Suite 106

Cara.Hendrickson@ilag.gov

*Counsel for the State of Illinois*

Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

By: */s/ Sarah A. Forster*
Sarah A. Forster*
  *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  (207) 626-8800
Fax:  (207) 287-3145
Sarah.Forster@maine.gov

*Counsel for the State of Maine*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

By: */s/ Katherine Dirks*
Katherine Dirks*
  *Chief State Trial Counsel*
Jonathan Green*
  *Division Chief*
Veronica Zhang*
  *Assistant Attorney General*
  *Non-Profit Organizations / Public Charities*
Massachusetts Office of the Attorney General
1 Ashburton Pl. Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

By: */s/ Neil Giovanatti*
Neil Giovanatti*
Alexus Ringstad*
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
RingstadA@michigan.gov

*Counsel for the People of the State of Michigan*

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

By:*/s Liz Kramer*
Liz Kramer*
  *Solicitor General*
Minnesota Attorney General's Office
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

*Counsel for the State of Minnesota*

**AARON D. FORD**

**MATTHEW J. PLATKIN**

33

ATTORNEY GENERAL OF NEVADA

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
   *Solicitor General*
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**RAÚL TORREZ**
ATTORNEY GENERAL OF NEW MEXICO

By: */s/ James W. Grayson*
James W. Grayson*
   *Chief Deputy Attorney General*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM  87504-1508
(505) 490-4060
jgrayson@nmdoj.gov

*Counsel for the State of New Mexico*

**JEFF JACKSON**
ATTORNEY GENERAL OF NORTH CAROLINA

**LAURA HOWARD**
CHIEF DEPUTY ATTORNEY GENERAL

By */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
   *Associate Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov

ATTORNEY GENERAL OF NEW JERSEY

*/s/ Jessica L. Palmer*
Jessica L. Palmer*
Lauren E. Van Driesen*
   *Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-4607
Jessica.Palmer@law.njoag.gov

*Counsel for the State of New Jersey*

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

By: */s/ Jessica Ranucci*
Jessica Ranucci*
   *Special Counsel, Federal Initiatives*
Rabia Muqaddam*
   *Special Counsel for Federal Initiatives*
Office of the Attorney General
28 Liberty St.
New York, NY 10005
(929) 638-0447
Jessica.ranucci@ag.ny.gov
rabia.muqaddam@ag.ny.gov

*Counsel for the State of New York*

**DAN RAYFIELD**
ATTORNEY GENERAL OF OREGON

By: */s Sadie Forzley*
Sadie Forzley*
   *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
sadie.forzley@doj.oregon.gov

*Counsel for the State of Oregon*

34

*Counsel for the State of North Carolina*

**JOSH SHAPIRO**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA

By: */s/ Kenneth L. Joel*
Kenneth L. Joel*
  *Deputy General Counsel*
Benjamin Holt*
  *Chief Counsel*
  *Pennsylvania Department of Labor*
Melissa Murphy*
  *Senior Counsel*
  *Pennsylvania Department of Labor*
Governor's Office of General Counsel
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 649-8669
kennjoel@pa.gov

*Counsel for Governor Josh Shapiro*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

By: */s/ Kyla Duffy*
Kyla Duffy*
  *Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2809
kduffy@riag.ri.gov

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
  *Solicitor General*
Office of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

**NICHOLAS W. BROWN**
ATTORNEY GENERAL OF WASHINGTON

By: */s/ Abby Kahl*
Abigail Kahl*
Andrew R.W. Hughes*
  *Assistant Attorneys General*
Office of the Attorney General
2425 Bristol Court SW
Second Floor
PO Box 40117
Olympia, WA 98504
360-534-4864
Abigail.Kahl@atg.wa.gov
Andrew.Hughes@atg.wa.gov

*Counsel for the State of Washington*

**JOSHUA L. KAUL**
ATTORNEY GENERAL OF WISCONSIN

By: */s/ Charlotte Gibson*
Charlotte Gibson*
  *Assistant Attorney General*
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI  53707
(608) 957-5218 (phone)
(608) 294-2907 (fax)

*Counsel for the State of Wisconsin*

       * *Motion for admission pro hac vice forthcoming*