# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| STATE OF MARYLAND; STATE OF DELAWARE; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF ARIZONA; STATE OF CONNECTICUT; DISTRICT OF COLUMBIA, STATE OF HAWAI'I; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR *ex rel.* Andy Beshear, in his official capacity as Governor of the COMMONWEALTH OF KENTUCKY; STATE OF MAINE; COMMONWEALTH OF MASSACHUSETTS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; JOSH SHAPIRO, in his official capacity as Governor of the COMMONWEALTH OF PENNSYLVANIA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN; <br><br>    Plaintiffs, <br><br>  v. <br><br>CORPORATION FOR NATIONAL AND COMMUNITY SERVICE, operating as AmeriCorps; and JENNIFER BASTRESS TAHMASEBI, in her official capacity as Interim Head of the Corporation for National and Community Service; <br><br>    Defendants. | Civ. No. 25-cv-01363 (DLB) |

## PLAINTIFF STATES' SUPPLEMENTAL BRIEFING
## ON SEPARATION OF POWERS AND CONTRARY TO LAW CLAIMS

Pursuant to this Court's order of May 19, 2025, Plaintiffs submit this supplemental brief, providing greater detail as to the framework for their Separation of Powers claim and the specific violations supporting such a claim. Further, the discussion provided in this supplemental brief provides additional support for Plaintiffs' contrary to law claims.

## I.    Separation-of-Powers Claims Are Evaluated Under the *Youngstown* Framework

"The structure of our Government as conceived by the Framers of our Constitution disperses the federal power among the three branches—the Legislative, the Executive, and the Judicial—placing both substantive and procedural limitations on each." *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise,* 501 U.S. 252, 272 (1991). "[T]he separation of powers doctrine prohibits each branch of government from 'intrud[ing] upon the central prerogatives of another.' Such an intrusion occurs when one branch arrogates to itself powers constitutionally assigned to another branch . . . ." *United States v. Moussaoui*, 382 F.3d 453, 469 (4th Cir. 2004) (quoting *Loving v. United States*, 517 U.S. 748, 757 (1996)) (alteration in original)).

It is beyond cavil that the President's authority to act, "[n]o matter the context," "necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). To determine whether the Executive breached the Separation of Powers, courts apply the framework set out in Justice Robert Jackson's concurring opinion in *Youngstown*. *See e.g.*, *Does 1–26 v. Musk*, No. 25-0462-TDC, 2025 WL 840574, at *25 (D. Md. Mar. 18, 2025) *stayed pending appeal on other grounds*, No. 25-1273, 2025 WL 1020995 (4th Cir. Mar. 28, 2025);

*PFLAG, Inc. v. Trump*, No. CV 25-337-BAH, 2025 WL 685124, at *14 (D. Md. Mar. 4, 2025) (applying *Youngstown*).[1]

Under the *Youngstown* framework, courts first categorize the degree of Executive authority at issue: whether the Executive acts "pursuant to express or implied authorization of Congress"; in "a zone of twilight" where concurrent Congressional authority exists; or "incompatibl[y] with the express or implied will of Congress." *Youngstown*, 343 U.S. at 637 (R. Jackson, J., concurring). Where the Executive takes action contrary to the will of Congress, the Executive's authority is at its "lowest ebb." *Id.* (R. Jackson, J., concurring).

At step two, having categorized the type of Executive action at issue, courts then determine whether the corresponding degree of Executive authority sustains such an action. *See, e.g., League of United Latin Am. Citizens v. Exec. Off. of the President*, No. CV 25-0946 (CKK), 2025 WL 1187730, at *38 (D.D.C. Apr. 24, 2025) (explaining this framework). Where the Executive acts contrary to congressional will, such action is lawful only if the President has constitutional authority that is "both 'exclusive' and 'conclusive' on the issue." *Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (quoting *Youngstown*, 343 U.S. at 637–38 (R. Jackson, J., concurring)).

