IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| STATE OF MARYLAND, *et al.*,<br><br>    Plaintiffs,<br><br> v.<br><br>CORPORATION FOR NATIONAL AND COMMUNITY SERVICE, *operating as* AMERICORPS, *et al.*,<br><br>    Defendants. | No. 1:25-cv-01363-DLB |

**DEFENDANTS' SUPPLEMENTAL BRIEFING**

**INTRODUCTION**

Pursuant to this Court's May 19, 2025 order, Defendants respectfully submit this Supplemental Briefing in response to Plaintiffs' Supplemental Brief in Support of Their Request for a Section 705 Stay and a Preliminary Injunction, ECF No. 140 ("Pls.' Supp. Br.").

**ARGUMENT**

**I. Plaintiffs' Separation of Powers Claims Fail**

Plaintiffs attempt to cast Defendants' actions as violations of the constitutional separation of powers framework through the invocation of *Youngstown*. *See* Pls.' Supp. Br. at 1-6. But such artful pleading cannot bely the true nature of their claims as rooted in statute, not the Constitution. Indeed, their varying claims that Defendants have violated appropriations statutes fit neatly under the Impoundment Control Act—which precludes relief. And the remainder of Plaintiffs' claims masquerading as constitutional issues fall neatly within the *Dalton* statutory framework. "[C]laims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review . . . ." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). Plaintiffs' alleged constitutional claims are, at bottom, statutory claims.

**A. Plaintiffs' Constitutional Argument Is An Improper Attempt to Bypass the Impoundment Control Act**

At the outset, Plaintiffs' theory of their separation of powers claim is that *Youngstown*'s tripartite framework applies to separation of powers claims *viz* alleged impoundment of appropriated funds. *See* Pls.' Supp. Br. at 1-6. But this general argument ignores—and attempts to pretermit—the specific statutory framework applicable to disputes between Congress and the President.

Congress and the President share constitutional responsibility for enacting federal law, and the President has responsibility for implementing it, including when it comes to obligating and expending funds. Congress has enacted a statutory framework, including through the Impoundment Control Act, to govern inter-branch relations in this sensitive area. That framework generally requires the President to notify Congress when he determines that appropriated funds should be deferred or rescinded, and it prescribes a set of remedies for the Legislative Branch

2

when it disagrees with the Executive Branch's determination in a particular case. Plaintiffs argue that what is, at its nature, am impoundment claim—*i.e.*, a claim that the President has failed to spend all appropriated funds, is a clear-cut question of separation of powers: if the President fails to spend all appropriated dollars, he has failed to act in compliance with the Constitution. Pls.' Supp. Br. at 2-4. But this approach fails to consider both the specific and differential nature of the funding appropriations and the reinforcing exclusive jurisdiction of the Impoundment Control Act.

Plaintiffs are, in effect, attempting to enforce the Impoundment Control Act via the garb of a freestanding constitutional claim. That is improper. As the Impoundment Control Act reflects, Congress has constructed a reticulated scheme to govern the relationship between the Legislative and Executive Branches when it comes to spending appropriated funds. That statute is built around give-and-take between the political branches. Thus, the statute directs the President to notify Congress when he proposes to defer or rescind appropriated funds, *see* 2 U.S.C. §§ 683(a), 684(a), which allows Congress to determine how to respond given the particular circumstances of a specific proposal. And the statute specifies particular forms of legislative action that Congress may undertake to address proposed rescissions. *See id*. § 688.

Moreover, to the extent that the Impoundment Control Act contemplates litigation to enforce any obligation to spend appropriate funds, it provides for suits brought by the Comptroller General, an official within the Legislative Branch. 2 U.S.C. § 687. And the statute imposes limitations on the bringing of any such suit that reinforce Congress's desire to control any response to the Executive's actions: no such suit may be brought until the Comptroller General files "an explanatory statement" of "the circumstances giving rise to the" contemplated suit "with the Speaker of the House of Representatives and the President of the Senate" and then "25 calendar days of continuous session of the Congress" elapse. *Id*. Regardless whether such a suit would be cognizable under Article III and the separation of powers, the statute does not contemplate enforcement at the behest of private parties. And the statute certainly does not

contemplate that private parties would be entitled to bring enforcement actions without regard to the procedural limitations that Congress imposed for the Comptroller General.

