IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STATE OF MARYLAND, *et al.*,          *

     Plaintiffs,          *

v.          *          Civ. No. DLB-25-1363

CORPORATION FOR NATIONAL AND          *
COMMUNITY SERVICE, *operating as*
*AmeriCorps, et al.*,          *

     Defendants.          *

## MEMORANDUM OPINION

AmeriCorps is the nation's national service agency. AmeriCorps operates national service programs and funds service programs operated by states, local governments, nonprofits, and universities. For more than 20 years, AmeriCorps has placed thousands of full- and part-time volunteers in service programs in every state. These volunteers, supported by federally funded living stipends, childcare and health benefits, and education awards, work on programs that target AmeriCorps's national service priorities such as conservation and protection of forests and public lands, public health initiatives, veterans support, and educational programs. Through AmeriCorps-funded programs, volunteers help some of the most vulnerable populations in the country, such as veterans transitioning from combat, homebound seniors, children with learning disabilities, and people struggling with substance abuse. When hurricanes, floods, and wildfires strike the states, AmeriCorps deploys volunteers to support relief, recovery, and rebuilding efforts. These volunteers represent the best of us.

Throughout the month of April—National Volunteer Month—AmeriCorps made sweeping, across-the-board cuts to service programs. On April 15, 2025, the agency ordered all members of the National Civilian Community Corps—a full-time residential volunteer program

for young adults serving on short-term volunteer projects nationwide—to leave their assigned posts pending their termination from the program. The next day, AmeriCorps placed 85 percent of its staff on administrative leave. In the following days, AmeriCorps reduced its workforce from more than 700 employees to 116 employees. On April 25, AmeriCorps terminated over 1,000 grants for AmeriCorps-funded programs across the country, ordered those programs closed, and forced the exit of roughly 30,000 volunteers working on the programs. The reason: "[T]he award[s] no longer effectuate[] agency priorities." In so doing, AmeriCorps axed roughly half of its grant funding, including 80 percent of the grants awarded under its largest program, AmeriCorps State and National, which funds service projects for communities most in need.[1]

Twenty-four states and the District of Columbia filed suit. They seek a preliminary injunction enjoining the defendants from "dismantling" AmeriCorps. For the following reasons, the preliminary injunction is granted in part and denied in part. Before AmeriCorps could make any significant changes to service delivery, it first had to engage in notice-and-comment rulemaking. It did not. As a result, the States have been irreparably harmed. The balance of the equities and the public interest weigh in favor of preliminary injunctive relief.

I.    **Background**

   A.    **The History of AmeriCorps**

---

[1] Two days before the mass grant termination, the President proclaimed the week National Volunteer Week. Proclamation No. 10,923, 90 Fed. Reg. 17517 (Apr. 28, 2025). The Presidential proclamation stated: "We pay tribute to every American who gives their time and talents in service to our Nation. We celebrate their selfless spirit — the driving force that inspires them to uplift others and serve a purpose greater than their own. In times of need, the American people emerge stronger than ever." *Id.* The President "call[ed] upon all Americans to observe this week by volunteering in service projects across our country and pledging to make service a part of their daily lives." *Id.*

The Corporation for National and Community Service ("CNCS"), operating as "AmeriCorps," is a federal agency that "administer[s] the programs established under the national service laws." 42 U.S.C. § 12651; *see* 45 C.F.R. § 2500.2(a). The agency's origins date back to the Domestic and Volunteer Service Act of 1973, which established Volunteers in Service to America ("VISTA"), the National Older Americans Volunteer Program, and the "ACTION Agency" charged with operating these programs. Pub. L. No. 93-113, § 401, 87 Stat. 394, 405 ("the 1973 Act"). In 1990, Congress authorized new grant programs to support additional service initiatives and established a "Commission on National and Community Service" to administer the new programs. National and Community Service Act of 1990, Pub. L. No. 101-610, § 190, 104 Stat. 3127, 3168 ("the 1990 Act"). In 1993, Congress merged the Commission on National and Community Service with the ACTION Agency to form CNCS, known today as AmeriCorps. National and Community Service Trust Act of 1993, Pub. L. No. 103-82, §§ 191 & 203(c)(2), 107 Stat. 785, 873, 892 ("the 1993 Act") (codified at 42 U.S.C. §§ 12501 *et seq.*).

Congress created AmeriCorps in part to "renew the ethic of civic responsibility and the spirit of community and service," to "encourage citizens of the United States . . . to engage in full-time or part-time national service," and to "leverage Federal investments to increase State, local, business, and philanthropic resources to address national and local challenges." 42 U.S.C. § 12501.

B.    **Agency Structure**

AmeriCorps is a government corporation led by a Chief Executive Officer ("CEO") and a bipartisan Board of Directors ("Board"). *Id.* §§ 12651, 12651a(a)(2)(E), 12651c. The CEO and Board are appointed by the President with the advice and consent of the Senate. *Id.* §§ 12651a(a)(1), 12651c(a). The Board "ha[s] [the] responsibility for setting overall policy for the Corporation" and "review[s] and advise[s] the [CEO] regarding[] the actions of the [CEO] with

respect to the personnel of the Corporation, and with respect to such standards, policies, procedures, programs, and initiatives as are necessary or appropriate to carry out the national service laws." *Id.* § 12651b(g)(5)(A). The CEO is "responsible for the exercise of the powers and the discharge of the duties of the Corporation that are not reserved to the Board" and has "authority and control over all personnel of the Corporation," except for the decisions reserved for the Inspector General. *Id.* § 12651d(a) (citing 5 U.S.C. § 414). The CEO also may "generally perform such functions and take such steps consistent with the objectives and provisions of the national service laws, as the Chief Executive Officer determines to be necessary or appropriate to carry out such provisions." *Id.* § 12651d(c)(11).

AmeriCorps also employs agency staff. Prior to the events that led to this litigation, the agency employed approximately 720 people across the country, including staff who reviewed grant applications, managed service projects and grants, or provided training to individuals participating in service projects. *See* ECF 124-1, ¶¶ 7, 25 (AmeriCorps Emps. Union Pres. decl.).

### C.    AmeriCorps Programs

Pursuant to its statutory authority, AmeriCorps operates various grant programs and other service initiatives, including AmeriCorps State and National, the National Civilian Community Corps, VISTA, and several others.

#### 1.    AmeriCorps State and National

##### a.    AmeriCorps State and National Grants

One of AmeriCorps's largest grant programs is known as "AmeriCorps State and National." *See* ECF 1, ¶ 78. AmeriCorps is authorized by statute to "make grants to States, subdivisions of States, territories, Indian tribes, [and] public or private nonprofit organizations" to "carry out . . . national service programs" and to "make grants in support of other national service programs . . .

that are carried out by other entities." *See* 42 U.S.C. § 12571(a). Authorized grants include planning grants, which fund, for up to one year, the development of a service program; operational grants, which fund, for up to three years, the "establishment, operation, or expansion" of a service program; and replication grants, which fund, for up to three years, expansion of proven service programs to other geographic locations. *See* 42 U.S.C. § 12574; 45 C.F.R. § 2521.20.

The statute authorizing the grants also stipulates how these funds must be allotted. AmeriCorps must allot a certain amount of funding to "formula grants" in each state, the District of Columbia, and Puerto Rico. These grants are distributed according to the following formulas:

> (1) Of the funds allocated by [AmeriCorps] for provision of assistance under section 12571(a) . . . for a fiscal year, the Corporation shall make a grant to each of the several States, the District of Columbia, and the Commonwealth of Puerto Rico that submits an application . . . that is approved by the Corporation.

> (2) . . . [AmeriCorps] shall allot for a grant to each such State under this subsection for a fiscal year an amount that bears the same ratio to 35.3 percent of the allocated funds for that fiscal year as the population of the State bears to the total population of the several States, the District of Columbia, and the Commonwealth of Puerto Rico, in compliance with paragraph (3).

> (3) . . . Notwithstanding paragraph (2), the minimum grant made available to each State approved by [AmeriCorps] under paragraph (1) for each fiscal year shall be at least $600,000, or 0.5 percent of the amount allocated for the State formula under this subsection for the fiscal year, whichever is greater.

42 U.S.C. § 12581(e); *see also id.* § 12581(a)–(b). Of the AmeriCorps State and National grant funds available, roughly one-third are allotted as formula grants to states. *See* 45 C.F.R. § 2521.30(a).

States also may apply for "direct" grants. These grants are awarded on a competitive basis to states as well as nonprofits and Indian tribes. 42 U.S.C. § 12581(d)(1). AmeriCorps also awards these direct grants to local governments and higher education institutions. 45 C.F.R. § 2521.10(a); *see also, e.g.*, ECF 5-6, ¶ 7 (Calif. decl.). Whereas states are allotted a certain amount of funding

through formula grants, states must compete against non-state entities for direct grants. "[N]ot more than 62.7 percent" of AmeriCorps State and National grant funds may be awarded as direct grants. 42 U.S.C. § 12581(d)(1).

The awarding of AmeriCorps State and National grants is governed by certain "service priorities." *See id.* § 12572(f)(1). AmeriCorps establishes national service priorities for programs funded through AmeriCorps State and National direct grants. *See id.* § 12572(f)(1)(A). The statute requires the agency to "provide advance notice to potential applicants of any national service priorities to be in effect under this subsection for a fiscal year" and "by regulation establish procedures to ensure the equitable treatment of national service programs" that "receive funding under this division for multiple years" and "would be adversely affected by annual revisions in such national service priorities." *Id.* § 12572(f)(2)–(3). The statute also requires states to "establish, and . . . periodically alter priorities as appropriate regarding the national service programs to be assisted" under formula grants. *Id.* § 12572(f)(1)(B). State priorities for formula grants are "subject to [the agency's] review as part of the application process." *Id.* Under current agency regulations, "[a] State may apply priorities different than those of AmeriCorps in selecting its formula programs." 45 C.F.R. § 2522.460(b).

With funds from formula and direct grants, states may operate service programs through subgrants to other entities, such as non-profit organizations. *See* 42 U.S.C. § 12572(b)(1); *see also, e.g.*, ECF 5-8, ¶ 8 (Colo. decl.) ("[T]he AmeriCorps agency administers a separate, nationally competitive grant process. In this process, the State Service Commission selects and submits single-state applications for consideration in the federally managed competition."); ECF 5-45, at 11–12 (listing Wisconsin's state service commission subgrantees for AmeriCorps formula and competitive grants). For formula grants, states select programs to fund with their allotment. *See*,

*e.g.*, ECF 5-39, ¶ 7 (R.I. decl.). States also can award planning grants for development of new AmeriCorps programs. *See, e.g.*, ECF 5-20, ¶ 14 (Mass. decl.). For direct grants, states also select programs as subgrantees when they apply for AmeriCorps funding. *See, e.g.*, ECF 5-12, ¶ 8 (Del. decl.). However, unlike with formula grants, states competing for direct grants must submit their selected subgrantees for AmeriCorps approval, AmeriCorps selects the subgrantees, and states administer the grant for the selected programs or planning grants. *See, e.g.*, ECF 5-31, ¶¶ 6–7 (N.J. decl.); *see also* 45 C.F.R. § 2521.20(a)–(b).

AmeriCorps grant recipients generally must supply matching funds for AmeriCorps awards. *See* 42 U.S.C. § 12571(e); 45 C.F.R. §§ 2521.35, 2521.70. States may meet their match requirements through their subgrantees. *See* 45 C.F.R. § 2521.60(a)(2). Private donors and philanthropies often supply matching funds. *See, e.g.*, ECF 5-39, ¶ 65 (R.I. decl.).

Like all AmeriCorps program funding, AmeriCorps State and National grants must "be used only for a program that does not duplicate, and is in addition to, an activity otherwise available in the locality of such program." 42 U.S.C. § 12637(a).

### b.  AmeriCorps State and National Members

AmeriCorps State and National programs are carried out by individuals participating in full- or part-time community service for finite service terms. These "AmeriCorps members" are enrolled in approved national service positions in the awarded program. *See* 42 U.S.C. §§ 12572, 12581(d)(1), 12582. AmeriCorps members engage in activities such as staffing food pantries, contributing to wildfire recovery efforts, tutoring students, and doing vital sign checks for individuals with chronic illness. *See, e.g.*, ECF 5-4, ¶ 35 (Ariz. decl.); ECF 5-6, ¶ 14 (Calif. decl.); ECF 5-8, ¶ 49(a) (Colo. decl.); ECF 5-35, ¶ 6 (N.Y. decl.); ECF 5-45, ¶ 9(c) (Wisc. decl.). AmeriCorps members are not considered employees of the organizations in which they serve, nor

are they considered federal employees. *See* 42 U.S.C. § 12511(30); 45 C.F.R. § 2523.100. Members receive a living allowance and health insurance, and full-time members are eligible for childcare needed to allow the member's participation in the service program. 42 U.S.C. § 12594(a), (d)–(e). AmeriCorps members also receive an education award that can be used for the cost of attendance at higher education institutions, for student loan repayment, and for other select education-related expenses. *Id.* § 12604. Members receive an award "equal to the maximum amount of a Federal Pell Grant" after they complete full-time service or half of this value for part-time service. *Id.* § 12603(a)–(b). If a member is released early for compelling personal circumstances, they can receive a prorated education award. *Id.* § 12603 (citing *id.* § 12593(c)(1)(A)).

Organizations participating in AmeriCorps programs cannot "displace an employee, position, or volunteer (other than a participant under the national service laws), including partial displacement such as reduction in hours, wages, or employment benefits, as a result of the use by such employer of a participant in a program receiving assistance under the national service laws." *Id.* § 12637(b).

For operational grants, funding to states and their subgrantees goes in part towards members' living allowances. *See, e.g.*, ECF 5-16, ¶ 13 ("In Program Year 2024, Serve Illinois received $28,992,935 in federal funding . . . . This funding goes towards paying AmeriCorps members a living allowance for their service year."); ECF 5-45, ¶ 8 (Wisc. decl.) ("The AmeriCorps grant funds received by those entities pay for the living allowances of AmeriCorps members . . . ."). Other expenses paid by grants include, for example, program operations, *see, e.g.*, ECF 5-16, ¶¶ 13–14 (Ill. decl.), recruitment and management of AmeriCorps members, *see, e.g.*, ECF 5-4, ¶ 12 (Ariz. decl.), and monitoring and compliance costs, *see, e.g.*, ECF 5-39, ¶ 8

(R.I. decl.). Education awards for members are not funded by grants. They are paid directly by AmeriCorps out of the "National Service Trust" established by Congress in part for this purpose. *See* 42 U.S.C. §§ 12601, 12604.[2]

AmeriCorps may "suspend or terminate payments" under its grants or "revoke the designation of [national service] positions" related to a grant "whenever the Corporation determines there is a material failure to comply with this subchapter or the applicable terms and conditions of any such grant or contract." *Id.* § 12636(a)(1). However, "assistance provided under this subchapter shall not be terminated or revoked for failure to comply with applicable terms and conditions of this subchapter unless the recipient of such assistance has been afforded reasonable notice and opportunity for a full and fair hearing." *Id.* § 12636(a)(2)(B).

### 2. The National Civilian Community Corps

The AmeriCorps statute also authorizes the creation of the National Civilian Community Corps ("NCCC"). *See id.* § 12612(a). The NCCC is a full-time, residential service program for young adults who work on projects involving disaster relief, home construction, and trail maintenance. ECF 1, ¶ 58(a). AmeriCorps directly oversees the NCCC program, but NCCC members are not considered federal employees except for the limited purposes of work-related injuries and tort liability. *Id.* ¶ 58; 42 U.S.C. §§ 12615(a), 12620. NCCC members are assigned to regional campuses and deployed to states to conduct service projects to "meet an identifiable public need," with an "emphasis on projects in support of infrastructure improvement, energy conservation, and urban and rural development." 42 U.S.C. §§ 12615(c)–(d), 12617(a)(1). One

---

[2] Planning grants do not have any AmeriCorps members. *See, e.g.*, ECF 5-38, ¶ 7 (Penn. decl.). "Education Award Programs" enroll AmeriCorps members but are not required to provide members with a living allowance or other AmeriCorps member benefits. *See* 42 U.S.C. § 12581a. Members who serve in an Education Award Program are still eligible for an education award. *See id.*

sub-programs of the NCCC is a partnership with the Federal Emergency Management Agency ("FEMA"), called "FEMA Corps," which "places members in service positions to perform disaster public assistance, planning, preparedness, and recovery activities." 45 C.F.R. § 2500.20(a)(1). AmeriCorps's Disaster Service Unit, a department within AmeriCorps, "coordinates with FEMA to secure funding to mobilize AmeriCorps NCCC and AmeriCorps State and National members under a federally declared disaster." *See id.*; ECF 5-8, ¶ 33(d) (Colo. decl.). Another NCCC sub-program, Forest Corps, "places members in service positions to perform wildfire mitigation, reforestation, and climate resiliency activities." 45 C.F.R. § 2500.20(a)(1). Teams of NCCC members have responded to wildfires and helped with hurricane relief efforts. *See, e.g.*, ECF 5-28, ¶ 13 (Mich. decl.); ECF 124-1, ¶ 17 (AmeriCorps Emps. Union Pres. decl.). Like AmeriCorps members enrolled in programs funded by AmeriCorps State and National grants, NCCC members receive a living allowance, health insurance, and upon completion of service, an education award. *See* 42 U.S.C. § 12618.

### 3. VISTA

VISTA is an AmeriCorps program that dates back to the 1973 Act, which "provide[d] for the [VISTA] program of full-time volunteer service" in order "to strengthen and supplement efforts to eliminate and alleviate poverty." *Id.* § 4951. The VISTA program partners with organizations to send members across the country for service projects. *See* 45 C.F.R. § 2500.20(a)(4). VISTA members are placed at both private organizations and state and local government agencies. *See id.* § 2566.100.

VISTA members, like AmeriCorps and NCCC members, are not considered federal employees except for limited purposes under federal law, such as tort liability. *See* 42 U.S.C. § 5055(a). They receive a living allowance, health coverage, and childcare—paid directly by

AmeriCorps—and are eligible for an education award or a cash stipend upon completion of service. *See* 42 U.S.C. §§ 4955, 12595. AmeriCorps also provides grants to entities that conduct VISTA-supported projects. *See id.* §§ 4960, 5081; ECF 5-11, at 14–15 (Del. decl.). State instrumentalities, such as state agencies, may host VISTA members and receive VISTA support grants. *See, e.g.*, ECF 5-21, ¶ 10(a) (Md. decl.).

