# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

STATE OF MARYLAND,
    200 Saint Paul Place
    Baltimore, MD  21202

STATE OF DELAWARE,
    820 North French Street
    Wilmington, DE  19801

STATE OF CALIFORNIA,
    300 South Spring Street, Suite 1702
    Los Angeles, CA  90013

STATE OF COLORADO,
    1300 Broadway
    Denver, CO  80203

STATE OF ARIZONA,
    2005 North Central Avenue
    Phoenix, AZ  85004

STATE OF CONNECTICUT,
    165 Capitol Avenue
    Hartford, CT  06106

DISTRICT OF COLUMBIA,
    400 6th Street NW
    Washington, DC  20001

STATE OF HAWAIʻI,
    425 Queen Street
    Honolulu, HI  96813

STATE OF ILLINOIS,
    115 South LaSalle Street, 35th Floor
    Chicago, IL  60603

OFFICE OF THE GOVERNOR *ex rel. Andy Beshear, in his official capacity as Governor of the* COMMONWEALTH OF KENTUCKY,
    700 Capitol Avenue, Suite 106
    Frankfort, KY  40601

Civ. No. 1:25-cv-01363-DLB

STATE OF MAINE,
   6 State House Station
   Augusta, ME  04333

COMMONWEALTH OF MASSACHUSETTS,
   1 Ashburton Place
   Boston, MA  02108

PEOPLE OF THE STATE OF MICHIGAN,
   525 W. Ottawa Street
   Lansing, MI  48933

STATE OF MINNESOTA,
   445 Minnesota Street, Suite 600
   Saint Paul, MN  55101

STATE OF NEVADA,
   555 East Washington Avenue,
   Las Vegas, NV  89101

STATE OF NEW JERSEY,
   25 Market Street
   Trenton, NJ  08625

STATE OF NEW MEXICO,
   P.O. Drawer 1508
   Santa Fe, NM  87504

STATE OF NEW YORK,
   28 Liberty Street
   New York, NY  10005

STATE OF NORTH CAROLINA,
   P.O. Box 629
   Raleigh, NC 27602

STATE OF OREGON,
   100 Southwest Market Street
   Portland, OR  97201

JOSH SHAPIRO, *in his official capacity as Governor of* the COMMONWEALTH OF PENNSYLVANIA,
   30 North 3rd Street, Suite 200
   Harrisburg, PA  17101

2

STATE OF RHODE ISLAND,
    150 South Main Street
    Providence, RI  02903

STATE OF VERMONT,
    109 State Street
    Montpelier, VT  05609

STATE OF WASHINGTON,
    2425 Bristol Court SW, Second Floor
    P.O. Box 40117
    Olympia, WA  98504

STATE OF WISCONSIN,
    P.O. Box 7857
    Madison, WI  53707

        Plaintiffs,

    v.

CORPORATION FOR NATIONAL AND
COMMUNITY SERVICE, *operating as*
AMERICORPS,
    250 E Street SW
    Washington, DC  20525

JENNIFER BASTRESS TAHMASEBI, *in her*
*official capacity as Interim Head of the Corporation*
*for National and Community Service*,
    250 E Street SW
    Washington, DC  20525

OFFICE OF MANAGEMENT AND BUDGET,
    725 17th Street NW
    Washington, DC  20503

RUSSELL VOUGHT, *in his official capacity as*
*Director of the Office of Management and Budget*,
    725 17th Street NW
    Washington, DC  20503

        Defendants.

3

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    Since January 20, 2025, the Trump Administration has engaged in unprecedented efforts to unilaterally terminate federal programs, spending, and personnel without Congressional approval.  Now this campaign has reached AmeriCorps, the federal agency for national service and volunteerism.  At the behest of or in conjunction with the White House's Office of Management and Budget (OMB), AmeriCorps has attempted to withhold or improperly condition tens of millions of dollars in funding for national service programs across the country.

2.    AmeriCorps—officially, the Corporation for National and Community Service[1]— has operated as an independent agency of the federal government since 1993.  AmeriCorps members volunteer in the areas of disaster relief, economic opportunity, education, environmental stewardship, community health, and veteran services.[2]  Until the events described in this complaint, AmeriCorps supported more than 200,000 members and volunteers with living stipends and benefits each year and was managed by a staff of approximately 700 employees.[3]

3.    By terminating AmeriCorps programs, grants, and staff members, the Administration has effectively neutralized AmeriCorps' programming capacity and its ability to carry out its statutory mission.  First, on April 15, at the behest of the so-called Department of Government Efficiency (DOGE), AmeriCorps leadership placed all members serving in the National Civilian Community Corps (NCCC) on administrative leave and notified them that their

---

[1] By regulation, "[t]he Corporation for National and Community Service has adopted AmeriCorps as its official agency operating name."  45 C.F.R. § 2500.2(a).

[2] AmeriCorps, *FY 2024 Annual Management Report* 9, https://www.americorps.gov/sites/default/files/document/AmeriCorps-FY24-Annual-Management-Report.pdf.

[3] *See id.* at 8.

participation in the program "w[ould] terminate" on April 30.  *See* Memorandum from Ken Goodson, NCCC National Director, AmeriCorps (Apr. 15, 2025), attached as Ex. A.

4.      The following day, AmeriCorps placed 85% of its paid staff on administrative leave.  *See* Email from Jennifer Bastress Tahmasebi to AmeriCorps Board (Apr. 17, 2025), attached as Ex. C; Memorandum from Jennifer Bastress Tahmasebi, Interim Agency Head, AmeriCorps (Apr. 16, 2025), attached as Ex. D.

5.      On April 24, AmeriCorps began to issue Reduction in Force (RIF) notices to employees on administrative leave.  *See* RIF Notice, attached as Ex. E.  News reports indicated that these RIFs would result in cuts to AmeriCorps' workforce of "up to 50 percent or more."[4]

6.      The following day, after business hours, Defendants began notifying State Service Commissions—which administer funding for many AmeriCorps programs—that nearly $400 million worth of AmeriCorps programs were immediately terminated.[5]  *See* Cancelled Programs Workbook, attached as Ex. F.  Defendants' notices informed recipients that their programs "no longer effectuate[d] agency priorities"; that they "must immediately cease all award activities"; that "[a]ll member activities should cease immediately"; and that they "should document that [each] member was exited for compelling personal circumstances due to the agency's termination of the grant and program closure."  *E.g.*, Del. Termination Notice (AmeriCorps State and National), attached as Ex. G; Del. Termination Notice (VISTA), attached as Ex. H.

---

[4] Tobi Raji, *AmeriCorps staff members placed on leave after DOGE visit*, Wash. Post, Apr. 16, 2025, https://www.washingtonpost.com/nation/2025/04/16/americorps-cuts-doge-trump/.

[5] Tobi Rajj, *DOGE orders major cut to AmeriCorps funding, imperiling agency's work*, Wash. Post, April 25, 2025, https://www.washingtonpost.com/nation/2025/04/25/americorps-grant-cuts-doge/.

7.      These terminations received bipartisan criticism.  U.S. Senator Bill Cassidy (R-La.), for example, "object[ed] to cutting AmeriCorps grants like those that support Louisiana's veterans and organizations that provide crucial support after hurricanes and natural disasters."[6] U.S. Senator Chris Coons (D-Del.), co-chair of the bipartisan National Service Caucus, wrote a letter joined by 148 Congressional colleagues that "urge[d] the administration to continue implementing the statutory requirements of the national service laws" and expressed "grave concerns that significant reductions in force will prevent AmeriCorps from being able to effectively and efficiently award appropriated funding to programs operating in communities across the country."[7]

8.      The Administration's abrupt decision to tear apart AmeriCorps flouts Congress's creation of AmeriCorps and assignment of agency duties; usurps Congress's power of the purse and thereby violates the Constitution's separation of powers; and arbitrarily and capriciously—without any reasoned analysis—vitiates the agency's ability to function consistent with its statutory mission and purpose.  It also violates a provision of AmeriCorps' statutory appropriation that requires the agency to make "significant changes to program requirements, service delivery or policy only through public notice and comment rulemaking."  *E.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, § 401, 138 Stat. 460, 695 (Mar. 23, 2024).

9.      On June 5, 2025, the Court entered a Preliminary Injunction in this matter, barring AmeriCorps from taking any significant action to change service delivery in the Plaintiff States, without proceeding through the required notice and comment process.

---

[6]  https://x.com/SenBillCassidy/status/1915886202651349128.

[7]  Letter from U.S. Senator Christopher A. Coons, et al., to President Donald J. Trump (Apr. 23, 2025), https://www.coons.senate.gov/imo/media/doc/americorps_rif_letter.pdf.

10.    Since at least that time, however, OMB—acting alone and/or in concert with AmeriCorps—has significantly undermined service delivery by withholding, delaying, or improperly conditioning funds intended for Plaintiff States' Service Commissions and AmeriCorps programs.  The impact has been enormous, effectively cancelling or withholding across the Plaintiff States: (1) millions of dollars in State Service Commission Investment Fund grants; (2) tens of millions of dollars in AmeriCorps Seniors programs,  and (3) tens of millions of dollars in competitive grant funding for AmeriCorps programs.

11.    Just as AmeriCorps cannot terminate the agency's functions by fiat or defund the agency, OMB cannot withhold, delay, or condition funds in defiance of administrative procedures, Congressional appropriations, and the Constitutional separation of powers.  Accordingly, the Defendants' actions should be declared unlawful and vacated.

## JURISDICTION AND VENUE

12.    The Court has jurisdiction over this Complaint under 28 U.S.C. § 1331, 28 U.S.C. § 1361, and 5 U.S.C. § 702.

13.    There is a controversy under 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 1361, 2201–2202, 5 U.S.C. §§ 704–706 and the Court's equitable powers.

14.    Venue is proper in this District because Plaintiff State of Maryland and its Attorney General reside in this District and the other Plaintiffs consent to adjudication of these issues here. Moreover, a substantial part of the acts or omissions giving rise to this action occurred in this District, and this action seeks relief affecting AmeriCorps members and employees who reside in this District.

## PARTIES

**I.      Plaintiffs**

15.      The State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown.

16.      The State of Delaware, represented by and through its Attorney General, Kathleen Jennings, is a sovereign state of the United States of America. The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to 29 Del. C. § 2504.

17.      The State of California is a sovereign state of the United States of America.  California is represented by Attorney General Rob Bonta, who is the chief law enforcement officer of California.

18.      The State of Colorado is a sovereign state in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado.  The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

19.      The State of Arizona is a sovereign state in the United States of America.  Arizona is represented by Attorney General Kris Mayes, who is the chief law enforcement officer of Arizona.

20.      The State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

21.     The District of Columbia is a municipal corporation organized under the Constitution of the United States.  It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government.  The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb.  The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

22.     The State of Hawai'i is a sovereign state of the United States of America.  Hawai'i is represented by Attorney General Anne E. Lopez, Hawai'i chief legal officer, who is authorized by Hawai'i Rev. Statutes sec. 28-1 to pursue this action.

23.     The State of Illinois is a sovereign state of the United States of America.  Illinois is represented by Attorney General Kwame Raoul, who is the chief law enforcement officer of Illinois and is authorized to pursue this action under Illinois law.  *See* 15 ILCS 205/4.

24.     Office of the Governor, *ex rel.* Andy Beshear, brings this suit in his official capacity as the Governor of the Commonwealth of Kentucky.  The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," Ky. Const. § 81.  In fulfilling his constitutional duties, the Governor has authority to bring this action.

25.     The State of Maine is a sovereign state of the United States of America.  Maine is represented by Aaron M. Frey, the Attorney General of Maine.  The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. § 191.

9

26.    The Commonwealth of Massachusetts is a sovereign state of the United States of America.  Massachusetts is represented by Andrea Joy Campbell, the Attorney General of Massachusetts, who is the chief law officer of Massachusetts and authorized to pursue this action.

27.    The People of the State of Michigan is represented by Attorney General Dana Nessel.  The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

28.    The State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota.  The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01.  The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

29.    The State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State of the United States of America.  The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

30.    The State of New Jersey is a sovereign state of the United States of America. New Jersey is represented by Matthew Platkin, the Attorney General of New Jersey, who is the chief law enforcement officer of New Jersey and authorized to sue on the State's behalf.

31.    The State of New Mexico is a sovereign state of the United States of America.  New Mexico is represented by Attorney General Raúl Torrez who is the chief law enforcement officer of New Mexico.

10

32.     The State of New York is a sovereign state of the United States of America.  New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

33.     The State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson who is the chief law enforcement officer of North Carolina.

34.     The State of Oregon is a sovereign state of the United States.  Oregon is represented by Attorney General Dan Rayfield.  The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.  ORS 180.060.

35.     Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania.  The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed."  Pa. Const. art. IV, § 2.  The Governor oversees all executive agencies in Pennsylvania.

36.     The State of Rhode Island is a sovereign state of the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

37.     The State of Vermont is a sovereign state of the United States of America.  Vermont is represented by Attorney General Charity Clark.  Attorney General Clark is authorized to initiate litigation on Vermont's behalf.

38.     The State of Washington is a sovereign state of the United States of America. Washington is represented by Attorney General Nicholas W. Brown.  The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern.  Chapter 43.10 RCW.

11

39.     The State of Wisconsin is a sovereign state of the United States of America. Wisconsin is represented by Attorney General Josh Kaul, who is the chief law enforcement officer of Wisconsin.

## II.     Defendants

40.     Defendant Corporation for National and Community Service, operating as AmeriCorps, is an executive agency of the United States pursuant to 5 U.S.C. § 105.  As such, it engages in agency action and is named as a defendant in this action pursuant to 5 U.S.C. § 702.

41.     Defendant Jennifer Bastress Tahmasebi is the interim agency head of AmeriCorps. She is named in her official capacity.  (Collectively, AmeriCorps and Defendant Tahmasebi are referred to as "AmeriCorps Defendants.").

42.     Defendant OMB is an executive agency of the United States pursuant to 5 U.S.C. § 105.  As such, it engages in agency action and is named as a defendant in this action pursuant to 5 U.S.C. § 702.

43.     Defendant Russell Vought is the Director of OMB.  He is named in his official capacity.  (Collectively, OMB and Defendant Vought are referred to as "OMB Defendants.").

## FACTUAL ALLEGATIONS

### III.     AmeriCorps' History, Structure, and Programs

#### a.     Statutory History

44.     The Corporation for National and Community Service (AmeriCorps) traces its origins back to the Domestic and Volunteer Service Act of 1973, Pub. L. 93-113, § 401, 87 Stat. 394, 405 (Oct. 1, 1973) (the 1973 Act).  The 1973 Act created Volunteers in Service to America (VISTA), a "program of full-time volunteer service" designed "to strengthen and supplement efforts to eliminate poverty and poverty-related human, social, and environmental problems in the

12

United States." *Id.* § 101, 87 Stat. at 396. The 1973 Act also created several National Older American Volunteer Programs, including the Retired Senior Volunteer Program (RSVP), *id.* § 201, 87 Stat. at 401, and the Foster Grandparent Program, *id.* §§ 211–212, 87 Stat. at 402–03. Congress established an entity known as the ACTION Agency to operate these programs. *Id.* § 401, 87 Stat. at 405.

45.     Later, Congress enacted the National and Community Service Act of 1990, Pub. L. 101-610, § 190, 104 Stat. 3127, 3168 (Nov. 16, 1990) (the 1990 Act), to establish a Commission on National and Community Service. The Commission administered grant programs authorized by the 1990 Act to support, among other things, school-aged service, *id.* § 111, 104 Stat. at 3132; youth conservation and human service corps, *id.* § 121, 104 Stat. at 3140; and full- and part-time national and community service, *id.* § 141, 104 Stat. at 3150.