## II.    Defendants Violate the Separation of Powers Pursuant to *Youngstown*

### A.  Step One- Defendants' Actions Contravene the Expressed Will of Congress

Applying the *Youngstown* framework, Defendants' actions to cut vast swaths of AmeriCorps are contrary to the express will of Congress. Where, as here, Congress has

---

[1] The *Does 1–26* case discusses *Local 2677, American Federation of Government Employees v. Phillips*, 358 F. Supp. 60, 76–77 (D.D.C. 1973), which "found a Separation of Powers violation pursuant to *Youngstown* when the President sought to terminate the Office of Economic Opportunity ('OEO'), submitted a budget proposal that the OEO receive no funding for the following year for its Community Action Agency ('CAA') program, and stopped providing new funding to CAA grantees and instead required them to phase out their activities." 2025 WL 840574, at *25.

appropriated moneys specifically to carry out the mission and programs of an agency, and to support its personnel and administration, the Executive must follow the dictates of Congress. Defendants' attempt to unilaterally refuse to expend appropriated funds was contrary to the will of Congress. *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) ("Under Article II of the Constitution . . . , the President must follow statutory *mandates* so long as there is appropriated money available and the President has no constitutional objection to the statute.").

Indeed, Congress established a comprehensive statutory regime that governs when and how the Executive Branch may decline to spend duly appropriated funds through the Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. §§ 681 *et seq*. (ICA). The ICA sets forth the procedure by which the Executive may propose either rescission of appropriated funding or deferral of obligation of such funding. *Id*. §§ 683, 684(b). Far from enabling unilateral Executive action, the ICA requires that the President must "propose[]" any rescission to Congress (which Congress must then affirmatively approve) and may not defer funding for the policy reasons defendants explicitly invoke here. *Id*. §§ 683, 684.

Here, as explained in greater detail below in Section III, Congress carefully delineated the amount of AmeriCorps funds to be spent, where such funds must be allocated, and the types of programs to which they may be awarded. Governing appropriations law requires that the $975 million appropriated by Congress to "carry out" national service activities actually be expended for that purpose. *See* Further Consolidated Appropriations Act, P.L. 118-47, div. D, tit. IV, 138 Stat. 460, 694 (2024) (the "2024 Appropriations Act"). But Defendants have refused to follow this clear command. Moreover, through statute, Congress expressed its clear desire that AmeriCorps establish and maintain the National Civilian Community Corps (NCCC). By terminating NCCC, Defendants contravened clear congressional intent. Finally, federal law requires that formula-

funded AmeriCorps grants be provided to states on a precise population basis, 42 U.S.C. § 12581(e)(2)–(3), and Defendants' indiscriminate termination of States' formula subgrants necessarily violates this requirement.

In sum, Defendants' actions, refusing to spend vast portions of AmeriCorps' budget, are contrary to the express will of Congress.

### B.   Step Two- The Executive Holds No Authority to Overcome the Will of Congress Here

As Defendants have taken action contrary to the will of Congress, the Executive's authority is at its "lowest ebb." *See Youngstown*, 343 U.S. at 637 (R. Jackson, J., concurring). At step two, the President holds no "'exclusive' and 'conclusive'" constitutional authority that could sustain Defendants' actions. *Zivotofsky*, 576 U.S. at 10(quoting *Youngstown*, 343 U.S. at 637–38 (R. Jackson, J., concurring). To the contrary, "Congress's control over federal expenditures is 'absolute.'" *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)). The Constitution makes clear that, "[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). That principle flows from Congress's authority over spending: the Constitution "grants the power of the purse to Congress, not the President," and "vests exclusive power to Congress to impose conditions on federal grants." *Id.* at 1231. Accordingly, Defendants have no constitutional authority, let alone exclusive authority, to refuse to spend AmeriCorps' funds.

Specific constitutional provisions buttress this general principle and confirm that the Executive lacks constitutional authority to unilaterally decline to spend duly appropriated federal funds. For example, the Constitution grants to Congress the "power of the purse," authorizing it

"to lay and collect Taxes, Duties, Imposts and Excises" and providing that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Supreme Court has long recognized that unilateral executive action claiming the power of the purse violates separation-of-powers principles. In *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524 (1838), the Court held that the Executive could not withhold money that Congress had, by statute, mandated be paid for services performed in connection with transportation of mail. Sanctioning this theory would "vest[] in the President a dispensing power, which has no countenance for its support in any part of the constitution." *Id.* at 525. Later Justices recognized *Kendall*'s "obvious connection to the separation of powers." *United States v. Texas*, 599 U.S. 670, 734 (2023) (Alito, J., dissenting); *see also OPM*, 496 U.S. 414, 435 (1990) (White, J., concurring) ("The Executive Branch does not have the dispensing power on its own." (citing *Kendall*, 37 U.S. at 613)). Lower court opinions have similarly relied upon *Kendall* for the proposition that "the President is bound to abide by the requirements of duly enacted and otherwise constitutional statutes." *E.g.*, *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996).