As the Supreme Court has recognized, Congress may impliedly preclude some parties from seeking judicial review of administrative action by constructing a detailed scheme that provides for review only by other parties. For example, in *Block*, Congress provided for dairy "[h]andlers and producers—but not consumers"—to "participate in the adoption and retention of" certain agency orders related to milk prices and for handlers, at least, to pursue administrative remedies and obtain judicial review of agency orders with which they disagreed. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 346 (1984). In holding that the statutory structure precluded consumers' attempt to challenge those orders through the APA, the Supreme Court explained that there was no "express provision for participation by consumers in any" administrative or judicial proceeding related to the orders and that, "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id*. at 347.

So too here. The Impoundment Control Act provides a variety of mechanisms for legislative responses to any proposal by the Executive Branch to defer or rescind appropriated funds and, to the extent it contemplates litigation at all, it contemplates only suits brought by a Legislative Branch official and only after Congress has first had the opportunity to act.

That scheme provides no role for third parties like plaintiffs to play in either the legislative or judicial enforcement processes. In so doing, the scheme preserves the political branches' accountability for enacting and implementing the appropriations laws. And it accounts for the possibility that the Executive Branch may decide to withhold funds in a wide variety of contexts for a wide variety of reasons—some of which may implicate the Executive's own constitutional prerogatives, some of which may give Congress no concern at all, and some of which may draw a response from Congress affirmatively acquiescing in or rejecting the Executive's proposal. *Cf. City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress

has previously acknowledged that "the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year" and such delays may result from "the normal and orderly operation of the government" (quotation omitted)).

Given the many different contexts and justifications that may accompany such proposals—and given the sensitive nature of the dual authority that Congress and the President share in this sphere—it makes sense that the scheme provides Congress itself with the ability to determine how best to respond (if at all) to any particular proposal. And any disputes between the President and Congress in this sphere may be "hashed out in the hurly-burly, the give-and-take of the political process between the legislative and the executive." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020) (quotation omitted). In that process, Congress has ample political tools to address any perceived problem itself, including by altering existing or future appropriations or engaging in its traditional oversight functions.

Moreover, emphasizing the point, the Impoundment Control Act expressly provides that "[n]othing contained in this Act, or in any amendments made by this Act, shall be construed" as "affecting in any way the claims or defenses of any party to litigation concerning any impoundment." 2 U.S.C. § 681. That provision makes clear Congress's intent that third parties do not rely on the statute's provisions to generate a judicially enforceable right to compel spending that did not otherwise exist.

In short, permitting Plaintiffs to challenge the Executive Branch's spending decisions through an APA suit would "severely disrupt" the statute's "complex and delicate" enforcement scheme. *Block*, 467 U.S. at 348. It is thus "clear that Congress intended that" any response to the Executive's actions in this sphere should "be confined to" the Legislative Branch-directed responses undertaken "in accordance with" the statute's scheme. *Id.*

Defendants acknowledge that Plaintiffs have not explicitly pled an Impoundment Control Act claim. But they should not be able to ignore the restrictions that this statute imposes—ones negotiated by the political branches—solely by artful pleading, when they seek a broader remedy.

5

This Court should reject Plaintiffs attempts to enforce appropriations statutes directly.

## II.     Defendants Are Abiding By Statutory Appropriations Requirements

### A.  Defendants Are In Compliance With The 2024 and 2025 Appropriations Acts

Plaintiffs' claims grounded in statute, *see* Pls.' Supp. Br. at 6-14, cannot succeed. Plaintiff's arguments rest on the notion that the Continuing Appropriations Act, in which Congress appropriated funds to AmeriCorps for the remainder of fiscal year 2025 to carry out their obligations under their respective statutes, creates a statutory obligation for the agency to spend the money appropriated for grant funding or provision of services *for Plaintiffs*, thus transforming the inquiry into one of statutory assessment.  *See id*.  But Congress did not require direct expenditure to Plaintiffs—it set up a process where allocated funds would be used for grant agreements.  When Congress demands direct expenditures, it knows how to do so. *Compare*, *e.g.*, *Sullivan v. United States*, 395 U.S. 169, 172 (1969) (quoting statutory language providing that funds "shall be allocated to *and expended for*") (emphasis added).  As the Supreme Court has explained, an "obligation" is a "definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received," and "[t]he Government may incur" such an obligation "by contract," as AmeriCorps did through the disbursement of grants to awardees.  *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 307-08 (2020) (citation omitted); *see City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426-27 (D.C. Cir. 1994) (noting that "[f]unds appropriated for an agency's use can become unavailable" if the funds have "been awarded to . . . recipients" via a contract).