### 4. Other AmeriCorps Programs

There are several other AmeriCorps programs. Most relevant to this case are AmeriCorps Seniors, a compilation of service initiatives for older Americans; the Volunteer Generation Fund, which awards grants for capacity building and organization infrastructure; research grants that support research on national service and service-learning; and Days of Service grants, which fund service activities conducted in conjunction with honoring Dr. Martin Luther King, Jr. and the September 11th Day of Service and Remembrance. *See* 42 U.S.C. §§ 5001, 12653, 12653p. Some of these grants are awarded to states and then distributed to subgrantees. *See, e.g.*, ECF 5-12, ¶ 10 (Del. decl.); ECF 5-45, ¶ 10 (Wisc. decl.).

### D. State Service Commissions

To receive AmeriCorps grant funding and national service positions, states must "maintain a State Commission on National and Community Service." 42 U.S.C. § 12638(a)(1). With the agency's permission, states can entrust the duties of a so-called "state service commissions" to a private entity. *See id.* State service commissions administer grants awarded to states, including direct and formula AmeriCorps State and National grants, and conduct their own competitive processes to select subgrantees. *See, e.g.*, ECF 5-4, ¶ 10 (Ariz. decl.). State service commissions administer other grants as well, including Volunteer Generation Fund grants. *See* 42 U.S.C. § 12653p(b); *see, e.g.*, ECF 5-20. ¶ 8 (Mass. decl.). AmeriCorps also awards separate grants to

fund state service commission operations, known as Commission Support Grants and Commission Investment Fund Grants. *See* 42 U.S.C. § 12574; *see also, e.g.*, ECF 5-8, ¶ 34(d) (Colo. decl.); ECF 5-36, ¶ 4 (Or. decl.). Formula grant funding also can provide administrative support for grant administration, *see* ECF 5-4, ¶ 10 (Ariz. decl.), and state service commissions may retain a percentage of a grant for the cost of administration, *see, e.g.*, ECF 5-8, ¶ 34(b) (Colo. decl.); ECF 5-20, ¶ 7 (Mass. decl.).

Every organization that applies for AmeriCorps State and National direct grants must "consult with and coordinate activities with the State Commission for each State in which the program will operate . . . ." 42 U.S.C. § 12583(c)(3); *see also* 45 C.F.R. § 2550.80(a).

### E.     Congressional Appropriations

AmeriCorps programs are funded by annual congressional appropriations. In Fiscal Year 2024, Congress appropriated $975,525,000 "[f]or necessary expenses for [AmeriCorps] to carry out [the 1973 Act] and [the 1990 Act]." Further Consolidated Appropriations Act, 2024 ("2024 Appropriations Act"), Pub. L. No. 118-47, 138 Stat. 460, 694. The annual appropriations bill also stated that "of the amounts provided under this heading . . . $19,538,000 shall be available to provide assistance to State commissions on national and community service" under the statute authorizing State Commission Support Grants, "$37,735,000 shall be available to carry out" the statute authorizing the establishment of the NCCC, and "$8,558,000 shall be available for expenses authorized" by the statute authorizing the Volunteer Generation Fund, which "shall be awarded by CNCS on a competitive basis." *Id.* at 694–95. In the joint explanatory statement accompanying the bill, Congress indicated that $557,094,000 of the funds appropriated was for AmeriCorps State and National grants, $103,285,000 was for the VISTA program, and $236,917,000 was for AmeriCorps Seniors. *See* 170 Cong. Rec. H2060–61 (daily ed. Mar. 22, 2024).

In Fiscal Year 2024, Congress also appropriated $180 million to the National Service Trust "to remain available until expended"; $99,686,000 "[f]or necessary expenses of administration," including "payment of salaries" and expenses such as "employment of experts and consultants" or "authorized travel"; and $7,595,000 "[f]or necessary expenses of [AmeriCorps's] Office of Inspector General." *See* 2024 Appropriations Act, 138 Stat. at 694.

In addition to appropriating funds, Congress included an "administrative provision[]" for Fiscal Year 2024 that "[AmeriCorps] shall make any significant changes to program requirements, service delivery or policy only through public notice and comment rulemaking." 2024 Appropriations Act § 401, 138 Stat. at 695.

For Fiscal Year 2025, Congress appropriated the same amounts "under the authority and conditions" of the Fiscal Year 2024 appropriations act. *See* Full-Year Continuing Appropriations & Extensions Act, 2025 ("2025 Appropriations Act"), Pub. L. No. 119-4, § 1101(a), 139 Stat. 9, 10–11.

### F.    Recent Changes to AmeriCorps

On February 11, 2025, President Donald J. Trump issued Executive Order 14210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative." Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025) ("Workforce Optimization Order"). The Workforce Optimization Order's purpose is "[t]o restore accountability to the American public" by "commenc[ing] a critical transformation of the Federal bureaucracy." *Id.* § 1. It further states that "[b]y eliminating waste, bloat, and insularity, [the] Administration will empower American families, workers, taxpayers, and our system of Government itself." *Id.* To accomplish this purpose, the order directs agency heads to "promptly undertake preparations to initiate large-scale reductions in force (RIFs)." *Id.* § 3(c).

On February 26, 2025, President Trump issued Executive Order 14222, "Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative." Exec. Order No. 14,222, 90 Fed. Reg. 11095 (Feb. 26, 2025). To "commence[] a transformation in Federal spending on contracts, grants, and loans to ensure Government spending is transparent and Government employees are accountable to the American public," the order instructs agency heads to, among other things, consult with the Department of Government Efficiency ("DOGE") "team lead" to "review all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of [the] Administration." *Id.* § 3(b). "Covered contracts and grants" are defined as "discretionary spending through Federal contracts, grants, loans, and related instruments, but excludes direct assistance to individuals; expenditures related to immigration enforcement, law enforcement, the military, public safety, and the intelligence community; and other critical, acute, or emergency spending, as determined by the relevant Agency Head." *Id.* § 2(d).

## 1. Staffing decisions

On April 8, 2025, AmeriCorps informed its employees that it was taking steps to comply with the Workforce Optimization Order by initiating, among other things, a deferred resignation program and a reduction in force of "up to 50 percent or more." ECF 124-1, at 14 (AmeriCorps Emps. Union Pres. decl.). On April 16, 2025, after consulting with the DOGE team at AmeriCorps, defendant and AmeriCorps Interim Agency Head Jennifer Bastress Tahmasebi placed 85 percent of the agency's staff on administrative leave. ECF 1-3, at 2. Additionally, a "significant number" of AmeriCorps staff who supported the NCCC program elected to take the deferred resignation option. *Id.* This left 106 "core staff" members and nine staff in the Office of General Counsel. *Id.*

Roughly one week later, AmeriCorps began sending out reduction in force ("RIF") notices to employees on administrative leave. ECF 1, ¶ 6; *see* ECF 124-1, ¶ 21 (AmeriCorps Emps. Union Pres. decl.). Kelly Daly, president of the AmeriCorps Employees Union and an employee impacted by the RIF, has learned from remaining staff that 116 AmeriCorps employees are left, down from roughly 720 employees before the RIFs. ECF 124-1, ¶ 25. The RIF impacted approximately 90 percent of the union's bargaining unit. *Id.* The RIFs have left one employee to manage and disburse funds from the National Trust Service; that employee now is responsible for processing up to 29,801 education awards for AmeriCorps members. *Id.* ¶ 26. Seventeen portfolio managers and senior portfolio managers now manage AmeriCorps State and National, VISTA, and AmeriCorps Seniors, which previously required "hundreds of staff." *Id.* ¶ 27.

### 2. NCCC Terminations

On April 15, 2025, AmeriCorps sent an email to NCCC members with the subject line "Letter to All Members on Demobilization." ECF 1-2, at 2. The email stated:

> In alignment with the Trump-Vance Administration priorities and Executive Order 14222, "Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative," AmeriCorps NCCC is working within new operational parameters that impact the program's ability to sustain program operations. As a result, **AmeriCorps is sending all NCCC members to their homes of record as soon as possible**.
>
> **At this time, all teams are directed to return to their Region campus immediately—as soon as is safely practicable.** NCCC Members will be moved into administrative hold with pay status through April 30th, 2025, after which they will be exited from the NCCC program. The program will exit all Members early with Compelling Personal Circumstances (CPC) status.

*Id.* Bastress Tahmasebi sent an email on April 17, 2025 that states: "AmeriCorps made the decision to place more than 750 AmeriCorps NCCC members on administrative leave through April 30, 2025, at which point their terms will conclude." ECF 1-3, at 3.[3]

On April 29, 2025, AmeriCorps informed individuals invited to join the Forest Corps that "AmeriCorps will continue with the Forest Corps program for this year." ECF 141, at 16. The email explained:

> At this time, we are planning for the program to run. However, please be aware that there is some uncertainty regarding the future of the program and operations may be curtailed at any point. We recognize the uncertainty is unsettling and may cause difficulties in planning the course of your year. We deeply regret these circumstances and realize it may result in you deciding not to participate in the program. We hope that is not the case, but if you decide withdrawal from the program is the best course of action for yourself, we understand. If you decide to continue with the program, we thank you for your high degree of flexibility and for your commitment to serving your country.

*Id.* Another email, sent on an unknown date, told current Forest Corps members that "the Forest Corps program is continuing this year" and asked the recipients to accept or decline the invitation to participate in the program. *Id.* at 18.

### 3. Award Termination Letters

On April 25, 2025, AmeriCorps sent letters to AmeriCorps award recipients that the agency was terminating their grants. ECF 1, ¶ 7. Each letter stated:

> Effective immediately, the AmeriCorps award subrecipient(s) included in the attached spreadsheet is/are being terminated per 2 CFR 200.340(a)(4) because it has been determined that the award no longer effectuates agency priorities. You must immediately cease all award activities. This is a final agency action and is not administratively appealable. . . . Please immediately notify subrecipients and/or community partners, if applicable, and initiate your internal termination and closeout procedures. . . . Costs after termination are allowable if: (a) The costs result from financial obligations which were properly incurred before the effective date

---

[3] Thirty-five staff members supporting the NCCC program were placed on administrative leave and then were temporarily brought back to work to send NCCC members to their homes of record. ECF 124-1, ¶ 25 (AmeriCorps Emps. Union Pres. decl.).

> of termination, and (b) costs are for necessary and reasonable termination and closeout activities.

See, e.g., ECF 1-7, at 2–3. The termination letters also informed state service commissions that, for AmeriCorps State and National grants,

> [s]tate commissions and prime grantees should immediately notify subgrantees, operating sites, and members and follow grant close-out procedures. All member activities should cease immediately. Members should be exited for compelling personal circumstances (CPC). The program should document that the member was exited for compelling personal circumstances due to the agency's termination of the grant and program closure. If possible, the program should try to have the member transferred to another program. If this is not possible, the program should note in the CPC documentation that member reassignment was not an option.

See, e.g., id. at 3. And AmeriCorps informed grant recipients with VISTA members active on their programs that "all members will be removed from your project effective immediately." See, e.g., ECF 1-8, at 3.[4] Commissions with Volunteer Generation Fund and Days of Service awards received instructions that "[n]otification of award termination should be sent to all subrecipients and community partners" and that "[c]ommunication to subrecipients should include instruction to immediately cease award activity." See, e.g., id. And AmeriCorps directed "research and evaluation" award recipients to notify subrecipients and community partners of the award termination. See, e.g., id.

The grant terminations and exiting and removal of members impacted 1,031 AmeriCorps programs, roughly $396.5 million in federal funding for AmeriCorps programs, and 32,465 AmeriCorps participants serving as AmeriCorps State and National members, VISTA members,

---

[4] VISTA project sponsors were informed that VISTA members were placed on administrative hold with pay. ECF 5-11, ¶ 18 (Del. decl.). At least some VISTA members were offered the opportunity to seek transfer or reassignment to other VISTA project sponsors to complete their service term. See id. at 26–27. AmeriCorps told these VISTA members that, if they could not "secure a suitable reassignment [by] May 19, 2025, [their] AmeriCorps VISTA service [would] be terminated on or after May 20, 2025." Id. at 27.

and AmeriCorps Seniors volunteers. ECF 1-6, at 3. Terminated awards include 838 AmeriCorps State and National awards (representing approximately $371.1 million in federal funding), 145 VISTA awards (approximately $9.3 million in federal funding), 18 Volunteer Generation Fund awards (approximately $7.8 million in federal funding), 16 AmeriCorps Senior awards (approximately $2.7 million in federal funding), eight Day of Service Awards (approximately $1.4 million in federal funding), and six research awards (approximately $4.2 million in federal funding). ECF 1-6, at 3.

### G.    The Plaintiffs and their Programs

The plaintiffs in this suit are 24 states and the District of Columbia (the "States" or "the plaintiff states"). Collectively, the States operate thousands of AmeriCorps programs, support thousands of AmeriCorps members, and receive millions of dollars in AmeriCorps funding. AmeriCorps programs in the States provide critical, sometimes life-saving assistance to their communities. The States' AmeriCorps programs are too numerous to summarize, or even list, here, but an overview of AmeriCorps priorities and programs is in order.

#### 1.    Public Health

One major priority of AmeriCorps funding is public health. In Michigan, for example, Wayne State University operates the AmeriCorps Community Training for Overdose Rescue, which "[e]ducate[s] citizens about the risks of opioid misuse and train[s] them in overdose rescue strategies." ECF 5-28, ¶ 9. AmeriCorps funds the Kentucky Health Corps, "which provides healthcare support in the area of memory care, skilled nursing, and assisted living to seniors and people with disabilities in healthcare facilities." ECF 1, ¶ 132. It also funds Healthy Communities, a Connecticut program that places AmeriCorps members in federally qualified health centers to coordinate care and ensure that patients have the information they need to make informed medical

decisions. ECF 5-9, ¶ 24–25. Healthy Communities has served 469 patients since its inception three years ago. *Id.* In Wisconsin, AmeriCorps funds the Marshfield Clinic's Recovery Corps program, which trains AmeriCorps members to be recovery coaches for people with opioid and other substance addictions and to provide community education about substance use disorders and recovery resources. ECF 5-45, ¶ 9(c). During the 2023–24 program year, Marshfield Clinic's AmeriCorps members supported 150 people with substance use disorders. *Id.* The Los Angeles County Department of Public Health uses AmeriCorps members to conduct community outreach during public health crises and to schedule vaccination appointments, among other functions. *See* ECF 5-6, ¶ 10. Since 2022, 128 AmeriCorps members serving at the L.A. County Department of Public Health "have provided 90,739 service hours conducting 151 community presentations and 6,461 outreaches, reaching more than 234,000 residents." *Id.* The Department of Public Health reports that AmeriCorps members' efforts—including outreach during recent measles, flu, and COVID-19 outbreaks; opioid overdose awareness and Naloxone distribution; and mental health workshops—have "contributed to reducing disease transmission and lower[ed] the overall public health burden" within the state. *Id.* ¶ 14.

## 2. Veterans

States also use AmeriCorps funding to support veteran transition services. One of Wisconsin's subgrantees is Easterseals Wisconsin, which provides therapeutic recreation activities for veterans and their families. ECF 5-45, ¶ 9(a). In North Carolina, AmeriCorps members assisted 286 veterans in accessing benefits such as stable housing, medical care, and disability benefits during the 2023–24 service year. ECF 5-30, ¶ 6. Washington operates Vet Corps, a program that helps veterans transition from the military and build relationships "in a new world with individuals who understand [them]." ECF 5-42, ¶ 13. Connecticut's AmeriCorps Seniors program organizes

Veterans Coffeehouses across the state, which "offer veterans and their families a welcoming environment to connect, share experiences, and access essential resources." ECF 5-9, ¶ 8.

### 3. Conservation and Environmental Protection

Another key AmeriCorps priority is conservation and environmental protection. In Pennsylvania, for example, AmeriCorps funds the Pennsylvania Mountain Service Corps, which focuses on education, environment, and community wellness. ECF 5-37, ¶ 5. Members of the Mountain Service Corps serve outdoors at nature stewardship sites and have tested and cleaned up hundreds of miles of water within the state. *Id.* ¶ 14. In California, AmeriCorps funds GrizzlyCorps, which sends recent college graduates into rural communities across the state to promote regenerative agri-food systems and fire and forest resilience. ECF 5-5, ¶ 3. GrizzlyCorps fellows "support community-led efforts in rural California to manage forests ecologically, with tools like prescribed fire, and aid in fire restoration and preparedness efforts." *Id.* ¶ 4. They also help California progress towards its climate reduction requirements, including reduced greenhouse gas emissions, and have helped the state map emergency escape routes for wildfires. *Id.* ¶ 12(a)–(b). Similarly, AmeriCorps funds Colorado State University Extension, which "operates a variety of season-specific initiatives supporting the stewardship of Colorado's wildlands, including land stewardship, forest monitoring, wildland fire mitigation, supporting wildlife habitation, and reintroduction of native plants." ECF 5-8, ¶ 52(a). AmeriCorps funds Kentucky's Environmental Education Leadership Corps ("EELCorps"), which provides environmental literacy and education programs across the state. ECF 5-17, ¶¶ 4–5. During the 2024–25 service year, AmeriCorps members serving in EELCorps provided environmental education programs, lessons, and activities to nearly 20,000 Kentuckians. *Id.* ¶ 7. Through the VISTA program, AmeriCorps supports Hawaiʻi's Department of Land and Natural Resources by providing critical assistance in areas such

as climate change, natural resource protection, community building, and transportation access, with a focus on Hawai'i's "unique challenges as an island state." ECF 5-15, ¶¶ 8–9. The VISTA participants "help develop strategies for energy affordability and efficiency, community outreach for underserved populations, and climate adaptation planning." *Id.* ¶ 10.