46.     Congress then formed AmeriCorps by merging the Commission and the ACTION Agency under the National and Community Service Trust Act of 1993, Pub. L. 103-82, §§ 191 & 203(c)(2), 107 Stat. 785, 873, 892 (Sept. 21, 1993) (the 1993 Act) (codified at 42 U.S.C. §§ 12501 et seq.); 42 U.S.C. § 12651.

47.     Congress created AmeriCorps and its predecessors in order to (among other things) "renew the ethic of civic responsibility and the spirit of community and service throughout the varied and diverse communities of the United States," 42 U.S.C. § 12501(b)(2); "build on the existing organizational service infrastructure of Federal, State, and local programs, agencies, and communities to expand full-time and part-time service opportunities for all citizens," *id.* § 12501(b)(7); "leverage Federal investments to increase State, local, business, and philanthropic resources to address national and local challenges," *id.* § 12501(b)(17); and "support institutions

13

of higher education that engage students in community service activities and provide high-quality service-learning opportunities." *Id.* § 12501(b)(18).

>    b.    *Agency Structure*

48.    AmeriCorps is a Government corporation, 42 U.S.C. § 12651, led by a Board of Directors, *id.* § 12651a, and a Chief Executive Officer (CEO). *Id.* § 12651c.

49.    Members of AmeriCorps' Board and its CEO both are appointed by the President with the advice and consent of the Senate. *Id.* §§ 12651a(a)(1) & 12651c(a).

50.    By statute, AmeriCorps' Board is at least bipartisan: "To the maximum extent practicable, the President shall appoint members . . . so that no more than 50 percent of the appointed members of the Board, plus 1 additional appointed member, are from a single political party." *Id.* § 12651a(a)(2)(E).

51.    AmeriCorps' Board "set[s] overall policy for the Corporation" and "review[s] and advise[s] the Chief Executive Officer regarding, the actions of the Chief Executive Officer with respect to the personnel of the Corporation, and with respect to such standards, policies, procedures, programs, and initiatives as are necessary or appropriate to carry out the national service laws." *Id.* § 12651b(g)(5)(A).

52.    AmeriCorps' CEO is "responsible for the exercise of the powers and the discharge of the duties of the Corporation that are not reserved to the Board," and "ha[s] authority and control over all personnel of the Corporation." *Id.* § 12651d(a).

53.    The CEO also "may . . . generally perform such functions and take such steps consistent with the objectives and provisions of the national service laws, as the Chief Executive Officer determines to be necessary or appropriate to carry out such provisions." *Id.* § 12651d(c)(11).

c.    *Agency Programs*

54.    AmeriCorps directly operates several service programs—notably, the National Civilian Community Corps—but most of its funding goes to support programs independently operated by State and local governments, nonprofit organizations, and universities.

55.    AmeriCorps supports service programs through direct grants; pass-through grants, which are awarded to State Service Commissions[8] for the purpose of distributing to subgrantees; and education awards.

56.    AmeriCorps "shall, directly or through grants, contracts, or cooperative agreements (including through State Commissions), conduct appropriate training for and provide technical assistance to—(1) programs receiving assistance under the national service laws; and (2) entities (particularly entities in rural areas and underserved communities) that desire to—(A) carry out or establish national service programs; or (B) apply for assistance (including subgrants) under the national service laws." *Id.* § 12657.

57.    AmeriCorps education awards are provided to volunteers (rather than to programs), *id.* § 12602(a), in an amount "equal to the maximum amount of a Federal Pell Grant," *id.* § 12603(a), and may be used to, among other things, "repay student loans" or "pay all or part of the

---

[8]    To receive AmeriCorps funding, the 1993 Act requires each State either to (a) create a State Commission on National and Community Service, or (b) obtain approval from AmeriCorps "to use an alternative administrative entity to carry out the duties otherwise entrusted to a State Commission."    42 U.S.C. § 12638(a)(1)–(2).    In Plaintiff State Maryland, for example, AmeriCorps pass-through grants are allocated by the Governor's Office on Service and Volunteerism within the Department of Service and Civic Innovation.

Certain Plaintiff States—Massachusetts, Minnesota, and Nevada—have designated private nonprofit groups to serve as their State Service Commissions under 42 U.S.C. § 12638(a)(2). *See* AmeriCorps, *State Service Commissions*, https://www.americorps.gov/contact/state-service-commissions (last accessed Apr. 21, 2025). Notwithstanding that the administrative entities for those States are private nonprofits, competitive and formula grants administered by those entities are "ma[de] . . . to each of the several States." *See* 42 U.S.C. § 12581(d)(1) & (e)(1).

cost of attendance or other educational expenses at an institution of higher education." *Id.* § 12604(a)(1)–(2).

58.     AmeriCorps education awards are paid out of the National Service Trust, a Treasury account that consists of, among other things, appropriated funds that have been designated for that purpose. *Id.* § 12601(a).

59.     In addition to education awards, AmeriCorps also funds benefits such as living allowances, health coverage, and childcare for full-time members to enable their uncompensated volunteer work. *See id.* § 4955; *id.* § 12594(a), (d), & (e).

60.     Programs directly operated by AmeriCorps include:

a.     National Civilian Community Corps (Title I-E of the 1993 Act), a full-time residential program for young adults (aged 18–26) who live together for 10–11 months while working on service projects such as maintaining trails, constructing homes, and disaster relief. *Id.* § 12612; *see also* National Defense Authorization Act for FY 1993, PL 102-484, § 1092, 106 Stat. 2315, 2522 (Oct. 23, 1992) (creating NCCC's predecessor, the Civilian Community Corps, to "combine the best practices of civilian service with the best aspects of military service").

b.     Volunteers in Service to America (Title I-A of the 1973 Act), the "program of full-time volunteer service" formerly administered by the ACTION Agency. 42 U.S.C. § 4951. Members "perform . . . volunteer service" to "assist in the solution of poverty and poverty-related problems and secure and increase opportunities for self-advancement by persons affected by such problems." *Id.*

61.     Grant programs through which AmeriCorps provides funding include:

a.  AmeriCorps State and National Grants (Title I-C of the 1993 Act; Title I-D of the 1990 Act), which "make grants to States, subdivisions of States, territories, Indian tribes, public or private nonprofit organizations, and institutions of higher education for the purpose of assisting the recipients of the grants—(1) to carry out full- or part-time national service programs, including summer programs . . . ; and (2) to make grants in support of other national service programs . . . that are carried out by other entities." *Id.* § 12571(a).  35.3% of State and National Grants are awarded to State Service Commissions on a formula basis to provide pass-through funding to service programs, *id.* § 12581(e)(2); most of the remainder are awarded "on a competitive basis" to States as well as "to nonprofit organizations seeking to operate a national service program in 2 or more of those States, and to Indian tribes." *Id.* § 12581(d)(1).  Types of programs supported include Education Corps, Veterans Corps, and Opportunity Corps.  *Id.* § 12572(b)–(c).

b.  Innovation and Demonstration Programs (Title I-H of the 1993 Act; Title I-E of the 1990 Act; Title I-C of the 1973 Act), which support various pilot programs, *see, e.g.*, *id.* § 12653k, and "demonstration programs."  *See, e.g.*, *id.* § 4992(a).

c.  National Older American Volunteer Programs (Title II of the 1973 Act):

    i.  Retired and Senior Volunteer Program (Title II-A of the 1973 Act), which "make[s] grants to State agencies . . . or grants to or contracts with other public and nonprofit private agencies and organizations to pay part or all of the costs for the development or operation, or both, of volunteer service projects" for "retired individuals and working older individuals . . . 55 years of age or older."  *Id.* § 5001(a).

17

ii. AmeriCorps Seniors' Foster Grandparent Program (Title II-B of the 1973 Act), through which "foster grandparents" provide one-on-one tutoring and mentorship "to children who are individuals with disabilities, who have chronic health conditions, who are receiving care in hospitals, who are residing in homes for dependent and neglected children, or who are receiving services provided . . . for children having special or exceptional needs or circumstances identified as limiting their academic, social, or emotional development." *Id.* § 5011(a).

iii. AmeriCorps Seniors' Senior Companion Program (Title II-C of the 1973 Act), through which volunteers "provide services designed to help older persons requiring long-term care, including services to persons receiving home health care, nursing care, home-delivered meals or other nutrition services; services designed to help persons deinstitutionalized from mental hospitals, nursing homes, and other institutions; and services designed to assist persons having developmental disabilities and other special needs for companionship." *Id.* § 5013(a).

62. AmeriCorps also provides two types of grants directly to State Service Commissions to support their operations:

a. Commission Support Grants (CSGs), which help State Service Commissions carry out their duties under 42 U.S.C. § 12638(e) and 45 C.F.R. § 2550.80; and

b. Commission Investment Fund (CIF) grants, which "expand the capacity (knowledge, skills, and resources) of State Commissions . . . in priority performance areas defined by AmeriCorps. . . . The CIF grants may be used to support

18

Commission staffing and staff development in priority performance areas, training events, and collaborative activities." *See* AmeriCorps, *Fiscal Year 2025 Commission Investment Funds*, attached as Ex. I.

63.    Each year, AmeriCorps is responsible for drafting Notices of Funding Opportunities (NOFO) that provide public notice of each grant it plans to award, including funds that AmeriCorps is statutorily required to allocate to the Plaintiff States.  2 C.F.R. § 2205.100; *id.* § 200.204 (requiring NOFOs for competitive awards and setting minimum content.)

64.    For FY 2024, Congress appropriated AmeriCorps $975,525,000 "to carry out" the 1990 and 1973 Acts (including $37,735,000 for NCCC); $180,000,000 "[f]or payment to the National Service Trust"; $99,686,000 "[f]or necessary expenses of administration" (i.e., employee salaries); and $7,595,000 "[f]or necessary expenses of [AmeriCorps'] Office of Inspector General," for a total of $1,262,806,000.  Further Consolidated Appropriations Act, 2024, div. D, tit. IV, 138 Stat. at 694–95.

65.    For FY 2024, Congress directed that AmeriCorps allocate the funds appropriated "to carry out" the 1990 and 1973 Acts as follows, 170 Cong. Rec. H2060–61 (Mar. 22, 2024):

| Program | Amount | Percentage |
|---|---|---|
|  |  |  |
| *Directly Operated Programs* |  |  |
| National Civilian Community Corps | $37,735,000 | 3.87% |
| Volunteers in Service to America | $103,285,000 | 10.59% |
| **Subtotal** | **$141,020,000** | **14.46%** |
|  |  |  |
| *Grant Programs* |  |  |
| AmeriCorps State and National Grants | $557,094,000 | 57.11% |
| National Older American Volunteer Programs | $236,917,000 | 24.29% |
| *Retired Senior Volunteer Program* | *$55,105,000* | *5.65%* |
| *Foster Grandparents Program* | *$125,363,000* | *12.85%* |
| *Senior Companion Program* | *$56,449,000* | *5.79%* |
| Innovation, Assistance, and Other Activities | $14,706,000 | 1.51% |

| | | |
|---|---|---|
| State Commission Support Grants | $19,538,000 | 2.00% |
| **Subtotal** | **$828,255,000** | **84.90%** |
| | | |
| *Other* | | |
| Evaluation | $6,250,000 | 0.64% |
| | | |
| **Total** | **$975,525,000** | |

66.     Congress also provided that AmeriCorps "shall make any significant changes to program requirements, service delivery or policy only through public notice and comment rulemaking." Further Consolidated Appropriations Act, 2024 § 401, 138 Stat. at 695.

67.     For FY 2025, Congress reappropriated the amounts from the FY 2024 appropriations act, "under the authority and conditions provided in" that Act. Full-Year Continuing Appropriations Act, 2025, Pub. L. 119-4, § 1101(a)(8), 139 Stat. 9, 11 (Mar. 15, 2025).

68.     The only material basis identified by statute for which AmeriCorps may cancel a grant it has awarded to a State is if it determines "there is a material failure to comply with this subchapter or the applicable terms and conditions of any such grant or contract issued pursuant to this subchapter." 42 U.S.C. § 12636(a). Furthermore, by statute, grants "shall not be terminated or revoked for failure to comply with applicable terms and conditions of this subchapter unless the recipient of such assistance has been afforded reasonable notice and opportunity for a full and fair hearing" at a location convenient to the grantee, and the opportunity to demonstrate. *Id*. § 12636(a)–(b).

69.     Under applicable regulations, AmeriCorps must give a grantee 7 days' notice of proposed cuts, during which it may submit "written material in opposition to the proposed action" that shows "good cause why such assistance should not be terminated or revoked." 45 C.F.R. § 2540.400 ("Under what circumstances will the Corporation suspend or terminate a grant or contract?").

20

d.    *Current Competitive Grant Process*

70.    AmeriCorps issued its NOFO for Fiscal Year 2025 AmeriCorps State and National

Competitive Grants on or about August 19, 2024.  NOFO, FY 2025 AmeriCorps State and National

Grants,                              *available*                              *at*

https://americorps.gov/sites/default/files/document/2025_ASNCompetitveNOFO_August19.508

_0.pdf.  This NOFO concerned the approximately 62.7% of AmeriCorps State and National Grants

that are awarded on a competitive basis.[9]  *See* 42 U.S.C. § 12581(d)(1).

71.    Plaintiff States' Service Commissions submitted their applications for competitive

grants on or before January 23, 2025.  The state applications consist of hundreds of sub-

applications from nonprofit organizations and local government agencies that were themselves

selected by the States through a competitive process.

---

[9]    Other competitive AmeriCorps grants, such as Seniors RSVP grants and Volunteer Generation Fund grants, are awarded through a similar process.  *See, e.g.*, NOFO, FY 2025 AmeriCorps Seniors RSVP Competition, https://americorps.gov/sites/default/files/document/FY25RSVPNOFO_508_9.5.24_0.pdf; NOFO, FY 2023 Volunteer Generation Fund, https://americorps.gov/sites/default/files/document/AmeriCorps_FY2023_VGF_NOFO_508.pdf. For formula-based grants such as State Commission Support Grants and 35.3% of State and National Grants, AmeriCorps allocates an amount equivalent to the ratio that "the population of the State bears to the total population of the several States, the District of Columbia, and the Commonwealth of Puerto Rico."  42 U.S.C. § 12581(e)(2); *see, e.g.*, Memorandum re Instructions for Being Awarded Fiscal Year 2024 Commission Support Grant and Commission Investment Fund Grants Allocations via Round Two (June 21, 2024), https://americorps.gov/sites/default/files/document/FY%202024%20CSG-CIF%20Round2%20Commission%20Guidance.508.pdf; Memorandum re Fiscal Year 2024 Formula Guidance for State Commissions (Mar. 1, 2024), https://americorps.gov/sites/default/files/document/FY%202024%20Formula%20Guidance.pdf. South Dakota does not receive formula-based grants because it lacks a State Service Commission.

72.     AmeriCorps programs are approved for a three-year period of performance but apply for funding every year out of the agency's annual appropriations.  NOFO, FY 2025 AmeriCorps State and National Grants at 6.

73.     Competitive grant applications are divided into three types based on where a program falls within the three-year grant cycle:

    a.  *Continuation applicants*, which are in the first or second year of operation within a three-year grant cycle, *see id.* at 27;

    b.  *Recompete applicants* (also called *renewal applicants*), which are in the final year of the three-year grant cycle or have received a competitive AmeriCorps grant in the past five years, *see* AmeriCorps, *Application Instructions: State and National Competitive New and Continuation* 6, https://www.americorps.gov/sites/default/files/document/508-2025_ASNApplicationInstructions_August21_0.pdf; and

    c.  *New applicants*, which are all other applicants.