Moreover, the Executive cannot decline to spend duly appropriated AmeriCorps funds without violating the Presentment Clauses. The Constitution prescribes a "single, finely wrought and exhaustively considered[] procedure" for enacting legislation: passage of a bill by both houses of Congress and presentment to the President for his signature or veto. *INS v. Chadha*, 462 U.S. 919, 951 (1983); *see* U.S. Const. art. I, § 7, cls. 2, 3. A refusal to follow appropriations law and federal statutes governing AmeriCorps accordingly violates the Presentment Clauses by attempting to repeal federal laws that the President dislikes without following the "finely wrought" procedures for doing so. *Chadha*, 462 U.S. at 951; *see id.* at 954 ("[R]epeal of statutes, no less than enactment, must conform with Art. I.").

Finally, and independently, the Executive cannot decline to spend duly appropriated AmeriCorps funds without violating the Take Care Clause. The Constitution provides that the Executive must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3, cl. 3; *Utility Air Reg. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President . . . faithfully executes them."). But when the Executive refuses to spend funds that Congress has duly authorized and appropriated, in furtherance of the President's own policy goals, it is refusing to "faithfully execute" congressional commands, and any action taken pursuant to such a policy thus violates the Constitution for that reason, too. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order.").

Taken together, the Constitution's provisions and structure assign authority over appropriations and lawmaking to Congress, not the Executive. Because Defendants lack any relevant constitutional authority in this area, their actions, even if ostensibly taken in service of Executive Orders, are contrary to the Separation of Powers.

For their part, Defendants argue only that their actions were taken to comply with two Executive Orders, Defs.' Resp. at 4. But, "[o]f course, an executive order cannot supersede a statute," much less the Constitution. *See Marks v. CIA*, 590 F.2d 997, 1003 (D.C. Cir. 1978). Perhaps for this reason, Defendants have not argued that their actions are consistent with the Separation of Powers, failed to offer any substantive response in their brief, and explicitly took no position on this issue at the preliminary injunction hearing.

### III.    Defendants' Constitutional Violation is Underscored by Multiple Statutory Violations that additionally support Plaintiffs' Contrary to Law Claims

Defendants' violation of multiple statutory constraints on AmeriCorps funding further highlights how Defendants' actions were taken against the will of Congress, and provides

additional support for Plaintiffs' Separation of Powers claim.  Moreover, Defendants' violations of these specific statutes are also plainly contrary to law.

### A.    AmeriCorps' Appropriations Law Requires the Disbursement of Grant Funds

Under the 2024 Appropriations Act, Congress appropriated AmeriCorps a total of $975,525,000 to "carry out" the national service laws.  *See* 2024 Appropriations Act, 138 Stat. at 694; *see also* Full-Year Continuing Appropriations Act 2025, P.L. 119-4, § 1101(a)(8), 139 Stat. 9, 11 (2025) (reappropriating for FY 2025 amounts "under the authority and conditions provided in" the 2024 Appropriations Act).  The phrase "carry out" provides no discretion to rescind or withhold the disbursement of funds.

Indeed, appropriated funds must be used only for their intended purposes, except as otherwise provided by law. 31 U.S.C. § 1301(a).  There is no doubt what those intended purposes are for AmeriCorps.  AmeriCorps' enabling act defines the term "carry out," when "used in connection with a national service program," to mean "the planning, establishment, operation, expansion, or replication of the [AmeriCorps] program."[2]  42 U.S.C. § 12511(8).  Congress accordingly refused to provide discretion to rescind or withhold the disbursement of AmeriCorps funds.  Moreover, Defendants have compelled AmeriCorps to expend its funding in order to unilaterally close entire programs, further action that is unauthorized by statute.  *See Local 2677, American Federation of Government Employees v. Phillips*, 358 F. Supp. 60, 76 n.17 (D.D.C.