Indeed, this is why Plaintiffs' constitutional claim—even if Plaintiffs can enforce appropriation disbursements via a freestanding constitutional claim—ultimately fails.  As discussed at oral argument, most of the AmeriCorps funds at issue are disbursed via grant agreements between the Plaintiffs (or others) and AmeriCorps.  Those grant agreements set out the specific entitlement of individual parties to funds; the appropriations statutes themselves do not include such specific disbursement requirements.  *See* Defs.' Opp. Br. at 25; *See* 42 U.S.C. § 12581(a)-(e) (describing AmeriCorps' allotment of *grants* to the States).  Execution of those grant

agreements—and their terminations—are governed by the terms of the applicable grant agreements. It may well be that the termination of individual grant agreements violated the terms of those agreements—a matter for the Court of Federal Claims. But that would be a question of compliance with the terms of the relevant legal instruments, not the Constitution. Indeed, were it otherwise, the President would not able to exercise his supervisory responsibilities to ensure proper oversight over the funding, including, as appropriate, to determine that such funding accorded with the policy preferences of the democratically elected Executive. It cannot be, for example, that every time an agency terminates a grant—and thus leaves some appropriated money that would have gone toward that grant unspent—the agency violates the Constitution, even if the agency violated the contractual agreement itself. And if that is true for some grants, it is unclear—and Plaintiffs offer no limiting principle—for why it is not true for a broader subset of grants or other instruments that do not provide for direct payment of appropriated sums for private parties.

Ultimately, neither the appropriations acts, nor the agency-specific statutes under which Plaintiffs claim reliance, create an obligation as to specific funds owed directly to Plaintiffs, outside of grants, or services to be provided to Plaintiffs, or creates a statutory prohibition on terminating any particular grant or service. As discussed above, fundamentally, Plaintiffs are not funded through direct congressional appropriations. Rather, they are explicitly funded through grant agreements with AmeriCorps. *See* 42 U.S.C. § 12581(a)-(e) (describing AmeriCorps' allotment of *grants* to the States). Execution of those grant agreements—and their terminations—are governed by the applicable grant agreements. Defendants' conduct under those grant agreements may be reviewable—as Defendants argue, in the Court of Federal Claims—but the mere fact that a grant agreement is funded through an appropriation does not mean that the routine execution of that grant agreement takes on statutory—let alone constitutional—dimensions.

**B. Defendants Are Supporting NCCC In Compliance With Statutory Requirements**

Plaintiffs claim that NCCC must "continue to operate" and that the appropriated amount of $37,735,000 should be fully allocated to the NCCC. Pls.' Supp. Br. at 10-12. First, the existence

7

of NCCC as a program is discretionary, as made clear by 42 U.S.C. § 12612(a).  Indeed, the statute does not affirmatively say that the Corporation (AmeriCorps) shall establish the NCCC, but that, "the Corporation *may* establish the [NCCC] . . . ." *Id*. (emphasis added).  Defendants' rely on a medley of statutory provisions detailing what AmeriCorps "shall" do in relation to the NCCC, but all such claims rely on the foundational predicate that the existence of NCCC itself is discretionary as made evident by the statutory language, *see id.*; Pls.' Supp. Br. at 9-10.

In any event, the NCCC is still very much in existence.  It may be operating in a smaller capacity, but is fulfilling programmatic duties and engaging in partnership activities.  *See* Exhibit A; Exhibit B.