### 4. Education

AmeriCorps also funds educational programs, including programs to support English language learners, students with Individualized Education Programs ("IEPs"), and students impacted by disasters. For instance, AmeriCorps funds the Framingham Teacher Residency AmeriCorps program at Framingham State University, a public university in Massachusetts. ECF 5-19, ¶¶ 2–3. Through the program, AmeriCorps members serve as resident teaching assistants in Framingham Public Schools, where many students speak Portuguese or Spanish as their first languages. *Id.* ¶¶ 6, 15. In California, AmeriCorps members serving in rural Imperial County's Borderlands project provide daily tutoring to more than 200 low-achieving K-12 students and approximately 90 special education students with IEPs. ECF 92-2, ¶ 34(a). In Delaware, AmeriCorps funds Children's Beach House, an organization that supports Delaware children, including those in foster care. ECF 5-10, ¶ 22. More than half of the people Children's Beach House serves are children with IEPs. *Id.* Children's Beach House relies on AmeriCorps grants to maintain the state-mandated adult-to-child ratios in its afterschool programs. *Id.* ¶ 23. Children attend these programs to catch up on schoolwork they miss due to speech and language therapy sessions, to access tutoring tailored to slower processing speeds, and to engage in programs designed to strengthen their social-emotional skills. *Id.* In North Carolina, two AmeriCorps projects provided academic assistance, mentoring, and nutrition education services to students in areas still recovering from Hurricane Helene; removed debris; repaired storm drainage systems;

delivered meals to homebound or stranded families; and staffed shelters in those areas. ECF 5-30, ¶¶ 21–22.

### H.    Procedural History

On April 29, 2025, the States filed a complaint against AmeriCorps and Bastress Tahmasebi (together, "the agency" or "the defendants"). ECF 1. The complaint has five counts. *See id.* Three counts are for violations of the Administrative Procedure Act ("APA"). The States allege that the defendants acted contrary to law (Count I), without observance of procedure required by law (Count II), and arbitrarily and capriciously (Count III). *See id.* ¶¶ 207–31. They claim that AmeriCorps violated the APA by reducing AmeriCorps staffing and cutting funds appropriated by Congress to carry out the national service laws, by failing to engage in notice-and-comment rulemaking, by failing to provide advance notice of a change in agency service priorities, and by failing to provide impacted award recipients with an opportunity to be heard. The States also raise a constitutional claim, alleging that the defendants acted in violation of the separation of powers principle (Count IV), and an *ultra vires* claim, alleging that the defendants acted in excess of the scope of their authority (Count V). *See id.* ¶¶ 232–42.

On May 6, 2025, the States moved for a stay under the Administrative Procedure Act, 5 U.S.C. § 705, and a preliminary injunction. ECF 5 & 5-1. They ask the Court to vacate the termination of NCCC members, the decision to place on administrative leave and subsequently institute a RIF for AmeriCorps staff, and the termination of AmeriCorps-funded programs in the States. *Id.* at 2. The defendants opposed the motion and requested that the Court stay any order granting relief for seven days. ECF 106. The States replied. ECF 124. On May 19, 2025, the Court held a hearing on the motion and ordered supplemental briefing, which the parties filed. ECF 140 & 141. They also notified the Court about supplemental authority, ECF 143, 144, 147, and the

States provided an update to the record regarding the 2025 grant cycle. ECF 142.[5] A bipartisan group of 33 former governors filed an amicus brief in support of the States' motion for a preliminary injunction. ECF 72.

For the reasons that follow, the Court grants in part and denies in part the States' motion for a preliminary injunction.[6]

## II.    Jurisdiction

Before turning to the merits, the Court must assure itself it has jurisdiction over the States' claims. The jurisdictional questions are: Do the States challenge a final agency action subject to judicial review; do the States have standing to bring their APA claims; and do the States' claims belong in this Court or in the United States Court of Federal Claims.

### A.    Final Agency Action

The States bring several claims under the APA. They allege that the mass termination of the AmeriCorps grant-funded programs and the removal of NCCC members from service were

---

[5] In a supplemental notice of authorities filed last night, the States advised the Court that the Office of Management and Budget proposed for the Fiscal Year 2026 budget "to eliminate the Corporation for National and Community Service (operating as AmeriCorps), consistent with the President's efforts to decrease the size of the Federal Government to enhance accountability, reduce waste, and reduce unnecessary governmental entities. This account provides funding for the orderly closure of AmeriCorps." *See* ECF 147-1, at 15 (OMB, "Technical Supplement to the 2026 Budget," Appendix 1055).

[6] The Court denies the States' motion for a stay. The APA permits a reviewing court "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *Casa de Md., Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020) (quoting *District of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 16 (D.D.C. 2020)), *order dissolved*, No. PX-20-2118, 2023 WL 3547497 (D. Md. May 18, 2023). Because the Court grants the motion for a preliminary injunction, the States' motion for an administrative stay is denied as moot.

arbitrary and capricious, contrary to law, and without observance of procedure required by law.[7]
The Court must determine whether these agency actions are within the scope of the APA's "basic
presumption of judicial review." *See Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967). The
APA allows for judicial review of "final agency action for which there is no other adequate remedy
in a court." 5 U.S.C. § 704. Whether there is a final agency action is a jurisdictional question in
the Fourth Circuit. *See, e.g.*, *Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*, 105
F.4th 627, 631 (4th Cir. 2024) (noting "finality under the APA is a jurisdictional requirement").
"To constitute 'final agency action' within the meaning of Section 704, the challenged action must
have two characteristics. First, the challenged action must be 'circumscribed and discrete.' . . .
Second, the 'agency action' must be 'final.'" *NAACP v. Bureau of the Census*, 945 F.3d 183, 189
(4th Cir. 2019) (internal citations omitted) (first quoting 5 U.S.C. § 704; and then quoting *Vill. of
Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 194 (4th Cir. 2013)).

### 1. Discrete Agency Action

"'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction,
relief, or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. § 551(13). "[T]he term is
not so all-encompassing as to authorize [courts] to exercise 'judicial review [over] everything done
by an administrative agency.'" *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir.
2004) (quoting *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948)). Even so, "'agency

---

[7] The Court refers to the April 25, 2025 award terminations, the "exit[ing]" of AmeriCorps
members from AmeriCorps State and National programs "due to the agency's termination of the
grant and program closure," and the "remov[al]" of VISTA members from "project[s]," *see* ECF
1-8, collectively as the "closure" or "mass closure" of AmeriCorps programs. Termination of
AmeriCorps awards that do not have any associated members, such as planning grants, and
termination of Education Award Programs, which enroll members but do not provide them with a
living stipend, also may be included in this description to the extent that they were impacted by
AmeriCorps's April 25, 2025 termination letters.

action' undoubtedly has a broad sweep." *Id.* "[T]he word 'action[]' . . . is meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001); *see also FTC v. Standard Oil Co.*, 449 U.S. 232, 238 n.7 (1980) ("According to the legislative history of the APA: 'The term "agency action" . . . assure[s] the complete coverage of every form of agency power, proceeding, action, or inaction.'" (quoting S. Doc. No. 79-248, at 255 (2d Sess. 1946))). The term "action" encompasses an agency's "policy or routine practice." *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 164 (E.D.N.Y. 2018). And an agency's policy is reviewable even when "the details of the . . . policy are still unclear." *See Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008).

The States challenge the "dismantling" of AmeriCorps. This challenge is essentially a broad programmatic attack that is not subject to judicial review. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). However, the States have identified two discrete agency actions that are ripe for judicial review: (a) the mass closure of 1,031 AmeriCorps programs and (b) the removal of all NCCC members from service.[8]

### a.    Mass Program Closure

The decision to close over 1,000 AmeriCorps programs was a discrete agency action. The grant termination letters informed grant recipients that their funding was terminated, that VISTA members were removed, and that AmeriCorps members must be exited from the program due to "program closure." *See, e.g.*, ECF 5-8, at 33. These letters advised: "This is a final agency action and is not administratively appealable." *See, e.g.*, *id.* The defendants do not dispute that the

---

[8] The States also challenge the decision to place 85 percent of AmeriCorps staff on administrative leave and the subsequent RIF. Because, as discussed later, the States have not established standing to challenge the placement of AmeriCorps staff on administrative leave and the RIF, the Court need not determine whether either decision constitutes a discrete, final agency action.

program closures are agency actions. Instead, they suggest that the States must separately challenge each individual grant termination as distinct final agency actions. The Court disagrees.

Recently, the First Circuit confronted a similar agency action in *New York v. Trump*, 133 F.4th 51 (1st Cir. 2025). In *New York*, states challenged the suspension and termination of federal funding across numerous executive agencies. 133 F.4th at 63. The federal defendants in that case argued that the plaintiff states could not challenge "unidentified past funding decisions across thousands of programs and an untold number of hypothetical future funding decisions" because this constituted a "broad programmatic attack." *Id.* at 68. The First Circuit disagreed. Although the plaintiff states challenged the pause or termination of many obligated funds across several agencies, the First Circuit concluded that "numerous notices and emails authored by Agency Defendants," as well as declarations that described the pausing or termination of obligated funds, "support the finding that their funding freezes were categorical in nature, rather than being based on 'individualized assessments of their statutory authorities and relevant grant terms.'" *Id.* at 68–69. In finding the funding freezes "categorical in nature," the First Circuit stressed that "a court is 'not required to exhibit a naiveté from which ordinary citizens are free.'" *Id.* (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019)).

So too here. The decision to terminate grant funding and close over 1,000 AmeriCorps programs on the same day (April 25, 2025) and for the same reason ("the award no longer effectuates agency priorities") was "categorical in nature" and was not based on an individualized assessment of the grant terms or the grantee's adherence to applicable regulations or statutes. The vague reason for grant terminations also suggests that the agency did not base its program closure decisions on its assessment of the services provided under each award. The agency acknowledged as much when, during the hearing, the defendants' counsel stated "[t]here's no distinction being

made between the various services." ECF 146, at 95:8–9 (May 19, 2025 Hr'g Tr.). The same-day decision to eliminate funding for nearly half of AmeriCorps programs and to exit AmeriCorps members from those programs because of a "shift in AmeriCorps priorities," ECF 106, at 31, is an "across the board" agency action that "can of course be challenged under the APA by a person adversely affected[.]" *See Lujan*, 497 U.S. at 890 n.2. The mass closure of AmeriCorps programs is a discrete agency action that is ripe for judicial review under the APA.

### b.     Removal of NCCC Members

The decision to exit NCCC members from the NCCC program also was a discrete agency action. On April 15, 2025, AmeriCorps sent an e-mail notifying the recipients that "AmeriCorps is sending all NCCC members to their homes of record as soon as possible" and that "NCCC Members will be moved into administrative hold with pay status through April 30th, 2025, after which they will be exited from the NCCC program." *See* ECF 1-2, at 2. This blanket decision to remove all NCCC members from service was categorical in nature. It was a discrete agency action.

### 2.    Finality

Agency action is "final" when two conditions are met: (1) "the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177– 78 (1997) (first quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); and then quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatl.*, 400 U.S. 62, 71 (1970)). "To meet [the second] requirement, a party must demonstrate that the challenged act had 'an immediate and practical impact,' or 'alter[ed] the legal regime' in which it operates." *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (first quoting *Golden &*

*Zimmerman LLC v. Domenech*, 599 F.3d 426, 433 (4th Cir. 2010); and then quoting *Bennett*, 520 U.S. at 156).

The decision to close AmeriCorps programs was a final agency action. The termination letters said as much. The agency told AmeriCorps award recipients that the award termination, program closure, and forced exit or removal of AmeriCorps and VISTA members is "a final agency action and is not administratively appealable." *See, e.g.*, ECF 5-38, at 14. The program closures "had 'an immediate and practical impact'" on the States—grantees no longer receive funding or the service of AmeriCorps and VISTA members. *See City of New York*, 913 F.3d at 431 (quoting *Golden & Zimmerman LLC*, 599 F.3d at 433).

The decision to remove all NCCC members from service also was final. AmeriCorps announced its decision this way:

> AmeriCorps is sending all NCCC members to their homes of record as soon as possible . . . . [A]ll teams are directed to return to their Region campus immediately . . . NCCC Members will be moved into administrative hold with pay status through April 30th, 2025, after which they will be exited from the NCCC program. The program will exit all Members early with Compelling Personal Circumstances (CPC) status.

*See* ECF 1-2. The message was clear: The agency's decision-making process was complete, and all NCCC members were exited from the program. *See* ECF 1-3. The action marked the consummation of the agency decision-making process.

At the motions hearing, counsel for the defendants was unable to answer the Court's questions about the status of the NCCC, including whether the NCCC is still in existence or whether any members remain. After the hearing, the defendants filed a supplemental brief that stated "the NCCC is still very much in existence." ECF 141, at 8. As evidence for their position, they submitted two emails regarding Forest Corps, a sub-program of the NCCC. One of the emails, sent April 29, 2025, informed future Forest Corps participants that "AmeriCorps will continue with

the Forest Corps program for this year" but qualified that "there is some uncertainty regarding the future of the program and operations may be curtailed at any point." *See id.* at 16. The other email, sent on an unidentified date, informed "current Forest Corps members" that "the Forest Corps program is continuing this year." *Id.* at 18. Both emails indicated that members may decline to participate in the program. *See id.* at 16, 18.

These two emails do not make the agency's decision to end the service of NCCC members any less final. The defendants have not disputed that "*all* NCCC members" were sent to their homes of record, moved to administrative hold, and exited from service. Informing a handful of *new* NCCC members that they may be in service in the future—with a heavy dose of "uncertainty" about the future of the program—is separate from the decision made two weeks earlier to "demobiliz[e]" all NCCC members. *See* ECF 1-2, at 2 (email to NCCC members with subject line "Letter to All Members on Demobilization"). And the undated email to "current" Forest Corps members, asking if they are still willing to participate in the program and advising them that they may "accept or decline the opportunity to participate," ECF 141, at 18, does not undermine the finality of the decision to remove all NCCC members from service. Even if these two emails suggest the NCCC has not been abolished entirely, removing over 750 NCCC members from service still constitutes final agency action. That the agency may, at some point in the future, implement the Forest Corps program again does not render the removal of NCCC members from service any less definitive. Surely, "*final* does not mean *permanent*." *Widakuswara v. Lake*, No. 25-CV-1015, 2025 WL 1166400, at *12 (D.D.C. Apr. 22, 2025); *see also Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435–36 (D.C. Cir. 1986) (explaining that a finality assessment requires looking to "whether the agency's position is 'definitive' and whether it has a 'direct and immediate . . . effect on the day-to-day business' of the parties challenging the action" (cleaned up) (quoting *Standard*

*Oil Co.*, 449 U.S. at 239)); *cf. Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 56 (D.C. Cir. 2016) ("The fact that a regulation might be interpreted again at some point in the indeterminate future cannot, by itself, prevent the initial interpretation from being final.").

The decision to remove all NCCC members from service also satisfies the second *Bennett* prong. The agency has pulled from service NCCC members who, pursuant to the agency's statute, carried out "national service programs" to "meet national and community needs." *See* 42 U.S.C. §§ 12611, 12612. NCCC members serving in the States were immediately placed on administrative hold before their removal at the end of April. *See, e.g.*, ECF 5-28, ¶ 12 (explaining that AmeriCorps "placed all NCCC teams serving in Michigan on administrative leave" pending their release from service on April 30, 2025). NCCC members who were engaged in efforts such as disaster relief were recalled from their service projects. *See* ECF 5-28, ¶ 13 (explaining that Michigan "had plans to deploy an additional NCCC team in April to some of the Michigan communities hit hardest by the March 2025 ice storm in Northern Michigan but had to abandon this plan as a result of the demobilization of NCCC members across the country"); ECF 5-30, ¶¶ 7–8 (NCCC members assigned to help distribute donations to communities impacted by Hurricane Helene removed from service). This action had "an immediate and practical impact" on the states where the NCCC members were serving. *See City of New York*, 913 F.3d at 431 (quoting *Golden*, 599 F.3d at 433). The agency's decision to demobilize all NCCC members was a final agency action. *Cf. New York v. McMahon*, No. 25-10601, 2025 WL 1463009, at *24 (D. Mass. May 22, 2025) (finding "the mass terminations of half the Department of Education, and the transfer of certain programs out of the Department" were final agency actions subject to judicial review); *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No. 25-cv-1780, 2025 WL 660053, at *5 (N.D. Cal. Feb. 28, 2025) ("OPM's direction to the other agencies [to dismiss employees] constituted a final agency action for the

purposes of the APA."); *Widakuswara*, 2025 WL 1166400, at *12 (finding that "blanket placement of employees on administrative leave" was a "discrete, final agency action[] subject to judicial review"); *Nat'l Treasury Emps. Union v. Vought*, No. CV 25-0381, 2025 WL 942772, at *12–13 (D.D.C. Mar. 28, 2025) (finding stop-work order issued at the Consumer Financial Protection Bureau constituted final agency action).[9]

The States challenge final agency actions reviewable under the APA.

### B.      Agency Discretion

"The APA prohibits judicial review of actions committed to agency discretion by law." *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 964 (4th Cir. 2025) (citing 5 U.S.C. § 701(a)(2)). The Court does not have jurisdiction to review such actions. *Id.* (citing *Angelex Ltd. v. United States*, 723 F.3d 500, 505–06 (4th Cir. 2013)). The agency argues that implementation of the NCCC is committed to agency discretion and is not subject to judicial review under the APA.

Section 701(a)(2) "'is a very narrow exception' and 'applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Angelex Ltd.*, 723 F.3d at 506 (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971)). Courts cannot review agency actions "when no judicially manageable standards are available to assess how and when an agency should exercise its discretion such that a court would have 'no law to apply.'" *Pharm. Coal.*, 126 F.4th at 963 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830–31 (1985)). Decisions committed to agency discretion by law include "an agency's decision

---

[9] The defendants appear to argue that the agency actions are not final because they represent "ongoing implementation of the Executive Order." ECF 106, at 25. An agency action is not unreviewable merely because there is more to come. Were it so, agencies could effectively avoid judicial review by invoking broadly worded Executive Orders.

not to institute enforcement proceedings," which implicates "'complicated balancing of a number of factors which are peculiarly within its expertise'"; the "refusal to grant reconsideration of an action because of material error" given "'the impossibility of devising an adequate standard of review for such agency action'"; and "[t]he allocation of funds from a lump-sum appropriation." *Lincoln v. Vigil*, 508 U.S. 182, 191–92 (1993) (first quoting *Heckler*, 470 U.S. at 831; and then quoting *ICC v. Locomotive Eng'rs*, 482 U.S. 270, 282 (1987)).