74.     The NOFO outlines a comprehensive application review procedure whereby:

    a.  AmeriCorps does an initial compliance and eligibility check for each application. *Id.* at 23.

    b.  A team of external reviewers substantively evaluates each application using 11 weighted criteria, including an explanation of the community problem and how the proposed intervention will result in measurable outputs; documented evidence to support the program design; member experience; host organization capability, staffing, supervision, and "commitment to diversity, equity, inclusion, and accessibility"; and program budget and cost effectiveness. *Id.* at 18–24.

c.  AmeriCorps internally reviews each application, consults with State Service Commissions, and checks for budget compliance and the presence of prohibited activities. *Id.* at 24.

d.  AmeriCorps conducts a post-review quality control that evaluates the initial results for fairness and consistency. *Id.*

e.  Prior to awarding a grant, AmeriCorps performs a risk assessment of each organization, which considers financial compliance and past performance indicators. *Id.* at 24–25.

f.  AmeriCorps engages interactively with applicants to request additional information or resolve problems with the applications. *Id.* at 26.

75.    In the NOFO, AmeriCorps announced that it would complete this process for State and National Competitive Grants applications and notify successful applicants by "mid-April 2025." *Id.* at 1.

**IV.    Congress, OMB, and Apportionment**

76.    To finance federal programs and activities, Congress empowers agencies (including AmeriCorps) to incur financial obligations that will result in immediate or future disbursements of federal funds from the United States Treasury. *See* 2 U.S.C. § 622(2)(A)(i).

77.    One way Congress confers such power is through appropriations, which create the legal authority to "make funds available for obligation" and to make "expenditure[s]" for the purposes, during the time periods, and in the amounts specified in the law authorizing the appropriations. *See* 2 U.S.C. § 622(2)(A)(i).

78.    Each year the President prepares and submits a proposed budget for the upcoming fiscal year to Congress for consideration, which includes proposed annual appropriations. In

advance of this submission, OMB coordinates with executive agencies to prepare a consolidated federal budget proposal. U.S. GAO, *Principles of Federal Appropriations Law* 2-15 (4th ed. 2016) ("*GAO Redbook*"), available at https://www.gao.gov/legal/appropriations-law/red-book. Congress prescribes both the timing of the President's budget request and much of its required content to facilitate Congressional consideration. *See* 2 U.S.C. § 631 (requiring President to submit a budget proposal on or before the first Monday in February of each calendar year, for the following federal fiscal year); 31 U.S.C. §§ 1104–1109 (prescribing content and justification for budget requests).

79.    With respect to the President's funding proposals for various federal programs, Congress has several options. It may approve the President's proposed funding levels or alter them; it may reject the President's proposal entirely; or it may add new programs not requested in the budget. *GAO Redbook* at 2-15.

80.    Ultimately, Congress crafts its own appropriations legislation, whether consolidated in a single bill or divided into two or more smaller bills addressing particular subsets of government programs. *See* 2 U.S.C. § 631.

81.    Where Congress does not adopt an appropriations act by the beginning of its fiscal year, it can instead adopt a continuing resolution to avert a funding gap. Continuing resolutions generally continue the levels of funding from the prior year's appropriations (or the prior continuing resolution) for a set period. *See* Cong. Research Serv., CRS-R46595, *Continuing Resolutions: Overview of Components and Practices* 1–4 (Mar. 27, 2025), https://www.congress.gov/crs-product/R46595.

82.    Through appropriations acts, Congress prescribes how appropriated funds may be used in three primary ways. First, Congress defines the purposes for which appropriations may be

used. The so-called "purpose statute" states that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law," 31 U.S.C. § 1301(a)—that is, funds can only be used for the purposes that Congress has designated.

83.    Second, Congress prescribes how long an appropriation is available to an executive agency, *i.e.*, the "period of availability" within which an agency may obligate or actually expend an appropriation. *GAO Redbook*, at 5-3.

84.    Third, Congress prescribes the amount of the appropriation. In other words, Congress prescribes *how much* an executive agency can spend for the purposes and time periods Congress defines. *Id.* at 5-3, 6-3.

85.    Through another statute—the Antideficiency Act—Congress has exercised additional control over federal spending by requiring that appropriations to executive agencies be "apportioned," that is, parceled out, over the appropriations' period of availability, rather than releasing an agency's full appropriation to it at the beginning of the fiscal year. 31 U.S.C. §§ 1511–1516.

86.    Apportionment is designed to prevent an agency from obligating available funds in a way that would result in a budget deficiency—for example, if an agency were to spend all or most of its appropriation too early—thereby requiring Congress to appropriate additional funds to cover that deficiency. U.S. GAO, GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget Process* 12-13 (2005), https://www.gao.gov/assets/gao-05-734sp.pdf.

87.    Apportionment is implemented through an administrative process by which appropriated funds that are available for obligation are distributed to agencies by time periods (months, quarters, seasons, etc.); activities, functions, projects, or objects; or some combination of the two. 31 U.S.C. § 1512(b).

25

88.    OMB[10] is responsible for "apportion[ing] in writing an appropriation available to an executive agency." 31 U.S.C. § 1513.  Agencies submit apportionment requests to OMB, which then approves them.  OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, §§ 120.16, 120.30, 120.39 (July 2024), https://www.whitehouse.gov/wp-content/uploads/2018/06/a11.pdf.

89.    Agencies have a "duty to request an apportionment from the Office of Management and Budget, that would carry out the directives of Congress." *Berends v. Butz*, 357 F. Supp. 143, 156 (D. Minn. 1973).

90.    OMB must also comply with a specific timeline for the apportionment: appropriations must be apportioned by twenty days prior to the start of the fiscal year for which the appropriations were provided, or thirty days after the date of enactment of the appropriations act (or continuing resolution), whichever comes later.  31 U.S.C. § 1513(b).

91.    In apportioning funds, OMB may reserve (that is, withhold) portions of appropriations, but "only—(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." 31 U.S.C. § 1512(c)(1).

92.    "A reserve . . . may be changed as necessary to carry out the scope and objectives of the appropriation concerned."  *Id.* § 1512(c)(2).

93.    If OMB "decides that an amount reserved will not be required to carry out the objectives and scope of the appropriation concerned," then OMB "shall recommend the rescission

---

[10] The President is responsible for apportionment by statute but has delegated this authority to OMB. Executive Order 11541 (July 1, 1970), *available at* https://www.archives.gov/federal-register/codification/executive-order/11541.html.

of the amount . . . . Reserves established under this section shall be reported to Congress as provided in the Impoundment Control Act of 1974 (2 U.S.C. [§] 681 et seq.)."   31 U.S.C. § 1512(c)(2).

94.     "Under the Impoundment Control Act of 1974, an impoundment is an action or inaction by an officer or employee of the United States that delays or precludes the obligation or expenditure of budget authority provided by Congress."  *GAO Redbook* at at 2-47 (citing 2 U.S.C. §§ 682(1) & 683).

95.     "There are two types of impoundment actions: deferrals and rescission proposals." *Id.*

96.     "In a deferral, an agency temporarily withholds or delays funds from obligation or expenditure.  The President is required to submit a special message to Congress reporting any deferral of budget authority."  *Id.*; *see* 2 U.S.C. § 682(1) (defining "deferral of budget authority" to "include[]—(A) withholding or delaying the obligation or expenditure of budget authority (whether by establishing reserves or otherwise) provided for projects or activities; or (B) any other type of Executive action or inaction which effectively precludes the obligation or expenditure of budget authority, including authority to obligate by contract in advance of appropriations as specifically authorized by law").

97.     "Deferrals are authorized only to provide for contingencies, to achieve savings made possible by changes in requirements or greater efficiency of operations, or as otherwise specifically provided by law."  *GAO Redbook* at 2-47–2-48.

98.     "The President's deferral authority under the Impoundment Control Act thus mirrors his authority to establish reserves under the Antideficiency Act.  In other words, deferrals

27

are authorized only in those situations in which reserves are authorized under the Antideficiency Act." *Id.* at 2-48 n.56 (citing 31 U.S.C. § 1512(c)).

99.    "Deferrals for policy reasons are not authorized." *Id.* at 2-48 n.56 (citing 2 U.S.C. § 684(b)).

100.    "A deferral may not be proposed for any period of time extending beyond the end of the fiscal year in which the special message proposing the deferral is transmitted to the House and the Senate." 2 U.S.C. § 684(a).

101.    "A rescission involves the cancellation of budget authority previously provided by Congress (before that authority would otherwise expire), and can be accomplished only through legislation." *Id.* at 2-48.

102.    "The President must advise Congress of any proposed rescissions, again in a special message. The President is authorized to withhold budget authority that is the subject of a rescission proposal for a period of 45 days of continuous session following receipt of the proposal. Unless Congress acts to approve the proposed rescission within that time, the budget authority must be made available for obligation." *Id.* at 2-48–2-49.

103.    If the President transmits a special message to Congress within 45 days of the end of the fiscal year, then the Impoundment Control Act "does not permit budget authority proposed for rescission to be withheld until its expiration simply because the 45-day period has not yet elapsed." Letter from Thomas H. Armstrong, General Counsel, GAO, to the Hon. Steve Womack, Chairman, House Comm. on the Budget, No. B-330330, at 5 (Dec. 10, 2018), https://www.gao.gov/assets/b-330330.pdf.

104.    "The ICA [Impoundment Control Act] permits only the temporary withholding of budget authority and provides that unless Congress rescinds the amounts at issue, they must be

made available for obligation.  The President cannot rely on the authority in the ICA to withhold amounts from obligation, while simultaneously disregarding the ICA's limitations."  *Id.* at 1–2.

105.    "Regardless of whether the 45-day period for congressional consideration provided in the ICA approaches or spans the date on which funds would expire, section 1012(b) [2 U.S.C. § 683(b)] requires that budget authority be made available in sufficient time to be prudently obligated."  *Id.* at 6.

## V.    AmeriCorps' Presence in Plaintiff States

106.    As noted above, much of AmeriCorps' funding goes toward AmeriCorps State and National, which provides grants to many agencies and instrumentalities of Plaintiff States. Members and volunteers under AmeriCorps' other programs also serve on projects and programs in each of Plaintiff States.

### a.    *Maryland*

107.    In Plaintiff State of Maryland, the State Service Commission that manages AmeriCorps grants is the Governor's Commission on Service and Volunteerism (Maryland Governor's Commission).  The Maryland Governor's Commission was created in 1994 to review and approve all AmeriCorps State funding and to serve as a body of ambassadors for service and volunteerism in local communities.  The Maryland Governor's Commission is administered by the Governor's Office on Service and Volunteerism, which is itself part of the Maryland Department of Service and Civic Innovation (DSCI).

108.    In FY 2024, the Maryland Governor's Commission managed more than $6.2 million in federal funding from AmeriCorps: $4.2 million in AmeriCorps State Grants, $1.1 million in AmeriCorps State Planning Grants (which assist Maryland-based entities in developing

national service programs),[11] $389,181 in State Commission Operations Support Grants (which support the Governor's Commission in performing its duties under 45 C.F.R. § 2550.80),[12] and $530,759 in State Commission Investment Fund Grants (which cover training and technical assistance).[13]

109.    That year, AmeriCorps State and National Planning Grants supported 25 service programs across Maryland, such as Civic Works Service Corps, Maryland Refugee Corps (operated by the International Rescue Committee), Maryland Reading Corps, Teach for America Maryland, City Teaching Alliance–Baltimore, and HabiCorps (operated by Habitat for Humanity of the Chesapeake).  These programs worked across 174 locations and involved 672 participants. Federal funding partially or fully supported more than 80 program staff members.

110.    In total, in FY 2024, AmeriCorps provided more than $21 million in funding and education awards to support all projects and programs within Maryland.[14]

111.    That year, 4,949 AmeriCorps members and volunteers served on all projects and programs within Maryland.[15]

112.    AmeriCorps supports numerous service programs that are directly operated by Maryland public entities.  Several State universities in Maryland operate AmeriCorps programs,

---

[11]    *See* 2024 Terms and Conditions for AmeriCorps State and National Grants 2, https://americorps.gov/sites/default/files/document/2024ASNProgram508TC.pdf.

[12]    *See* FY 2024 Commission Support Grant Terms and Conditions 1, https://americorps.gov/sites/default/files/document/2024-TC-CSG-508-112723.pdf.

[13]    *See* 2024 Terms and Conditions for Training and Technical Assistance Commission Investment Fund Grants 1, https://americorps.gov/sites/default/files/document/2024-TC-CIF-508-112723.pdf.

[14]    AmeriCorps, *2024 Year in Review—Maryland*, https://americorps.gov/sites/default/files/upload/state_profiles/pdf_2025/MD_Combined.pdf.

[15]    *Id.*

which place hundreds of members at local schools and organizations. The Maryland Park Service also collaborates with AmeriCorps to operate the Maryland Conservation Corps, which supports public parks and natural resource management across the State.

113.    For example, Salisbury University (located on Maryland's Eastern Shore) runs a robust AmeriCorps program known as ShoreCorps. During the current service year (August 2024–August 2025), ShoreCorps enrolled 178 members, who as of April 2025 have collectively provided approximately 53,000 hours of service at 57 government and nonprofit entities across the rural Eastern Shore. ShoreCorps members collectively have managed 1,164 volunteers and provided services for 517 youths and 1,557 adults.

114.    This year, Salisbury was awarded $490,538 by AmeriCorps to operate ShoreCorps. The federal funding covers salaries for ShoreCorps' full-time staff; stipends and benefits for members; and other program costs.

115.    In addition, Salisbury relies on ShoreCorps in several other ways:

    a.  Many ShoreCorps members serve at the university itself, by volunteering at Food for the Flock (the campus food pantry), the Office of Student Support Services (which mentors first-generation and vulnerable students), or Sammy's Stash (which provides professional attire to students for interviews, internships, and jobs), or by participating in the Presidential Citizen Scholars Program (which partners with local government to research and act on community needs).

    b.  Many ShoreCorps members pay university tuition with AmeriCorps education awards supported by the National Service Trust. In 2024, $118,061 in Salisbury University tuition was paid using AmeriCorps education awards.

31

c.  Salisbury relies on ShoreCorps to expand its presence in and partnership with the community.  By placing ShoreCorps members with organizations in the area, the university creates lasting partnerships and fosters positive marketing that helps to recruit future students.

d.  The ShoreCorps program is a key element of Salisbury's overall identity, mission, and strategic plan.  ShoreCorps is the largest AmeriCorps program in Maryland, and has received multiple awards recognizing its enormous service contribution on the eastern shore of Maryland.  Indeed, the current University strategic plan has an explicit focus on increased engagement with the community, relying on ShoreCorps as a cornerstone of that effort.

116.  Frostburg State University in Western Maryland also operates an AmeriCorps program, Appalachian Service Through Action and Resources (ASTAR), which has existed since 1994.

117.  This year, ASTAR recruited and enrolled 59 AmeriCorps members to serve in western Maryland.  ASTAR placed members at ten organizations this year, including food banks, an educational farm, and Special Olympics Maryland.  ASTAR also placed members at over 15 elementary, middle, and high schools through Frostburg's Education Department.  ASTAR members assist their organizations with such diverse tasks as developing and implementing new and engaging lesson plans in schools, developing engaging experiential learning trips, providing food to the local community, expanding programming for special needs athletes, and providing resources for marginalized communities in Western Maryland.