---

[2] Appropriations-related "[s]tatutes frequently contain their own set of definitions for terms that they use.  These definitions take precedence over other sources to the extent that they apply." U.S. Gov't Accountability Off., GAO-16-464SP, *Principles of Federal Appropriations Law* 1-34 (4th ed. 2016), https://www.gao.gov/assets/2019-11/675699.pdf ("*GAO Redbook*"); *see also Star-Glo Assocs., LP v. United States*, 414 F.3d 1349, 1354 (Fed. Cir. 2005) ("In considering the effect of appropriations language both the Supreme Court and [the Federal Circuit] have recognized that the General Accounting Office's publication, *Principles of Federal Appropriations Law* . . . provides significant guidance.").

1973) (appropriation of money "to carry out" statutory programs implicitly "forbid[s] the use of funds for termination purposes").

The case law bears out the plain textual reading. "When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)). "It is no exaggeration to say that 'an agency literally has no power to act . . . unless and until Congress confers power upon it.'" *Id.* (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)); *U.S. Dep't of Navy*, 665 F.3d at 1347 ("Federal statutes reinforce Congress's control over appropriated funds."). "[A]ll uses of appropriated funds must be affirmatively approved by Congress; the mere absence of a prohibition is not sufficient." *Id.* at 1348; *see also* I *GAO Redbook* 4-6, 4-20 (2004). Here, neither the 2024 Appropriations Act nor the enabling statutes provide the power to revoke or withhold disbursements.

Similarly, "[i]t is for Congress," and not for the Executive, "in the responsible exercise of its legislative power to make provisions for termination of a program." *Phillips*, 358 F. Supp. at 79. "Until those provisions are made, the function of the Executive is to administer the program in accord with the legislated purposes." *Id.*; *see also City & County of San Francisco*, 897 F.3d at 1232 ("[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections.") (quoting *Aiken County*, 725 F.3d at 259).

In sum, Defendants have failed to follow the 2024 and 2025 appropriations laws. Those laws require the expenditure of $975 million to "carry out" the AmeriCorps program; but Defendants instead have terminated huge numbers of programs based on the unexplained determination that they "no longer effectuate agency priorities," in service of executive orders broadly aimed at reducing the size of the federal government. *See* Defs.' Resp. at 4 (arguing

AmeriCorps' actions are "[i]n accordance with" recently issued executive orders). AmeriCorps appropriations laws and related statutes preclude such action. Defendants have therefore acted contrary to the express will of Congress.

### B.    NCCC Is Not an Optional Program

In opposition to Plaintiffs' motion, Defendants also argue in passing that they may terminate NCCC "because implementation of the NCCC program is left entirely to agency discretion under 42 U.S.C. § 12612(a)." Defs.' Resp. at 2. But contrary to Defendants' contention, the National and Community Service Act of 1990, Pub. L. 101-610, § 190, 104 Stat. 3127, 318 (1990), as amended ("the 1990 Act") does not give Defendants discretion to discontinue NCCC. In fact, "[u]pon establishment" of the program continued operation of the NCCC is mandatory. 42 U.S.C. § 12615(a) ("Upon the establishment of the [NCCC] Program, the [NCCC] shall be under the direction of the Director. . ."); *see also*, *id.* § 12623(3) ("The term 'Corps' means the [NCCC] required under section12615.").

Congress could hardly have been clearer as to the authority of AmeriCorps with respect to NCCC: the agency must operate and maintain NCCC as a going concern. For example, the 1990 Act states that the "Chief Executive Officer"—currently Defendant Bastress Tahmasebi—"*shall* monitor and supervise the administration of the National Civilian Community Corps Program authorized to be established under section 12612 of this title." *Id.* § 12619(a) (emphasis added). The 1990 Act sets forth a number of further mandatory duties that Defendants must undertake with respect to NCCC, such as appointing an NCCC director and a leadership team, (*id.* §§ 12619(c)(1)(a), (c)(2)(a)), establishing units within the corps and unit leaders (*id.* § 12615(c)), and maintaining campuses for boarding and operations (*id.* § 12615(d)). Defendants also "*shall* conduct periodic evaluations of NCCC" and send their reports to Congress. *Id.* § 12624 (emphasis

added); *see also id.* § 12651b(g)(11).  Thus, while the law provides ample authority for AmeriCorps to establish and operate NCCC, Congress plainly did not authorize the shuttering of NCCC altogether.[3]

Underscoring Congress's desire that NCCC continue to operate for the current fiscal year, Congress appropriated funds to "carry out" the program—not to bury it. Further Consolidated Appropriations Act, 2024, div. D, tit. IV, 138 Stat. 459, 694; Full-Year Continuing Appropriations Act, 2025, P.L. 119-4, § 1101(a)(8), 139 Stat. 9, 11 (Mar. 15, 2025); *see also* 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."): *see Phillips*, 358 F. Supp. at 76 (observing that, when Congress appropriated money "*to carry out*" a program, section 1301(a)'s predecessor "would appear to forbid the use of funds for termination purposes").