### C. AmeriCorps Is In Compliance With The State Formula Grant Funding Scheme

Plaintiffs argue that Defendants violated federal law by not following specific grant allocation formulas to Plaintiff States.  Pls.' Mot. at 13; 42 U.S.C. § 12581(e)(1)-(3) (stating that AmeriCorps shall allot "35.3 percent of the allocated funds for that fiscal year" to states in proportion with their population to other states, and that the minimum grant to each state "shall be at least $600,000, or .5 percent of the amount allocated" under the proportional formula.).  Plaintiffs fail to establish that Defendants have violated this statute.

Indeed, the statute only requires Defendants to *allot* the formula grants in accordance with the required minimum percentage.  This was done in FY 2024 through April of FY 2025.  However, there is no requirement under the statute to *maintain* that required percentage through the life of a grant.  By way of example, when AmeriCorps finds a grantee to be noncompliant with the conditions of a grant, the agency may claw back funds spent on noncompliant activities—regardless of whether the grant funds were competitive or formula funds.  *See* 42 U.S.C. § 12636(a)(1); *id*. § 12639(m).  Moreover, the Chief Executive Officer of AmeriCorps may cancel or suspend grant payments.  *See id.* § 12651d(b)(6).  And the State Commissions may cancel subgrants awarded with formula funds, and a subgrantee that had formula funds may relinquish their subgrants.  2 CFR §§ 200.339-343; 45 CFR § 2540.400.  All such permissible activities thus

reduce the percentage of formula funds at a given point in time. *See* 42 U.S.C. § 5052(a) (detailing authorization to terminate payments under contracts and grants); *see also* 45 CFR §§ 2551.34, 2552.34, 2553.31; *see also* 45 CFR § 2556.140 (detailing authorization to terminate VISTA projects and assistance). But the only relevant point in time for measuring the percentage of formula funds is at the *initial* point of allocation. Here, AmeriCorps was fully in compliance with 42 U.S.C. § 12581(e)(1)-(3) because the amount initially allotted to the States was over the required disbursement of 35.3 percent of AmeriCorps State and National Grants and the greater amount of $600,000, or .5 percent of the amount allocated under the proportional formula.

### III. Plaintiffs' Remaining Constitutional Claims Fail

#### A. The Presentment Clause Has Not Been Violated

Plaintiffs' constitutional claims are barred because they are, at their heart, purely statutory. As to the Presentment Clause, Plaintiffs allege that, "a refusal to follow appropriations law and federal statutes . . . violates the Presentment Clauses by attempting to repeal federal laws . . . without following the 'finely wrought' procedures for doing so." Pls.' Supp. Br. at 5.

At bottom, this claim hinges, in turn, on Plaintiffs' allegations concerning their statutory claims. The Supreme Court has made clear that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review . . . ." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). This keeps with the long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id*. at 472. Because Plaintiffs' claims here comprise restatements of the allegation that AmeriCorps acted in excess of its statutory duty, Plaintiffs cannot prevail on their claims alleging constitutional violations.

At base, while the amount of the grant is set by appropriations law, at least generally, the conduct of that grant agreement is governed by the grant agreement's terms and agency oversight responsibility. This reading gives meaning to both the Congressional appropriations statutes and the agency's enabling statutes recognizing of AmeriCorps' important oversight responsibilities, including terminating a grant when necessary. 42 U.S.C. ch. 129 §§ 12501-12682.

9

### B. The Take Care Clause Has Not Been Violated

In addition, Plaintiffs' claim under the Take Care Clause, *see* Pls.' Supp. Br. at 6, also fails on its own merits. It should be noted at the outset that the Government is not aware of any case that has ever held that the Take Care Clause can be used as a mechanism to obtain affirmative relief. In reality, that claim comprises a broad programmatic attack against the President as well as the agency Defendants in an attempt to circumvent the limitations of the APA. Plaintiffs cannot prevail on their Take Care Clause claim because the Take Care Clause does not provide a cause of action against the President or any other Defendant, and this Court, in any event, has no jurisdiction to issue declaratory or injunctive relief against the President in his official capacity based on constitutional claims. *See Dalton*, 511 U.S. at 473. Moreover, even if the Clause could furnish a basis for affirmative relief, Plaintiffs seek to rely on violations of purported duties that are found nowhere in the statutes establishing the Defendant agencies, but rather, are based on Plaintiffs' subjective views about how to best implement and administer those agencies.