For example, in *Lincoln v. Vigil*, the Supreme Court held that the Indian Health Service's ("IHS") decision to discontinue a program providing clinical services was "'committed to agency discretion by law' and therefore not subject to judicial review under the [APA]." 508 U.S. at 184 (quoting 5 U.S.C. § 701(a)(2)). *Lincoln* concerned the Snyder Act and the Indian Improvement Act, statutes under which Congress generally authorized the IHS to "'expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians,' for the 'relief of distress and conservation of health'" and for "therapeutic and residential [mental health] treatment centers" *Id.* at 185 (quoting 25 U.S.C. §§ 13, 1621(a)(4)(D)). IHS, which received lump-sum appropriations, previously funded the Indian Children's Program, a collection of services that IHS provided in the Southwest. *Id.* at 184. The agency decided to discontinue the Indian Children's Program and instead fund nationwide efforts. *Id.* at 185–88. The program was not referenced in either the Snyder Act or the Improvement Act, nor was it referenced in the congressional appropriations act providing IHS with a lump sum appropriation. That is, "Congress never authorized or appropriated moneys expressly for the Program" or otherwise "'statutorily restrict[ed] what can be done with those funds.'" *Id.* at 187, 192 (quoting *LTV Aerospace Corp.*, 55 Comp. Gen. 307, 319 (1975)). The *Lincoln* Court affirmed that "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to

allocate resources by putting restrictions in the operative statutes . . . ." *Id.* at 193. However, "the appropriations Acts for the relevant period d[id] not so much as mention the Program, and both the Snyder Act and the Improvement Act likewise speak about Indian health only in general terms." *Id.* at 193–94. The Court distinguished the relevant appropriations acts from appropriations acts in which Congress did place restrictions on appropriated funds. *See id.* at 194 n.4. It emphasized that "where 'Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions . . . .'" *Id.* at 192 (quoting *LTV Aerospace*, 55 Comp. Gen. at 319). Thus, "[t]he decision to terminate the Program was committed to the Service's discretion." *Id.* at 194. Moreover, the APA's notice-and-comment rulemaking requirement did not apply to the agency's decision to discontinue the program due to the statute's exemption for "rules of agency organization" and "general statements of policy." *Id.* at 197 (quoting 5 U.S.C. § 553(b)(A)).

A contrast of the facts in *Lincoln* with the facts in this case illustrates why here, unlike in *Lincoln*, the decision to remove all NCCC members from service was not committed to agency discretion by law. In *Lincoln*, Congress did not mention the program terminated by the agency in the statutes authorizing the broader Indian health programs. Here, Congress authorized the creation of the NCCC by statute and established requirements for its operation and organization. *See* 42 U.S.C. § 12611 *et seq.* In *Lincoln*, the appropriation bills did not mention the terminated program at all. Here, the appropriations act mentions the NCCC. When appropriating funds "[f]or necessary expenses for the [AmeriCorps] to carry out [the 1973 Act] and the [1990 Act]" in Fiscal Year 2024 and 2025, Congress allocated roughly $37.7 million to the NCCC. *See* 2024 Appropriations Act, 138 Stat. at 694; 2025 Appropriations Act § 1101(a), 139 Stat. at 10–11. Finally, and of particular import here, in *Lincoln*, the agency was not required to engaged in notice-and-comment

rulemaking before it terminated the program. Here, Congress has required that when AmeriCorps makes "any significant changes to program requirements, service delivery or policy," it must do so through notice-and-comment rulemaking. *See* 2024 Appropriations Act § 401, 138 Stat. at 695. Thus, in contrast to the lump-sum appropriations for Indian health programs in general in *Lincoln*, Congress has specifically authorized the NCCC's creation, established requirements for its operation, allotted a specific amount to the NCCC in annual appropriations acts, and set parameters for when AmeriCorps can make changes to "program requirements, service delivery or policy" in the same act appropriating annual funding for the NCCC. Congress has, therefore, "circumscribe[d] agency discretion." *See Lincoln*, 508 U.S. at 193. AmeriCorps's restricted authority over the NCCC stands in sharp contrast to the agency's broad discretion over Indian health programs in *Lincoln*.[10]

The removal of all NCCC members from service was not committed to agency discretion by law. It is subject to the Court's review under the APA.

## C.    Standing

Article III of the Constitution extends the "judicial Power" of the federal courts only to "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1; *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). There is a case or controversy only if the plaintiff has standing to assert their claim. *TransUnion*, 594 U.S. at 423. To establish standing, a plaintiff must show "(1) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that the injury would likely be

---

[10] The defendants argue that "implementation of the NCCC program is left entirely to agency discretion under 42 U.S.C. § 12612(a)." ECF 106, at 9. The States respond that NCCC is a mandatory program. The Court need not resolve this dispute. Even if the agency had the authority to decommission NCCC members or abolish the NCCC in its entirety, there is still "law to apply" to the mass removal of NCCC members from service. *See Angelex Ltd.*, 723 F.3d at 506.

redressed by judicial relief." *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 294 (4th Cir. 2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). The plaintiffs "must demonstrate standing 'with the manner and degree of evidence' required at the relevant 'stage[ ] of the litigation.'" *Id.* at 295 (alteration in original) (quoting *Lujan*, 504 U.S. at 561). At this stage, that means they "must make a 'clear showing' that [they are] 'likely' to establish each element of standing." *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

Additionally, "standing is not dispensed in gross." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. Fed. Elec. Comm'n*, 554 U.S. 724, 734 (2008)). Instead, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* (quoting *Davis*, 554 U.S. at 734). When there are multiple plaintiffs, the Court need only determine that there is at least one plaintiff with standing for a particular claim to consider the claim. *Id.*; *see also Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Sec.*, 983 F.3d 671, 681 (4th Cir. 2020) ("[O]nly one plaintiff needs to have standing for a court to hear the case.").

Injury in fact is "the '[f]irst and foremost of standing's three elements.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)). The "injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). When, as here, "a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *Id.* (citing *Clapper*, 568 U.S. at 401).

The States allege that the agency violated the APA by failing to engage in notice-and-comment rulemaking required by law.[11] To establish injury-in-fact for violation of a procedural rule such as a notice-and-comment requirement, a plaintiff must allege more than "a bare procedural violation, divorced from any concrete harm." *See Spokeo*, 578 U.S. at 341. "When plaintiffs challenge an action taken without required procedural safeguards, they must establish the agency action threatens their concrete interest." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014); *see also Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 492 (D. Md. 2020) ("While violation of a procedural right '*in vacuo*' is insufficient by itself to confer Article III standing, a procedural injury that is tethered to some 'concrete interest' adversely affected by the procedural deprivation is sufficient." (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009))); *Nat'l Fed'n of the Blind v. U.S. Dep't of Educ.*, 407 F. Supp. 3d 524, 533 (D. Md. 2019) ("Deprivation of a procedural right . . . can constitute an injury for purposes of standing when it is tied to a specific resultant harm."). "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7; *see also Mendoza*, 754 F.3d at 1010 (noting that once a plaintiff has shown that "the agency action threatens their concrete interest[,] . . . the normal standards for immediacy and redressability are relaxed").

A plaintiff asserting a procedural violation "need not show that the result of the agency's deliberations will be different if the statutory procedure is followed." *Pye v. United States*, 269

---

[11] Because the Court finds that the States have shown a likelihood of success on the merits of their APA claim for failure to engage in notice-and-comment rulemaking, it does not reach the grounds for the other alleged APA violations relating to the mass closure of AmeriCorps programs or the removal of NCCC members from service. Further, because the Court finds that the States do not have standing to challenge AmeriCorps's reductions in agency staff, the Court does not address the claims challenging the staffing reductions.

F.3d 459, 471 n.7 (4th Cir. 2001). "Nor need they establish that correcting the procedural violation would necessarily alter the final effect of the agency's action on the plaintiffs' interest." *Mendoza*, 754 F.3d at 1010; *see also Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94 (D.C. Cir. 2002) ("A plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered."). "Rather, if the plaintiffs can 'demonstrate a causal relationship between the final agency action and the alleged injuries,' the court will 'assume[] the causal relationship between the procedural defect and the final agency action." *Mendoza*, 754 F.3d at 1010 (alteration in original) (quoting *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005)).

Here, the States bring several APA claims. In each of these claims, the States assert they have been injured by one or more of the following agency actions: (1) the mass closure of AmeriCorps programs; (2) the termination of NCCC members from service; and (3) the placement of 85 percent of AmeriCorps staff on administrative leave and the subsequent reduction in force.

### 1. AmeriCorps Program Closures

The States have standing to challenge the agency's decision to close over 1,000 AmeriCorps programs. On April 25, 2025, AmeriCorps notified the States, through state service commissions and state instrumentalities, that certain state-administered grants were terminated, that VISTA members would be removed from service projects, and that AmeriCorps members working on State and National programs must cease activity immediately. The loss of federal funding for grants awarded to state service commissions and state instrumentalities and the loss of

AmeriCorps and VISTA members working on those programs are concrete injuries caused by agency action. The States have standing to challenge the mass closure of AmeriCorps programs.[12]

### 2. The Termination of NCCC Members

The States also have standing to challenge the removal of NCCC members from service. NCCC is a national service corps operated by AmeriCorps whose mission includes assisting states with disaster relief efforts. ECF 1, ¶ 58(a). NCCC members are stationed in regional campuses around the country. *See* ECF 5-8, ¶ 32 (Colo. decl.). When the need arises, NCCC members are dispatched from their home campuses to the location in need. *See, e.g.*, *id.*; ECF 92-2, ¶ 15 (Cal. decl.); ECF 5-12, ¶ 13 (Del. decl.). NCCC members have helped with recovery from the California wildfires, New Mexico floods, and Hurricanes Helene and Milton in Florida. ECF 124-1, ¶ 17 (AmeriCorps Emps. Union Pres. decl.). In 2024, NCCC members conducted disaster relief and other projects in some of the plaintiff states. *See, e.g.*, ECF 5-12, ¶ 15 (10 NCCC participants in Delaware); ECF 5-18, ¶ 15 (90 NCCC participants in Kentucky); ECF 5-25, ¶ 10 (11 NCCC participants in Maine); ECF 5-39, ¶ 11 (17 NCCC participants in Rhode Island); ECF 5-42, ¶ 15 (47 NCCC participants in Washington).

---

[12] The defendants argue "Plaintiffs do not have standing to seek injunctive relief regarding assistance that is disbursed directly or otherwise provided via direct services to entities or citizens other than the Plaintiff states in this suit." ECF 106, at 16–17. But what the "'injury-in-fact' test requires" is "that the party seeking review be himself *among* the injured." *Lujan*, 504 U.S. at 563 (emphasis added) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972)). And "[i]f there is in fact some specific [agency action], applying some particular measure across the board . . . and if that [agency action] is final, and has become ripe for review . . . it can of course be challenged under the APA by a person adversely affected." *Lujan*, 497 U.S. at 890 n.2. As AmeriCorps award recipients, the States were injured by the final agency action of mass program closure on April 25, 2025, and they have standing to challenge that final agency action, even if the action also adversely impacted non-parties. *See, e.g.*, *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 25-CV-00097, 2025 WL 1116157, at *6–8, *24–25 (D.R.I. Apr. 15, 2025) (parties impacted by grant freeze that also impacted non-parties had standing to challenge agency action); *cf. New York*, 133 F.4th at 67–68; *Hispanic Affs. Project v. Acosta*, 901 F.3d 378, 387–88 (D.C. Cir. 2018).

At least two plaintiff states have been concretely injured by the agency's April 15, 2025 decision to terminate all NCCC members from service. Earlier this year, NCCC members were deployed to the western part of North Carolina to support the state's Hurricane Helene recovery effort. ECF 5-30, ¶ 8. NCCC members were helping staff the Multi-Agency Warehouse in Statesville, a facility operated by a state agency, the North Carolina Department of Public Safety's Emergency Management division. *Id.* The Warehouse "coordinates distribution of donations to affected communities in western North Carolina." *Id.* These NCCC members were terminated from service in April. *Id.* Likewise, Michigan "relies on NCCC AmeriCorps teams to be deployed to communities to manage and support residents." ECF 5-28, ¶ 13. Michigan's commission planned to "deploy an additional NCCC team in April to some of the Michigan communities hit hardest by the March 2025 ice storm in Northern Michigan but had to abandon this plan as a result of the demobilization of NCCC members across the country." *Id.*

The removal of NCCC members from these states is causally connected to a non-speculative increase in demand for state disaster relief services. Because disaster relief efforts are not discretionary, when the NCCC members engaged in these efforts were taken out of service, states could not simply opt out of filling this gap. This much is evident in North Carolina, where, since the NCCC members were ordered to leave, "the [state] Warehouse has struggled to backfill volunteers to replace the terminated NCCC service members, resulting in a backlog of incoming donations processing, picking and packing." ECF 5-30, ¶ 8. The termination of the NCCC program "has resulted in an overall delay in processing the inventory and disrupted management and operational continuity." *Id.*

Thus, there is a non-speculative and imminent threat of an increased reliance on state disaster relief services due to the mass removal of NCCC members in at least some of the plaintiff

states who relied on NCCC members for disaster relief assistance. The increased demand for state services comes with associated costs that amount to a cognizable injury. *See, e.g.*, *Pennsylvania v. President [of the] United States*, 930 F.3d 543, 562 (3d Cir. 2019), as amended (July 18, 2019) ("States will suffer a concrete financial injury from the increased use of state-funded services."), *rev'd and remanded on other grounds sub nom. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020).

This injury is not, as the defendants describe it, a "downstream" harm to state resources. In support of this argument, the defendants rely heavily on *United States v. Texas*, 599 U.S. 670 (2023), but that case finds no comparison here. In *Texas*, the Supreme Court considered a challenge to the Department of Homeland Security's ("DHS") guidelines for immigration enforcement, which prioritized arrest and removal of certain non-citizens. 599 U.S. at 673. Texas and Louisiana sued DHS and other federal officials and agencies, alleging that the new guidelines violated certain statutes by shirking DHS's responsibilities to make additional arrests of noncitizens. *Id.* at 673–74. The states argued that they had standing to challenge the guidelines based on the costs they would incur to provide social services to non-citizens who were not arrested under the new policy. *Id.* at 674. The Supreme Court rejected this theory of standing. *Id.* at 676. While recognizing the additional costs as an "injury," the Supreme Court concluded that these monetary costs were not "legally and judicially cognizable" because, at bottom, plaintiffs did not have standing to "challenge[] . . . the Executive Branch's exercise of enforcement discretion over whether to arrest or prosecute." *Id.* at 676–77. In so holding, the Supreme Court explained that "in 'American jurisprudence at least,' a party 'lacks a judicially cognizable interest in the prosecution . . . of another,'" highlighting the Executive Branch's "enforcement discretion over whether to arrest or prosecute." *Id.* at 677 (quoting *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973)). It noted that,

while states "sometimes have standing to sue the United States or an executive agency or officer[,] . . . . federal policies frequently generate indirect effects on state revenues or state spending," and "when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id.* at 680 n.3. Even so, the *Texas* Court underscored that "this case raises only the *narrow* Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law." *Id.* at 684–85 (emphasis added).

Here, the States do not assert standing based on financial costs they expect to incur in providing social services because of Executive Branch enforcement priorities. The States assert standing based on the costs they have and will incur in providing state disaster relief services that they relied on NCCC members to provide. *See, e.g.*, *DeOtte v. Nevada*, 20 F.4th 1055, 1068 (5th Cir. 2021) (Nevada had standing to challenge regulation impacting availability of contraceptive coverage based on "the financial strain caused by an increase in women relying on its family planning programs"). The *Texas* Court's warning that the "indirect effects" of federal policy are sometimes too attenuated to establish a state's standing is not on point here, where AmeriCorps has terminated the service of members of the NCCC—a national service corps dedicated "to meet[ing] national and community needs," 42 U.S.C. § 12611—who provide nondiscretionary disaster relief services in the States. The increase in demand for state services is a concrete harm caused by the removal of NCCC members.

At least North Carolina and Michigan have standing to challenge the decision to remove all NCCC members from service.[13]

---

[13] Because "only one" plaintiff needs standing for the Court to hear the claim, the Court need not decide whether the other plaintiffs have standing to challenge the NCCC member termination. *See Outdoor Amusement*, 983 F.3d at 681.

### C.    Reductions in Agency Staff

The States do not have standing to challenge AmeriCorps's decisions to place 85 percent of agency staff on administrative leave and to institute a RIF. They argue that the significant reduction in agency staff has prevented and will continue to prevent them from receiving assistance from AmeriCorps staff as they undergo the grant reapplication process and that it will delay the adjudication of their grant applications. The States rely on a declaration from Kelly Daly, the president of the AmeriCorps Employees Union, who asserts that the reduction from 720 to 116 AmeriCorps employees leaves "[t]he few remaining staff members . . . unable to complete the day-to-day work required to keep the Agency running." ECF 124-1, ¶¶ 25–26. According to Daly, this work includes providing "the needed technical assistance or program oversight" and administering funds for grant and project recipients, and she predicts "almost certain[] . . . difficulties" and an inability "to process new grant or grant continuation applications in a timely manner, if at all." *Id.* ¶ 28.

The States, too, express concerns that the reduction in AmeriCorps staff will cause delays in the grant application and approval processes. Maryland fears that, with the reduction in force, there will be delays in grant approval and the state will not be able to financially support AmeriCorps programs, to start its programs on time, "to realistically plan for future operations," or "to secure philanthropic assistance." ECF 5-21, ¶ 11(a)–(b). Arizona's commission has similar concerns about communication delays. *See* ECF 5-4, ¶¶ 18–20. Massachusetts and Delaware also are concerned that the loss of AmeriCorps staff will lead to delays in processing grant applications. *See, e.g.*, ECF 5-20, ¶ 13 (Mass. decl.); ECF 5-12, ¶ 17 (Del. decl.). Colorado's commission fears "[d]elays in future funding," "a lack of guidance on procedural questions," and "[a]n anticipated increase to approval times for administrative actions." ECF 5-28, ¶ 33(a)–(c).

The States also assert that several of them already have felt the effects of the reduction in AmeriCorps staff. Illinois's commission notes the sudden loss of "[a]ll communications with [its] federal [grant] portfolio manager," as a result of which Illinois has "no guidance concerning any necessary budget amendments in e-Grants" or its 2025 grant applications. ECF 5-16, ¶¶ 25–26. Maryland's commission states that it has not been able to engage in its regular communications with AmeriCorps agency staff for advice. ECF 5-21, ¶ 11.

These alleged harms do not satisfy the injury-in-fact requirement for standing. The anticipated delay in adjudicating grant applications because of the loss of AmeriCorps staff, on its own, is not a concrete harm. Insofar as the States identify concrete harms that may result from the delays—lack of funding, delayed starts to programs, and inability to plan or secure other funding— these future harms are possible but not concrete. "Allegations of *possible* future injury do not satisfy the requirements of Art[icle] III." *Whitmore v. Arkansas*, 498 U.S. 149, 158 (1990) (emphasis added). Instead, a plaintiff must show that "the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*, 568 U.S. at 414 n.5). At this point, the Court can only speculate about how the grant application process will unfold over the next few months and what the fallout of the staffing reductions will entail. Daly and the States' concerns about how delays in processing grant applications will cause the States harm are not unfounded, but right now, the anticipated harms are "too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'" *See Clapper*, 568 U.S. at 401 (quoting *Whitmore*, 498 U.S. at 158).