118.  Like Salisbury, Frostburg relies on AmeriCorps support in several ways:

a. ASTAR members routinely serve at the university.  Currently, ASTAR has enrolled members serving at Frostburg's Center for Literary Arts, the Children's Literature Center, the PAWS Pantry (a student food bank), and the Biology Department.

b. Many ASTAR members use their education awards to pay university tuition.  Of the current ASTAR members who are expected to receive education awards, 11 are enrolled Frostburg students; they are expected to use most or all of their $20,000 in education awards to pay tuition at Frostburg.

c. By placing ASTAR members with local organizations, Frostburg fosters partnerships and develops a positive public image within the community.  These efforts, in turn, assist Frostburg with marketing and recruiting.

119.    Along with the State universities, the Maryland Park Service (MPS) receives support from AmeriCorps.  MPS operates the Maryland Conservation Corps (MCC), which was established in 1984 to mobilize young adults in intensive environmental conservation efforts that preserve, protect, enhance, and restore Maryland's natural resources.

120.    In the 2023–2024 service year alone, MCC members improved thousands of acres of public lands; restored hundreds of miles of trails and waterways across Maryland; provided environmental education programs to more than 28,000 students, youth, and park visitors; and helped respond to wildfires and clean up park facilities and trails after major storms.

121.    In the 2024–2025 service year, MCC received $922,079 from AmeriCorps to support 42 full-time members who serve in state parks and natural resource management areas across Maryland.

122.    Finally, along with funding, AmeriCorps provides members and programmatic support to assist service programs operated by State instrumentalities in Maryland.

33

123.    For example, five VISTA members currently are placed with DSCI and provide critical capacity to support DSCI's mission of promoting service and volunteerism in Maryland. Their living stipends are paid directly by AmeriCorps.

b.    *Delaware*

124.    In Plaintiff State of Delaware, the State Service Commission is the Governor's Commission on Community and Volunteer Service (Delaware Governor's Commission). Established in 1994, the Delaware Governor's Commission is charged with administering federally sponsored national service programs.

125.    The Delaware Governor's Commission receives and manages Prime Grants from AmeriCorps, awards and disburses subgrants from the Primes, monitors subgrantees for performance and compliance with grant requirements, provides training and technical assistance for subgrantees, and functions as liaison between AmeriCorps and subgrantees.

126.    In FY 2024, the Delaware Governor's Commission administered nearly $1.5 million in federal funding from AmeriCorps: $837,187 million in AmeriCorps State Grants, $103,140 in AmeriCorps State Planning Grants, and $507,086 in State Commission Operations Support and State Commission Investment Fund Grants.

127.    The Delaware Governor's Commission manages two separate types of AmeriCorps State Grants:

a.    *Competitive grants* (approximately two-thirds of AmeriCorps State Grants):  The Delaware Governor's Commission issues Requests for Proposals (RFPs) that are based on federal Notices of Funding Opportunity issued by AmeriCorps.  Grant applicants submit application materials in response to the RFPs, and AmeriCorps exercises its discretion in approving grant applications.

34

b. *Formula grants* (approximately one-third of AmeriCorps State Grants):  The Delaware Governor's Commission receives Congressionally appropriated money from AmeriCorps and itself selects the subgrantees for this money.  The Delaware Governor's Commission issues RFPs, but these are not based on federal NOFOs.

128.    Currently, the Delaware Governor's Commission manages grants for ten subgrantees, namely, the Children's Beach House, West End Neighborhood House, Leading Youth Through Empowerment, Literacy Delaware, Reading Assist Institute, TeenSHARP, SummerCollab, Family Promise, Spur Impact, and We Prosper Family Organization.

129.    Subgrantees use the funds they receive from AmeriCorps Delaware to run programs to benefit Delawareans.  The money is used to recruit, manage, pay, and train AmeriCorps members and handle program operations and costs, monitor and support host sites to ensure compliant and effective service.

130.    Many subgrantees then post AmeriCorps members at partner organizations called host sites. The host sites typically pay a fee to a subgrantee for member placement, provide service sites for members and supervise regular service, and verify hours and performance measures.

131.    Through this arrangement, AmeriCorps Delaware currently funds 119 AmeriCorps volunteers throughout Delaware.

132.    In total, in FY 2024, AmeriCorps provided more than $6.6 million in funding and education awards to support all projects and programs within Delaware.[16]

---

[16]    AmeriCorps, *2024 Year in Review—Delaware*, https://americorps.gov/sites/default/files/upload/state_profiles/pdf_2025/DE_Combined.pdf.

133.    That year, 1,322 AmeriCorps members and volunteers served on all projects and programs within Delaware.[17]

134.    AmeriCorps also supports service programs that are directly operated by Delaware public entities.

135.    For example, Delaware's Department of Health and Social Services has operated the Delaware Foster Grandparent Program for 59 years.  This program funds and organizes over dozens of volunteers in K–12 schools who help children gain skills and confidence to succeed in school, tutor students in literacy or math, and support improvement in social and emotional skills.

<em>c.    California</em>

136.    California Volunteers—part of the Governor's Office of Service and Community Engagement—is the State Service Commission that manages AmeriCorps grants on behalf of Plaintiff State of California.  Reflecting California's population, it is the largest State Service Commission both in terms of volunteer numbers and financial awards.

137.    For the 2024–25 service year, California Volunteers manages 88 programs supported by AmeriCorps , involving 6,902 participants at 1,875 locations. AmeriCorps provided over $66 million in funding for these projects under the FY 2025 State and National grant award.

138.    One such program is Prevent Child Abuse California, which hosts 65 AmeriCorps members who provide academic assistance, life skills, and financial literacy to hundreds of foster youths across 15 counties.  This program is supported by $1.16 million in AmeriCorps funding and $886,000 in matching funds.

---

[17] *Id.*

139.    Another program managed by California Volunteers is the Partnership for Veterans and People Experiencing Homeless, which hosts 25 AmeriCorps members that provide housing services, job placement, and case management to veterans and homeless individuals in Santa Barbara County.  This program is supported by $675,000 in AmeriCorps funding and $812,000 in matching funds.

140.    A third program managed by California Volunteers is Reading Partners California, which hosts 80 AmeriCorps members who recruit and manage approximately 1400 volunteers to provide one-on-one literacy tutoring to students at 58 low-income elementary schools.  This program is supported by $2 million in AmeriCorps funding and $2.4 million in matching funds.

141.    California communities also benefit from the services provided by members in other AmeriCorps programs, such as VISTA, RSVP, Foster Grandparents, and—until recently—NCCC.  In fiscal year 2024, AmeriCorps funded 254 additional service projects in California through these programs, covering 12,173 participants at 1,352 locations. AmeriCorps members participating under these programs provide incalculable services to California communities, from education to environmental stewardship, disaster relief to tax preparation.

142.    The NCCC Pacific Region campus is located in Sacramento, California.  In 2024, the campus hosted 142 AmeriCorps members.  An additional 388 AmeriCorps members from across the country were deployed to 47 service locations in California.

143.    In total, in FY 2024, AmeriCorps provided nearly $133 million in funding and education awards to support all projects and programs within California.[18]

---

[18]    AmeriCorps, *2024 Year in Review—California*, https://www.americorps.gov/sites/default/files/upload/state_profiles/pdf_2025/CA_Combined.pdf.

144.    One of eight AmeriCorps regional offices is located in Los Angeles, California.

145.    For the coming grant cycle (FY 2025), California Volunteers held its own competitive application process in the fall to select programs for its AmeriCorps State and National competitive grants application, which it then submitted to AmeriCorps in January. In this application, California Volunteers requested funding up to $42 million to support 35 programs covering 2,758 proposed AmeriCorps members, plus an additional $6,471,487 in continuation grant funds to support 5 programs and 293 AmeriCorps members.

146.    Once California Volunteers receives its competitive awards, it will allocate funds from California's formula grant to support projects that were not funded under the competitive grant. California also has grant funds allocated for Commission Support and a Commission Investment Fund.

147.    The majority of California Volunteers' AmeriCorps projects are school-based, either providing services to K–12 students or utilizing AmeriCorps members who are in college (College Corps). These programs must begin by mid-August, prior to the school year. However, members cannot be enrolled or funded until the final award is approved by AmeriCorps and fully executed. In past years, California has had to submit its formula grant application by mid-June to ensure timely processing by AmeriCorps.

148.    California's Department of Developmental Services also has operated a Foster Grandparent Program since 1967.  The program facilitates senior volunteers providing one-on-one support to children with developmental and intellectual disabilities.

                    d.    Colorado

149.    In Plaintiff State of Colorado, AmeriCorps grants are managed by Serve Colorado, a state government office housed within the Office of the Lieutenant Governor.

38

150.    Serve Colorado receives and manages grant funds from AmeriCorps, awards and disburses subgrants, monitors subgrantees for performance and compliance with grant requirements, provides training and technical assistance for subgrantees, and functions as a liaison between AmeriCorps and subgrantees.

151.    Serve Colorado currently manages 34 grants for AmeriCorps State and National subgrantees, including nonprofit organizations, local governments, and institutions of higher education in urban, rural, and mountain towns across Colorado.  Subgrantees use the funds they receive from Serve Colorado to run programs to benefit Coloradans by recruiting, managing, paying, and training AmeriCorps members, handling program operations and costs, and monitoring and supporting subgrantees.

152.    In 2024 alone, Serve Colorado's subgrants supported nearly 1,400 AmeriCorps members who contributed over one million hours of service across all 64 Colorado counties.  Those members supported nearly 20,000 students, treated over 2,100 acres of public land, restored over 800 miles of trail, and provided human services to 27,000 people.

153.    Since 2015, Serve Colorado has awarded nearly $102 million in AmeriCorps grants and has enlisted nearly 12,000 AmeriCorps members in service to the State of Colorado.

e.    *Other States*

154.    Other Plaintiff states similarly rely on AmeriCorps funds to support community-oriented projects and initiatives.  Except for South Dakota, all fifty states (as well as Puerto Rico and the U.S. Virgin Islands) have established State Service Commissions to administer AmeriCorps funds for the benefit of their citizens and communities.[19]

---

[19]    *See* AmeriCorps, *State Service Commissions*, https://www.americorps.gov/contact/state-service-commissions (last accessed Apr. 21, 2025).

155.    In Arizona, for example, the Governor's Office of Youth, Faith, and Family's Commission on Service & Volunteerism administers AmeriCorps grants. In FY 2024, the Commission administered federal grants funding over 1,500 AmeriCorps members providing services in the State.  AmeriCorps also directly funded an additional 3,280 members and volunteers in Arizona.  In total, the federal investment was $18.3 million.  The Commission manages seven Prime Grants.  Three are through competitive funding, while four are formula Primes.  Across these grants, the Commission manages grants for 26 subgrantees.  Since 1994, more than 28,000 Arizona residents have contributed nearly 30 million hours of service and earned education awards totaling more than $78.5 million.

156.    For Program Year 2024, the Serve Illinois Commission on Volunteerism and Community Service (Serve Illinois), which is administered by the Illinois Department of Human Services, manages grants for 33 subgrantees, which in turn serve 33 programs.  In Program Year 2024, Serve Illinois received and managed $28,992,935 in federal funding through these grants. For these grants managed by Serve Illinois, there are approximately 714 members.  These members serve in areas that seek to expand economic opportunity, in education, in areas designed to improve health futures, in areas designed to aid in environmental stewardship, and in areas to aid veterans and military families throughout State of Illinois.  For example, these members serve at the Boys and Girls Clubs of Chicago, Dundee Township, Elgin, and Livingston County; at the Greater Chicago Food Depository; at the Association House of Chicago; at Youth and Opportunity United; and at Literacy Volunteers of Illinois, among others.  AmeriCorps' impact on Illinois is substantial

and wide-ranging—in total, in 2024 there were 9,447 members and volunteers at 1,111 service locations.[20]

157.    In Kentucky, the Serve Kentucky Commission—attached to the Cabinet for Health and Family Services—awards and manages between $10 million and $15 million in AmeriCorps funds each year.  Serve Kentucky disburses AmeriCorps funds to such programs as the Christian Appalachian Project, through which members provide housing development and repair, emergency utility and crisis assistance, hunger relief, affordable clothing, infant and toddler care, and pre-school, afterschool and summer education; Family Resource and Youth Services Centers, which employ 73 people who tutor students in literacy and provide basic needs support to kids; and Kentucky Health Corps, which provides healthcare support in the area of memory care, skilled nursing, and assisted living to seniors and people with disabilities in healthcare facilities.

158.    The Maine Commission for Community Service manages grants for 8 subgrantees, including Maine Conservation Corps (operated by the Maine Department of Agriculture, Conservation & Forestry), Alpha Legal Foundation, Main Street Skowhegan, White Pine Programs, the Greater Portland Council of Governments' Resilience Corps, Food for All, and Hospice Volunteers of Somerset County.

159.    In Massachusetts, the State Service Commission that manages AmeriCorps grants is the Massachusetts Service Alliance.  Its predecessor was the Massachusetts National and Community Service Commission, established by Governor William F. Weld in 1994.  In 2006, Governor Mitt Romney designated a charitable corporation, the Massachusetts Service Alliance,

---

[20]    See AmeriCorps, *2024 Year in Review—Illinois,* https://americorps.gov/sites/default/files/upload/state_profiles/pdf_2025/IL_Combined.pdf    (last accessed April 25, 2025).

Inc., as an "alternative administrative entity" for purposes of 42 U.S.C. § 12638(a)(2) and subject to the requirements of 42 U.S.C. § 12638. This designation as an alternative administrative entity may be revoked at any time by the Governor of Massachusetts by further Executive Order. Massachusetts's State Service Commission monitors and evaluates the implementation of AmeriCorps state programs in Massachusetts. In FY 2024, Massachusetts's State Service Commission was awarded more than $23 million in AmeriCorps funding to support programs across the state. The AmeriCorps programs in Massachusetts include programs for the City of Boston and the City of Lawrence, and a program at Framingham State University, a public state university in Massachusetts. The Framingham State University program supported by AmeriCorps is the Framingham Teacher Residency program, which provides a residency model for those looking to begin their careers in teaching, and supports residents who commit to teaching in Framingham Public Schools for a minimum of three years.

160. The Michigan Community Service Commission (MCSC) manages grants for 32 subgrantees funded with AmeriCorps grants engaged in the areas of disaster services, public safety, public health, education, economic mobility, workforce development, youth services, and climate resiliency across Michigan. For fiscal year 2024, MCSC had over $30 million dollars available in AmeriCorps grant funding.

161. In Minnesota, the State Legislature established the Minnesota Commission on National and Community Service ("MCNCS") in 1994 to administer, inter alia, the federal AmeriCorps Program in Minnesota. In 2002, the Minnesota Legislature approved MCNCS becoming a 501(c)(3) nonprofit organization known as ServeMinnesota, with the broader mission of advancing national service and volunteerism across Minnesota. As such, ServeMinnesota is responsible for administering federal AmeriCorps funds to programs throughout Minnesota.

ServeMinnesota disburses allocated AmeriCorps funds through a competitive grantmaking process to eligible entities to provide critical support such as environmental, education, and community building resources for Minnesota and its residents.

162.    Nevada Volunteers is the State Service Commission that administers AmeriCorps State and National Grants on behalf of Nevada.  An independent nonprofit corporation designated by the Nevada Governor's Office to implement the AmeriCorps program in Nevada consistent with the 1993 Act, Nevada Volunteers receives and manages State and National Grants from AmeriCorps, awards and disburses subgrants, monitors subgrantees for performance and compliance with grant requirements, provides training and technical assistance, and functions as liaison between AmeriCorps and subgrantees.  From February 2024 to February 2025, Nevada Volunteers administered 12 programs supported by AmeriCorps State Grants, involving 345 members who completed service at 41 service locations across the state.  AmeriCorps provided $4,350,957 in funding for these projects, plus an additional $500,605 in State Commission Operations Support.  The AmeriCorps program in Nevada includes local programs for the City of Las Vegas and the City of Henderson.  For example, the City of Las Vegas AmeriCorps Program provides educational support and resources (e.g., K-12 tutoring) for children throughout the city. The City of Las Vegas AmeriCorps Program supports over 60 servicemember positions.