Congress provided that $37,735,000 "shall be available to carry out" NCCC.  2024 Appropriations Act, 138 Stat. at 694.  In appropriations law, "available" is a term of art that refers to funds being "available for obligation," *e.g.*, 2 U.S.C. § 683(b), because "the President must take care to ensure that appropriations are prudently obligated during their period of availability," and

---

[3] The "may establish" language of 42 U.S.C. § 12612(a) reflects NCCC's origin as a pilot program, when Congress's stated purpose was to "provide a basis for determining . . . whether residential service programs administered by the Federal Government" could meet certain goals, such as "significantly increas[ing] the support for national service and community service." National Defense Authorization Act for Fiscal Year 1993, P.L. 102-484, § 195, 106 Stat. 2315, 2522 (1992).  After successive reauthorizations, Congress amended the 1990 Act in 2009 to replace the "Civilian Community Corps Demonstration Program" with the "National Civilian Community Corps Program." Edward M. Kennedy Serve America Act, P.L. 111-13, 123 Stat 1460 (2009). Congress also rewrote the purpose of Subtitle E: instead of "determining . . . whether" the program was effective, the purpose today is "to authorize the operation of, and support for, residential and other service programs that combine the best practices of civilian service with the best aspects of military service, including leadership and team building, to meet national and community needs." 123 Stat. at 1521, *codified at* 42 U.S.C. § 12611.

the President has "no unilateral authority to withhold funds from obligation." *See* .S. Gov't Accountability Off., *Impoundment Control Act—Withholding of Funds through Their Date of Expiration*, B-330330, at 1–2 (Comp. Gen. Dec. 10, 2018), https://www.gao.gov/assets/b-330330.pdf; *In re Aiken County*, 725 F.3d at 261 n. 1 ("[E]ven the President does not have unilateral authority to refuse to spend the funds."); *cf.* S. Rep. No. 93-688, 93d Cong., 2d Sess. 75 (1974) ("[T]he objective [of the Impoundment Control Act] is to assure that the practice of reserving funds does not become a vehicle for furthering Administration policies and priorities at the expense of those decided by Congress").   As used here, "[t]he 'shall be available' family of earmarking language presumptively 'fences in' the earmarked sum (both maximum and minimum)," *Star-Glo Assocs., LP v. United States*, 414 F.3d 1349, 1354 (Fed. Cir. 2005) (quoting 2 *GAO Redbook* 6-8 (2d ed. 1992)), meaning that Congress intended exactly $37,735,000 would be spent on NCCC.

Although in some circumstances the meaning of "shall be available" "can establish a cap if Congress so intends," Congress has made clear it intended to "fence[] in" exactly $37,735,000 for NCCC. *See id.* (quoting 2 *GAO Redbook* 6-8 (2d ed. 1992)); *id.* at 1355 (relying on "legislative history" to find "a clear intent to impose a statutory cap"). The Joint Explanatory Statement accompanying the 2024 appropriations act designates exactly $37,735,000 to NCCC, which when combined with amounts designated for other national service programs, produces the total of $975,525,000 that Congress appropriated for AmeriCorps "to carry out" the national service laws. Further Consolidated Appropriations Act, 2024, 138 Stat. 694; 170 Cong Rec. H2060–61 (Mar. 22, 2024).  Congress thus clearly expressed its will that the NCCC be supported via appropriated funds, and not be terminated.

Finally, the administrative rider to the 2024 Appropriations Act aligns with this interpretation of Congressional will.  That is, Congress imposed additional guardrails on any

alterations to NCCC operations, because any "significant" changes to "service delivery or policy," for instance, required the agency to conduct notice and comment rulemaking.  *See* Appropriations Act of 2024, § 401, 138 Stat. at 695.

Accordingly, in both NCCC's enabling act and appropriations, Congress expressed its clear will that NCCC be established and operated as a going concern, and Congress provided no authority to terminate the program entirely.  This appropriation is not optional.