Through the Take Care Clause, the Constitution vests the President with broad, discretionary authority to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Inevitably, the laws that the President executes are those enacted by Congress. But no court has read the Take Care Clause as opening the door to any plaintiff seeking to challenge the way the President executes Congress's laws. Rather, as the Supreme Court has recognized, the duty of the President when exercising his power to see that the laws are faithfully executed is "purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1866); *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66 (1803) ("[T]he President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character."). To hold otherwise would upset our constitutional scheme of separation of powers and allow judicial superintendence over the exercise of Executive power that the Clause commits to the President alone. *Baker v. Carr*, 369 U.S. 186, 217 (1962) (Courts lack jurisdiction over a claim where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political

department."); *see also Dalton*, 511 U.S. at 474–75 (judicial review of discretionary Presidential decisions "is not available"); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (holding that it would be improper for the courts to take over the President's duty to "take Care that the Laws be faithfully executed" (quoting U.S. Const. art. II, § 3)); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."); *Chi. & S. Air Lines*, 333 U.S. at 114 (refusing to review President's decision that "embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate"); *Mississippi*, 71 U.S. (4 Wall.) at 499.

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials. The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process. *See Free Enter. Fund v. Pub Co. Acct. Oversight Bd.*, 561 U.S. 477, 492–93 (2010) ("It is *his* responsibility to take care that the laws be faithfully executed."); *id.* at 495–97; *see also Printz v. United States*, 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689–90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712–13 (1997) (Breyer, J., concurring). A subordinate Executive officer cannot violate the President's duty to faithfully execute the laws. To the extent Plaintiffs seek to challenge the legality of Defendants' conduct, they cannot do so through the Take Care Clause, but must do so, if at all, through the APA, which in this case presents separate insurmountable obstacles for Plaintiffs.

**IV.    Plaintiffs Should Be Ordered to Post Security in Connection with Any Preliminary Injunctive Relief and this Court Should Stay Relief Pending the Government's Determination of Whether to Appeal.**

Last, the Court should reject Plaintiffs' argument that they should not be required to post a bond. Federal Rule of Civil Procedure 65(c) provides that a district court "may issue a preliminary injunction of a temporary restraining order *only if* the movant gives security in an amount that the

court considers proper to pay the costs and damages sustained by any party fond to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added). The rule is mandatory and unambiguous. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999). As the Fourth Circuit has directed, "[i]n fixing the amount of an injunction bond, the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *Id.* at 421 n.3. The Fourth Circuit continued: "[t]he amount of the bond, then, ordinarily depends on the gravity of the potential harm to the enjoined party." *Id.* And another Fourth Circuit case found that an injunction requiring the Department of Agriculture to provide continued funding to the food stamp program without the requiring the State of Maryland to post security is reversible error. *See Maryland Dept. of Human Resources v. U.S. Dept. of Agriculture*, 976 F.2d 1462 (4th Cir. 1992).

Indeed, recently the D.C. Circuit in a per curiam opinion noted that "injunction bonds are generally required." *Nat. Treas. Empl. Union v. Donald J. Trump, et al.*, No. 25-5157, 2025 WL 2116273, at n.4 (D.C. Cir. May 16, 2025). In response to the lower court's finding that a bond would conflict with plaintiff's right to seek judicial review, the Circuit panel disagreed, stating that such logic would "apply any time a district court grants a preliminary injunction — an exception that swallows the rule." *Id*. *National Kidney Patients Association v. Sullivan*, 958 F.2d 1127, 1129 (D.C. Cir. 1992); *see also Edgar v. Mite Corp.*, 457 U.S. 624, 649 (1982) (Stevens, J., concurring) (an injunction bond "is the moving party's warranty that the law will uphold the issuance of the injunction"); *Monzillo v. Biller*, 735 F.2d 1456, 1461 (D.C. Cir. 1984) ("Rule 65(c) of the Federal Rules of Civil Procedure requires the filing of a security bond by a party who benefits from a temporary restraining order or preliminary injunction"); *Habitat Education Center v. United States Forest Service*, 607 F.3d 453, 459 (7th Cir. 2010) (because the "costs of government are borne ultimately by taxpayers," Rule 65(c) applies no less when a "government agency" is subject to a preliminary injunction).