The States also claim they have been injured because the state service commissions have had to field questions about AmeriCorps programs they do not administer because there are not

enough AmeriCorps staff members left to answer their questions. *See* ECF 124, at 4 (citing ECF 5-39, ¶ 49 (R.I. decl.)). This, too, does not satisfy the injury requirement. The Supreme Court recently rejected a similar theory of injury. *See OPM v. Am. Fed'n of Gov't Emps., AFL-CIO*, No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025). At the district court, a group of nonprofits and unions challenged staff reductions across several federal agencies. *Am. Fed'n of Gov't Emps., AFL-CIO*, 2025 WL 660053, at *3. One of the plaintiff nonprofits, Vote Vets Action Fund ("VoteVets"), challenged a staff reduction of more than 1,000 employees at the Department of Veterans Affairs. *Id.* at *11. The district court found that the nonprofit had standing to challenge the staffing terminations based on the nonprofit chairman's statement that, because of the terminations, "[t]he time of VoteVets' staff and consultants has been diverted from VoteVets' regular activities to field and respond to inquiries from veterans and their families and to connect them with case workers in congressional offices." *Id.* at *12. The district court found standing in part because VoteVets had "been forced to divert 'almost all of [their] resources' in 'counteracting the problem,' depriving the organization of its ability to continue to provide services to its members." *Id.* (alteration in original) (citation omitted). It granted a temporary restraining order and then a preliminary injunction. *Id.*; *see Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No. 25-cv-1780, 2025 WL 820782, at *8 (N.D. Cal. Mar. 14, 2025). The Supreme Court stayed the injunction because the allegations of the nonprofits were "insufficient to support the organizations' standing." *OPM*, 2025 WL 1035208, at *1 (citing *Clapper*, 568 U.S. 398). Here, the States' alleged injury from having to field questions about impacted programs they do not administer likewise is insufficient to support standing.

Even if the States could establish injury-in-fact, they have not established that this Court could redress their injuries from the RIF. "To satisfy the redressability element of standing, a

plaintiff 'must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018) (quoting *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018)). "The burden imposed by this requirement is not onerous." *Id.* A plaintiff only needs to show that they "personally would benefit in a tangible way from the court's intervention." *Sierra Club*, 899 F.3d at 284 (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. 2000) (en banc)).

The States have not cleared this modest hurdle. If the Court were to find in favor of the States on their claims that the staffing reductions violated the APA (or the separation of powers) and to order the reinstatement of the terminated AmeriCorps staff, the Court could not tell the agency how to prioritize agency needs or direct the day-to-day operations of the staff. The priorities and assignments of employees would be within the discretion of the agency, not this Court. The States' theory of standing to challenge the agency's staffing reduction is premised on the unfounded assumption that the AmeriCorps employees would return seamlessly to their prior roles and functions and respond to communications and complete tasks in the timeframe the States expect. The Court cannot make that assumption. The States have not established their injuries resulting from the staffing reduction would be redressed by reinstating the terminated AmeriCorps staff.

In sum, the States have not shown that they have standing to challenge AmeriCorps's reduction in staffing. Their asserted injuries are either not concrete or speculative. And an injunction enjoining the reduction in staffing and ordering agency staff to return to work is not likely to redress their asserted injuries. Because the States do not have standing to challenge the

agency's staffing decisions, the Court denies the States' request to enjoin the reduction in AmeriCorps staff.

### D.    The Tucker Act and Jurisdiction over the States' Claims

The parties dispute whether this Court or the Court of Federal Claims has jurisdiction over the States' claims. The States argue this case belongs in this Court; the defendants argue this case belongs in the Court of Federal Claims.

"The United States is immune from suit unless it unequivocally consents." *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 322 (2020). Through the APA, the United States has consented to suit in the U.S. district courts by a person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. The APA's waiver of sovereign immunity only applies to "[a]n action in a court of the United States seeking relief other than money damages." *Id.* Judicial review under the APA is available only for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Through the Tucker Act, the United States has consented to suit in the Court of Federal Claims for "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). In these suits, the aggrieved party may seek money damages. *See Me. Cmty. Health Options*, 590 U.S. at 321–22. If "'a plaintiff has an adequate remedy by suit under the Tucker Act,' they are precluded from review under the APA." *Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023) (quoting *Randall v. United States*, 95 F.3d 339, 346 (4th Cir. 1996)). "The interplay between the Tucker Act and the APA is somewhat complicated and raises some significant issues of federal court jurisdiction." *Randall*, 95 F.3d at 346.

The States contend the Court has jurisdiction over their APA claims because they have been aggrieved by AmeriCorps's actions, they seek equitable relief not money damages, and they do not have an adequate remedy under the Tucker Act. AmeriCorps contends the States' APA claims, when stripped to their essence, are breach of contract claims for money damages against the United States that must be filed in the Court of Federal Claims. If the States' claims are what the States say they are, they belong here. If the States' claims are essentially breach of contract claims for monetary damages, they belong in the Court of Federal Claims.

Whether the States' claims are at their "essence" contract claims depends on (1) "the source of the rights" upon which the States base their claims and (2) "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). To answer these questions, the Court "must look beyond the form of the pleadings to the substance of the claim." S*uburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007). If the States' claims are contractual at their "essence," the States must seek relief in the Court of Federal Claims. *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1102 (D.C. Cir. 2022) (quoting *Megapulse*, 672 F.2d at 967).

### 1. Source of the Rights

The parties dispute the source of the rights on which the States base their claims. In the States' view, the source of their rights is federal statutes. In the defendants' view, the source of the rights is the terminated grants. To resolve this dispute, the Court "consider[s] whether, among other factors, the plaintiff[s'] asserted rights and the government's purported authority arise from statute," "whether the plaintiff[s'] rights 'exist[ ] prior to and apart from rights created under the contract,'" and "whether the plaintiff[s] 'seek[] to enforce any duty imposed upon' the government 'by the . . . relevant contracts to which' the government 'is a party.'" *Crowley*, 38 F.4th at 1107

(fourth alteration in original) (first quoting *Spectrum Leasing Corp.*, 764 F.2d 891, 894 (D.C. Cir.

1985); and then quoting *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017)).

Applying these factors here, the Court finds that the sources of the States' rights on which

they base their claims are federal statutes, not the grants. In their complaint, the States assert rights

that arise from federal laws that AmeriCorps allegedly violated when it terminated the AmeriCorps

grants, forced the exiting and removal of AmeriCorps members and VISTA members, and removed

NCCC members from service.[14] The States allege that AmeriCorps did not comply with, among

other statutory provisions, the notice-and-comment rulemaking requirement in the 2024

Appropriations Act and the 2025 Appropriations Act.[15] The right asserted—to participate in notice-

and-comment rulemaking prior to significant changes to AmeriCorps's program requirements,

service delivery or policy—is separate and apart from any rights that States have under the grants.

In fact, the States do not allege that AmeriCorps violated the terms of the grants or that AmeriCorps

owes them a duty under the grants. And the defendants never refer to the terms of the grants either.

Indeed, they affirm that "the terminated grants at present were not terminated because of a failure

to follow the material terms of the corresponding grant." ECF 106, at 31. The agency's "purported

---

[14] The defendants do not argue that the States must bring their claims challenging the removal of NCCC members in the Court of Federal Claims. Thus, the remainder of the Court's analysis in this section focuses on the claims involving the closure of AmeriCorps-funded programs.

[15] Because, as discussed later, the plaintiffs have demonstrated a likelihood of success on the merits of their claim that the defendants violated the APA by failing to engage in notice-and-comment rulemaking, the Court's analysis focuses on this claim. However, the other claims brought by the plaintiffs, which the Court does not reach at this stage, are also grounded in alleged violations of federal statutes and the U.S. Constitution, including the claims that AmeriCorps acted arbitrarily and capriciously and in excess of statutory authority, that AmeriCorps did not give the States an opportunity to challenge the grant terminations in violation of 42 U.S.C. § 12636(a)(2)(B), that AmeriCorps made changes in national service priorities without providing the States with advance notice in violation of 42 U.S.C. § 12572(f)(2), that AmeriCorps deprived states of congressionally mandated grant funding in violation of 42 U.S.C. § 12581(e), and that AmeriCorps violated the separation of powers doctrine. ECF 1, ¶¶ 207–17, 226–37.

authority," *Crowley*, 38 F.4th at 1107, for terminating the grants is a federal regulation that AmeriCorps cited in the termination letters. *See* ECF 1-7 (citing 2 C.F.R. § 200.340(a)(4)). The grant terms are simply not relevant to this case at all. "[I]t would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach." *Aids Vaccine Advocacy Coal. v. Dep't of State*, No. CV 25-00400, 2025 WL 752378, at *9 (D.D.C. Mar. 10, 2025), *stay denied*, 145 S. Ct. 753 (2025) (mem.). The source of the rights for the States' notice-and-comment claims is a federal statute, not the grants. *See Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) ("Maryland's claims ar[o]se under a federal grant program and turn[ed] on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties.").

### 2. Type of Relief Sought

The Court next considers whether the type of relief sought indicates the States' claims are, at their essence, contract claims. "The crux of this inquiry . . . boils down to whether" the States "effectively seek[] to attain monetary damages in the suit." *See Crowley*, 38 F.4th at 1107. The defendants argue that the "heart of this action . . . is a request to prevent the termination of those programs that are funded by grants or to enforce the monetary obligations of the government pursuant to" the grants. ECF 106, at 20. They insist that the States' requested relief is "reopening the spigot of grant disbursement." *Id.* at 21. As the agency sees it, because the States seek to force the government to keep paying them the funds under the grants, the States' claims are really breach of contract claims that must be filed in the Court of Federal Claims. The States, on the other hand,

insist they seek equitable relief, not money damages, and that this Court, not the Court of Federal Claims, has jurisdiction over their suit.

"To determine whether a plaintiff seeks primarily injunctive relief such that a district court has jurisdiction over his claim, courts must look to the 'essence' of the complaint and whether the relief requested is 'not . . . an incident of, or collateral to, a monetary award.'" *Coleman*, 74 F.4th at 615–16 (quoting *Randall*, 95 F.3d at 347). "A plaintiff does not 'in essence' seek monetary relief, however, merely because he or she hints at some interest in a monetary reward from the federal government or because success on the merits may obligate the United States to pay the complainant." *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995). Still, "Claims Court jurisdiction cannot be avoided by framing an essentially monetary claim in injunctive or declaratory terms." *Portsmouth Redev. & Hous. Auth. v. Pierce*, 706 F.2d 471, 474 (4th Cir. 1983).

*Bowen v. Massachusetts*, 487 U.S. 879 (1988), is instructive. There, the Supreme Court held that the APA's provision that precludes actions for "money damages" against the federal government, 5 U.S.C. § 702, "does not bar a State from seeking specific relief to obtain money to which it claims entitlement under the federal Medicaid statute," *Great-West Life & Annuity Ins. v. Knudson*, 534 U.S. 204, 212 (2002). In *Bowen*, Massachusetts sued the Secretary of Health and Human Services for alleged APA violations, seeking to enjoin the Secretary's refusal "to reimburse a State for a category of expenditures under its Medicaid program." 487 U.S. at 882. The Supreme Court concluded that the district court had jurisdiction to hear the case. *Id.* at 883. This was because the plaintiff was not seeking money damages, even though the relief sought involved the payment of money. *Id.* at 893. Rather, the plaintiff sought to enjoin the agency from refusing to reimburse the state for certain expenditures under the Medicaid program. *Id.* at 893–94. Specifically, Massachusetts sought "to enforce § 1396b(a) of the Medicaid Act, which provides that the

Secretary [of Health and Human Services] 'shall pay' certain amounts for appropriate Medicaid services." *Id.* at 900. The Court rejected the argument that the state brought a suit for money damages, even though the suit sought to "enforce the statutory mandate . . . which happens to be one for the payment of money." *Id.* As the Supreme Court explained, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.* at 893. If the district court's judgment led the Secretary to "reimburse Massachusetts the requested sum," then "this outcome is a mere by-product of that court's primary function of reviewing the Secretary's interpretation of federal law." *Id.* at 910. The *Bowen* Court reasoned that money damages "are given to the plaintiff to substitute for a suffered loss, whereas specific remedies are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Id.* at 895 (internal quotation marks & emphasis omitted) (quoting *Md. Dep't of Hum. Res.*, 763 F.2d at 1446). *Bowen* thus rejected the notion that all forms of monetary relief are also monetary damages. *Id.* at 897–98.

Since *Bowen*, the Supreme Court has confirmed that *Bowen* "did not deal with specific performance of a *contractual* obligation to pay *past* due sums." *Great-West Life*, 534 U.S. at 212. *See also Me. Cmty. Health Options*, 590 U.S. at 326 ("In *Bowen*, the State did not seek money damages, but instead sued for prospective declaratory and injunctive relief to clarify the extent of the Government's ongoing obligations under the Medicaid program.").

Here, as in *Bowen*, the essence of the complaint and requested relief is equitable, not monetary. The States do not request any monetary damages. They do not seek money as a substitute for a loss, *see Bowen*, 487 U.S. at 895, or "specific sums already calculated, past due, and designed to compensate for completed labors," *see Me. Cmty. Health Options*, 590 U.S. at 327. Instead, the States seek declaratory and prospective injunctive relief. Specifically, they seek a declaration "that

the decision to dismantle AmeriCorps and actions taken to effectuate it are unlawful and/or unconstitutional because they violate the APA and/or the United States Constitution." ECF 1, at 63. They seek an injunction that would "postpone the effective date of the decision to dismantle AmeriCorps and actions taken to effectuate it," "vacate the decision to dismantle AmeriCorps and actions taken to effectuate it," and enjoin the defendants "from effectuating the decision to dismantle AmeriCorps." *Id.* To be sure, the "decision to dismantle AmeriCorps" described in the States' complaint includes the decision to terminate grants awarded to the States. But that their requested relief will "require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *See Bowen*, 487 U.S. at 893.

In addition to the relief that is sought, the Court also considers the relief that is "appropriate." *Megapulse*, 672 F.2d at 968. The appropriate relief here, as discussed later, is enjoining the agency actions that were "significant changes" to "program requirements, service delivery or policy" made without public notice-and-comment rulemaking in violation of Congress's instructions in its annual appropriations for the agency. *See* 2024 Appropriations Act § 401, 138 Stat. at 695. This relief requires the agency to restore the status quo before it made these "significant changes" and thus to restore the AmeriCorps programs, including the grant awards and the AmeriCorps members and VISTA members associated with the programs. That the relief requires AmeriCorps to ultimately disburse grant funds does not mean monetary damages are the essence of the relief. *See Kidwell*, 56 F.3d at 284. As the Supreme Court held in *Bowen*, simply because the appropriate relief "may require one party to pay money to another" does not strip this Court of jurisdiction. *See Bowen*, 487 U.S. at 893, 910.

The essence of the appropriate relief in this case is the enforcement of the congressionally mandated notice-and-comment rulemaking requirement for "any significant changes" to "program

requirements, service delivery or policy." That a Court Order enjoining the grant terminations will result in payment of funds to the States is "a mere by-product of [the] court's primary function" of reviewing agency action under the APA. *See id.* at 910.

After examination of the rights asserted and the requested and appropriate relief, the Court easily concludes that the States' APA claims are not, in "essence," contract claims. *See Megapulse*, 672 F.2d at 968.

Moreover, the Tucker Act does not provide the States with an adequate remedy. The Tucker Act "authorize[s] courts to award injunctive relief in limited circumstances, when such relief is necessary to provide an entire remedy and when the injunction is 'an incident of and collateral to' an award of monetary relief." *Randall*, 95 F.3d at 347 (quoting 28 U.S.C. § 1491(a)(2)). This authorization under § 1491(a)(2) is limited:

> To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States.

The scope of this authorization to grant injunctive relief does not include enjoining the closure of AmeriCorps programs, requiring the agency to engage in notice-and-comment rulemaking, reinstating terminated grants, and returning AmeriCorps and VISTA members to their programs.[16]

---

[16] While the defendants argue that this action, in essence, is to compel the government to pay out amounts owed under the grant agreements between the States and AmeriCorps, restoration of the grant funding alone is insufficient to restore the members who worked on the terminated programs. VISTA members receive their living allowance directly from AmeriCorps. The States are not seeking money to retain VISTA members; they are seeking the re-assignment of VISTA members to their service projects. And while AmeriCorps members' living allowances are paid out of the terminated grant funds, their education awards for completing service are paid directly out of the National Service Trust. Restoration of grant funds alone will not remedy the States' harm caused by the termination of AmeriCorps programs.

Because of the narrow scope of equitable relief available under the Tucker Act, the States cannot obtain this relief in the Court of Federal Claims.