163.    The New Jersey Commission on National and Community Service administers AmeriCorps funding for the State of New Jersey and supports the growth and development of national service and volunteerism throughout New Jersey.  In FY 2024, the New Jersey Commission received at least $6 million in federal formula funding from AmeriCorps, and managed awards for 23 subgrantees.  Grant recipients run projects that—among other things—

promote ecological stewardship, assist individuals in addiction recovery, advance disaster preparedness, and support vulnerable populations including children and the elderly.

164.    New Jersey also has operated a Foster Grandparent Program for well over 35 years (originally through its Department of Human Services and now through its Department of State), which enables low-income seniors to volunteer as mentors and tutors to children with special needs.  Volunteers receive a tax-free stipend of $4 per hour as well as travel reimbursements. Foster grandparents assist with literacy, basic math, and conversation skills; participate in recreational activities; encourage student engagement in classroom learning experiences; and provide guidance in appropriate behavior and social development.  The special child-grandparent relationship helps children feel secure, gain self-esteem and enjoy learning, leading to healthy minds and bodies that foster future educational success.

165.    The New York State Commission on National and Community Service administers AmeriCorps funding to improve lives, strengthen communities, and foster civic engagement through service and volunteering across New York.  Supported by the State Commission, AmeriCorps members in New York provide tutoring to elementary school students, serve in soup kitchens and homeless shelters, help New Yorkers access public benefits, and provide education on health issues and disaster preparedness to impoverished communities.

166.    OregonServes disburses allocated AmeriCorps funds through a competitive grantmaking process to eligible entities to run AmeriCorps programs and hire AmeriCorps members to provide services in their community. Grantees selected by OregonServes for 2024–2025 include the Ethos Rural Outreach Program, which provides K-12 education support in areas with limited education budgets, and the Salvation Army–Grants Pass Corps, which provides critical support such as housing, education, and employment resources for homeless individuals.

167.    Operating within the Pennsylvania Department of Labor and Industry, PennSERVE is Pennsylvania's designated state service commission for AmeriCorps.  During the 2024–2025 grant year (since July 1, 2024) PennSERVE has managed a total of $17,938,078 from four different federal grant awards which fund 28 AmeriCorps programs across Pennsylvania.  PennSERVE's programs currently have nearly 900 AmeriCorps members serving in Pennsylvania at over 250 active host sites spread across 41 counties.  Some of the Pennsylvanians benefiting from these AmeriCorps/PennSERVE programs include 90 veterans who are currently receiving peer support and assistance with mental illness and addiction problems in Butler, PA; 2,483 students in rural northwestern PA currently receiving academic and social-emotion support before, during, and after school; over 7,700 K–12 students who have an AmeriCorps teacher in their Greater Philadelphia-area classrooms; approximately 1,000 low-income residents in southern-central Pennsylvania receiving access to financial education, free tax preparation, and workforce readiness training; individuals and families in the Lehigh Valley where AmeriCorps members improve community stabilization by increasing access to food, housing, income, and health resources; and elementary school students in Pittsburgh receiving support to improve academic engagement and academic performance.

168.    In Vermont, AmeriCorps grants are managed by SerVermont, a state government office within the Agency of Human Services.  SerVermont currently manages 5 grants for AmeriCorps State and National: the Lyndon Economic Opportunity AmeriCorps Program, Vermont Housing and Conservation Board, EveryBody Works, Vermont Environmental Careers and Opportunities; and Vermont Youth Conservation Corps.  Subgrantees use the funds they receive from SerVermont to run programs to benefit Vermonters by recruiting, managing, paying, and training AmeriCorps members, handling program operations and costs, and monitoring and

supporting subgrantees.   In 2024, SerVermont's subgrants supported roughly 300 AmeriCorps members who contributed service across the State of Vermont.  Those members supported 7,339 children and youth, treated over 1,800 acres of public land, improved over 130 miles of trail, and recruited or managed over 22,000 volunteers, among other accomplishments.  Since 1994 more than 6,600 Vermont residents have serviced approximately 9.8 million hours.

169.    In Washington, ServeWashington, part of the State's Office of Financial Management, awards and disburses subgrants from both competitive and formula funding.  Until April 25, ServeWashington managed grants for 22 subgrantees, including the Washington State Department of Veterans' Affairs, the Washington State Department of Employment Security, Chelan-Douglas County Community Action Council, Girl Scouts of Western Washington, United Way of King County, United Way of Benton and Franklin Counties, College Possible, and Washington Association of Child Advocate Programs, among others.   These grants funded AmeriCorps volunteers to work at food banks, help communities build climate resilience and prepare for disasters, tutor children in reading, rehabilitate low-income housing, plant trees, mentor at-risk youth, provide services to home-bound seniors, provide services to at risk veterans and those transitioning from the military, and reduce gang involvement in schools and neighborhoods, among many other things.

## VI.    The Administration's Unlawful Efforts to Terminate and Defund AmeriCorps Programs Prior to the Preliminary Injunction

170.    The Administration made a decision to dismantle AmeriCorps.  Defendants have sought to effectuate this decision by releasing from service more than 750 NCCC members, placing most agency staff on administrative leave in anticipation of terminations, cancelling contracts and grants, and withholding or delaying program funding. Each of these measures are final agency actions.

171.    As described by AmeriCorps' Interim Agency Head, Jennifer Bastress Tahmasebi, in an email to AmeriCorps' Board: "A team from DOGE arrived last Tuesday [April 8]. Since they arrived[,] myself, the acting Chief Operating Officer (Jill Graham), the acting General Counsel (Jana Maser), the acting Deputy General Counsel (Liz Appel) have worked with them around Administration goals to cut staff, contracts, contractors, and agency deliverables." A true and correct copy of the Bastress Tahmasebi Email is attached as Ex. C.

172.    "The DOGE team requested and we have granted access to all our systems including email." *Id.*

173.    Bastress Tahmasebi further explained that AmeriCorps' leadership "engaged in conversations with the DOGE team on what the staffing structure should look like consistent with Administration goals." *Id.*

174.    On April 15, all members of AmeriCorps NCCC received a memorandum from Ken Goodson, NCCC National Director, that provided "official notification that you are being released from the AmeriCorps NCCC program effective April 30th, 2025. Effective April 30th, 2025, your status as an AmeriCorps NCCC Corps Member will terminate and your NCCC provided benefits will be discontinued." A true and correct copy of the Goodson Memorandum is attached as Ex. A.

175.    Because AmeriCorps regulations do not provide for termination of NCCC members by AmeriCorps, without cause, before the end of their term of service, AmeriCorps described this termination as "approving your early release . . . for compelling personal circumstances." Ex. A; 45 C.F.R. § 2522.230(a).

176.    The Goodson Memorandum continued: "Your early departure is considered compelling as it results from program circumstances beyond your control." Ex. A.

177. An email, sent from the general AmeriCorps NCCC mailbox, accompanying the Goodson Memorandum stated that: "In alignment with the Trump-Vance administration priorities and Executive Order 14,222 'Implementing the President's Department of Government Efficiency Cost Efficiency Initiative,' AmeriCorps NCCC is working within new operational parameters that impact the program's ability to sustain program operations."[21] A true and correct copy of this email is attached as Exhibit B.

178. Similarly, Defendant Bastress Tahmasebi attributed the decision to shut down NCCC to a "shift in the staff footprint" resulting from DOGE's deferred resignation program "combined with additional efforts to downsize the agency through reductions in force." Ex. C.

179. As a result of the Goodson Memorandum, more than 750 AmeriCorps NCCC members were placed on administrative leave. *Id.*

180. The next day, Bastress Tahmasebi issued a memorandum that "put 85% of [AmeriCorps'] staff on administrative leave." *Id.* A true and exact copy of the Bastress Tahmasebi Memorandum is attached as Ex. D.

181. The Bastress Tahmasebi Memorandum stated: "During the period that you are on administrative leave you are not to enter AmeriCorps premises, access AmeriCorps systems, or attempt to use your position or authority with AmeriCorps in any way without . . . prior permission of a supervisor in your chain of command." *Id.*

182. In conjunction with the acceptance of "deferred resignation" offers, the Bastress Tahmasebi Memorandum reduced AmeriCorps' active workforce to 115 employees (106 core staff

---

[21] Holly Taft, *Doge Cuts Pull AmeriCorps Volunteers Off of Disaster Relief Jobs*, WIRED, Apr. 16, 2025, https://www.wired.com/story/doge-cuts-americorps-volunteers-disaster-relief-jobs/.

and 9 employees of AmeriCorps' Office of General Counsel). Ex. C. That is less than one-fifth as many personnel as AmeriCorps had on January 20.

183.    On April 24, AmeriCorps began to issue RIF notices to employees on administrative leave. A true and correct copy of one RIF notice is attached as Exhibit E.

184.    According to news reports, and as has been the case at other agencies targeted by DOGE, the intent is to "cut [AmeriCorps'] workforce by 'up to 50 percent or more.'"[22] Indeed, upon information and belief, the vast majority of those AmeriCorps employees who had been placed on administrative leave either accepted deferred resignation offers or received a RIF notice.

185.    AmeriCorps has thus terminated or barred from work the vast majority of its members and employees—including those responsible for allocating federal funds and performing AmeriCorps' statutorily mandated duties. *See, e.g.*, 42 U.S.C. § 12657.

186.    At the same time, AmeriCorps, at the behest of DOGE, has terminated "almost all" of its outside contractors, who performed functions including information technology, human resources, and financial services. Ex. C, at 2. These functions are now supposedly being "transfer[ed]" to the few remaining staff. *Id.*

187.    After business hours on Friday, April 25, Defendants notified grantees that their programs—collectively funded by nearly $400 million in AmeriCorps grants, or approximately 41% of AmeriCorps' budget—were immediately terminated.[23]

---

[22] Tobi Raji, *AmeriCorps staff members placed on leave after DOGE visit*, Wash. Post, Apr. 16, 2025, https://www.washingtonpost.com/nation/2025/04/16/americorps-cuts-doge-trump/.

[23] Tobi Rajj, *DOGE orders major cut to AmeriCorps funding, imperiling agency's work*, Wash. Post, April 25, 2025, https://www.washingtonpost.com/nation/2025/04/25/americorps-grant-cuts-doge/.

188.    According to the Summary worksheet of an Excel workbook that was last modified by Defendant Bastress Tahmasebi on April 21, of at least 1,031 programs the Defendants cut, 838 (more than four-fifths) were AmeriCorps State and National programs funded by subgrants awarded and administered by State Service Commissions.  A true and correct PDF copy of the Excel workbook, including a printout of metadata showing that Defendant Bastress Tahmasebi last edited the file, is attached as Exhibit F.

189.    By dollar value, of the $396,509,896 in grant-supported programs that were terminated, more than 93% ($371,129,870) were administered by the AmeriCorps State and National Office.  *Id.*  That constitutes two-thirds of the $557,094,000 that Congress directed AmeriCorps to assign to its State and National Grants for FY 2024.  *See* 170 Cong. Rec. H2060–61 (Mar. 22, 2024).

190.    Defendants have cited no authority that permits them to terminate programs funded as subgrants to grants awarded to State Service Commissions.

191.    The Data worksheet of the Excel workbook provides details on each of at least 1,031 programs that the Defendants cut, revealing that every state and several territories were impacted.  Ex. F.

192.    Defendants' notices not only terminated, collectively, nearly $400 million of funding to service programs, they also directed the immediate cessation of all volunteer service performed in connection with those programs.

193.    For example, the notice received by the Delaware Governor's Commission with respect to AmeriCorps State and National Grants stated in pertinent part:

> Effective immediately, the AmeriCorps award subrecipient(s) included in the attached spreadsheet is/are being terminated per 2 CFR 200.340(a)(4) because it has been determined that the award no longer effectuates agency priorities.  You

must immediately cease all award activities. This is a final agency action and is not administratively appealable.

. . .

State commissions and prime grantees should immediately notify subgrantees, operating sites, and members and follow grant close-out procedures. All member activities should cease immediately. Members should be exited for compelling personal circumstances (CPC). The program should document that the member was exited for compelling personal circumstances due to the agency's termination of the grant and program closure.

A true and correct copy of that notice is attached as Ex. G.

194.    Delaware also received a notice from Defendants that terminated the VISTA program in Delaware. A true and correct version of that is attached as Ex. H.

195.    The notice terminating the VISTA program duplicated the language of the notice terminating AmeriCorps State and National Grants, and added: "If you have [VISTA] members active on your award/agreement, all members will be removed from your project effective immediately." Ex. H.

196.    The regulation cited by Defendants, 2 C.F.R. § 200.340(a)(4), does not permit Defendants to change the priorities applicable to grants by AmeriCorps on a whim during a given fiscal year. *See* 42 U.S.C. § 12572(f) (requiring AmeriCorps to give notice of priorities for competitive grants that will be in effect "for a fiscal year," and providing that the *States, not AmeriCorps*, set the priorities for formula grants under 42 U.S.C. § 12638(e)(1)); *see also* 45 C.F.R. § 2522.460(b) ("A State may apply priorities different than those of AmeriCorps in selecting its formula programs."). Rather, during a fiscal year, AmeriCorps only "may . . . suspend or terminate payments under a contract or grant providing assistance under this subchapter, or revoke the designation of positions . . . as approved national service positions," when AmeriCorps "determines there is a material failure to comply with this subchapter or the applicable terms and

conditions of any such grant or contract issued pursuant to this subchapter." 42 U.S.C. § 12636(a)(1).

197.    Even upon finding "a material failure," AmeriCorps "must provide the recipient reasonable notice and opportunity for a full and fair hearing." 45 C.F.R. § 2540.400(b); *see* 42 U.S.C. § 12636(a)(2)(B). AmeriCorps must afford notice that it "intends to terminate or revoke assistance," describe "the grounds and the effective date for the proposed termination or revocation," and allow the recipient "at least 7 calendar days" to "show[] good cause why such assistance should not be terminated or revoked." 45 C.F.R. § 2540.400(b)(1). None of that occurred here. Defendants did not even bother to explain why—under an inapposite regulation — "the award[s] no longer effectuate[d] agency priorities." *Cf.* 2 C.F.R. 200.340(a)(4).

198.    On April 29, Plaintiff States filed the original Complaint and Motion for Preliminary Injunction in this action, ECF 1 & 5, requesting that this Court block the illegal dismantling of AmeriCorps exemplified by Defendants' aforementioned misconduct.

## VII.    The Administration's Unlawful Efforts to Withhold, Delay, and Condition AmeriCorps Funds After the Preliminary Injunction

199.    On June 5, 2025, this Court issued a Memorandum and Order granting in part Plaintiffs' request for a preliminary injunction. The Court later modified the preliminary injunction on July 10, 2025. Among other things, the Court concluded that Plaintiffs were harmed by the unnoticed termination of AmeriCorps programs in their states, and by the termination of all NCCC members. The Court also concluded that Plaintiffs were likely to succeed on their claim that the termination of programs and NCCC members constituted a significant change in service delivery, for which a notice and comment process was required under governing appropriations law, but Defendants failed to undertake such a process.