## C.    Federal Law Requires a Precise Allocation of AmeriCorps Formula Funds

As a final example of Defendants' actions taken contrary to Congressional will, in violation of the Separation of Powers, the wholesale termination of 1,031 programs and their funding, based on nothing more than unexplained "priorities" of the Executive, violates Congress's specifically mandated formula for funding AmeriCorps State and National Grants, as well as its explicit intention to allow each state to determine its own priorities for that spending.

State and National Grants is AmeriCorps' largest grant program, providing funds to States, local governments, and others to either carry out their own programs or—in the case of State Service Commissions—"to make grants in support of other national service programs . . . that are carried out by other entities." 42 U.S.C. § 12571(a).  Congress has specified how AmeriCorps must allocate funding appropriated for these grants among States, territories, and Indian tribes.

Under the statutory scheme, AmeriCorps must reserve (1) "no more than 62.7 percent [of funds appropriated for AmeriCorps State and National Grants] for grants awarded on a competitive basis" to States, nonprofits, and Indian tribes, 42 U.S.C. § 12581(d)(1); (2) 1 percent for certain territories, *id.* § 12581(a); and (3) 1 percent for Indian tribes, *id.* § 12581(b).  Subsection (d) of the statute mandates that 35.3 percent of AmeriCorps State and National Grants "shall" be provided to States as formula grants on a population basis, with each State's minimum being the larger of

$600,000 or 0.5 percent of all such grants. *Id.* § 12581(e)(2)–(3). Congress therefore explicitly required these funds be provided to the state service commissions, provided a specific calculation for determining those funds, and further denoted and that such funds must be subsequently allocated according to each *State's* priorities, not those of the agency or the executive branch more broadly. 42 U.S.C. § 12572(f)(1)(B); 45 C.F.R. § 2522.460(b) ("A State may apply priorities different than those of AmeriCorps in selecting its formula programs.").

Because the statute requires that 35.3 percent of State and National Grants be allocated among the States in accordance with each State's population, and Defendants cut millions in formula subgrants across all Plaintiff States—including, for seven Plaintiff States, *all* formula subgrants—Defendants necessarily caused each State's proportion of formula funds to deviate from the statutory measure. Put another way, Defendants were required to provide each state with a precise amount of formula grants, in an amount depending on the state's relative population, but Defendants' numerous cuts necessarily reduced State formula grants below what each State should have been awarded. California, for example, saw all but two of the State's formula subgrants terminated, necessarily reducing their formula funding level below the amount proportionate to their population. Amend. Moua Decl. (Cal.), Doc. No. 92-2, ¶ 21; *see also* Anderson Decl. (Penn.), Doc. No. 5-38, ¶¶ 17, 20 ("26 of 28 of Pennsylvania's subgrants have also been terminated").

By disrupting the population-based allocation, Defendants also hampered States' ability to prioritize different programs in accordance with Congress's design. State Service Commissions process applications both for their own formula subgrants and for AmeriCorps' nationally competitive grants; they rely on notice of their population-based formula allocation to know how much money will be available to fund programs that do not receive competitive grants. *See* Lorenz Decl. (Md.), Doc. No. 5-21, ¶ 11(b)(i)–(ii); Johnson Decl. (N.C.), Doc. No. 5-30, ¶ 30

13

("VolunteerNC cannot move forward with selecting formula grantees if it is not known how much the allocation is for the program year."); Amend. Moua Decl., Doc. No. 92-2, *id.* ¶ 44 (States "prepare and submit [their] formula-based application once [they] know which projects were selected for competitive funding, if any"). Defendants' refusal to comply with the statutory requirements for allocating formula grants has harmed States and violates the separation of powers and Congress's power of the purse. *See, e.g.*, *City of Providence*, 954 F.3d at 27 (explaining that for a formula grant, the agency "is obliged to distribute funding pursuant to a statutory formula").

Neither Defendants' "shift in AmeriCorps priorities," Defs.' Resp. at 24, nor their professed goal to "act as responsible stewards of public funds," *id.* at 28, comport with their appropriate role within the separation of powers. *See, e.g.*, *Phillips*, 358 F. Supp. at 77 (separation of powers violated where executive agency head eliminated funding for Congressionally-mandated agency program because of the "President's assessment of the needs of the nation" and "his responsibility to [] fiscal integrity," since "if the power sought here were found valid, no barrier would remain to the executive ignoring any and all Congressional authorizations if he deemed them, no matter how conscientiously, to be contrary to the needs of the nation."). Accordingly, the Court should hold that Plaintiff States have shown a significant likelihood of success on the merits with respect to their Separation of Powers claim, and enter a preliminary injunction.