As Plaintiffs are, in part, seeking the disbursement of grant funds, the Court should order the posting of a bond equal to the size of any payment that the Court orders on a preliminary basis here. Without such a protective measure, there may be no way to recover the funds lost to United States taxpayers if the Court were later to find that Defendants were "wrongfully enjoined." *See* Fed. R. Civ. P. 65(c); *cf. California*, 145 S. Ct. at 968-69 ("respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed. No grantee promised to return withdrawn funds should its grant termination be reinstated, and the District Court declined to impose bond") (quotation omitted). The Plaintiff States are well-resourced sovereign entities seeking to set aside over a thousand grant terminations and employee RIFs subject to agency discretion. The Court should thus require Plaintiff States to provide security in an amount commensurate with these costs. At a minimum, this Court should require a bond that provides a real prospect of recovery in the event that any injunction is overturned; a prospect that cannot be satisfied by a nominal bond alone.

Finally, to the extent the Court issues injunctive relief, the United States respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized, or at a minimum, that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized.

## **CONCLUSION**

For these reasons, this Court should deny Plaintiffs' Motion for a Section 705 Stay and Preliminary Injunction.

Dated: May 21, 2025                    Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

*/s/ Sarmad Khojasteh*
SARMAD KHOJASTEH
*Senior Counsel*
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel.: (202) 353-0261
Email: Sarmad.Khojasteh@usdoj.gov

*/s/ Pierce J. Anon*
PIERCE J. ANON (N.Y. Bar No. 6184303)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel. (202) 305-7573
Email: Pierce.Anon@usdoj.gov

*/s/ Beatrice C. Thomas*
BEATRICE C. THOMAS
*Assistant United States Attorney*
United States Attorney's Office
36 S. Charles Street, 4th Floor
Baltimore, MD 21202
Email: Beatrice.Thomas@usdoj.gov

*Attorneys for Defendants*

# EXHIBIT A

| | |
|---|---|
| **From:** | Goodson, Ken |
| **To:** | Sugie, Masayuki; Gipson-Nahman, Tanya |
| **Subject:** | FW: Update on Status of Forest Corps |

**From:** _ANCCC <ANCCC@americorps.gov>
**Sent:** Tuesday, April 29, 2025 8:46 AM
**Cc:** _ANCCC <ANCCC@americorps.gov>
**Subject:** Update on Status of Forest Corps

Dear Forest Corps Invitee,

We are writing to provide you with an important update on your invitation for NCCC service.

We are pleased to inform you that AmeriCorps will continue with the Forest Corps program for this year. AmeriCorps NCCC staff will be reaching out to you in the near future with more information.

At this time, we are planning for the program to run. However, please be aware that there is some uncertainty regarding the future of the program and operations may be curtailed at any point. We recognize the uncertainty is unsettling and may cause difficulties in planning the course of your year. We deeply regret these circumstances and realize it may result in you deciding not to participate in the program. We hope that is not the case, but if you decide withdrawal from the program is the best course of action for yourself, we understand.

If you decide to continue with the program, we thank you for your high degree of flexibility and for your commitment to serving your country.

Thank you again for your interest in AmeriCorps NCCC.

*AmeriCorps NCCC*

# EXHIBIT B

| | |
|---|---|
| **From:** | Sugie, Masayuki |
| **To:** | Vazquez Torres, Eimie K; Nelson, Rosie |
| **Subject:** | Phone call about Forest Corps |

Hello current Forest Corps members (BCCd),

As you saw from the email sent by our headquarters earlier this week, the Forest Corps program is continuing this year. Because of a short timeframe to prepare, please expect a phone call from either myself or one of the people listed in the "To" line of this e-mail tomorrow, with a 202 originating area code. We'll be asking you to confirm your participation in Forest Corps, and answer questions as we're able. If you already know that you would accept or decline the opportunity to participate, please feel free to hit reply-all and let us know. We'll still give you a call tomorrow.

## Masa Sugie (he/him)
**Deputy Region Director for Unit Leadership**
NCCC-Pacific Region
AmeriCorps.gov
M: (202) 391-1113



If you are external to AmeriCorps and would like to book an appointment with me, please click here. If you are internal, please use the Outlook Scheduler to make an appointment.