The Federal Circuit has confirmed as much. In *Katz v. Cisneros*, the Federal Circuit reversed a district court's order transferring a case to the Court of Federal Claims, concluding that the Tucker Act did not deprive the district court of jurisdiction over a claim brought by a housing developer seeking contract payments reduced by an order of the Department of Housing and Urban Development ("HUD"). 16 F.3d 1204, 1208–09 (Fed. Cir. 1994). The Federal Circuit determined that the developer could not obtain relief in the Court of Federal Claims because it sought prospective relief and "payments to which it alleges it is entitled pursuant to federal statute and regulations" rather than "money as compensation for a loss suffered." *Id.* at 1208.[17] The developer challenged HUD's interpretation of regulations that impacted its payments under a contract. *Id.* at 1206. The *Katz* Court concluded that "[a]n adjudication of the lawfulness of HUD's regulatory interpretation will have future impact on the ongoing relationship between the parties" and "[t]he Court of Federal Claims cannot provide this relief." *Id.* at 1209. The case at its root was a "challenge[] [to] the interpretation of law which controls payments to [the developer]," rather than "a contract case." *Id.* The developer "challenged HUD's actions as a regulator." *Id.* The Court of Federal Claims did not have jurisdiction over the case even if, after HUD's interpretation of the regulation had been adjudicated, "monetary consequences [would] flow through the contractual scheme." *Id.*

Here, too, the States seek prospective relief, rather than "money as compensation for loss suffered." *See id.* at 1208. The only appropriate remedy for the alleged violation of the notice-and-

---

[17] The Federal Circuit also determined that the Court of Federal Claims lacked jurisdiction over the case because there was no privity of contract between the developer and the government. *See Katz*, 16 F.3d at 1210. However, it did not ground its holding in the lack of privity alone.

comment requirement is to restore the AmeriCorps programs, including both the grant funding and members, until the agency conducts notice-and-comment rulemaking. The Court of Federal Claims cannot award this prospective relief. *See id.* at 1209. Even if "monetary consequences will flow through the [grants]," the Tucker Act is not the proper avenue of relief. *See id.*

The defendants insist that the Supreme Court's April 4, 2025 per curiam opinion in *Department of Education v. California*, 145 S. Ct. 966 (2025), requires this Court to find that it does not have jurisdiction over the States' claims. In *California*, the Supreme Court stayed a temporary restraining order "enjoining the Government from terminating various education-related grants." *Id.* at 968. The District of Massachusetts had found that the plaintiff states were likely to succeed on their APA claims and issued a TRO requiring the government "to pay out past-due grant obligations and to continue paying obligations as they accrue." *Id.* The First Circuit denied the government's motion for a stay, brought in part based on the government's contention that the district court lacked jurisdiction over the suit because it belonged in the Court of Federal Claims. *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96–97 (1st Cir. 2025). The First Circuit determined that, "although the terms and conditions of each individual grant award [we]re at issue," the Tucker Act did not divest the district court of jurisdiction. *Id.* On the government's emergency application, the Supreme Court stayed the TRO because the government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *California*, 145 S. Ct. at 968. The Court recognized that, under *Bowen*, "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* (quoting *Bowen*, 487 U.S. at 910). However, the Court reasoned that the "APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *Id.*

(quoting *Great-West Life*, 534 U.S. at 212). The Court also found that, because the plaintiffs "represented in th[at] litigation that they ha[d] the financial wherewithal to keep their programs running," they could "recover any wrongfully withheld funds through suit in an appropriate forum." *Id.* at 969.

*California* does not compel the conclusion that this Court lacks jurisdiction over the States' claims. The *California* Court's "stay order is not a ruling on the merits," *see Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring), even if it provides "a window into the Supreme Court's view of the merits," *CASA de Md., Inc. v. Trump*, 971 F.3d 220, 230 (4th Cir. 2020), *vacated for reh'g en banc*, 981 F.3d 311 (4th Cir. 2020) (dismissed Mar. 11, 2021). While lower courts certainly must respect Supreme Court stay orders issued on the Court's emergency docket, *see CASA*, 971 F.3d at 230, *California* did not overturn *Bowen*, and under *Bowen*, the States' claims are not, at their essence, contract claims. Also, *California* is factually distinguishable. There, "the terms and conditions of each individual grant award [we]re at issue." *California*, 132 F.4th at 96–97. Here, neither party relies on the terms and conditions of individual grant awards to either raise or defend against the legal challenge. Here, the States do not seek pay out for past-due grant obligations or enforcement of a contractual obligation to pay money. And here, the appropriate relief is not an order requiring the defendants "to pay out past-due grant obligations and to continue paying obligations as they accrue." *See California*, 145 S. Ct. at 968. The relief here remedies the defendants' violation of a legal obligation to make changes to AmeriCorps "program requirements, service delivery or policy" only through public notice-and-comment rulemaking. *See* 2024 Appropriations Act § 401, 138 Stat. at 695. And in contrast to the plaintiffs in *California*, who "represented . . . that they have the financial wherewithal to keep their programs running" and could "recover any wrongfully withheld funds through suit in an

appropriate forum," *California*, 145 S. Ct. at 969, here, as discussed below, the States have shown that they will suffer irreparable harm from the loss of not only grant funding but also AmeriCorps and VISTA members serving states service programs.

AmeriCorps also relies on *U.S. Conference of Catholic Bishops v. U.S. Department of State*, No. 25-CV-00465, 2025 WL 763738 (D.D.C. Mar. 11, 2025), and *Solutions in Hometown Connections v. Noem*, No. LKG-25-885, 2025 WL 1103253 (D. Md. Apr. 14, 2025). In *Conference of Catholic Bishops*, the court understood the plaintiff to seek "an award of money due." 2025 WL 763738, at *5. This Court does not understand the States to seek a similar money award. In *Solutions in Hometown Connections*, the Homeland Security Secretary decided "to indefinitely freeze, and to ultimately terminate, certain grants" issued by the United States Citizenship and Immigration Services to, among other things, "assist lawful permanent residents with learning English, studying for the citizenship test and applying to be naturalized citizen." 2025 WL 1103253, at *1. The court concluded that the relief sought was money damages because the plaintiffs were seeking "reimbursement for expenses already incurred in reliance upon the terms of their Grants," *id.* at *11, akin to the specific past due sums discussed in *Maine Community Health Options*, 590 U.S. at 327. Unlike the plaintiffs in these cases, the States do not seek reimbursement for expenses incurred or money damages "to substitute for a suffered loss." *See Bowen*, 487 U.S. at 895 (emphasis omitted) (quoting *Md. Dep't of Hum. Res.*, 763 F.2d at 1446).

Since *Megapulse*, the District of Columbia Circuit has warned against a Tucker Act interpretation that is "so broad as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." 672 F.2d at 968. The

States' claims are not contractual in nature. This Court has jurisdiction over them.[18]

## III.  Preliminary Injunction

To obtain a preliminary injunction, the States must establish (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm if preliminary relief is not granted; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest. *See Frazier v. Prince George's County*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter*, 555 U.S. at 20).

### A.  Likelihood of Success on the Merits

The States are likely to succeed on the merits of their APA claim that the agency's failure to engage in notice-and-comment rulemaking before closing AmeriCorps programs and ending the service of NCCC members was not in accordance with the law.

---

[18] Other district courts have reached similar conclusions in grant termination cases decided after the Supreme Court's grant of a stay in *California*. *See, e.g.*, *Sustainability Inst. v. Trump*, No. 25-CV-2152, 2025 WL 1486978, at *1–6 (D.S.C. Apr. 29, 2025) (finding jurisdiction over APA claims brought after the federal government froze funding and distinguishing *California* because "the terms and conditions of the individual grants are not at issue here" and "[p]laintiffs have provided considerable evidence of irreparable harm should they not regain access to their grant funding"); *S. Educ. Found. v. U.S. Dep't of Educ.*, No. 25-CV-1079, 2025 WL 1453047, at *5–11 (D.D.C. May 21, 2025) (holding the district court had jurisdiction over APA and non-APA claims arising out of federal grant terminations); *Climate United Fund v. Citibank, N.A.*, No. 25-CV-698, 2025 WL 1131412, at *9–12 (D.D.C. Apr. 16, 2025) (holding Tucker Act did not apply to claims that EPA violated the APA and Constitution by terminating grants); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 25-CV-00097, 2025 WL 1116157, at *14 (D.R.I. Apr. 15, 2025) (holding Tucker Act did not apply to claims that agencies violated the APA by freezing grants and contracts authorized under two federal statutes); *Maine v. U.S. Dep't of Agric.*, No. 25-CV-00131, 2025 WL 1088946, at *19 (D. Me. Apr. 11, 2025) (holding Tucker Act did not apply to claims challenging agencies' "compliance with the APA"); *Pacito v. Trump*, No. 25-CV-255, 2025 WL 1077401 (W.D. Wash. Apr. 9, 2025) (holding Tucker Act did not apply to claims challenging termination of funding for United States Refugee Assistance Program because plaintiffs asserted "rights derived from statutory mandates, not contractual promises, and [sought] equitable enforcement of statutory obligations, not contractual remedies").

The APA directs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A),(C). "Congress enacted the APA to provide a general authorization for review of agency action in the district courts." *Bowen*, 487 U.S. at 903. The APA "requires agencies to engage in 'reasoned decisionmaking'" and establishes procedures for judicial review and "accountab[ility] to the public." *Dept. of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (first quoting *Michigan* v. *EPA*, 576 U.S. 743, 750 (2015) (internal quotation marks omitted), and then quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)).

"[W]here an agency's decision does not comport with governing statutes or regulations, that decision is 'not in accordance with law' and must be set aside." *J.E.C.M. ex rel. Saravia v. Lloyd*, 352 F. Supp. 3d 559, 583 (E.D. Va. 2018). An agency's "order may not stand if the agency has misconceived the law." *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). In determining whether agency action is "not in accordance with law," the court must "bear[] in mind that it is [the court's] duty under the APA to 'decide all relevant questions of law' and to 'interpret constitutional and statutory provisions.'" *Perez v. Cuccinelli*, 949 F.3d 865, 872 (4th Cir. 2020) (citing 5 U.S.C. § 706); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391–92 (2024) ("The APA thus codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment.").

"Generally, an agency decision is arbitrary and capricious if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the

product of agency expertise.'" *Sierra Club*, 899 F.3d at 293 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)). Of course, "'agencies are free to change their existing policies as long as they provide a reasoned explanation for the change,' 'display awareness that they are changing position,' and consider 'serious reliance interests.'" *FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 917 (2025) (cleaned up) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)).

The States allege that the agency violated the APA by failing to engage in notice-and-comment rulemaking before terminating 1,031 AmeriCorps programs and more than 750 NCCC members. A violation of a notice-and-comment rulemaking requirement can run afoul of the APA in three ways. An agency acts "contrary to law" when it fails to engage in notice-and-comment procedures "explicitly required" by Congress. *Michigan v. EPA*, 268 F.3d 1075, 1088, 1089 (D.C. Cir. 2001) ("In making such determinations EPA must use notice and comment proceedings. . . . Because Congress's intent is clear, EPA's proposed approach is simply contrary to law."). Failure to adhere to a notice-and-comment rulemaking requirement is an action not "made in 'observance of procedure required by law.'" *HLI Lordship Indus., Inc. v. Comm. for Purchase from the Blind & Other Severely Handicapped*, 791 F.2d 1136, 1140 (4th Cir. 1986) (quoting 5 U.S.C. § 706(2)(D)). And such actions also "may be set aside as arbitrary and capricious." *Safari Club Int'l v. Zinke*, 878 F.3d 316, 325 (D.C. Cir. 2017).

In the act appropriating AmeriCorps funding for Fiscal Year 2024, Congress included the following requirement: "[AmeriCorps] shall make any significant changes to program requirements, service delivery or policy only through public notice and comment rulemaking." 2024 Appropriations Act § 401, 138 Stat. at 695. Congress re-adopted this requirement for Fiscal Year 2025 by reference. *See* 2025 Appropriations Act § 1101(a), 139 Stat. at 10–11 (appropriating

funds for Fiscal Year 2025 "under the authority *and conditions* provided in applicable appropriations Acts for fiscal year 2024" (emphasis added)). In fact, this provision has been in the annual appropriations bill funding AmeriCorps for many years. *See, e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 401, 136 Stat. 4459, 4900 (2022) ("[AmeriCorps] shall make any significant changes to program requirements, service delivery or policy only through public notice and comment rulemaking."); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, § 401, 136 Stat. 49, 488 (same). A version of this requirement first appeared in the 2004 appropriations statute, directing AmeriCorps to "make any significant changes to program requirements or policy only through public notice and comment rulemaking." Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, 118 Stat. 3, 402. The agency argues that this notice-and-comment provision does not apply to the agency actions challenged here. The Court disagrees.

"When construing a statute, we start with its text." *Raplee v. United States*, 842 F.3d 328, 332 (4th Cir. 2016). "'[A]bsent ambiguity or a clearly expressed legislative intent to the contrary,' we . . . give a statute its 'plain meaning.'" *United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010) (alteration in original) (quoting *United States v. Bell*, 5 F.3d 64, 68 (4th Cir. 1993)). "To determine a statute's plain meaning, this court looks not only to the statute's language, but also to the context in which that language appears, and the broader context of the statute as a whole." *Pharm. Coal.*, 126 F.4th at 953.

The statute says: "[AmeriCorps] shall make any significant changes to program requirements, service delivery or policy only through public notice and comment rulemaking." 2024 Appropriations Act § 401, 138 Stat. at 695. By the statute's unambiguous terms, AmeriCorps may make "any significant changes" to "program requirements," "service delivery," and "policy"

only through "public notice and comment rulemaking." The government seems to interpret the text to require notice-and-comment rulemaking for service delivery changes only if there is a change in "'service delivery' . . . requirements." *See* ECF 106, at 29. This strained interpretation distorts the plain language of the statute. The word "requirements" is modified only by "program"; it is not modified by "service." The text simply does not say, and cannot be reasonably read to say, that notice-and-comment rulemaking is required before AmeriCorps may make any significant changes to "service delivery requirements."[19]

The term "service delivery" plainly means the delivery of service through service programs funded by AmeriCorps and carried out with the help of volunteers and service members. Neither party suggests a different understanding of the term. Consideration of the "specific context in which [the] language is used, and the broader context of the statute as a whole" confirms this interpretation of "service delivery." *See In re Total Realty Mgmt., LLC*, 706 F.3d 245, 251 (4th Cir. 2013) (quoting *Holland v. Big River Minerals Corp.*, 181 F.3d 597, 603 (4th Cir. 1999)). Congress included the notice-and-comment requirement in the annual appropriations bill that funded AmeriCorps "to carry out" the statutes that authorized the terminated AmeriCorps grants, the national service positions that are no longer filled with AmeriCorps members, the VISTA program, and the NCCC. *See* 2024 Appropriations Act,138 Stat. at 694–95. Those statutes authorize AmeriCorps to make grants to support the planning, operation, and expansion of service programs; to approve AmeriCorps member positions to carry out those programs; to recruit and

---

[19] The government also suggests that "service" modifies not only "delivery" but also "policy" such that notice-and-comment rulemaking is required before making changes to "service delivery" and "service policy." *See* ECF 106, at 29. Regardless of whether "service" modifies both "delivery" and "policy," the text is clear and unambiguous: "[A]ny significant changes" to "service delivery" may be made only through public notice-and-comment rulemaking.

place VISTA members in full-time volunteer positions; and to create the NCCC to "carry out" the purpose of "meet[ing] national and community needs" by working in teams to complete service projects. *See* 42 U.S.C. §§ 4951 *et seq.*; *id.* §§ 12571 *et seq.*; *id.* §§ 12611 *et seq.*[20]

On April 25, 2025, in one fell swoop, the agency closed hundreds of AmeriCorps service programs in every state, abruptly cut off nearly $400 million in program funding (which represents about half of all AmeriCorps funding), and required programs to "cease all award activities." *See* ECF 1-6, at 3–19; *see, e.g.*, ECF 1-7, at 2. More than 80 percent of the programs cut were AmeriCorps State and National programs—the largest grant program that AmeriCorps runs. ECF 1, ¶ 178. In addition to the loss of program funding, grantees were instructed that all AmeriCorps member activity must "cease immediately" and to exit all AmeriCorps members serving on the programs due to "program closure." *See, e.g.*, ECF 1-7, at 3. Program closures impacted roughly 30,000 AmeriCorps and VISTA members. *See* ECF 1-6, at 3. As a result of the mass program closures, entities selected to operate and plan national service programs lost an essential source of funding, AmeriCorps members were exited from their national service positions, and VISTA members have been removed from service projects. This has led to significant disruptions in the delivery of services, including the termination or suspension of childhood literacy programs, tutoring, mobility access, assistance with college admissions for rural students, and classroom support at early childhood centers. *See, e.g.*, ECF 5-9, ¶ 21 (Conn. decl.); ECF 5-13, ¶ 8.c (Del. decl.); ECF 5-22, ¶¶ 9.c, 10 (Md. decl.); ECF 5-27, ¶ 11 (Mich. decl.); ECF 5-44, ¶ 15 (Wash. decl.). By cutting more than 80 percent of the programs funded by America State and National

---

[20] The Court notes that Congress appropriated funds to "carry out" statutes that enshrine other protections to prevent changes to AmeriCorps program policy from "adversely affect[ing]" service programs. *See, e.g.*, 42 U.S.C. § 12572(f)(3)(B) ("[AmeriCorps] shall by regulation establish procedures to ensure the equitable treatment of national service programs that . . . would be adversely affected by annual revisions in such national service priorities.").

grants and forcing the removal of roughly 30,000 AmeriCorps and VISTA members from service, the agency clearly made "significant changes to . . . service delivery."

The same is true for the agency's decision to remove NCCC members from service. On April 15, 2025, the agency sent "all NCCC members" to their homes of record and placed them on administrative hold pending their exit from the NCCC program. *See* ECF 1-2, at 2. As a result, NCCC members providing disaster relief services were pulled out of service projects, and planned service initiatives have been cancelled. ECF 5-28, ¶ 13 (Mich. decl.) ECF 5-30, ¶¶ 7–8 (N.C. decl.). The states can no longer rely on NCCC members to assist them when disasters strike. These two agency actions—individually and collectively—constitute "significant changes to . . . service delivery."

The Court's conclusion turns entirely on a reading of the plain and unambiguous statutory language. So a peek into the legislative history of the notice-and-comment requirement is not necessary. But it is enlightening. The requirement was included in a bipartisan amendment to the bill funding AmeriCorps for Fiscal Year 2004. Senator Barbara Mikulski of Maryland, the amendment's principal author, explained its inception and purpose:

> [T]his amendment is simple and straightforward . . . . It . . . insists that any changes for rules for volunteer programs must have public comment. One of my guiding principles is that people have a right to know, to be heard and to be represented. The Mikulski-Bond amendment upholds this principle. *It ensures that the public gets a meaningful chance to comment on decisions that affect their communities and the volunteers who serve them.* Recently, National Service tried to change the rules for AmeriCorps. I was very troubled by the corporation's actions for two reasons: the process and the policy. My first concern was the process or actually the lack of a process. *The corporation acted behind closed doors without input from Congress, volunteer advocates, or the communities they serve.* . . . My second concern is policy. *The AmeriCorps rules changes would hurt communities who depend on volunteers by eliminating support for long-standing, successful volunteer programs and by increasing financial and administrative burdens on communities and volunteer organizations.* . . . [I]t is clear that the corporation needs specific direction to ensure that the public has a right to be heard. . . . [T]he staff must not make rule changes without leadership and public comment. This

amendment is good process, and good policy. *It makes sure that the public has an opportunity to comment on any changes to National Service programs.*

149 Cong. Rec. S14507 (daily ed. Nov. 12, 2003) (statement of Sen. Mikulski) (emphases added). The catalyst for the notice-and-comment requirement was to prevent AmeriCorps from pulling the rug out from under volunteer organizations and the communities they serve—exactly what occurred here when the agency "acted behind closed doors" to make a change in service delivery and "eliminat[ed] support for long-standing, successful volunteer programs" without affording the public the opportunity to comment "on decisions that affect [their] communities and the volunteers who serve them." *See id.*

The termination of AmeriCorps grants and programs, the exiting of AmeriCorps members, and the removal of NCCC members constitute "significant changes to . . . service delivery." By law, the agency could only make those changes through public notice-and-comment rulemaking.[21] Because the agency did not do so, the States have shown a likelihood of success that the agency actions were contrary to law, arbitrary and capricious, and without observance of procedures required by law, in violation of the APA.[22]

---

[21] As the defendants point out, the APA's notice-and-comment requirements do not apply to "a matter relating to agency management or personnel or to . . . grants." 5 U.S.C. § 553(a)(2). However, the APA is not the only source of procedural requirements for agency action. Indeed, the APA itself acknowledges as much. *See* 5 U.S.C. § 553(b) (exempting certain agency rules from rulemaking requirements "[e]xcept when notice or hearing is required *by statute*" (emphasis added)). If either of the agency actions challenged here is exempted from the APA's notice-and-comment requirement, that exemption is preempted by the more specific language in the appropriations act.