200.    The Court ordered, *inter alia*, that Defendants reinstate the programs terminated in Plaintiff States, and all NCCC members.  The Court also ordered that Defendants comply with governing FY 2025 appropriations law, and make no significant change to service delivery in Plaintiff States without proceeding through the required notice and comment process.

201.    In separate litigation, another court in this district issued a preliminary injunction against AmeriCorps on July 7, 2025.  *See Elev8 Baltimore, Inc. v. AmeriCorps*, 1:25-cv-01458-MJM, ECF Nos. 45–46.  Among other things, that court ordered the rescinding of reduction in force notices to AmeriCorps union employees, and the reinstatement of all such employees who were placed on administrative leave.  *See* ECF No. 46 at 1.

202.    Since at least that time, however, OMB—independently and/or in concert with AmeriCorps—has engaged in a mass-withholding, delay, and improper conditioning of AmeriCorps funds, across multiple types of programs.

203.    While OMB has taken these actions without any clear public notice—refusing to publish apportionment data on a public website as required by law,[24] Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, §204, div. E, tit. II, 136 Stat. 4667 (Dec. 9, 2022)—there is ample evidence that OMB is indeed withholding, delaying, and conditioning funding intended for specific AmeriCorps programs.

---

[24]    *See* Letter from Edda Emmanuelli Perez, General Counsel, U.S. GAO, to Russell T. Vought,    Director,    OMB,    No.    B-337581    (Apr.    8,    2025), https://www.gao.gov/assets/880/878943.pdf ("[T]here is a statutory requirement for OMB to post the apportionment data on a public website."); *Citizens for Responsibility & Ethics in Wash. v. OMB*, No. 1:25-cv-01111-EGS, ECF 34, at 3 (July 21, 2025) ("Under the law, the decision of the Executive Branch must be made public within two days of the decision.  And if Defendants need to make a new decision, that new decision must also be made public within two days.").

204.     For example, OMB alluded to such withholdings in their Technical Supplement to the President's 2026 Proposed Budget.  The Appendix of that document indicates that OMB intends for AmeriCorps to spend $780 million in FY 2025 funds, approximately $196 million less than Congress appropriated.  The budget even includes a specific line item of $196 million as "Undistributed" funds.

205.     Then, in mid-June—months behind schedule, and several weeks after this Court issued its Preliminary Injunction—AmeriCorps belatedly notified States of the results of the State and National FY 2025 Grant Competition.

206.     Upon information and belief, AmeriCorps only awarded competitive grants to continuation applicants for FY 2025, that is, those programs that were in the middle of a three-year funding cycle.

207.     The notifications sent to Plaintiff States' Service Commissions by AmeriCorps show that all of Plaintiff States' recompete and new applicants were marked "Not Funded" or "Funded pending release of FY 2025 appropriated dollars."  *See* 2025 AmeriCorps State and National Funding Status Charts, attached as Exhibit J.  For example:

    a.  In Maryland, two new and recompete applicants—one of which is Frostburg State University's ASTAR program—were "Funded pending release of FY 2025 appropriated dollars."  The remaining four new and recompete applicants were "Not Funded," including Salisbury University's ShoreCorps and the Maryland Department of Natural Resource's Maryland Conservation Corps.  Only two continuation applicants were "Funded."

    b.  In Delaware, both (new) applicants were "Not Funded."

c.  In California, six new and recompete applicants—including the San Diego Office of Education—were "Funded pending release of FY 2025 appropriated dollars," including programs operated by the City of Ontario and the San Diego County Office of Education.  The remaining 30 new and recompete applicants were "Not Funded," including the Napa County Office of Education's CalSERVES VIP program; the Regents of the University of California's GrizzlyCorps program; the Judicial Council of California's California JusticeCorps program; the Imperial County Office of Education's Borderlands program; and the Porterville Unified School District's Building Community, Changing Lives program.  Only the five continuation applicants were marked as "Funded."

d.  In Colorado, one recompete applicant was "Funded pending release of FY 2025 appropriated dollars."  The remaining 12 new and recompete applicants were "Not Funded."  Only three continuation applicants were "Funded."

e.  In Arizona, every new and recompete applicant was "Not Funded."  That includes State-operated programs at Arizona State University and Northern Arizona University.  All programs that were "Funded" were continuation applicants.

f.  In Kentucky, every new and recompete applicant was "Not Funded."  That includes programs operated by Kentucky's subdivisions such as the Jefferson County Board of Education and the Ohio Valley Educational Cooperative.  All programs that were "Funded" were continuation applicants.

g.  In Illinois, all nine new applicants were "Not Funded."  All programs that were "Funded" were continuation applicants.

h.  In Massachusetts, five new and recompete applicants were "Funded pending release of FY 2025 appropriated dollars." The remaining 12 new and recompete applicants were "Not Funded," including programs operated by the County of Barnstable and Framingham State University.  All five programs that were "Funded" were continuation applicants.

i.  In Michigan, two new and recompete applicants—one which is Michigan State University's MSU College Advising Corps—were "Funded pending release of FY 2025 appropriated dollars." The remaining 16 new and recompete applicants were "Not Funded," including programs operated by Eastern Michigan University, Michigan State University, Wayne State University, and the Michigan Department of Environment, Great Lakes, and Energy.  All programs that were "Funded" were continuation applicants.

j.  In Minnesota, two recompete applicants were "Funded pending release of FY 2025 appropriated dollars." The remaining five new and recompete applicants were "Not Funded."  All programs that were "Funded" were continuation applicants.

k.  In New York, two new and recompete applicants—one of which is the Research Foundation for the State University of New York's Empire State Corps—were "Funded pending release of FY 2025 appropriated dollars." The remaining 12 new and recompete applicants were "Not Funded," including programs operated by the City of Rochester, the New York City Housing Authority, and the City of New York's Office of the Mayor.  Only three continuation applicants were "Funded."

l.  In Washington, one recompete applicant was "Funded pending release of FY 2025 appropriated dollars." The other four recompete applicants were "Not Funded,"

56

including the Washington State Department of Veterans Affairs' Vet Corps Washington and the State of Washington's Washington Conservation Corps. All five programs "Funded" were continuation applicants.

208.    Upon information and belief, the caveat "funded pending release of FY25 appropriated dollars" indicates that OMB has not, in fact, "release[d] [ ] FY25 appropriated dollars" for AmeriCorps programs.

209.    The FY2025 appropriations law was enacted on March 15, 2025. Full-Year Continuing Appropriations Act, 2025, Pub. L. 119-4, § 1101(a)(8), 139 Stat. at 11.

210.    Under 31 U.S.C. § 1513(b)(2)(B), OMB was required to apportion AmeriCorps' FY2025 appropriations no later than "30 days after the date of enactment of the law by which the appropriation is made available," i.e., April 14, 2025.

211.    The AmeriCorps Defendants have represented to the Court that AmeriCorps had requested that OMB release the full amount of FY2025 appropriated funds to the agency.

212.    Upon information and belief, OMB has not released AmeriCorps' FY2025 appropriations as required.

213.    Instead, upon information and belief, OMB has reserved AmeriCorps' appropriations for reasons other than "(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." *See* 31 U.S.C. § 1512(c)(1).

214.    This inference is consistent with recent public reporting, which indicates that OMB has begun to withhold apportionments of "billions of dollars at a wide range of U.S. agencies" as part of the administration's efforts to "refus[e] to spend congressionally mandated funds."[25]

215.    In Congressional testimony, Defendant Vought also has "confirmed the Trump administration is considering taking unilateral action to withhold funding for federal agencies at the end of the fiscal year, despite lawmakers in both parties saying the move would be unlawful."[26]

216.    The President has not transmitted a special message to Congress proposing the rescission or deferral of AmeriCorps' FY2025 appropriations, as would be required to lawfully withhold the funds.  *See* 2 U.S.C. §§ 683(a) & 684(a).

217.    In the absence of a special message to Congress, OMB bears a ministerial duty to apportion AmeriCorps' FY2025 appropriations "to carry out the scope and objectives of the appropriation concerned."  31 U.S.C. § 1512(c)(2).

218.    Even if the President did transmit a special message to Congress, "unless Congress rescinds the amounts at issue, they must be made available for obligation."  No. B-330330, *supra*, at 1–2.

---

[25]    Jeff Stein et al., *Trump administration is preparing to challenge budget law, U.S. officials say*, Wash. Post, June 25, 2025, https://www.washingtonpost.com/business/2025/06/25/trump-budget-law-challenge/.

[26]    Eric Katz, *Withholding agency funds at the end of the year under consideration, White House says*, Gov't Exec. (June 25, 2025), https://www.govexec.com/management/2025/06/withholding-agency-funds-end-year-under-consideration-white-house-says/406323/ ("'[W]e believe that we have, under the law, numerous options with regard to how to achieve savings, including rescissions that are timed at the end of the fiscal year,' Vought said.")

219.    Thus, even if the President did transmit a special message to Congress, OMB would bear a ministerial duty to "release[] [the funds] in sufficient time to allow them to be prudently obligated." *See id.* at 6.

220.    By including the "funded pending release of FY25 appropriated dollars" caveat in competitive grant awards, Defendants have conditioned support for AmeriCorps programs on OMB's eventual "release" of Congressionally appropriated funds.

221.    Upon information and belief, Defendants have decided not to "release" FY 2025 appropriations for any new or recompete applicants for AmeriCorps competitive grants, meaning that programs "funded pending release of FY25 appropriated dollars" will ultimately not be funded at all.

222.    Upon information and belief, Defendants made a categorical decision to only fund continuation applicants for FY 2025.  That decision marks a significant change for AmeriCorps, which awarded funds to recompete and new applicants in prior years.

223.    Plaintiff States consistently competed for and won competitive State and National Grants in the past for new, recompete, and continuation applicants, relied upon the resulting awards, and intended to apply again in the future.

224.    On June 30, without any notice or explanation, Defendants also allowed funding for more than 120 AmeriCorps Foster Grandparent and Senior Companion programs across the country to expire without renewal, notwithstanding that Congress enacted appropriations to fund those programs under the 2025 appropriations law.  Full-Year Continuing Appropriations Act, 2025, Pub. L. 119-4, § 1101(a)(8), 139 Stat. at 11; *see* 170 Cong. Rec. H2060–61.

225.    Upon information and belief, most if not all of the programs applied to renew their funding, but Defendants decided to deny such applications without notice to the programs.

59

226.    Approximately half of the affected AmeriCorps Seniors programs appear to be located within the Plaintiff States, and many are operated directly by Plaintiff States or their instrumentalities.

227.    For example, Defendants allowed funding to expire for:

    a.    California's Foster Grandparent and Senior Companion Programs, operated by the California Department of Developmental Services;

    b.    Delaware's Foster Grandparent Program, operated by the Delaware Department of Health and Social Services;

    c.    Hawai'i's Foster Grandparent and Senior Companion Programs, operated by the Hawai'i Department of Human Services; and

    d.    New Jersey's Foster Grandparent Program, operated by the New Jersey Department of State.

228.    Finally, AmeriCorps has not awarded CIF grants for FY 2025.

229.    Although AmeriCorps communicated each State's anticipated CIF allocations in March, *see* 2025 Commission Support Grant and Commission Investment Fund Allocations, attached as Ex. K, and stated in guidance that "[a]ll compliant applicants will be awarded no later than June 20, 2025," Ex. I, none of Plaintiff States has been awarded CIF grants as promised,

230.    At least one Plaintiff State's Service Commission was told by AmeriCorps that their CIF grant would be awarded "upon release of the agency's appropriated FY25 funding" by OMB.

## VIII.    Harms to the Plaintiff States

231.    Plaintiff States will be directly and irreparably harmed by Defendants' unlawful termination and defunding of AmeriCorps programs.  Indeed, irreparable harms already are being felt by the Plaintiff States.

60

232.     As of April 25, Defendants immediately closed a majority of AmeriCorps programs in many Plaintiff States.   In Delaware, for example, Defendants eliminated nine out of ten programs that had been awarded more than $1.2 million in funding for FY 2025.  Ex. G.  Without notice, Defendants terminated all but one State-supported program in Washington and every State-supported program in Michigan.

233.     In Nevada, Defendants shut down 8 AmeriCorps programs.   In Illinois, they eliminated 28 programs and impacted 632 members.  In Kentucky, they closed 21 programs, ended service for 691 members, and caused the loss of more than $9 million in federal funds.  And in New York, Defendants terminated 40 programs operating at more than 300 locations across the State and prematurely ended the service of over 1,200 AmeriCorps members.

234.     Defendants also demanded that "[a]ll member activities should cease immediately." *Id.*  Plaintiff States were forced to issue immediate stop-work orders to their service projects or direct those projects to take steps to wind down their efforts.

235.     Under the Terms and Conditions for AmeriCorps State and National Grants, "[m]embers must be exited within 30 days of the end of their term of service."[27]  Defendants' April 25 notices directed that "[m]embers should be exited for compelling personal circumstances (CPC)," Ex. G; therefore, Plaintiff States had until May 25, at latest, to exit members from their terminated programs, after which it was impracticable to return them to service.

236.     Even after the Court enjoined Defendants' unlawful termination of these programs and ordered Plaintiffs restored to the status quo prior to April 25, Defendants' categorical decision

---

[27] AmeriCorps, 2024 Terms and Conditions for AmeriCorps State and National Grants 5, https://www.americorps.gov/sites/default/files/document/2024ASNProgram508TC.pdf    (last accessed Apr. 28, 2025).

not to fund *any* new or recompete applicants for FY 2025 competitive grants means that dozens of AmeriCorps programs across the Plaintiff States—many operated by Plaintiff States or their instrumentalities—will not be awarded competitive grants out of FY 2025 appropriated funds.

237.    Although some programs that were "Not Funded" may be included as part of their State's formula grant, because formula grants are based on each State's population and must be shared among many subgrantees, the amount of funding the programs will receive likely will be less than the new or recompete competitive grants Defendants categorically refused to award.

238.    In addition, at least one program that was "Funded pending release of FY 2025 appropriated dollars" chose to decline competitive funding because it could not be confident that those funds actually would materialize.

239.    Frostburg State University's ASTAR program felt compelled to decline competitive funding and request a smaller amount of funding as a subgrantee within Maryland's formula grant.

240.    Insofar as Defendants' unlawful decision not to fund *any* new or recompete applicants for competitive grants forces Plaintiff States to support those programs with formula subgrants, that also reduces the amount of formula funding available for other AmeriCorps programs within Plaintiff States, further compounding the harm.

241.    In addition to the wave of terminations, Plaintiff States have been and will continue to be harmed by the other manifestations of Defendants' decision to dismantle AmeriCorps. An 85% reduction in AmeriCorps' personnel would, if it went into effect, leave the agency incapable of fulfilling its mission or carrying out its statutorily mandated purposes.

242.    The agency's few remaining staff members would not be able to administer existing grants or timely process requests for new ones. Nor would they be able to certify AmeriCorps'

members' eligibility for education awards, process enrollments and exits, track members' hours, or ensure proper disbursement of federal funds. Delays in or loss of members' education awards would discourage members from serving and harm State universities whose tuition is paid using those awards. Finally, loss of support from AmeriCorps staff would impede Plaintiff States from resolving member enrollment issues, complaints and grievances, and errors in exit records.

243.    Defendants' unlawful refusal to award *any* new or recompete competitive grants for FY 2025 will force programs to close or scale back operations, causing harms that will be felt in each of the Plaintiff States. For instance, State agencies and universities at which AmeriCorps members are currently enrolled will lose that valuable service. States either will need to contribute their own funds to fill the gap or, more often, shutter the programs entirely. Partner organizations that rely on AmeriCorps members will be similarly limited or closed, and the vulnerable populations served by these organizations—such as immigrants, refugees, students, and the elderly—will place increased demand on State services.