Dated:  May 20, 2025                    Respectfully submitted,

**ANTHONY G. BROWN**                    **KATHLEEN JENNINGS**
ATTORNEY GENERAL OF MARYLAND            ATTORNEY GENERAL OF DELAWARE

By: */s/ Keith M. Jamieson*            By: */s/ Ian R. Liston*
Keith M. Jamieson (D. Md. Bar. No. 31543)    Ian R. Liston*
Virginia Williamson (D. Md. Bar. No. 31472)    *Director of Impact Litigation*
   *Assistant Attorneys General*        Vanessa L. Kassab*

14

Federal Accountability Unit
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland  21202
(410) 576-6960
kjamieson@oag.state.md.us

*Counsel for the State of Maryland*

**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

By: */s/ Ezra Kautz*
Ezra Kautz*
  *Deputy Attorney General*
Joel Marrero*
William H. Downer*
  *Supervising Deputy Attorneys General*
Brian Bilford*
  *Deputy Attorney General*
Michael L. Newman*
  *Senior Assistant Attorney General*
California Department of Justice
1300 I Street
Sacramento, CA  95814
(916) 210-6346
Joel.Marrero@doj.ca.gov
William.Downer@doj.ca.gov
Ezra.Kautz@doj.ca.gov
Brian.Bilford@doj.ca.gov
Michael.Newman@doj.ca.gov

*Counsel for the State of California*

**KRISTIN K. MAYES**
ATTORNEY GENERAL OF ARIZONA

By  */s/ Joshua A. Katz*
Joshua A. Katz*
  *Assistant Attorney General*
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Katz@azag.gov

*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE  19801
(302) 683-8899
Ian.Liston@delaware.gov

*Counsel for the State of Delaware*

**PHILIP J. WEISER**
ATTORNEY GENERAL OF COLORADO

By: */s/ Sarah H. Weiss*
David Moskowitz*
  *Deputy Solicitor General*
Sarah H. Weiss*
  *Senior Assistant Attorney General*
Kyle M. Holter*
Sam Wolter*
  *Assistant Attorneys General*
Colorado Office of the Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
sarah.weiss@coag.gov
kyle.holter@coag.gov
samuel.wolter@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
ATTORNEY GENERAL OF CONNECTICUT

By: */s/ Andrew Ammirati*
Andrew Ammirati*
  *Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5090
Andrew.Ammirati@ct.gov

*Counsel for the State of Arizona*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF
    COLUMBIA

By: */s/ Andrew C. Mendrala*
Andrew C. Mendrala*
  *Assistant Attorney General*
Public Advocacy Division
Office of the Attorney General for the District
  of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726
Andrew.mendrala@dc.gov

*Counsel for the District of Columbia*

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

By: */s/ Abigail R. Durkin*
Abigail R. Durkin*
  *Assistant Attorney General II, Special
  Litigation Bureau*
Cara Hendrickson*
  *Assistant Chief Deputy Attorney General*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
Tel. (312) 814-3000
Abigail.Durkin@ilag.gov
Cara.Hendrickson@ilag.gov

*Counsel for the State of Illinois*

**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

By: */s/ Sarah A. Forster*

*Counsel for the State of Connecticut*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
  *Solicitor General*
Hawaiʻi Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**OFFICE OF THE GOVERNOR *ex rel.*
ANDY BESHEAR**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
THE COMMONWEALTH OF KENTUCKY

By: */s/ S. Travis Mayo*
S. Travis Mayo*
  *General Counsel*
Taylor Payne*
  *Chief Deputy General Counsel*
Laura C. Tipton*
  *Deputy General Counsel*
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

By: */s/ Katherine Dirks*

Sarah A. Forster*
   *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  (207) 626-8800
Fax:  (207) 287-3145
Sarah.Forster@maine.gov

*Counsel for the State of Maine*

Katherine Dirks*
   *Chief State Trial Counsel*
Jonathan Green
   *Division Chief*
Veronica Zhang
   *Assistant Attorney General*
   *Non-Profit Organizations / Public Charities*
Massachusetts Office of the Attorney General
1 Ashburton Pl. Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