[22] None of the parties discusses what notice-and-comment rulemaking procedures AmeriCorps must follow. Under the APA, notice-and-comment rulemaking requires a notice of proposed rulemaking in the Federal Register, which must provide, among other things, "the terms or substance of the proposed rule or a description of the subjects and issues involved" and the agency's legal authority, and an opportunity to submit "written data, views, or arguments," which must be "consider[ed]" by the agency. 5 U.S.C. § 553. Whatever notice-and-comment procedures AmeriCorps must follow, there is no dispute that it followed none here.

### B.    Irreparable Harm

To obtain a preliminary injunction, the States must show that they likely will suffer irreparable harm if the agency actions are not enjoined. *Winter*, 555 U.S. at 22. "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent'" and that the harm "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (first quoting *Direx Isr., Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991); and then quoting *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 680 (7th Cir. 2012)). Though "a procedural injury standing alone is insufficient to support a finding of irreparable harm, . . . it may be sufficient if it also detrimentally affects some other concrete interest of the plaintiffs." *Ass'n of Cmty. Cancer Ctrs.*, 509 F. Supp. 3d at 500 (citing *Summers*, 555 U.S. at 496). "Where a Plaintiff has been deprived of notice and the opportunity 'to have their comments considered prior to the promulgation of a rule which threatens' serious harms to their interests, they have suffered 'irreparable harm.'" *Am. Fed. of Teachers v. Dep't of Educ.*, No. SAG-25-628, 2025 WL 1191844, at *22 (D. Md. Apr. 24, 2025) (quoting *Ass'n of Cmty. Cancer Ctrs.*, 509 F. Supp. 3d at 501).

In similar cases, courts have found that plaintiffs asserting a notice-and-comment APA violation were likely to suffer irreparable harm if the agency action was not enjoined. For example, in *Northern Mariana Islands v. United States*, a district court granted a preliminary injunction enjoining enforcement of a new rule promulgated without proper notice-and-comment procedures. In that case, the Commonwealth of the Northern Mariana Islands, a U.S. territory, relied heavily on foreign workers who would be ineligible to enter the United States under federal immigration law. 686 F. Supp. 2d 7, 11–12 (D.D.C. 2009). When Congress enacted legislation to make

immigration policy more uniform, it established a transition period for the territory that involved a permit system and gave the Secretary of DHS broad authority to determine the number and allocation of permits issued under the new law. *Id.* at 12. One month before the transition period began, DHS announced an interim rule that would go into effect at the start of the transition period and would establish certain permit requirements, including a numerical limit on the number of permits and conditions for employers to utilize them. *Id.* at 12–13. DHS published notice of the interim rule and invited comments but "acknowledged . . . that the interim rule w[ould] take effect without being revised to account for any comments . . . ." *Id.* at 13. The court found that DHS likely violated the APA by issuing the interim rule without considering comments from interested parties, including the territory. *Id.* This procedural violation was an "actionable harm" that could not "be cured by ultimate success on the merits." *Id.* at 17. The rule would "dramatically alter the [territory's] current system for admitting nonresident guestworkers, who constitute two-thirds of the . . . private workforce." *Id.* The court found that DHS's failure to engage in notice-and-comment rulemaking "impaired the [territory's] ability to protect its interests" and that "the damage done by DHS'[s] violation of the APA cannot be fully cured by later remedial action." *Id.* at 18. "Once the program structured by the Rule has begun operation . . . DHS is far less likely to be receptive to comments," so without a preliminary injunction to prevent the rule from taking effect, the territory "w[ould] never have an equivalent opportunity to influence the Rule's contents." *Id.* at 18–19. Since the new rule—which had not "been tested via exposure to diverse public comment"—would radically change the territory's labor market, the territory would be irreparably harmed by the rule if it were not enjoined. *See id.* at 18 (quoting *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005)).

Similarly, in *Association of Community Cancer Centers*, the district court found that organizations representing health care stakeholders such as providers, patients, and pharmaceutical companies would suffer irreparable harm if an agency action subject to a notice-and-comment rulemaking requirement was not enjoined. The Centers for Medicare & Medicaid Services ("CMS") within the U.S. Department of Health and Human Services ("HHS") published a rule establishing a new Medicare reimbursement scheme but did not provide an opportunity to comment before the rule's effective date. 509 F. Supp. 3d at 488–89. The plaintiffs sued the HHS Secretary, alleging an APA violation for failure to engage in notice-and-comment rulemaking. *Id.* at 490. They moved for a temporary restraining order roughly three weeks before the new reimbursement scheme was scheduled to take effect. *Id.* at 488. The court granted the motion and temporarily enjoined enforcement of the rule. *Id.* After finding that the rule likely violated the APA, the court also found that the plaintiff organizations were "likely to suffer irreparable harm absent injunctive relief." *Id.* at 499. One such harm was the inability to participate in notice-and-comment procedures before CMS promulgated a rule that would "'dramatically alter' the pharmaceutical market and Medicare Part B." *Id.* at 501. The court noted that "[o]nce the new pricing scheme goes into effect . . . the plaintiffs will likely never have 'an equivalent opportunity to influence the Rule's contents.'" *Id.* (quoting *Northern Mariana Islands*, 868 F. Supp. 2d at 18–19). This amounted to "significant procedural injuries related to . . . impending economic harms," such as reduced revenue that would be unrecoverable damages due to sovereign immunity and that "threaten[ed] 'the very existence' of at least some of the organizational plaintiffs' members' businesses." *Id.* at 500 (citations to record omitted) (quoting *Otsuka Pharm. Co. v. Burwell*, No. GJH-15-852, 2015 WL 1962240, at *11 (D. Md. Apr. 29, 2015)). Thus, the plaintiffs were "deprived of the ability to have their comments considered prior to promulgation of a rule which

threaten[ed] . . . to cause severe economic losses and to shutter operations that provide critical medical care." *Id.* at 501. That was irreparable harm.[23]

These cases are persuasive, even if they are not directly on point. In *Northern Mariana Islands* and *Association of Community Cancer Centers*, the plaintiffs knew about the intended rule changes before they occurred because the agency gave them notice. The problem in those cases was that the plaintiffs were not given an opportunity to comment on the proposed rules before they would take effect. So, courts intervened and enjoined the implementation of the rules until notice-and-comment procedures occurred. This case is different. Here, the States had no clue about the agency actions until they were abruptly announced. Out of the blue, AmeriCorps notified them that their grants were terminated, that AmeriCorps members had to be exited or removed, and that all NCCC members were being removed from service. By the time the States received notice of these agency actions, the ensuing harm had begun. Still, *Northern Mariana Islands* and *Association of Community Cancer Centers* underscore a principle that applies here: To establish irreparable harm from the notice-and-comment violation, the States must show that the agency actions, taken without engaging in notice-and-comment rulemaking, detrimentally affected their concrete interests and that, without an injunction, their injuries cannot be adequately remedied by a final

---

[23] Other courts also have issued preliminary injunctions after finding agency actions, if not enjoined, would cause irreparable harm to plaintiffs who did not get notice and an opportunity to comment on the action. *See, e.g.*, *Los Padres Forestwatch v. U.S. Forest Serv.*, 776 F. Supp. 2d 1042, 1051–52 (N.D. Cal. 2011) (issuing preliminary injunction after finding irreparable harm from government's "failure to solicit any public or interagency comment prior to approving the Project" that would clear vegetation in Los Padres National Forest because a "less-than-fully-informed-choice" by decisionmakers would increase the risk to the environment and because "the Project potentially threaten[ed] certain critical habitat and species"); *Am. Fed'n of Teachers*, 2025 WL 1191844, at *22–23 (issuing preliminary injunction after finding irreparable harm from deprivation of a union's right to comment on Dear Colleague letter from Department of Education because the deprivation could "suppress[] . . . First Amendment activity" and because, if they had been allowed to comment, "they could have raised concerns about the Letter conflicting with state standards" and its chilling effect on speech).

judgment. *See Ass'n of Cmty. Cancer Ctrs.*, 509 F. Supp. 3d at 500 (citing *Summers*, 555 U.S. at 496). The States have made that showing.

### 1. AmeriCorps Program Closures

On April 25, 2025, AmeriCorps closed over 1,000 AmeriCorps programs by terminating grants and requiring grantees to exit the AmeriCorps members and remove VISTA members working on the grant-funded programs. The bulk of these programs were funded by grants awarded to state service commissions and state instrumentalities. These grant-funded programs were selected by states to deliver services to their citizens with the help of AmeriCorps and VISTA members. The States have shown that they will suffer irreparable harm from the closure of these AmeriCorps programs.

Grant terminations have caused AmeriCorps-funded programs to cease or significantly curtail operations. For example, the California state service commission directed an AmeriCorps-funded program "to pause all activities." ECF 5-5, ¶ 9. In Colorado, several seasonal "initiatives supporting the stewardship of Colorado's wildlands, including land stewardship, forest monitoring, wildland fire mitigation, supporting wildlife habitat, and reintroduction of native plants" will not occur in summer 2025 "without immediate relief." ECF 5-8, ¶ 52.a. The Executive director of Kentucky's state service commission declared that the commission "does not possess the financial resources necessary to absorb or replace the loss of these terminated grants," and "[a]s a result, organizations that depend heavily on AmeriCorps funding to deliver essential services now face an immediate and critical threat to their operations," with "[m]any . . . forced to significantly scale back or, in some cases, cease operations entirely." ECF 5-18, ¶ 21. In Maryland, a university's service program funded by the state's formula grant allotment explained that "there is simply no way the University can continue to operate the program this year unless AmeriCorps's

termination decision is reversed." ECF 5-22, ¶ 10. New Jersey's state service commission has issued stop-work orders for AmeriCorps programs in the state due to grant terminations. ECF 5-31, ¶ 20. In Rhode Island, grant terminations "will shutter summer education opportunities for some Rhode Island youth" and "shut down seasonal programming targeted at improving nutritional outcomes for Rhode Islanders." ECF 5-39, ¶¶ 23–24. By statute, these AmeriCorps programs provide services to communities that are not otherwise provided. *See* 42 U.S.C. § 12637(a)(1) (AmeriCorps funding "shall be used only for a program that does not duplicate, and is in addition to, an activity otherwise available in the locality of such program.").

The loss of AmeriCorps members who worked on the AmeriCorps-funded programs is another irreparable harm. AmeriCorps members are not fungible. They have certain expertise and community ties and thus are not interchangeable with other personnel who may be able to step in and serve. In fact, AmeriCorps members are prohibited by law from "displac[ing]" employees or other volunteers at the organizations where they serve, making them a unique resource to state service programs. *See id.* § 12637(b)(1). Some members have specialized skills. For instance, closure of an AmeriCorps program funded by Massachusetts's formula allotment will result in the loss of educators who speak Portuguese or Spanish, "result[ing] in fewer educators who represent the broader student population in the district." *See* ECF 5-19, ¶ 15. The loss of these members not only disrupts programs—it threatens to shutter them altogether. For example, Easterseals Wisconsin will be unable to provide summer recreation and therapy activities for veterans and individuals with disabilities without AmeriCorps members. ECF 5-45, ¶ 19. Another Wisconsin program at the Racine Zoo cannot offer students summer science education programming, and the City of Green Bay's Parks and Recreation Department will have to cut back on summer activities. *Id.* Exited members who have built relationships with community members will sever essential

ties between these programs and the populations they serve. In some states, AmeriCorps members served in school settings, and "[s]topping service before the end of the school year will be disruptive to students, teachers, and administrators. Students have bonded and formed relationships and built trust with . . . [m]embers over the course of the school year . . . ." *See, e.g.*, ECF 5-37, ¶ 11 (Pa. decl.). The trust that these members have built with the community members is vital to programs that serve some of the States' most vulnerable populations. For example, in Pennsylvania, the loss of AmeriCorps members means that "veterans in Butler County will be without [m]embers with whom they have built trusting relationships." ECF 5-38, ¶ 28. A state service commission administrator in Colorado declared that even if the commission had the resources to replace AmeriCorps members serving in its Youth Mental Health Corps ("YMHC"), a mental health outreach program, "the relationships that have been formed over the past year between YMHC service members and their clients cannot simply be replaced or restarted without significant damage to the progress made with this vulnerable population." ECF 5-8 ¶ 50(e). The abrupt exiting of members and erosion of trust built between service programs and the community will have a detrimental impact on these programs absent immediate injunctive relief. *See HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) ("[E]ven if those local affiliates survive, the community connections they have developed are likely to erode in non-consenting jurisdictions where refugees no longer will be placed. These injuries would be significant and irreparable in the absence of an injunction.").

The same goes for VISTA members. The States have shown that VISTA members cannot be easily replaced by other personnel. *See, e.g.*, ECF 5-12, ¶ 24 (Del. decl.) ("AmeriCorps VISTA members provide nonprofit organizations with high-level professional skills that would otherwise be inaccessible due to financial constraints. . . . The elimination of VISTA stipends and support

removes the financial infrastructure that makes this talent accessible, leaving small nonprofits without the means to fill these gaps."). The loss of VISTA members has curtailed state service projects. *See, e.g.*, ECF 5-15, ¶ 16 (noting that Hawaiʻi does not have the resources to replace VISTA members' climate resilience work in the state); ECF 5-36, ¶ 22 (Or. decl.) ("The terminated VISTA members worked on assignments to build sustainable public health programs and systems that ensure health equity, community resiliency, and improved health outcomes. The termination of [the VISTA] program . . . brings this program to an abrupt halt."). Like AmeriCorps members, the loss of VISTA members poses a significant threat to state service projects that cannot be remedied by a final judgment.

The States cannot, as the defendants suggested at the motions hearing, simply pay AmeriCorps members to remain in their service programs. The States and subgrantees do not have the resources to offer AmeriCorps members the same benefits they received directly from AmeriCorps, such as the education benefit. *See, e.g.*, ECF 5-33, ¶ 16 (New Mexico state service commission "does not have the resources to offer comparable benefits to full-time service members absent AmeriCorps funding" so "the loss of AmeriCorps funds will lead to termination of service members' benefits and prevent some or all of those AmeriCorps service members from continuing to serve on a full-time basis"); ECF 5-10, ¶ 25 (Del. decl.) ("[Elimination of AmeriCorps member benefits] will severely limit organizations' ability to recruit qualified individuals, forcing them to rely solely on unpaid volunteers. . . . [M]any organizations may need to create new paid positions to fulfill the responsibilities previously handled by AmeriCorps members, but at a much higher cost. Given that most of these organizations operate as nonprofits or state-funded entities, the financial burden of staffing these roles could prove insurmountable.").

Any ultimate relief obtained through this litigation cannot remedy the harm from the loss of AmeriCorps members who were exited from the terminated programs.

As these declarations show, the States have been "deprived of the ability to have their comments considered prior to" the termination of AmeriCorps programs and that "threatens . . . to shutter operations" and the "'very existence' of at least some of the. . . plaintiffs' [programs]." *See Ass'n of Cmty. Cancer Ctrs.*, 509 F. Supp. 3d at 500 (citations to record omitted) (quoting *Otsuka Pharm. Co.*, 2015 WL 1962240, at *11). The damage to these AmeriCorps-funded programs caused by the agency's actions cannot be cured by later remedial action or a final judgment.

Further, the sudden mass grant termination, without any prior notice, has forced many of the States to scramble to fill gaps in services, to deal with the fallout of the mass exiting of members, and to close out the grants they administer. In California, the abrupt termination of 96.7 percent of the state service commission's subgrant awards has required the commission to undertake an exiting process, which is typically staggered based on service project end dates, for all 5,656 AmeriCorps members at once. ECF 92-2, ¶ 35. And as an administrator in Pennsylvania's service commission explained, since the grants were terminated, the commission's team is "singularly focused on managing the fallout from this unexpected and unprecedented situation." ECF 5-38, ¶ 23. Other states will have to come up with alternative programs to address gaps left by the withdrawal of funds and programs. *See, e.g.*, ECF 92-2, ¶ 34(a) (noting that the termination of AmeriCorps grant would force a rural California county to "quickly design and implement an alternate program to provide educational services, including Individualized Education Program (IEP) services mandated for special education students"); ECF 5-5, ¶ 12(b) ("California laws related to wildfire and forest resilience include requirements for defensible space around homes and buildings, community plans for escape routes and emergency response, promotion of

prescribed burns and other forms of fuel reduction, along with large budget allocations for fire prevention and response. . . . If the grant termination is allowed to stand, either the work GrizzlyCorps does to help California meet the requirements of these laws will not get done, or the state will need to do it at its own expense."). This "diversion of resources away from . . . core missions" to gap-fill in the absence of AmeriCorps funding is irreparable harm. *See HIAS, Inc.*, 985 F.3d at 326; *see also District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 42 (D.D.C. 2020) (explaining that "harms from the forced diversion of resources" have been "recognized as irreparable harm in other suits" (collecting cases)); *Maryland v. U.S. Dep't of Agriculture*, No. JKB-25-0748, 2025 WL 800216, at *20 (D. Md. Mar. 13, 2025) ("The States' diversion of resources as a result of the lack of notice also constitutes an irreparable harm."); *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 25-CV-03698, 2025 WL 1358477, at *22 (N.D. Cal. May 9, 2025) ("Further, facing the potential loss of federal funding, the local government plaintiffs experience irreparable harm when they are forced to plan how to mitigate that loss."), *vacated on recons. in part on other grounds*, 2025 WL 1413762 (N.D. Cal. May 15, 2025).