244.    States and their universities will also receive less tuition in the form of education awards paid to AmeriCorps members. The termination or reduction in scope of AmeriCorps programs will harm universities' reputations and impede their outreach to local communities. So too, universities' mission to engage with and serve their regions will irreparably suffer without AmeriCorps support.

245.    Defendants' decision to allow dozens of Foster Grandparent and Senior Companion programs to expire without notice also will harm the Plaintiff States, which will be deprived of volunteers in public schools and essential support for seniors. Low-income volunteers at programs that were allowed to expire will lose their modest stipend, thereby increasing their need for assistance from Plaintiff States' own resources.

63

246.     In Delaware, California, and New Jersey, for example, Defendants failed to award renewed funding to the State-operated Foster Grandparent Programs before the new budget year began on July 1.  Although the programs received no-cost extensions to continue to use previously awarded funds through September 30, they cannot reasonably plan for the upcoming service year while their funding remains in limbo.  The loss of AmeriCorps support likely would cause these programs—which have existed for decades—to close entirely.

247.     Even if the AmeriCorps Seniors programs were able to cobble together replacement funding from other sources—which is far from certain—many seniors would no longer be able to participate as volunteers.  Currently, meals and stipends provided to AmeriCorps Seniors volunteers are exempt from being considered income for eligibility for public benefits.  42 U.S.C. § 5058.  Without that exemption, low-income volunteers who receive stipends would risk losing their Supplemental Security Income or Section 8 housing.

248.     Defendants' refusal to award CIF grants to State Service Commissions unlawfully withholds millions of dollars on which Plaintiff States rely "to support Commission staffing and staff development in priority performance areas, training events, and collaborative activities."  *See* Ex. I.

249.     Finally, the administration's relentless efforts to gut AmeriCorps in apparent defiance of this Court's injunction will discourage participation in national service and dissuade local organizations from partnering with AmeriCorps programs in the future.  Defendants' arbitrary termination of millions of dollars' worth of programs during National Volunteer Week— even as President Trump "call[ed] upon all Americans to observe this week by volunteering in

service projects across our country and pledging to make service a part of their daily lives"[28]—
already has made a mockery of AmeriCorps' statutory mission to "renew the ethic of civic
responsibility and the spirit of community and service throughout the varied and diverse
communities of the United States."  42 U.S.C. § 12501(b)(2).

<h2 style="text-align:center">CLAIMS FOR RELIEF</h2>

<h3 style="text-align:center">COUNT I<br>Administrative Procedure Act—Contrary to Law<br><i>Alleged as to AmeriCorps Defendants</i></h3>

250.    Plaintiffs incorporate by reference the allegations contained in the preceding
paragraphs.

251.    Defendants include an "agency" under the APA.  5 U.S.C. §§ 551(1), 701.

252.    Defendants took final agency actions subject to judicial review when they made the
decision to place all NCCC members on administrative leave or hold pending termination, and
close more than 1,000 AmeriCorps programs.

253.    The APA requires courts to "hold unlawful and set aside" agency actions that are
"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.*
§ 706(2).

254.    AmeriCorps Defendants have acted contrary to law by improperly closing
AmeriCorps programs *en masse*, withholding or delaying funding intended for AmeriCorps
programs, and improperly conditioning funding.

255.    Specifically, the drastic reductions to AmeriCorps staffing, operations, and
programs defy statutory directives requiring AmeriCorps to spend $975,525,000 "to carry out" the

---

[28]  Presidential Proclamation of National Volunteer Week, 2025 (Apr. 23, 2025),
https://www.whitehouse.gov/presidential-actions/2025/04/national-volunteer-week-2025/.

1990 and 1973 Acts, Further Consolidated Appropriations Act, 2024, 138 Stat. at 694; to spend $99,686,000 on employee salaries and other "necessary expenses of administration," *id.*, 138 Stat. at 695; to "provide[] for an office of the Corporation for each State," 42 U.S.C. § 12651h; to "conduct appropriate training for and provide technical assistance to . . . programs receiving assistance under the national service laws," *id.* § 12657(a)(1); and to "grant assistance . . . to accomplish the goals of the VISTA program." *Id.* § 4960.

256.    Defendants also acted contrary to law by closing approximately $400 million worth of AmeriCorps programs without providing Plaintiff States with notice or an opportunity to be heard.  *See* 42 U.S.C. § 12636; 45 C.F.R. § 2540.400.

257.    Defendants also acted contrary to law by closing approximately $400 million worth of AmeriCorps programs without a legitimate or legal basis.

258.    Defendants also acted contrary to law by withholding, delaying, or improperly conditioning funds intended for specific AmeriCorps programs.

259.    Finally, Defendants acted contrary to law by defying Congress's directive that AmeriCorps "make any significant changes to program requirements, service delivery or policy only through public notice and comment rulemaking."  Further Consolidated Appropriations Act, 2024 § 401, 138 Stat. at 695 (amounts reappropriated "under the authority and conditions provided in" FY 2024 by Full-Year Continuing Appropriations Act, 2025, § 1101(a)(8), 139 Stat. at 11).

260.    Under the appropriations acts, Congress "explicitly required use of notice and comment" when AmeriCorps makes any significant changes to program requirements, service delivery or policy, and AmeriCorps' attempt to make such changes here without "notice and comment is contrary to law."  *See Michigan v. EPA*, 268 F.3d 1075, 1088 (D.C. Cir. 2001).

261.    Accordingly, Plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and setting aside the decision to cut AmeriCorps programs, NCCC personnel, and withhold or delay funding.

## COUNT II
### Administrative Procedure Act—Notice and Comment
### *Alleged as to AmeriCorps Defendants*

262.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

263.    Defendants include an "agency" under the APA.  5 U.S.C. §§ 551(1), 701.

264.    The APA requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

265.    In the FY 2024 appropriations act, Congress explicitly required that Defendants "shall make any significant changes to program requirements, service delivery or policy only through public notice and comment rulemaking."  Further Consolidated Appropriations Act, 2024 § 401, 138 Stat. at 695.

266.    In the FY 2025 appropriations act, Congress reappropriated the amounts from the FY 2024 appropriations act, "under the authority and conditions provided in" that Act.  Full-Year Continuing Appropriations Act, 2025, § 1101(a)(8), 139 Stat. at 11.

267.    By placing NCCC members on administrative leave pending termination, by closing nearly $400 million worth of AmeriCorps programs, and by withholding, delaying, or improperly conditioning AmeriCorps funds Defendants made "significant changes to program requirements, service delivery or policy."

268.    Defendants' actions could lawfully be issued only following public notice and comment rulemaking.

269.    Without having proceeded through notice-and-comment procedures, Defendants' actions are procedurally invalid under the APA.

270.    Accordingly, Plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and setting aside the decision to cut AmeriCorps programs, NCCC personnel, and withhold or delay funding.

**COUNT III**
**Administrative Procedure Act—Contrary to Law**
***Alleged as to OMB Defendants***

271.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

272.    Defendants include an "agency" under the APA.  5 U.S.C. §§ 551(1), 701.

273.    Defendants took final agency actions subject to judicial review when they made the decision to withhold funding for AmeriCorps programs in Plaintiff States, including: programs awarded competitive grant funds by AmeriCorps; Foster Grandparent and Senior programs awarded AmeriCorps funds; and State Service Commission Investment Fund Grants.

274.    The APA requires courts to "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2).

275.    Defendants have acted contrary to law by violating multiple federal statutes.

276.    *Impoundment Control Act.* Defendants have violated the Impoundment Control Act, 2 U.S.C. § 681 *et seq.*, which places strict limits on the Executive Branch's authority to refuse to spend funds appropriated by Congress.

277.    Specifically, under 2 U.S.C. § 684(a), whenever the President or any officer of the United States "proposes to defer any budget authority provided for a specific purpose or project," the President must transmit to Congress a communication specifying, among other things, the "amount of budget authority proposed to be deferred," the relevant affected agencies, the period of time "during which the budget authority is proposed to be deferred," the "reasons for the proposed deferral, including any legal authority invoked to justify the proposed deferral," and "all fact, circumstances, and considerations relating to or bearing upon the proposed deferral."

278.    Such messages must also be sent to the Comptroller General when they are transmitted to Congress.  *Id*. § 685(b).  Where such messages concern a proposed deferral, the Comptroller General is required to provide Congress with a report as to the "facts surrounding each proposed deferral of budget authority" and whether in the Comptroller's judgment "such proposed deferral is in accordance with existing statutory authority."  *Id*.  Similarly, the Comptroller General must provide such a report if he finds that the President or any officer of the United States "proposes to defer budget authority" or "has ordered, permitted, or approved . . . a deferral of budget authority."  2 U.S.C. § 686.

279.    The law defines "deferral of budget authority" broadly, including "withholding or delaying the obligation or expenditure of budget authority (whether by establishing reserves or otherwise) provided for projects or activities," or "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of budget authority, including authority to obligate by contract in advance of appropriations as specifically authorized by law."  2 U.S.C. § 682(1).

280.    Deferrals must be "consisten[t] with legislative policy," and so deferrals are "permissible only" in three specific circumstances: "(1) to provide for contingencies; (2) to achieve

savings made possible by or through changes in requirements or greater efficiency of operations; or (3) as specifically provided by law." *Id.* § 684(b). The subsection concludes, "[n]o officer or employee of the United States may defer any budget authority for any other purpose." *Id*.

281. The statute provides that the Comptroller General may bring a civil action for specific violations of the law, namely to challenge deferrals where "budget authority is required to be made available for obligation and such budget authority is not made available for obligation." 2 U.S.C. § 687. But such suit may only be brought after 25 days of Congressional session, following the report of the Comptroller General. *Id*.

282. At the same time, the statute does not bar suit by any other litigants in cases relating to impoundment. *See id.* § 681(3) ("Nothing in this act . . . shall be construed as affecting in any way the claims or defenses of any party to litigation concerning any impoundment[.]").

283. At bottom, the Impoundment Control Act does not permit OMB to defer appropriated funds based on policy disagreement with congressional priorities, nor rescind them without congressional approval. On the contrary, the Impoundment Control Act expressly and unequivocally disclaims any such authority: "Nothing contained in this Act, or in any amendments made by this Act, shall be construed as . . . superseding any provision of law which requires the obligation of budget authority or the making of outlays thereunder." 2 U.S.C. § 681(4).

284. Here, OMB has acted contrary to law by failing to comply with the Impoundment Control Act in any way whatsoever.

285. The Director of OMB failed to transmit a message to Congress pursuant to § 684(a), proposing and explaining his reasoning for a potential deferral. He similarly failed to provide such a message to the Comptroller General, as required by § 685(b). Nor are the deferrals, now already

occurring, consistent with legislative policy, as they do not accord with any of the permissible purposes set forth in § 684(b).

286.    *Anti-Deficiency Act.*  Defendants have also violated the Anti-Deficiency Act.  As relevant here, the Anti-Deficiency Act generally prohibits federal officials from obligating or expending federal funds in excess of an appropriation.  *See* 31 U.S.C. § 1511 et seq.

287.    For Executive Branch agencies, OMB is required to apportion an appropriation "not later than the later of . . . (1) 20 days before the beginning of the fiscal year for which the appropriation is available; or (2) 30 days after the date of enactment of the law by which the appropriation is made available." 31 U.S.C. § 1513(b)(2)(A)–(B).

288.    Under 31 U.S.C. § 1512, OMB has limited discretion in how it may release portions of appropriated funds to agencies ("apportion") for expenditure.

289.    Appropriations "shall be apportioned" by OMB "to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period." 31 U.S.C. § 1512(a).  In other words, OMB's authority to limit apportionments is restricted to situations where they would necessarily result in expenditures in excess of current appropriations.

290.    OMB has not and cannot identify any risk of AmeriCorps expending apportioned funds in excess of their current appropriations.  Accordingly, Defendants' withholding of funds pursuant to OMB's apportionment authority is contrary to 31 U.S.C. § 1512(a).

291.    OMB must apportion funds pursuant to relevant: (A) "months, calendar quarters, operating seasons, or other time periods;" (B) "activities, functions, projects, or objects;" or (C) a combination of the methods in (A) and (B).  *Id*. § 1512(b)(1).

71

292.    OMB has failed to apportion funds to AmeriCorps pursuant to any of the above procedures.

293.    Further, OMB may only establish a "reserve" of funds in apportionment decisions: "(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." *Id*. § 1512(c)(1).

294.    OMB has effectively created a "reserve" of withheld AmeriCorps funds, without satisfying any of the allowable purposes for such a reserve.

295.    Finally, any "reserve" of funds established under the law, "shall be reported to Congress as provided in the Impoundment Control Act of 1974." *Id*. § 1512(c)(2).  OMB has similarly failed to report the fact of the reserved AmeriCorps funds Congress.

296.    *Appropriations Law.*  Defendants have also violated relevant appropriations law.

297.    Specifically, the withholding of AmeriCorps funds defies the 2024 Appropriations law, which was incorporated into FY 2025 Appropriations as well.  That is, in the FY 2025 appropriations act, Congress reappropriated the amounts from the FY 2024 appropriations act, "under the authority and conditions provided in" that Act.  Full-Year Continuing Appropriations Act, 2025, § 1101(a)(8), 139 Stat. at 11.

298.    Those statutory directives require AmeriCorps to spend $975,525,000 "to carry out" the 1990 and 1973 Acts,  Further Consolidated Appropriations Act, 2024, 138 Stat. at 694; to spend $99,686,000 on employee salaries and other "necessary expenses of administration," *id.*, 138 Stat. at 695; to "provide[] for an office of the Corporation for each State," 42 U.S.C. § 12651h; to "conduct appropriate training for and provide technical assistance to . . . programs receiving

assistance under the national service laws," *id.* § 12657(a)(1); and to "grant assistance . . . to accomplish the goals of the VISTA program." *Id.* § 4960.

299.    The withholding, delaying, and improperly conditioning of AmeriCorps funds by OMB Defendants is contrary to the mandate of Congress, requiring that appropriated funds be prudently obligated for AmeriCorps programs during their period of availability.

300.    OMB also has acted contrary to appropriations law by enabling or compelling AmeriCorps to effectuate "significant changes to program requirements, service delivery or policy" without proceeding through "public notice and comment rulemaking." *See* Further Consolidated Appropriations Act, 2024 § 401, 138 Stat. at 695.

301.    In the FY 2024 appropriations act, Congress explicitly required that AmeriCorps Defendants "shall make any significant changes to program requirements, service delivery or policy only through public notice and comment rulemaking." *Id.*

302.    In the FY 2025 appropriations act, Congress reappropriated the amounts from the FY 2024 appropriations act, "under the authority and conditions provided in" that Act. Full-Year Continuing Appropriations Act, 2025, § 1101(a)(8), 139 Stat. at 11.

303.    By withholding, delaying, and improperly conditioning AmeriCorps funds, OMB Defendants enabled or compelled AmeriCorps to effectuate "significant changes to program requirements, service delivery or policy" without proceeding through "public notice and comment rulemaking," thereby acting contrary to the mandate of Congress.

304.    Accordingly, Plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and setting aside the decision to withhold, delay, and condition AmeriCorps funding.

**COUNT IV**

**Administrative Procedure Act—Unlawfully Withheld and/or**
**Unreasonably Delayed Agency Actions**
*Alleged as to OMB Defendants*

305.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

306.    Defendants include an "agency" under the APA.  5 U.S.C. §§ 551(1), 701.

307.    Defendants took final agency actions subject to judicial review when they made the decision to unreasonably delay and/or unlawfully withhold apportionments necessary to fund AmeriCorps programs in Plaintiff States, including programs awarded competitive grant funds by AmeriCorps; Foster Grandparent and Senior programs awarded AmeriCorps funds; and State Service Commission Investment Fund Grants.