By: */s/ Neil Giovanatti*
Neil Giovanatti*
Alexus Ringstad*
   *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
RingstadA@michigan.gov

*Counsel for the People of the State of Michigan*

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

By:*/s Liz Kramer*
Liz Kramer*
   *Solicitor General*
Minnesota Attorney General's Office
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

*Counsel for the State of Minnesota*

**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
   *Solicitor General*
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**MATTHEW J. PLATKIN**
ATTORNEY GENERAL OF NEW JERSEY

*/s/ Jessica L. Palmer*
Jessica L. Palmer*
Lauren E. Van Driesen*
   *Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-4607
Jessica.Palmer@law.njoag.gov

*Counsel for the State of New Jersey*

17

**RAÚL TORREZ**
ATTORNEY GENERAL OF NEW MEXICO

By: */s/ James W. Grayson*\*
James W. Grayson\*
    *Chief Deputy Attorney General*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM  87504-1508
(505) 490-4060
jgrayson@nmdoj.gov

*Counsel for the State of New Mexico*

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

By: */s/ Jessica Ranucci*
Jessica Ranucci\*
    *Special Counsel, Federal Initiatives*
Rabia Muqaddam\*
    *Special Counsel for Federal Initiatives*
Office of the Attorney General
28 Liberty St.
New York, NY 10005
(929) 638-0447
Jessica.ranucci@ag.ny.gov
rabia.muqaddam@ag.ny.gov

*Counsel for the State of New York*

**JEFF JACKSON**
ATTORNEY GENERAL OF NORTH CAROLINA

**LAURA HOWARD**
CHIEF DEPUTY ATTORNEY GENERAL

By /s/ Daniel P. Mosteller
Daniel P. Mosteller\*
    *Associate Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov

*Counsel for the State of North Carolina*

**DAN RAYFIELD**
ATTORNEY GENERAL OF OREGON

By: /s Sadie Forzley
Sadie Forzley\*
    *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
sadie.forzley@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSH SHAPIRO**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
THE COMMONWEALTH OF PENNSYLVANIA

By: */s/ Kenneth L. Joel*
Kenneth L. Joel\*
    *Deputy General Counsel*
Benjamin Holt\*
    *Chief Counsel*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

By: */s/ Kyla Duffy*
Kyla Duffy\*
    *Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street

18

*Pennsylvania Department of Labor*
Melissa Murphy*
   *Senior Counsel*
   *Pennsylvania Department of Labor*
Governor's Office of General Counsel
30 N. 3rd St., Suite 200
Harrisburg, PA  17101
(717) 649-8669
kennjoel@pa.gov

*Counsel for Governor Josh Shapiro*

Providence, RI 02903
(401) 274-4400, Ext. 2809
kduffy@riag.ri.gov

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
   *Solicitor General*
Office of the Vermont Attorney General
109 State Street
Montpelier, VT  05609
(802) 828-3171
Jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

**NICHOLAS W. BROWN**
ATTORNEY GENERAL OF WASHINGTON

By: */s/ Abby Kahl*
Abigail Kahl*
Andrew R.W. Hughes*
   *Assistant Attorneys General*
Office of the Attorney General
2425 Bristol Court SW
Second Floor
PO Box 40117
Olympia, WA 98504
360-534-4864
Abigail.Kahl@atg.wa.gov
Andrew.Hughes@atg.wa.gov

*Counsel for the State of Washington*

**JOSHUA L. KAUL**
ATTORNEY GENERAL OF WISCONSIN

By: */s/ Charlotte Gibson*
Charlotte Gibson*
   *Assistant Attorney General*
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI  53707
(608) 957-5218 (phone)
(608) 294-2907 (fax)

*Counsel for the State of Wisconsin*

*\* Pro hac vice*

## CERTIFICATE OF SERVICE

I certify that on May 20, 2025, I filed the foregoing document via CM/ECF and thereby served all parties who have appeared through counsel on the Court's electronic docket.

Respectfully submitted,

*/s/ Keith M. Jamieson*
Keith M. Jamieson (D. Md. Bar. No. 31543)
    *Assistant Attorney General*
Federal Accountability Unit
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland  21202
(410) 576-6960
kjamieson@oag.state.md.us