Also, States were deprived of their opportunity to comment on the closure of AmeriCorps programs funded by awards to non-state entities within their states. By statute, every organization that applies for AmeriCorps State and National direct grants must "consult with and coordinate activities with the State Commission for each State in which the program will operate . . . ." 42 U.S.C. § 12583(c)(3); *see also* 45 C.F.R. § 2550.80(a) (state service commissions required to develop "comprehensive national and community service plan[s]" that "must provide for effective coordination of funding applications submitted by the State and other organizations within the State under the national service laws"). According to AmeriCorps, "[t]his consultation is to ensure coordination and the effective use of national service resources." *See* Notice of Funding

Opportunity, "Fiscal Year (FY) 2025 AmeriCorps State and National Competitive Grants" 17 [https://perma.cc/P8EB-MVGW]. Further, before AmeriCorps awards national direct grants to non-state entities, it asks state service commissions for input on the grant applicants proposing AmeriCorps programs in their state. *See id.* at 18 (explaining AmeriCorps "will ask for Commission input on National Direct applicants, except Indian Tribes, proposing to operate in their state/territory" and noting the opportunity to voice support and opposition and provide comments); *see also* Notice of Funding Opportunity, "Fiscal Year (FY) 2024 AmeriCorps State and National Competitive Grants" 20 [https://perma.cc/ZP3V-N5RM] (AmeriCorps "will solicit Commission input on National Direct applicants, except Indian Tribes, proposing to operate in their state/territory" and noting the opportunity to voice support and opposition and provide comments); Notice of Funding Opportunity, "Fiscal Year (FY) 2023 AmeriCorps State and National Grants" 20 [https://perma.cc/4Y6Q-AHYJ]  (same); Notice of Funding Opportunity, "Fiscal Year (FY) 2022 AmeriCorps State and National Grants" 20 [https://perma.cc/DT6G-VKT9] (same). This coordination and feedback loop among state service commissions, non-state entities, and AmeriCorps emphasizes the centrality of state service commissions to the ecosystem of service programs in each state. Congress, by requiring national direct grant applicants to consult and coordinate with state service commissions, recognized the importance of coordinating service initiatives within states. AmeriCorps has further affirmed states' interests in grants awarded directly to non-state entities within their borders by requesting feedback from state service commissions before it makes national direct awards. By abruptly terminating funding and removing AmeriCorps members from programs operating in their borders states, the States were deprived of the opportunity to comment on the impact of these AmeriCorps program closures on their broader service initiatives.

In sum, the abrupt mass program closure and the exiting of AmeriCorps members without notice-and-comment rulemaking are causing adverse effects to concrete interests that cannot be remedied by a final judgment. Because the agency did not provide notice and an opportunity to comment before it made significant changes to service delivery, the States were unable to voice their concerns about these changes, and they have been forced to reckon with program closures, the loss of irreplaceable service providers, and the diversion of state resources. Instituting this massive change in service delivery without notice-and-comment rulemaking "impaired the [states'] ability to protect [their] interests," and "the damage done by [this likely] violation of the APA cannot be fully cured by later remedial action." *See Northern Mariana Islands*, 686 F. Supp. 2d at 18. Because of the cyclical nature of grants and the limited duration of AmeriCorps members' service terms, the opportunity to weigh in before AmeriCorps irreparably disrupts service delivery for the present grant cycle and member terms cannot be adequately afforded at a later date. Just as the *Northern Mariana Islands* Court found "DHS [wa]s far less likely to be receptive to comments" after "the program structured by the Rule has begun operation," AmeriCorps cannot adequately consider the States' concerns about the disruption to the delivery of services in the current grant cycle at the end of litigation. *See id.* The States have shown irreparable harm from the mass AmeriCorps program closures and the exiting of service members without notice-and-comment rulemaking.[24]

---

[24] The defendants argue that Nevada and the District of Columbia have not made any claims of irreparable harm because no declarations were submitted on their behalf. The record before the Court does not support such a finding. Nevada had eight of its AmeriCorps programs "shut down." ECF 1, ¶ 191. The District of Columbia also had several AmeriCorps programs closed out, including multiple American National Red Cross formula subgrantee programs and a formula grant program providing foster care mentoring and mediation. *See* ECF 1-6, at 11, 14, 15. Neither Nevada nor the District of Columbia was afforded the opportunity to comment before the sudden mass termination of AmeriCorps programs. Given the extensive declarations from similarly situated states that "have demonstrated, through record evidence, several highly predictable

### 2.  Removal of NCCC Members

The States also have shown irreparable harm from the removal of NCCC members from service.

NCCC members provide non-discretionary services that the states will have to provide in their absence. Recently, the NCCC has aided some States in disaster relief, such as responding to the California wildfires and New Mexico floods. *See* ECF 124-1, ¶ 17 (AmeriCorps Emps. Union Pres. decl.). NCCC members also have assisted with Hurricane Helene response and recovery in North Carolina. ECF 5-30, ¶ 8. The loss of NCCC members could "delay future hurricane recovery efforts" as New Jersey heads into hurricane season, ECF 5-31, ¶ 13, and has already caused Michigan to "abandon" plans to deploy service teams to assist communities impacted by the 2025 ice storm, ECF 5-28, ¶ 12. In North Carolina, a warehouse that distributes donations to communities hit by Hurricane Helene has "struggled to backfill volunteers to replace the terminated NCCC service members, resulting in a backlog of incoming donations processing, picking and packing" and an "overall delay in processing the inventory and disrupt[ion] . . . [in] operational continuity." ECF 5-30, ¶ 8. The absence of NCCC members has left a gap in these States' disaster relief efforts, and the resultant strain on state resources is an irreparable harm. *See California v. Azar*, 911 F.3d 558, 572–73, 581 (9th Cir. 2018) (finding states suffered irreparable harm from the economic impact of an interim final rule under which employers could refuse to

---

harms" from the failure to conduct notice-and-comment rulemaking, there is thus little reason to believe Nevada and the District of Columbia "are not similarly situated and have not been and will not be affected in the same ways." *See Maryland v. U.S. Dep't of Agric.*, No. JKB-25-748, 2025 WL 973159, at *8 (D. Md. Apr. 1, 2025) (emphasis removed) (citing *Weaver v. Henderson*, 984 F.2d 11, 14 (1st Cir. 1993) ("At the preliminary injunction stage, it is, after all, the district court's duty—and its prerogative—to assess the facts, draw whatever reasonable inferences it might favor, and decide the likely ramifications." (cleaned up) (citation omitted)).

cover workers' contraception, a policy that was likely to put a strain on state programs providing free or subsidized contraception); *Pennsylvania*, 930 F.3d at 574.

As the litigation proceeds, the States cannot simply pause their current and forthcoming disaster response efforts. They will have to fill this void with their own resources. The costs they will incur cannot be recovered at the end of this litigation. *See Mountain Valley Pipeline*, 918 F.3d at 366 ("Economic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation."); *see also* 5 U.S.C. § 702; *Ass'n of Cmty. Cancer Ctrs.*, 509 F. Supp. 3d at 500 ("Because the government is protected by sovereign immunity and no monetary damages are available, these severe economic losses can qualify as irreparable harm.").

The States have established that they likely will suffer irreparable harm if the agency actions are not enjoined.

## C.    Balance of Equities and Public Interest

The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). To balance the equities, the Court considers "the relative harms to [plaintiffs] and [defendants], as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers) (quoting *Rostker v. Goldberg*, 448 U.S. 1306, 1308 (1980) (Brennan, J., in chambers)). These factors weigh in favor of a preliminary injunction.

The States have shown that AmeriCorps likely violated the APA by failing to engage in notice-and-comment rulemaking before terminating 1,031 AmeriCorps programs, exiting thousands of AmeriCorps members, and removing more than 750 NCCC members from service. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Although the Court should not "collapse[]

the first *Winter* factor—likelihood of success on the merits—with the merged balance of equities and public interest factor," *USA Farm Lab., Inc. v. Micone*, No. 23-2108, 2025 WL 586339, at *4 (4th Cir. Feb. 24, 2025), the factors overlap here. The likely unlawful agency action has jeopardized or closed AmeriCorps-funded programs across the country. The affected AmeriCorps programs provided important services to impoverished, hard-to-reach, and underserved communities. *See* ECF 92-2, ¶ 34(c) (describing how AmeriCorps members at the American National Red Cross, Los Angeles Region and in the California Emergency Response Corps worked on improving emergency preparedness in vulnerable communities and how "[t]he loss of these programs will make it even harder to meet the enormous need in communities facing disaster"); ECF 5-8, ¶ 31 ("There is no region in Colorado that has not directly benefited from the contributions of [AmeriCorps] members."); ECF 5-42, ¶ 24 ("AmeriCorps programs are vital lifelines for communities across Washington. Postponing the start of these programs would not only disrupt services to schools, food banks, shelters, and other critical community outlets, but it would adversely affect the AmeriCorps members and seniors who rely on timely engagement and support."). The likely unlawful agency action also has deprived tens of thousands of AmeriCorps members of their service opportunities, living stipends, healthcare, childcare, and education benefits. *See* ECF 5-5, ¶ 10 (noting that the termination notices have "uproot[ed] the lives of members and key community services for California" and that some members have asked the Commission "whether they would be able to afford rent"); ECF 5-36, ¶ 17 (Or. decl.) (discussing loss of child care assistance and student loan forbearance status for AmeriCorps members); ECF 5-19, ¶ 12 (Mass. decl.) (describing risk that loss of childcare may force some AmeriCorps members enrolled at Framingham State University to withdraw from the program, "leaving their own education incomplete and depriving the classrooms where they served of quality teachers").

Correcting the unlawful changes in AmeriCorps service delivery is in the public interest. *See CACI, Inc.- Fed. v. U.S. Navy*, 674 F. Supp. 3d 257, 279 (E.D. Va. 2023) ("There is a strong public interest in curing the effects of the government's unlawful acts.").

The defendants claim they will be harmed by a preliminary injunction because AmeriCorps may be forced to distribute funds it cannot later recover and because granting a preliminary injunction "would disrupt the agencies' efforts to comply with Executive Orders" and "act as responsible stewards of public funds." ECF 106, at 35. These public funds were allocated to AmeriCorps by Congress "to carry out" the national service laws. *See* 2024 Appropriations Act, 138 Stat. at 694. In turn, AmeriCorps used the public funds to award grants to the states for service projects that help local communities. If, at the end of this litigation, the government is vindicated and cannot recover the funds that Congress appropriated for national service, the funds will have been spent on improving the lives of everyday Americans: veterans, people with substance use disorder, people with disabilities, children with learning differences, indigenous communities, people impacted by natural disasters, and people trying to survive below the poverty line. Any harm the defendants might face if the agency actions are enjoined pales in comparison to the concrete harms that the States and the communities served by AmeriCorps programs have suffered and will continue to suffer. The balance of the equities and the public interest heavily favors preliminary injunctive relief.

The States have established that they are entitled to a preliminary injunction.

## IV.    Scope of the Injunction

"A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). "[I]njunctive relief should be designed to grant the full relief needed to remedy

the injury to the prevailing party," but "it should not go beyond the extent of the established violation." *Hayes v. N. State L. Enf't Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993). "Whenever the extraordinary writ of injunction is granted, it should be tailored to restrain no more than what is reasonably required to accomplish its ends." *S.C. Dep't of Wildlife & Marine Res. v. Marsh*, 866 F.2d 97, 100 (4th Cir. 1989) (quoting *Consol. Coal Co. v. Disabled Miners*, 442 F.2d 1261, 1267 (4th Cir. 1971)). That is, "a court must ensure a preliminary injunction is 'no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)). In fashioning injunctive relief, the Court must "tak[e] account of 'what is necessary, what is fair, and what is workable.'" *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (quoting *New York v. Cathedral Acad.*, 434 U.S. 125, 129 (1977)).

### A.      Restoration of AmeriCorps Programs in Plaintiff States

The States have demonstrated that they are likely to suffer irreparable harm from the mass closure of AmeriCorps programs in their states without public notice-and-comment rulemaking. To "protect the status quo and prevent irreparable harm during the pendency of [the] lawsuit," the Court will enjoin the defendants from effectuating and enforcing the April 25, 2025 termination of grants and closure of AmeriCorps programs in the States. This relief does not extend to AmeriCorps programs in non-party states (and the States have not asked to so extend the relief). This relief requires the defendants to reinstate the terminated grants in the plaintiff states and to return AmeriCorps members and VISTA members to service on those programs (if they are willing and able to return). The agency must conduct public notice-and-comment rulemaking before instituting significant changes in service delivery. The scope of the injunction is narrowly tailored

to restore the AmeriCorps-funded programs in the plaintiff states to the status quo before the grants were terminated and programs closed on April 25, 2025.

This injunction does not prevent AmeriCorps from suspending or terminating individual AmeriCorps grants due to failure to abide by the terms and conditions of individual grants or the statutory requirements for grantees—provided that the agency follows the proper procedures for doing so. *See* 42 U.S.C. § 12636(a); 45 C.F.R. § 2540.400. Likewise, AmeriCorps and VISTA members still may be discharged from programs for cause or for compelling personal circumstances as allowed under the respective program rules and consistent with the law. *See* 42 U.S.C. § 12593(c); 45 C.F.R. §§ 2522.230, 2556.400.

### B.    Return of NCCC Members to Service

At least some of the States have made a clear showing of irreparable harm from the removal of NCCC members from service in their jurisdictions. The NCCC is a national service corps, based out of regional campuses, whose members are deployed to states within their respective regions for short-term projects. *See* 42 U.S.C. § 12615. NCCC members are not assigned to individual states for their full service terms. It is neither practical nor feasible to restrict the remedy to the States who have been irreparably harmed. Nor can the Court confine relief to a particular region, as all four regional campuses serve the plaintiff states. The Court cannot reasonably restrict the service areas of a national service organization to the plaintiff states. Accordingly, the Court will enjoin the defendants from effectuating and enforcing the April 15, 2025 removal of NCCC members from service, require the agency to return the NCCC members to service (if they are willing and able to return), and require the agency to engage in notice-and-comment rulemaking before instituting this significant change in service delivery.

Just as the agency is permitted to, under appropriate circumstances, terminate individual grants or discharge individual service members, the agency still retains the discretion to administer the NCCC program, and the agency still may dismiss members within the bounds of its statutory authority. *See, e.g.*, 42 U.S.C. § 12615(f)(2)(B) (permitting campus directors to "dismiss a member of the Corps from the Corps if the campus director determines that retention of the member in the Corps will jeopardize the enforcement of the [campus director's established standards of conduct] or diminish the opportunities of other Corps members").

This remedy will provide "full relief needed to remedy the [States'] injury" while being "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *See Roe*, 947 F.3d at 231 (quoting *Madsen*, 512 U.S. at 765).

## V.    Bond

Under Federal Rule of Civil Procedure 65(c), a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A district court "retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013). "Where the district court determines that the risk of harm is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly." *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999).

The defendants ask the Court to set a bond "equal to the size of any payment that the Court orders on a preliminary basis . . . ." ECF 106, at 36. The Court is not ordering the payment of a sum certain. The Court is enjoining likely unlawful agency actions and ordering compliance with the law. Compliance requires the defendants to reverse the significant changes in service delivery

that AmeriCorps made without the statutorily required public notice-and-comment rulemaking. The risk of harm to the defendants is remote.

Moreover, the circumstances of this case warrant a nominal bond. The States have challenged an abrupt and massive disruption to the NCCC's service projects and hundreds of AmeriCorps-funded service programs across the country. The AmeriCorps State and National program has been gutted, leaving the States with a sudden and unexpected lack of necessary funding; the state service commissions have been left reeling; and tens of thousands of Americans volunteering to serve their fellow countrymen have been sent home. This is a quintessential public interest lawsuit. Under these circumstances, the Court will impose a nominal bond of $100 per plaintiff. This approach aligns with the approaches of other courts that have preliminarily enjoined unlawful agency actions in public interest litigation. *See, e.g.*, *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) (holding decision to waive bond requirement was not abuse of discretion in environmental case in light of "the important public interest in the enforcement of [federal environmental law]"); *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) (holding nominal bond was not abuse of discretion in light of the "public interest underlying the litigation" and the government's failure to submit evidence that injunction would impose substantial cost); *Am. Fed'n of State, Cnty., & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. ELH-25-0596, 2025 WL 1206246, at *73 (D. Md. Apr. 17, 2025) (imposing nominal bond of $250 per plaintiff in data privacy case); *Maryland v. U.S. Dep't of Agric.*, No. JKB-25-0748, 2025 WL 973159, at *40 (D. Md. Apr. 1, 2025) (noting that "a nominal bond is common in public-interest litigation cases, as requiring plaintiffs to bear up front the total cost of the alleged governmental wrongdoing will often be effectively to foreclosure judicial review altogether" (internal quotation marks and citation omitted)); *Am. Ass'n of Colls. for Teacher Educ.*

*v. McMahon*, No. JRR-25-702, 2025 WL 833917, at *25 (D. Md. Mar. 17, 2025) (imposing nominal bond when the government defendants offered only "unsupported speculations" that the government would be unable to recoup distributed funds at the end of litigation); *J.S.G. ex rel. Hernandez v. Stirrup*, No. SAG-20-1026, 2020 WL 1985041, at *12 (D. Md. Apr. 26, 2020) (setting a nominal bond in immigration habeas case when defendants failed to substantiate any potential risk of financial harm); *see also Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*, 539 F. Supp. 3d 543, 561 (D.S.C. 2021) (imposing bond of $100 because of public interest nature of environmental suit); *Maine v. U.S. Dep't of Agric.*. No. 25-cv-00131 -, 2025 WL 1088946, at *30 (D. Me. Apr. 11, 2025) (imposing nominal bond and collecting cases); *cf. Hoechst Diafoil Co.*, 174 F.3d at 421 n.3 (explaining that "in some circumstances, a nominal bond may suffice").

## VI.    Conclusion

For the foregoing reasons, the States have shown that they are entitled to the extraordinary remedy of a preliminary injunction. A separate Order shall issue.

June 5, 2025

Date

Deborah L. Boardman
United States District Judge