308.    The APA authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed."  *Id.* § 706(1).  Relief is warranted under this provision where an agency completely fails to take, or unreasonably delays in taking, "a discrete agency action that it is required to take."  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis omitted); *see id.* at 63 n.1.

309.    The APA provides that, "within a reasonable time, each agency *shall* proceed to conclude a matter presented to it." 5 U.S.C. § 555(b) (emphasis added).

310.    Under 31 U.S.C. § 1513(b)(2)(B), OMB was required to apportion AmeriCorps' FY2025 appropriations no later than "30 days after the date of enactment of the law by which the appropriation is made available,"

311.    The FY2025 appropriations law was enacted on March 15, 2025.  Full-Year Continuing Appropriations Act, 2025, Pub. L. 119-4, § 1101(a)(8), 139 Stat. at 11.  Accordingly, OMB was required to apportion AmeriCorps' FY2025 appropriations no later than April 14, 2025.

74

312.    Because Defendants have failed to apportion FY2025 appropriations to AmeriCorps in the time mandated by statute, which in turn has prevented AmeriCorps from funding programs in Plaintiff States, Defendants have engaged in unlawful withholding and/or unreasonable delay of agency action within the meaning of § 706(1).

313.    Accordingly, Plaintiffs are entitled to a declaration that Defendants have engaged in unlawful withholding and/or unreasonable delay of agency action within the meaning of § 706(1), as well as to an order and judgment, and to a preliminary and permanent injunction, ordering Defendants to cease unlawfully withholding and/or unreasonably delaying AmeriCorps' apportionments.

## COUNT V
### Administrative Procedure Act—Arbitrary and Capricious
### *Alleged as to All Defendants*

314.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

315.    Defendants include one or more agencies under the APA.  5 U.S.C. §§ 551(1), 701.

316.    The APA requires courts to "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2).

317.    The decisions to place NCCC members on administrative leave pending termination, to close nearly $400 million worth of AmeriCorps programs, and to withhold, delay, or improperly condition AmeriCorps funds, all constitute final agency actions under the APA.

318.    These decisions were arbitrary and capricious because neither OMB nor AmeriCorps provided any reasoned explanation for their decision; they also failed to consider the legitimate reliance interests of States, grantees, the public, and other interested entities; similarly

failed to conduct statutorily mandated hearings during which those interests may have been presented, failed to consider reasonable alternatives; and they failed to weigh the purported benefits against the costs.

319.    Accordingly, plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, holding unlawful and setting aside the decisions cited above and enjoining any action taken to effectuate them.

**COUNT VI**
**U.S. Constitution—Separation of Powers**
***Alleged as to All Defendants***

320.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

321.    Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress." U.S. Const. art. I, § 1. The Constitution also "exclusively grants the power of the purse to Congress, not the President." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).

322.    The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no power "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

323.    The Constitution further provides that the executive must "take Care that the laws be faithfully executed." U.S. Const. Art. II, Sec. 3. The Executive Branch violates the Take Care Clause where it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without

authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution"). Given these principles, where the Executive Branch overrides a statute or the legislative intent of Congress, it violates the separation of powers doctrine.

324.    Here, where Congress has created AmeriCorps and funded its programs, AmeriCorps Defendants may not incapacitate AmeriCorps from carrying out statutorily assigned duties by cutting approximately $400 million worth of AmeriCorps programs funded by Congressional appropriations and by placing NCCC members on administrative leave pending termination, nor may any of the Defendants unilaterally withhold, delay, or improperly condition AmeriCorps funds.

325.    Accordingly, plaintiffs are entitled to a preliminary and permanent injunction, and to a declaration pursuant to 28 U.S.C. § 2201, declaring unlawful and setting aside the decisions referenced above and enjoining any action taken to enforce or implement them.

### COUNT VII
### *Ultra Vires* Executive Action
### *Alleged as to All Defendants*

326.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

327.    Neither the President nor an agency can take any action that exceeds the scope of their constitutional and/or statutory authority.

328.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27. Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond

th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com Corp.*, 337 U.S. 682, 689 (1949).

329.    The decisions to place NCCC members on administrative leave pending termination, to close nearly $400 million worth of AmeriCorps programs, and to withhold, delay, or improperly condition AmeriCorps funds exceed the statutory authority of Defendants.

330.    Accordingly, plaintiffs are entitled to preliminary and permanent injunctive relief preventing Defendants from effectuating the decisions cited above.  Pursuant to 28 U.S.C. § 2201, plaintiffs are also entitled to a declaration that such decisions, and actions taken to effectuate them are contrary to law and outside Defendants' authority.

## COUNT VIII
### Writ of Mandamus (28 U.S.C. §§ 1361, 1651)
### *Alleged as to All Defendants*

331.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs.

332.    To the extent no relief is available under the forgoing causes of action, Plaintiff States plead in the alternative that they are entitled to a writ of mandamus ordering the Defendants to comply with their statutory and constitutional duties and to make these funds available to Plaintiff States.

333.    The Agency Defendants are officers, employees or agencies of the United States. "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.

334.    The relief sought as to all Defendants is necessary and appropriate to aid in the jurisdiction of this Court and agreeable to the usages and principles of law.  "The Supreme Court

and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).

335.    Plaintiff States enjoy a clear and indisputable right to relief from the decisions to place NCCC members on administrative leave pending termination, to close nearly $400 million worth of AmeriCorps programs, and to withhold, delay, or improperly condition AmeriCorps funds.

336.    Defendant OMB is violating a clear duty to act by failing to apportion funds that lawfully have been allocated by Congress.

337.    Defendant AmeriCorps is violating a clear duty to act by withholding, delaying, or improperly conditioning funds for AmeriCorps programs.

338.    Defendants' violations have caused extraordinary and ongoing harms to Plaintiff States for which no adequate alternative remedy exists.

339.    Apportionment is but a ministerial duty and Defendants' failure to provide any justification for not releasing the funds is insufficient to overcome Defendants' duty to act.  *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545 (D.C. Cir. 1999)*.

340.    Defendants' delay in apportioning the funding and releasing the funds is unreasonable in light of (1) AmeriCorps' and OMB's statutory and regulatory obligations to make these appropriated funds available to the States; (2) their long-standing compliance with these requirements; and (3) States' significant reliance on these funds.

341.    The delays also are unreasonable because human health and welfare (*i.e.*, the well-being of those served by AmeriCorps programs) is at stake.

342.    No higher or competing priorities exist which would outweigh the benefit of expediting Defendants' delayed release of funding.

343.    The interests prejudiced by Defendants' delay are the interests of AmeriCorps programs in Plaintiff States and their many beneficiaries.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

i.    Declare that the decisions to cut AmeriCorps programs, NCCC staff, and withhold, delay, or condition AmeriCorps funds are unlawful and/or unconstitutional because they violate the APA and/or the United States Constitution;

ii.    Pursuant to 5 U.S.C. § 705, postpone the effective date of the decisions to cut AmeriCorps programs, NCCC members and staff, and withhold, delay, or condition AmeriCorps funding;

iii.    Pursuant to 5 U.S.C. § 706, vacate the decisions to cut AmeriCorps programs, NCCC members and staff, and withhold, delay, or condition AmeriCorps funding;

iv.    Preliminarily and permanently enjoin the Defendants from effectuating the decision to cut AmeriCorps programs, NCCC members and staff, and withhold, delay, or condition AmeriCorps funding;

v.    Enter an order pursuant to 5 U.S.C. § 706(1) compelling the Defendants to apportion the funds appropriated for AmeriCorps programs in Plaintiff States that the Defendants have withheld, and to make the funds available to the States for obligation;

vi.    Issue a writ of mandamus compelling the Defendants to apportion the funds appropriated for AmeriCorps programs in Plaintiff States and to make the funds available to the States for obligation;

vii.    Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

viii.    Grant other such relief as this Court may deem proper.

Dated:  July 23, 2025                                        Respectfully submitted,

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

By: */s/ Virginia A. Williamson*
Virginia Williamson (D. Md. Bar. No. 31472)
Keith M. Jamieson (D. Md. Bar. No. 31543)
  *Assistant Attorneys General*
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland  21202
(410) 576-6584
vwilliamson@oag.state.md.us

*Counsel for the State of Maryland*


**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

By: */s/ Ezra Kautz*
Ezra Kautz*
  *Deputy Attorney General*
Joel Marrero*
William H. Downer*
  *Supervising Deputy Attorneys General*
Brian Bilford*
  *Deputy Attorney General*
Michael L. Newman*
  *Senior Assistant Attorney General*
California Department of Justice
1300 I Street
Sacramento, CA  95814
(916) 210-6346
Joel.Marrero@doj.ca.gov
William.Downer@doj.ca.gov
Ezra.Kautz@doj.ca.gov
Brian.Bilford@doj.ca.gov
Michael.Newman@doj.ca.gov

*Counsel for the State of California*


**KRISTIN K. MAYES**

**KATHLEEN JENNINGS**
ATTORNEY GENERAL OF DELAWARE

By: */s/ Ian R. Liston*
Ian R. Liston*
  *Director of Impact Litigation*
Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE  19801
(302) 683-8899
Ian.Liston@delaware.gov

*Counsel for the State of Delaware*


**PHILIP J. WEISER**
ATTORNEY GENERAL OF COLORADO

By: */s/ Kyle M. Holter*
David Moskowitz*
  *Deputy Solicitor General*
Sarah H. Weiss*
  *Senior Assistant Attorney General*
Kyle M. Holter*
Sam Wolter*
  *Assistant Attorneys General*
Colorado Office of the Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
sarah.weiss@coag.gov
kyle.holter@coag.gov
samuel.wolter@coag.gov

*Counsel for the State of Colorado*


**WILLIAM TONG**

ATTORNEY GENERAL OF ARIZONA

By  */s/ Joshua A. Katz*
Joshua A. Katz*
   *Assistant Attorney General*
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Katz@azag.gov

*Counsel for the State of Arizona*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF
   COLUMBIA

By: */s/ Andrew C. Mendrala*
Andrew C. Mendrala*
   *Assistant Attorney General*
Public Advocacy Division
Office of the Attorney General for the District
   of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726
Andrew.mendrala@dc.gov

*Counsel for the District of Columbia*

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

By: */s/ Abigail R. Durkin*
Abigail R. Durkin*
   *Assistant Attorney General II, Special*
   *Litigation Bureau*
Cara Hendrickson*
   *Assistant Chief Deputy Attorney General*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
Tel. (312) 814-3000

ATTORNEY GENERAL OF CONNECTICUT

By: */s/ Andrew Ammirati*
Andrew Ammirati*
   *Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5090
Andrew.Ammirati@ct.gov

*Counsel for the State of Connecticut*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
   *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
   *Solicitor General*
Hawaiʻi Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**OFFICE OF THE GOVERNOR** *ex rel.*
**ANDY BESHEAR**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
THE COMMONWEALTH OF KENTUCKY

By:  */s/ S. Travis Mayo*
S. Travis Mayo*
   *General Counsel*
Taylor Payne*
   *Chief Deputy General Counsel*
Laura C. Tipton*
   *Deputy General Counsel*
Office of the Governor

Abigail.Durkin@ilag.gov
Cara.Hendrickson@ilag.gov

*Counsel for the State of Illinois*

700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

By: */s/ Sarah A. Forster*
Sarah A. Forster*
  *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  (207) 626-8800
Fax:  (207) 287-3145
Sarah.Forster@maine.gov

*Counsel for the State of Maine*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

By: */s/ Katherine Dirks*
Katherine Dirks*
  *Chief State Trial Counsel*
Jonathan Green*
  *Division Chief*
Veronica Zhang*
  *Assistant Attorney General*
  *Non-Profit Organizations / Public Charities*
Massachusetts Office of the Attorney General
1 Ashburton Pl. Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

By: */s/ Neil Giovanatti*
Neil Giovanatti*
Alexus Ringstad*
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
RingstadA@michigan.gov

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

By: */s/ Liz Kramer*
Liz Kramer*
  *Solicitor General*
Minnesota Attorney General's Office
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

*Counsel for the State of Minnesota*

*Counsel for the People of the State of Michigan*

**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
   *Solicitor General*
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**RAÚL TORREZ**
ATTORNEY GENERAL OF NEW MEXICO

By: */s/ James W. Grayson*
James W. Grayson*
   *Chief Deputy Attorney General*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM  87504-1508
(505) 490-4060
jgrayson@nmdoj.gov

*Counsel for the State of New Mexico*

**JEFF JACKSON**
ATTORNEY GENERAL OF NORTH CAROLINA

**LAURA HOWARD**
CHIEF DEPUTY ATTORNEY GENERAL

By */s/ Daniel P. Mosteller*

**MATTHEW J. PLATKIN**
ATTORNEY GENERAL OF NEW JERSEY

*/s/ Jessica L. Palmer*
Jessica L. Palmer*
Lauren E. Van Driesen*
   *Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-4607
Jessica.Palmer@law.njoag.gov

*Counsel for the State of New Jersey*

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

By: */s/ Jessica Ranucci*
Jessica Ranucci*
   *Special Counsel, Federal Initiatives*
Rabia Muqaddam*
   *Special Counsel for Federal Initiatives*
Office of the Attorney General
28 Liberty St.
New York, NY 10005
(929) 638-0447
Jessica.ranucci@ag.ny.gov
rabia.muqaddam@ag.ny.gov

*Counsel for the State of New York*

**DAN RAYFIELD**
ATTORNEY GENERAL OF OREGON

By: */s/ Coby Howell*
Coby Howell*
   *Senior Assistant Attorney General*
100 SW Market Street

84

Daniel P. Mosteller*
  *Associate Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov

*Counsel for the State of North Carolina*

**JOSH SHAPIRO**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
THE COMMONWEALTH OF PENNSYLVANIA

By: */s/ Kenneth L. Joel*
Kenneth L. Joel*
  *Deputy General Counsel*
Benjamin Holt*
  *Chief Counsel*
  *Pennsylvania Department of Labor*
Melissa Murphy*
  *Senior Counsel*
  *Pennsylvania Department of Labor*
Governor's Office of General Counsel
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 649-8669
kennjoel@pa.gov

*Counsel for Governor Josh Shapiro*

**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
  *Solicitor General*
Office of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov

Portland, OR 97201
Tel (971) 673-1880

Fax (971) 673-5000
coby.howell@doj.oregon.gov

*Counsel for the State of Oregon*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

By: */s/ Kyla Duffy*
Kyla Duffy*
  *Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2809
kduffy@riag.ri.gov

*Counsel for the State of Rhode Island*

**NICHOLAS W. BROWN**
ATTORNEY GENERAL OF WASHINGTON

By: */s/ Abby Kahl*
Abigail Kahl*
Andrew R.W. Hughes*
  *Assistant Attorneys General*
Office of the Attorney General
2425 Bristol Court SW
Second Floor
PO Box 40117

85

*Counsel for the State of Vermont*

Olympia, WA 98504
360-534-4864
Abigail.Kahl@atg.wa.gov
Andrew.Hughes@atg.wa.gov

*Counsel for the State of Washington*

**JOSHUA L. KAUL**
ATTORNEY GENERAL OF WISCONSIN

By: */s/ Charlotte Gibson*
Charlotte Gibson*
   *Assistant Attorney General*
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI  53707
(608) 957-5218 (phone)
(608) 294-2907 (fax)

*Counsel for the State of Wisconsin*

*\* Pro hac vice*