**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

---

STATE OF MARYLAND; STATE OF
DELAWARE; STATE OF CALIFORNIA; STATE
OF COLORADO; STATE OF ARIZONA; STATE
OF CONNECTICUT; DISTRICT OF COLUMBIA;
STATE OF HAWAIʻI; STATE OF ILLINOIS;
OFFICE OF THE GOVERNOR *ex rel.* Andy
Beshear, in his official capacity as Governor of the
COMMONWEALTH OF KENTUCKY; STATE OF
MAINE; COMMONWEALTH OF
MASSACHUSETTS; PEOPLE OF THE STATE OF
MICHIGAN; STATE OF MINNESOTA; STATE OF
NEVADA; STATE OF NEW JERSEY; STATE OF
NEW MEXICO; STATE OF NEW YORK; STATE
OF NORTH CAROLINA; STATE OF OREGON;
JOSH SHAPIRO, in his official capacity as
Governor of the COMMONWEALTH OF
PENNSYLVANIA; STATE OF RHODE ISLAND;
STATE OF VERMONT; STATE OF
WASHINGTON; STATE OF WISCONSIN;

        Plaintiffs,

    v.

CORPORATION FOR NATIONAL AND
COMMUNITY SERVICE, operating as
AmeriCorps; and JENNIFER BASTRESS
TAHMASEBI, in her official capacity as Interim
Head of the Corporation for National and
Community Service; OFFICE OF MANAGEMENT
AND BUDGET; and RUSSELL VOUGHT, in his
official capacity as Director of the Office of
Management and Budget;

        Defendants.

Civ. No. 25-cv-01363 (DLB)

---

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

I.    Legal Background .................................................................................................. 2

   A.    Constitutional provisions concerning federal spending ................................... 2

   B.    Statutory provisions governing Congress's control over federal spending ................. 2

      1.    Appropriations legislation ......................................................................... 3

      2.    The Antideficiency Act ............................................................................. 3

      3.    The Impoundment Control Act ................................................................... 4

II.   Factual Background ............................................................................................... 5

III.  Procedural History ................................................................................................ 7

STANDARD OF REVIEW ................................................................................................. 9

ARGUMENT ...................................................................................................................... 10

I.    Plaintiff States are Likely to Succeed on the Merits. ........................................... 10

   A.    Plaintiffs Have Shown a Likelihood of Success on Their APA Claims ................... 10

      1.    Plaintiffs Challenge Final Agency Action .................................................. 10

      2.    Plaintiffs Are Likely to Show That OMB Defendants Acted Contrary to Law ......... 14

         a.    OMB Defendants Violated the Antideficiency Act ................................. 14

         b.    OMB Defendants Violated the Impoundment Control Act ........................ 17

         c.    OMB Defendants Violated AmeriCorps' Appropriations Laws ..................... 19

      3.    Plaintiffs Are Likely to Show that OMB Defendants Acted Arbitrarily and Capriciously ......................................................................................... 204.
      Plaintiffs Are Likely to Show that OMB Defendants Unlawfully Withheld and/or Unreasonably Delayed Agency Action ........................................................ 22

   B.    Plaintiffs Are Likely to Show That OMB Defendants Violated the Separation of Powers ............................................................................................................... 24

II.   Plaintiff States are Irreparably Harmed by OMB's Actions ................................. 27

   A.    Withholding of Funds for Competitive Grants ................................................ 27

   B.    Withholding of Funds for Seniors Programs .................................................. 30

   C.    Withholding of Funds for CIF Grants ............................................................ 34

   D.    Long-Term Harm to State AmeriCorps Programs ........................................... 35

III.  The Balance of Equities and the Public Interest Weigh in Plaintiffs' Favor ................ 38

IV.   The Court Should Enjoin the Withholding of AmeriCorps Funds ........................ 39

CONCLUSION ................................................................................................................... 40

## **TABLE OF AUTHORITIES**

### **Cases**

*Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355 (4th Cir. 2012) ..................................... 9

*Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359 (1998) ..................................... 22

*Bennett v. Spear*, 520 U.S. 154 (1997) .......................................................................10, 11

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ................................................................... 39

*Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631 (2005) ............................................ 25

*Citizens for Resp. & Ethics in Wash. v. OMB*, No. CV 25-1051 (EGS),
  2025 WL 2025114 (D.D.C. July 21, 2025) ...............................................11, 13, 27

*City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018). ........... 19, 26

*City & County of San Francisco v. USCIS*, 408 F. Supp. 3d 1057 (N.D. Cal. 2019) .................. 35

*City of New Haven v. United States*, 809 F.2d 900 (D.C. Cir. 1987), ........................... 15

*City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579 (E.D. Pa. 2017) ........................ 26

*Clinton v. City of New York*, 524 U.S. 417 (1998) ................................................... 25, 26

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001). ....................................................... 14

*Encino Motorcars v. Navarro*, 579 U.S. 211 (2016) ...................................................... 21

*FDA v. Wages & White Lion Inv'ts*, __ U.S. __, 145 S. Ct. 898 (2025) ......................... 21

*Gonzalez v. Cuccinelli*, 985 F.3d 357  (4th Cir. 2021) ............................................. 23, 24

*HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) ................................... 10, 27, 32, 36

*HLI Lordship Indus. v. Comm. for Purchase from the Blind*, 791 F.2d 1136
  (4th Cir. 1986) .............................................................................................................. 21

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ................................................... 14

*Lackey v. Stinnie*, 145 S. Ct. 659 (2025) ........................................................................ 39

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ................................... 38

*Loving v. United States*, 517 U.S. 748 (1996) ................................................................ 25

*Michigan v. EPA*, 576 U.S. 743 (2015) .................................................................... 22

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) .................................................................................... 20

*Mountain Valley Pipeline v. 6.56 Acres of Land*, 915 F.3d 197 (4th Cir. 2019) ........................... 27

*New York v. Trump*, 769 F. Supp. 3d 119 (D.R.I. 2025) ..................................... 3, 4, 18, 27

Nken v. Holder, 556 U.S.  418 (2009). ............................................................... 10, 38

*North Carolina v. Covington*, 581 U.S. 486 (2017) ................................................. 40

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) ........................... 14, 22

*Pacito v. Trump*, 768 F. Supp. 3d 1199 (W.D. Wash. 2025) ................................. 18

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62
    (D.D.C. 2018) ...................................................................................... 21

*Ramah Navajo Chapter v. Salazar*, 644 F.3d 1054 (10th Cir. 2011). ...................... 15

*Rhode Island v. Trump*, No. 1:25-CV-128-JJM-LDA, 2025 WL 1303868
    (D.R.I. May 6, 2025) ......................................................................... 26, 44

*South Carolina v. United States*, 907 F.3d 742 (4th Cir. 2018) ............................ 22

*Stemple v. Bd. of Educ.*, 623 F.2d 893 (4th Cir. 1980) ......................................... 9

*Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ........ 23, 24

*Thompson v. Cherokee Nation of Okla.*, 334 F.3d 1075 (Fed. Cir. 2003) .................. 25

*Train v. City of New York*, 420 U.S. 35 (1975) ................................................. 25

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ............................ 10

*U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339 (D.C. Cir. 2012) .......................... 19, 26

*United States v. Moussaoui*, 382 F.3d 453 (4th Cir. 2004) .................................. 25

*Venetian Casino Resort v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008) ........................ 13

*Washington v. Trump*, 768 F. Supp. 3d 1239 (W.D. Wash. 2025) .......................... 18, 28

*Wudi Indus. (Shanghai) Co. v. Wong*, 143 F.4th 250 (4th Cir. 2025) ..................... 27

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .............................. 25

*Zivotofsky v. Kerry*, 576 U.S. 1 (2015)..........................................................................26

## Constitutional Provisions

U.S. Const. art. I, § 7..............................................................................................26

U.S. Const. art. I, § 7, cl. 2......................................................................................2

U.S. Const. art. I, § 8, cl. 1......................................................................................2

U.S. Const. art. I, § 9, cl. 7......................................................................................2

U.S. Const. art. II, § 3 ............................................................................................2

U.S. Constitution, art. II..........................................................................................26

## Statutes

138 Stat. 460 (2024)....................................................................................7, 19, 20, 25

138 Stat. 695 (2024)....................................................................................7, 19, 20, 25

139 Stat. 9 (2025) ..............................................................................................passim

2 U.S.C. § 622(2)(A)(i)............................................................................................3

2 U.S.C. § 681 ......................................................................................................4

2 U.S.C. § 682 ......................................................................................................3

2 U.S.C. § 682(3)..................................................................................................5

2 U.S.C. § 683 ......................................................................................................4

2 U.S.C. § 683(1)(B)..............................................................................................4

2 U.S.C. § 683(a)..............................................................................................4, 39

2 U.S.C. § 683(b)..................................................................................................5

2 U.S.C. § 684 ......................................................................................................4

2 U.S.C. § 684(a)........................................................................................4, 18, 39

2 U.S.C. § 684(b)............................................................................................4, 17

2 U.S.C. § 685 ......................................................................................................4

31 U.S.C. § 1301(a) ................................................................................................3

31 U.S.C. § 1341 ............................................................................................................ 3

31 U.S.C. § 1512(a) ........................................................................................................ 2

31 U.S.C. § 1512(b)(1) ............................................................................................ 3, 15

31 U.S.C. § 1512(c) ............................................................................................ 4, 23, 39

31 U.S.C. § 1512(c)(1) ..................................................................................... 4, 15, 23

31 U.S.C. § 1512(c)(2) ............................................................................................ 15, 16

31 U.S.C. § 1513(b) ........................................................................................................ 2

31 U.S.C. § 1513(b)(1)(B) ............................................................................................ 3

31 U.S.C. § 1513(b)(1). ....................................................................................... 3, 14, 22

31 U.S.C.§ 1513(b)(2)(B) ............................................................................... 4, 14, 22, 23

42 U.S.C. § 12571(a) ...................................................................................................... 5

42 U.S.C. § 12572 ........................................................................................................... 5

42 U.S.C. § 12572(f)(1)(B) .................................................................................... 5, 34

42 U.S.C. § 12581(d)(1) ................................................................................................ 6

42 U.S.C. § 12581(e)(2)–(3) ......................................................................................... 5

5 U.S.C. § 704 ............................................................................................................... 10

5 U.S.C. § 706(1) .................................................................................................... 22, 23

5 U.S.C. § 706(2) ......................................................................................................... 20

## Miscellaneous

*Application Instructions: State and National Competitive New and Continuation* 6
    https://www.americorps.gov/sites/default/files/document/508-
    2025_ASNApplicationInstructions_August21_0.......................................................... 6

Exec. Order 11,541 (July 1, 1970), *available at* https://www.archives.gov/
    federal-register/codification/executive-order/11541.html.................................... 2

GAO Letter to Congress, No. B-237297.3 (Mar. 6, 1990), https://www.gao.gov/assets/ogc-90-
    4.pdf.................................................................................................................... 16

GAO Letter to Congress, No. B-337375 (June 16, 2025),
    https://www.gao.gov/assets/880/878908.pdf....................................................... 18

GAO Letter to Congressional Committees, No. B-329092 (Dec. 12, 2017),
https://www.gao.gov/assets/b-329092.pdf. .............................................................. 17

GAO Letter to Sen. Comm. on Appropriations, No. B-329739 (Dec. 19, 2018),
https://www.gao.gov/assets/b-329739.pdf ........................................................ 18, 25

II GAO, *Principles of Federal Appropriations Law* 6-123 (3d ed. 2016) *available at*
https://www.gao.gov/legal/appropriations-law/red-book ............................... 15, 17, 25

Leanna Wells, *Northern Cambria Daycare says goodbye to Foster Grandparentprogram*,
WTAJ  (June 30, 2025), https://www.wtaj.com/news/local-news/northern-cambriadaycare-
says-goodbye-to-foster-grandparent-program/ (Pennsylvania) .................................................. 33

Letter from Senator Chris Coons to OMB Director Russell Vought (August 1, 2025),
https://www.coons.senate.gov/imo/media/doc/letter_to_omb_on_americorps.pdf. ................. 13

Michael Benny, *Syracuse Foster Grandparent program, which was a lifeline for the lonely, shuts
down*, CNY Central (July 1, 2025), https://cnycentral.com/news/local/foster-grandparent-
program-put-on-pause-over-funding-peaceinc-says-office-of-management-budget-syracuse-
city-school-district-head-start (New York) .............................................................................. 33

OMB Circular No. A-11 § 120.16 (2024), https://www.whitehouse.gov/wp-
content/uploads/2018/06/a11.pdf. .................................................................................... 24

Transcript, Interview of OMB Director Rusell Vought on *Face the Nation* (July 27, 2025),
https://www.cbsnews.com/news/face-the-nation-full-episode-transcript-07-27-2025/. ..... 16, 18

## INTRODUCTION

The White House Office of Management and Budget (OMB) and its Director, Russell Vought (collectively, "OMB Defendants"), are threatening numerous AmeriCorps programs in Plaintiff States by secretly withholding funding on which those programs depend. Notwithstanding this Court's Preliminary Injunction, which restored hundreds of programs unlawfully terminated by the Corporation for National and Community Service ("AmeriCorps") and its Interim Agency Head, Jennifer Bastress Tahmasebi (collectively, "AmeriCorps Defendants"), ECF 149 & 159, many of those same programs (and others) are threatened anew by OMB Defendants' unprecedented actions.  Specifically, OMB Defendants are refusing to release tens of millions of dollars that Congress already appropriated, and that AmeriCorps chose to award to service programs for fiscal year 2025.  These programs include AmeriCorps Seniors programs and those supported via highly competitive grants.  OMB is similarly withholding Commission Investment Fund ("CIF") grants to State Commissions on National and Community Service ("State Commissions").  OMB Defendants' covert acts undermine and threaten programs serving vulnerable Americans in Plaintiff States; they are blatantly illegal and should be enjoined.

OMB's role in federal spending is limited to the ministerial duty of parceling out ("apportioning") funds to agencies, to ensure agencies do not spend beyond their appropriations. Yet OMB Defendants seek to transform their limited function into the effective power to make and amend law, by defying Congressional appropriations that OMB does not favor.  Neither OMB nor the President have such authority.  The Executive is prohibited from unilaterally terminating appropriations on policy grounds by the Constitution, the Antideficiency Act, the Congressional Budget and Impoundment Control Act of 1974 ("ICA"), and the Administrative Procedure Act ("APA").  Plaintiff States are once again facing significant funding cuts to their AmeriCorps

1

Programs, this time due to OMB Defendants' actions, which will lead to a loss of services or termination of the programs. The administration's unlawful attacks on public service must stop, and a preliminary injunction is therefore warranted.

## BACKGROUND

### I.    Legal Background

#### A.   Constitutional provisions concerning federal spending

The Constitution affords Congress the "power of the purse," including the authority to levy taxes, fund government operations, and set the terms and conditions on that funding. U.S. Const. art. I, § 9, cl. 7; art. I, § 8, cl. 1. Upon presentment with a bill, the President may sign it into law, veto it, or take no action on it for a period of ten days, after which time it becomes law. U.S. Const. art. I, § 7, cl. 2. But once a spending law is enacted, the Constitution imposes on the President a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

#### B.   Statutory provisions governing Congress's control over federal spending

Congress has exercised its constitutional authority to define the President's administration of spending in three relevant respects. First, Congress makes appropriations through legislation which the President must "take care" to implement. Second, through the Antideficiency Act, Congress has authorized the President to parcel out funds that Congress has appropriated on a set schedule to prevent federal agencies from spending or obligating federal funds at a rate that exceeds the amount of funding appropriated.[1] 31 U.S.C. §§ 1512(a), 1513(b). Third, the ICA

---

[1] The President has delegated this largely ministerial apportionment responsibility to OMB Defendants. *See* Exec. Order 11,541 (July 1, 1970), *available at* https://www.archives.gov/federal-register/codification/executive-order/11541.html.

2

provides a mechanism, limited to prevent the President from acting unilaterally, under which the President may request that Congress delay or withhold appropriated funds.  2 U.S.C. §§ 682 et seq.

### 1. *Appropriations legislation*

"[A]n appropriation . . . creates the legal authority to make funds available for obligation and to make 'expenditures'" within the limitations specified in the law authorizing the appropriations, including limitations on time, period, and amount. *New York v. Trump*, 769 F. Supp. 3d 119, 128 (D.R.I. 2025) (citing U.S.C. § 622(2)(A)(i)).  The longstanding "purpose statute" provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a).

### 2. *The Antideficiency Act*

The Antideficiency Act, 31 U.S.C. § 1341 et seq., prevents executive agencies from obligating funds or making disbursements in excess of Congressional appropriations.  "[T]o prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation," the Antideficiency Act also authorizes appropriations to executive agencies to be "apportioned" (that is, parceled out) over their period of availability.  *Id.* § 1512(a). Funds may be apportioned by time (months, quarters, seasons, or other time periods); activities, functions, projects, or objects; or some combination of the two.  *Id.* § 1512(b)(1).

As the President's delegees, OMB Defendants are responsible for "apportion[ing] in writing an appropriation available to an executive agency . . . ." 31 U.S.C. § 1513(b)(1).  When Congress enacts an appropriation in the middle of the fiscal year, each agency has "15 days after the date of enactment" to "submit . . . information required for the apportionment."  *Id.* § 1513(b)(1)(B).  Then, "not later than . . . 30 days after the date of enactment of the law by which

the appropriation is made available," OMB Defendants "shall notify the head of the executive agency of the action taken in apportioning the appropriation." *Id.* § 1513(b)(2)(B).

The Antideficiency Act also narrowly limits when OMB Defendants may choose to "reserve" (withhold or delay) part of an appropriation. *Id.* § 1512(c). "[A] reserve may be established only—(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." *Id.* § 1512(c)(1). A related provision of the ICA confirms that "[n]o officer or employee of the United States may defer any budget authority for any other purpose." 2 U.S.C. § 684(b).

### 3. *The Impoundment Control Act*

The President lacks the power to unilaterally impound or withhold funds appropriated by Congress; however, the ICA provides a limited mechanism to request such an impoundment "under a very small set of highly circumscribed conditions."[2] *New York v. Trump*, 769 F. Supp. 3d at 129.

First, the President must raise any proposal to defer (delay) or rescind (cancel) a congressional appropriation by transmitting a "special message" to both Houses of Congress and the Comptroller General, which also must be published in the Federal Register. 2 U.S.C. §§ 681, 683 (rescissions), 684 (deferrals), 685 (transmission of messages; publication). The special message must justify the deferral or rescission, including its amount, and likely fiscal consequences. *Id.* §§ 683(a) (rescissions), 684(a) (deferrals). Deferrals must be consistent with "legislative policy." *Id.* § 684(b). As with reserves created under the Antideficiency Act, deferrals are permissible only "to provide for contingencies"; "to achieve savings made possible" through "changes in requirements or greater efficiency of operations"; or "as specifically provided by law."

---

[2] An impoundment includes any "action or inaction" by a government official "which effectively precludes the obligation or expenditure of budget authority." 2 U.S.C. § 683(1)(B).

*Id.* § 684(b). Deferrals for any other purpose are prohibited. *Id.* Moreover, no deferral may "extend[] beyond the end of the fiscal year" in which the deferral is proposed. *Id.* § 684(a).

For a proposed rescission, once the President transmits the special message, Congress has 45 days to approve the proposal by passing a "rescission bill," which rescinds authority to incur obligations under that appropriation. *Id.* § 682(3). If Congress does not act within 45 days, then the funds are not rescinded and "shall" be made available for obligation. *Id.* § 683(b).

## II.    Factual Background

The history and structure of AmeriCorps is described at greater length in Plaintiffs' First Motion for Preliminary Injunction, ECF 5, and as incorporated herein. Three types of programs are especially pertinent here.

First, AmeriCorps State and National (ASN), the agency's largest grant program, provides funds to States, local governments, and others to either carry out their own programs or—in the case of State Commissions—"to make grants in support of other national service programs . . . that are carried out by other entities." 42 U.S.C. § 12571(a). These ASN grants support myriad programs that carry out AmeriCorps' statutory priorities, including education, public health, clean energy, veterans' affairs, and disaster relief. *See* 42 U.S.C. § 12572; Mem. Op, ECF 148, at 18─21. Roughly one-third of ASN funds are awarded as formula grants to State Commissions based on population, which the States then subgrant to programs of their choosing. *Id.* §§ 12572(f)(1)(B) & 12581(e)(2)–(3). Most of the remaining ASN funds are awarded "on a competitive basis" to States, either via National Direct funding, where programs apply to AmeriCorps itself and compete for grants "seeking to operate a national service program in 2 or more of those States," and state competitive funding, where a program applies through and competes for grants awarded by the

State Commission. *Id.* § 12581(d)(1); *see also* Mem. Op., ECF 148, at 4–7 (summarizing the ASN program). These competitive grants, National Direct and state, are at issue in this motion.

AmeriCorps competitive grant programs are approved for a three-year period of performance but must apply for funding out of the agency's annual appropriations on a yearly basis. Competitive grant applications are divided into three types: (a) *continuation applications*, which are in the first or second year of operation within a three-year grant cycle; (b) *recompete applications* (or renewal applications), which are in the final year of their grant cycle or have received a competitive AmeriCorps grant within the past five years; and (c) *new applications*.[3]

Second, AmeriCorps funds various Seniors programs that provide service opportunities for persons 55 and older. The Foster Grandparent Program enlists seniors as mentors for K–12 students. The Senior Companion Program supports older Americans who provide assistance and companionship to seniors who have difficulty with daily living tasks. Low-income participants receive modest stipends of $4 per hour and other benefits for their service. *See, e.g.*, Carney Decl. (Del.) ¶ 26. Importantly, "[t]hese modest benefits are exempt from counting as income for the purpose of the volunteers' eligibility for SSI [Supplemental Security Income], Section 8, or other benefits" on which many senior volunteers depend. Hornberger Decl. (Cal.) ¶ 12.

Third, AmeriCorps provides Commission Investment Fund grants to State Commissions to expand the reach of AmeriCorps programs and invest in their future success. CIF funds often go toward commission staffing, staff development, training, and recruitment. *See, e.g.*, Kelly Decl. (Colo.) ¶¶ 15–16.

---

[3]    *See Application Instructions: State and National Competitive New and Continuation* 6, https://www.americorps.gov/sites/default/files/document/508-2025_ASNApplicationInstructions_August21_0.pdf.

For FY 2025, Congress appropriated AmeriCorps $975,525,000 to "carry out" the national service laws.  *See* Full-Year Continuing Appropriations Act, 2025, P.L. 119-4, § 1101(a)(8), 139 Stat. 9, 11 (2025) ("2025 Appropriations Act") (continuing amounts "under the authority and conditions provided in" the Further Consolidated Appropriations Act, P.L. 118-47, div. D, tit. IV, 138 Stat. 460, 694 (2024) ("2024 Appropriations Act")).  Congress also provided that AmeriCorps "shall make any significant changes to program requirements, service delivery, or policy only through public notice and comment rulemaking."  2024 Appropriations Act, § 401, 138 Stat. 695.

## III.    Procedural History

In April, Plaintiffs filed the original Complaint and Motion for Preliminary Injunction in this action, seeking to halt the administration's efforts to dismantle AmeriCorps by terminating programs and dismissing AmeriCorps members and staff.  ECF 1 & 5.

In early June, this Court issued a Preliminary Injunction which required, among other things, that AmeriCorps (1) reinstate terminated programs across Plaintiff States that accounted for hundreds of millions of dollars in FY 2024 grants, and (2) comply with section 401 of the 2024 Appropriations Act.  ECF 149; *see also* ECF 158.  In the following weeks, AmeriCorps Defendants filed a series of status reports representing that they were complying with the Preliminary Injunction.  ECF 150, 154, 156.

Yet, as Plaintiffs' State Commissions sought to prepare for the upcoming service year, facts emerged suggesting more trouble was afoot.  First, when the State Commissions received notice of the results of AmeriCorps' FY 2025 grant competition, many programs were "Funded pending release of FY 2025 appropriated dollars."  This caveat—which Plaintiffs' State Commissions had

never seen before[4]—was placed on new and recompete applicants but not on continuation grants.[5] Notably, when States began to receive formal Notices of Grant Award (NOGAs) for competitive grants—which "allow[] programs to proceed with operations and draw down funds"—they "d[id] not include any of the programs marked 'Funded pending release of FY 2025 appropriated dollars.'"  Moua Decl. (2d) (Cal.) ¶ 12.  In total, at least $33 million purportedly approved for competitive grants in Plaintiff States has not been released to these programs.[6]

Around the same time, Plaintiffs discovered that AmeriCorps Defendants had failed to award Plaintiff States' FY 2025 CIF grants, *see id.* ¶ 20, and they had failed to distribute funds for more than 120 Foster Grandparent and Senior Companion programs, many of which are located in Plaintiff States, and several of which are operated directly by Plaintiff States or their instrumentalities.  *See, e.g.*, Amador (Haw.) ¶¶ 18-19; *see also* Carney Decl. (Del.) ¶ 5 (seniors programs informed by AmeriCorps that funds were similarly being withheld "pending release of FY 2025 appropriated dollars").  When questioned about these failures, Defendant Bastress

---

[4] *See, e.g.,* McGuinness Decl. (2d) (Mass.) ¶ 27 ("I have worked to support AmeriCorps programs for 24 years, and I am unaware of any past instance where OMB has withheld AmeriCorps funding from the agency"); Moua Decl. (2d) ¶ 13(a); Kelly Decl. (2d) (Colo.) ¶ 12(b); Lucier Decl. (2d) (Conn.) ¶ 11(b); Gleixner-Hayat Decl. (Me.) ¶ 8(c); Trent Decl. (2d) (Mich.) ¶ 12(b); Bringardner Decl. (Ky.) ¶ 31 (all similar).

[5] *See, e.g.,* Litchfield Decl. (2d) (Ariz.) ¶ 10 (8 of 15 applicants for competitive funding were "Funded"; all were continuation grants); Moua Decl. (2d) (Cal.) ¶ 10 (only 5 of 40 applicants for competitive grants were "Funded," all of which were continuation grants; 6 additional programs were "Funded pending release of FY 2025 appropriated dollars"); Blissett Decl. (2d) (Ill.) ¶ 9 (5 of 14 competitive grant applicants were "Funded"; all were continuation grants); Nair Decl. (2d) (N.M.) ¶ 10 (only 1 of 6 competitive grant applications, a continuation grant, was funded); Almond Decl. (2d) (Wash.) ¶ 10 (5 of 10 competitive grant applicants—all continuation grants—were "Funded"; 1 recompete applicant was "Funded pending release of FY 2025 appropriated dollars").

[6] The charts attached as Exhibit J to the Amended Complaint show that the programs "Funded pending release of FY 2025 appropriated dollars" total approximately $33 million.

Tahmasebi told congressional staffers and the Executive Director of Colorado's State Commission that "OMB has declined to release the associated unallocated funds to the agency."  Email from Jennifer Bastress Tahmasebi to Cong. Approps. Comm. Staffers (June 30, 2025), attached as Exhibit 26; Attachment B to Kelly Decl. (2d) (Colo.).

Plaintiff States requested a status conference to assess AmeriCorps Defendant's compliance with the injunction, ECF 158, including whether OMB was acting in concert with AmeriCorps in violation of the Court's preliminary injunction.  The Court held a status conference on July 14.  There, Defendants argued—for the first time—that all information related to OMB's release of AmeriCorps' FY 2025 funding was privileged, including, remarkably, the mere fact of whether AmeriCorps possessed the funds.  Status Conf. Tr., ECF 168 at 7–8, 13–14.

In response to this Kafkaesque roundabout, Plaintiff States filed an Amended Complaint, ECF 171, adding OMB and its Director Russell Vought as Defendants.  It has become clear—supported by public reporting, Defendant Bastress Tahmasebi's representations, and other available facts detailed below—that OMB Defendants are indeed withholding significant sums of AmeriCorps funds.  The Amended Complaint challenges OMB's interference with AmeriCorps' disbursement of funds, and argues that these withholdings violate the APA and the Constitution.

## STANDARD OF REVIEW

A preliminary injunction is designed to preserve the status quo—specifically, "the 'last uncontested status between the parties which preceded the controversy'"—during the pendency of litigation.  *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012) (quoting *Stemple v. Bd. of Educ.*, 623 F.2d 893, 898 (4th Cir. 1980)).  A preliminary injunction is warranted when (1) "the plaintiffs are likely to succeed on the merits" (2) "plaintiffs are likely to suffer irreparable harm in the absence of an injunction," (3) "the balance of hardships weighs in their favor," and (4)

"an injunction serves the public interest." *HIAS, Inc. v. Trump*, 985 F.3d 309, 325–26 (4th Cir. 2021).  The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S.  418, 435 (2009).

## ARGUMENT

## I.    Plaintiff States are Likely to Succeed on the Merits.

Plaintiff States are likely to succeed on the merits of Count III of the Amended Complaint, because OMB Defendants have acted contrary to three statutes (the Antideficiency Act, the Impoundment Control Act, and the Full-Year Continuing Appropriations Act, 2025); on Count IV, because OMB Defendants have unlawfully withheld and/or unreasonably delayed actions that they were required to take; on Count V, because OMB Defendants have acted arbitrarily and capriciously; and on Count VI, because OMB Defendants have violated the separation of powers.

### A.  Plaintiffs Have Shown a Likelihood of Success on Their APA Claims

#### 1.  *Plaintiffs Challenge Final Agency Action*

OMB Defendants' withholding of AmeriCorps funding constitutes "final agency action" reviewable under the APA.  5 U.S.C. § 704.  An action is "final" if it (1) "'consummat[es]' [] the agency's decisionmaking process" and (2) determines "'rights or obligations'" or imposes "'legal consequences.'"  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  Courts follow a "'pragmatic' approach" in determining finality.  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (citation omitted).  Here, OMB Defendants took final agency action by deciding to withhold, and therefore failing to fully apportion, AmeriCorps funding.  Notwithstanding that

Defendants have tried to hide their decisions from affected entities and the public,[7] the record shows a final agency action to withhold significant funds from AmeriCorps programs.

Indeed, OMB's own documents show that the withholding of AmeriCorps funds is no accident. Specifically, in the Technical Supplement (breakdown) of the President's FY 2026 budget, OMB Defendants estimated that $196 million in AmeriCorps' FY 2025 funds would go "[u]ndistributed." *See* Ex. A to Notice of Supplemental Authority, ECF 147-1 at 14. Crediting AmeriCorps Defendants' repeated assertions that they are not withholding or refusing to spend FY 2025 appropriated funding, the only plausible way that $196 million in FY 2025 AmeriCorps funds would remain "undistributed" is if OMB withheld the money.[8] Thus, at least when the Technical Supplement was published in May 2025, OMB Defendants had decided to withhold $196 million in FY 2025 AmeriCorps funds. The decision to withhold these funds both "consummated" OMB's "decisionmaking process" and imposed legal consequences by preventing AmeriCorps from obligating funds that it had awarded to grant recipients. *Bennett*, 520 U.S. at 177–78.

Since then, OMB Defendants have effectuated that decision though the categorical withholding of funds from AmeriCorps programs. For example, across the Plaintiff States, not a single new or recompete applicant for competitive awards was designated "Funded" with FY 2025 funds. All such applicants were either "Not Funded" or "Funded pending release of FY 2025 appropriated dollars." The only programs actually "Funded" were continuation applicants in their

---

[7] OMB Defendants are statutorily required to post all apportionment decisions on a public website. *Citizens for Resp. & Ethics in Wash. v. OMB*, No. CV 25-1051 (EGS), 2025 WL 2025114, at *3–4 (D.D.C. July 21, 2025) ("*CREW*"), *appeal filed*, 25-5267 (D.C. Cir.). OMB Defendants ceased obeying that requirement in March of this year. *Id.* at *4–5. The District Court for the District of Columbia recently ordered them to comply. *Id.* at *20.

[8] *See, e.g.*, Status Conf. Tr. ECF 168, at 7 (Counsel for AmeriCorps: "AmeriCorps—the agency has decided to fund everything with the FY 2025 appropriated funds. They have requested full funding."); *id*. at 13 (Counsel for AmeriCorps: "AmeriCorps has requested full funding.").

first or second year of operation.[9]  And while "Funded" programs have started to receive formal award notices, those "Funded pending release of FY 2025 appropriated dollars" have not.  *See* Moua Decl. (2d) (Cal.) ¶ 12.  Similarly, funding for AmeriCorps Senior Programs has been withheld "pending release of FY 2025 appropriated dollars," *see* Carney Decl. (Del.) ¶ 5, and such funds have not been released by OMB.  *Id*. ¶ 23.  CIF grants likewise have not been distributed, despite AmeriCorps' conceded request for "full funding."  Status Conf. Tr., ECF 168 at 7.  Thus, the only plausible reason why new and recompete AmeriCorps programs were "Funded" only "pending release of FY 2025 appropriated dollars," is that OMB Defendants have not released those funds.  The failure to release those funds results from OMB Defendants' decision, stated in the Technical Supplement, to leave nearly $200 million in AmeriCorps funds "undistributed."

AmeriCorps Defendants also have stated repeatedly that OMB Defendants are withholding these very funds.  Defendant Bastress Tahmasebi told congressional staffers on June 30 that "AmeriCorps requested OMB release the unallocated funds" for "Commission Investment Funds, Foster Grandparents renewals, and Senior Companions renewals," as well as "AmeriCorps State and National new/recompetes" and "VISTA funds to enroll VISTA AmeriCorps members."  Email from Jennifer Bastress Tahmasebi to Cong. Approps. Comm. Staffers (June 30, 2025), attached as Exhibit 26.  Despite these requests, "OMB has declined to release the associated unallocated funds to the agency."  *Id*.  On July 3, Defendant Bastress Tahmasebi told the Executive Director of Colorado's State Commission that AmeriCorps "requested the unallocated funds used for the

---

[9] Not only did Defendants fail to fund *any* new or recompete applicants without conditions, they also outright denied awards to recompete applicants that had received competitive funding for many years.  *E.g.*, Sullivan Decl. (2d) (Del.) ¶ 12 (all of Delaware's competitive applicants were denied funding, even though one had received funding for more than a decade).  Plaintiffs do not know yet know whether that unusual pattern of denials also may be attributable to OMB Defendants' conduct.

Commission Investment Funds on May 21st.  OMB declined to release those funds."[10]  Attachment B to Kelly Decl. (2d) (Colo.).

Indeed, on August 1, 2025, the bipartisan Senate National Service Caucus wrote to OMB specifically to "urge" the agency to "faithfully implement" the FY 2025 appropriations designated for AmeriCorps.[11]  Included in this group of Senators were Republicans and Democrats from Plaintiff States.  They explained their understanding that OMB is withholding AmeriCorps funds, and implored the agency to "reverse [its] decision immediately" and "release all appropriated funds to execute awarded FY 25 grants."  *Id*.

That OMB tried to hide its decision to withhold vast sums of AmeriCorps funds does not render it any less final.  *See, e.g.*, *Venetian Casino Resort v. EEOC*, 530 F.3d 925, 929–30 (D.C. Cir. 2008) ("Although the details of . . . [the] policy are still unclear, the record leaves no doubt . . . [the] policy" exists).  Nor does OMB's decision to withhold funds become tentative merely because OMB Defendants may change their minds in the future.  *See CREW*, 2025 WL 2025114, at *15 ("No matter how many times an apportionment changes, each generated apportionment is 'legally binding[.]'").  The record demonstrates that OMB has made a final decision to withhold specific and substantial AmeriCorps funds indefinitely, funds which AmeriCorps itself has decided to award, and the withholding of these funds is causing Plaintiffs immediate injury.

Alternatively, the APA also permits courts to compel agency action unlawfully withheld or unreasonably delayed.  As the Supreme Court explained in *Norton v. Southern Utah Wilderness*

---

[10]  Given the overwhelming evidence that OMB Defendants are withholding funds from AmeriCorps, the Court need not address Defendants' claim that all decisions on apportionments—as well as the mere fact of whether AmeriCorps holds relevant funds—are somehow subject to the deliberative process privilege.  Status Conf. Tr., ECF 168 at 7–8, 13–14.

[11]  *See* Letter from Senator Chris Coons to OMB Director Russell Vought (August 1, 2025), https://www.coons.senate.gov/imo/media/doc/letter_to_omb_on_americorps.pdf.

*Alliance*, 542 U.S. 55 (2004) ("*SUWA*"), the APA defines "agency action" as including the "*failure to act.*"  *Id.* at 62.  As a result, courts must "compel agency action unlawfully withheld or unreasonably delayed."  *Id.*  The D.C. Circuit similarly has explained that where "an agency is under an unequivocal statutory duty to act, failure so to act constitutes, in effect, an affirmative act that triggers 'final agency action' review.  *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001). "Were it otherwise, agencies could effectively prevent judicial review of their policy determinations by simply refusing to take final action."  *Id*.

As explained further below, OMB Defendants were required by law to apportion AmeriCorps FY 2025 funds in writing not later than "30 days after the date of enactment of the law by which the appropriation is made available."  31 U.S.C. § 1513(b)(1) & (2)(B).  The FY 2025 appropriations law was enacted on March 15, 2025.  *See* 2025 Appropriations Act, 139 Stat. 11.  OMB Defendants thus were required to apportion AmeriCorps' FY 2025 appropriations no later than April 14, 2025.  Yet OMB Defendants failed to comply with this clear statutory deadline to apportion AmeriCorps funds.  Their failure to act is reviewable under the APA.

### 2. *Plaintiffs Are Likely to Show That OMB Defendants Acted Contrary to Law*

#### a. OMB Defendants Violated the Antideficiency Act

OMB Defendants have acted contrary to the Antideficiency Act because they have withheld AmeriCorps' FY 2025 funds indefinitely without any lawful basis.  *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.").  The Antideficiency Act requires OMB Defendants only to apportion "an appropriation . . . to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation."  31 U.S.C. § 1512(a).  Although OMB Defendants may parcel out appropriations by various increments—such as "months, calendar

quarters, operating seasons, or other time periods," or "activities, functions, projects, or objects," *see id.* § 1512(b)(1)—they have no authority under that subsection to withhold funds indefinitely.

Nor can OMB Defendants withhold appropriations based on policy disagreements between Congress and the Presidential administration. The next subsection of the Antideficiency Act restricts the circumstances in which OMB Defendants may establish "reserve[s]" of appropriated funds. They may "only" do so "(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." *Id.* § 1512(c)1). "Section 1512(c) seeks to limit the circumstances in which the full appropriation is not apportioned or utilized and a reserve fund is established." II GAO, *Principles of Federal Appropriations Law* 6-123 (3d ed. 2016) ("*GAO Redbook*"), *available at* https://www.gao.gov/legal/appropriations-law/red-book.[12] Congress rewrote this section when enacting the Impoundment Control Act (ICA) "to preclude the President from invoking the [Antideficiency] Act as authority for implementing 'policy' impoundments," *City of New Haven v. United States*, 809 F.2d 900, 906 n.18 (D.C. Cir. 1987), that is, impoundments "for general fiscal or economic policy reasons such as containment of federal spending and executive judgment of the relative merits, effectiveness, and desirability of competing federal programs." II *GAO Redbook* (3d ed.) at 6-123. The statute thus requires that any reserves created "shall be reported to Congress as provided in the Impoundment Control Act." 31 U.S.C. § 1512(c)(2).

Here, OMB Defendants have failed to notify Congress of any reserve as required by section 1512(c)(2). Even if they had, they could not justify the creation of any reserve for any of the

---

[12] The *GAO Redbook* and Comptroller General opinions are "not binding but offer[] persuasive agency analysis." *Ramah Navajo Chapter v. Salazar*, 644 F.3d 1054, 1064 nn.4–5 (10th Cir. 2011), *aff'd*, 567 U.S. 182 (2012).

permitted reasons listed under section 1512(c)(1) of the Antideficiency Act.  Defendants have not identified any relevant "contingenc[ies]" or "savings by or through changes in requirements or greater efficiency," nor does any law permit OMB Defendants to reserve AmeriCorps funds.  *See id.*  Moreover, Defendants' public conduct indicates that the funds impermissibly are being withheld to "further[] administration policies and priorities at the expense of those decided by Congress."  *See* GAO Letter to Congress, No. B-237297.3, at 2 (Mar. 6, 1990), https://www.gao.gov/assets/ogc-90-4.pdf (citation omitted).  Under Defendant Vought, OMB recently withheld billions of dollars in Congressionally appropriated education funding while it conducted a "programmatic review" of—in Defendant Vought's words—"programs that, as an administration, we don't support.  We've called for the elimination of them in the president's budget for precisely the reasons of which they flow to often left-wing organizations."[13]  Defendant Vought admitted "we're going to continue to go to the same process that we have gone through with regard to the Department of Education at every one of these agencies."  *See supra* note 13. And he claimed that "we have the ability and the executive tools to fund less than what Congress appropriated."  *Id.*  In combination with OMB Defendants' refusal to apportion AmeriCorps' funds, these statements make plain that OMB Defendants are withholding AmeriCorps' FY 2025 appropriations in order to "fund less than what Congress appropriated" and eliminate "programs that, as an administration, [they] don't support."  *Id.*  That is unlawful.

Nor may OMB Defendants withhold funds pursuant to section 1512(c)(2), which concerns proposed recissions of budgetary authority.  That subsection confers no additional authority to create reserves and requires OMB Defendants to "recommend the rescission of [an] amount" under

---

[13]  Transcript, Interview of OMB Director Russell Vought on *Face the Nation* (July 27, 2025), https://www.cbsnews.com/news/face-the-nation-full-episode-transcript-07-27-2025/.

the ICA; it does not permit OMB Defendants to withhold funds unilaterally. Further, section 1512(c)(2) is limited to amounts that "will not be required to carry out the objectives and scope of the appropriation concerned." Here, the money withheld by OMB Defendants plainly is "required to carry out the objectives and scope of the appropriation concerned." *See* 2025 Appropriations Act, 139 Stat. 11 ($975 million to "carry out" national service programs); 170 Cong. Rec. H2060–61 (allocating that amount among various AmeriCorps programs).

At bottom, the Antideficiency Act does not permit OMB Defendants to create reserves based on policy disagreements, and so by withholding AmeriCorps funds, OMB Defendants have acted contrary to law.

### b.  OMB Defendants Violated the Impoundment Control Act

OMB Defendants also have acted contrary to the ICA by withholding AmeriCorps funds for policy reasons without following the procedures required by law. *See* 2 U.S.C. § 684(b). "The Impoundment Control Act operates on the premise that when Congress appropriates money to the executive branch, the President is required to obligate the funds." GAO Letter to Congressional Committees, No. B-329092, at 2 & n.4 (Dec. 12, 2017), https://www.gao.gov/assets/b-329092.pdf. The ICA permits temporary withholdings (i.e., deferrals) of appropriated funds "only—(1) to provide for contingencies; (2) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (3) as specifically provided by law." 2 U.S.C. § 684(b). "The President's deferral authority under the Impoundment Control Act thus mirrors his authority to establish reserves under the Antideficiency Act." *GAO Redbook* (4th ed.) at 2-48 n.56. Just as OMB Defendants cannot reserve AmeriCorps' FY 2025 appropriated funds under the Antideficiency Act, they also cannot defer those funds under the ICA. *See* 2 U.S.C. § 684(b).

As an initial matter, OMB Defendants have failed to comply with the procedure for

proposing deferrals under the ICA.  To even propose a deferral, the President must send Congress a "special message" that "specif[ies]," among other things, "all facts, circumstances, and considerations relating to or bearing upon the proposed deferral."  2 U.S.C. § 684(a).  This special message must be transmitted "*prior to* withholding amounts."  GAO Letter to Sen. Comm. on Appropriations, No. B-329739, at 4 (Dec. 19, 2018), https://www.gao.gov/assets/b-329739.pdf (emphasis added).  Defendants simply ignored these procedures and thus violated the law.  *See* 2 U.S.C. § 684(a); *New York v. Trump*, 769 F. Supp. 3d 119, 138 (D.R.I. 2025) (States were likely to show "the Executive's actions were contrary to law when bringing about a deferral of budget authority without sending a special message to Congress as the ICA requires").

More fundamentally, the ICA—like the Antideficiency Act—forbids OMB Defendants from withholding funds "to substitute the Administration's policy for one already decided by the Congress."  GAO Letter to Congress, No. B-241514.5, at 2 (May 7, 1991), https://www.gao.gov/products/b-241514.5-0; *see id.* at 5 ("[T]he Act does not permit deferrals for policy reasons.").  Defendant Vought's public statements, catalogued above, explain that OMB Defendants have withheld funds from federal agencies simply to "eliminat[e]" various "programs that, as an administration, [they] don't support."  *See supra* note 13.  Because AmeriCorps' FY 2025 appropriated funds have been withheld in "an attempt to replace the policy decision already made by Congress with [the administration]'s own," this "deferral . . . is unauthorized" and contrary to the ICA.  *See* No. B-241514.5, *supra*, at 5; GAO Letter to Congress, No. B-337375, at 11 (June 16, 2025), https://www.gao.gov/assets/880/878908.pdf (agency violated the ICA when it withheld money to "prevent spending for purposes 'counter to the administration's priorities'"); *accord Pacito v. Trump*, 768 F. Supp. 3d 1199, 1230 n.6 (W.D. Wash. 2025) (noting that "withhold[ing] congressionally appropriated [ ] funds indefinitely" likely violated the ICA).

c.  OMB Defendants Violated AmeriCorps' Appropriations Laws

Finally, OMB Defendants have acted contrary to governing appropriations laws by defying the spending decisions enacted by Congress for AmeriCorps programs. "Because Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018). For FY 2025, Congress appropriated $975,525,000 for AmeriCorps to expend on financial assistance to states, non-profits, and volunteers under its statutory programs. 2024 Appropriations Act, 138 Stat. 694 (continued by 2025 Appropriations Act, 139 Stat. 11). Defendants' refusal to apportion and award these funds for FY 2025 contravenes these laws and Congressional authority. *See U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (Kavanaugh, J.) ("Congress's control over federal expenditures is 'absolute.'") (citation omitted).

Already, across the Plaintiff States, OMB Defendants have withheld at least $33 million in Congressionally apportioned FY 2025 funds for programs that AmeriCorps itself *approved* for competitive awards. Ex. J to Amend. Compl., ECF 171-3; *see also supra* note 5. AmeriCorps Defendants—enabled or directed by OMB Defendants—also have not awarded funding for millions of dollars' worth of Seniors programs across the Plaintiff States and have not disbursed more than $5 million in Commission Investment Fund grants to Plaintiff States' Service Commissions.[14]  Those withholdings and denials confirm that Defendants will not disburse

---

[14]  *E.g.*, Hornberger Decl. (Cal.) ¶ 15 ($1,353,548 in funding for California's Foster Grandparent Program "was approved . . . pending release of appropriated funds"); Carney Decl. (Del.) ¶ 22 ($593,360 withheld for Delaware's Foster Grandparent Program); Amador Decl. (Haw.) ¶ 18 ($502,826 for Hawaiʻi's Foster Grandparent Program "approved . . . pending release of appropriated funds"); Madden Decl. (2d) (N.J.) ¶ 7 (New Jersey "requested $885,000 for Fiscal Year 2025, but . . . that funding has not yet been received"); Darrow Decl. (2d) R.I.) ¶ 20 (at least $761,924 withheld for Seniors programs in Rhode Island); Ex. K to Am. Compl., ECF 171-4, at 5 (CIF allocations for each State, of which $5,027,771 has not been disbursed to Plaintiff States).

anywhere near the $975 million Congress appropriated to support AmeriCorps programs for Fiscal Year 2025. *See* 2025 Appropriations Act, 139 Stat. 11.

In addition, OMB Defendants have enabled or compelled AmeriCorps Defendants to violate section 401 of the 2024 Appropriations Act—continued by the 2025 Appropriations Act, 139 Stat. 11—which requires AmeriCorps to conduct notice-and-comment rulemaking prior to "*any* significant changes to [AmeriCorps] program requirements, service delivery or policy." 138 Stat. 695 (emphasis added). As the Court previously found in entering a preliminary injunction against AmeriCorps Defendants, "[t]he termination of AmeriCorps grants and programs, the exiting of AmeriCorps members, and the removal of NCCC members constitute 'significant changes to . . . service delivery'" that AmeriCorps "could only make . . . through public notice-and-comment rulemaking." Mem. Op., ECF 148 at 65. Defendants' withholding of tens of millions of dollars' worth of competitive grants, CIF grants, and funding for Seniors programs—which already has led programs in Plaintiff States to cut back or suspend operations—likewise are "significant changes" that Defendants have made without notice or comment. *See id.*

> 3. *Plaintiffs Are Likely to Show that OMB Defendants Acted Arbitrarily and Capriciously*

Plaintiff States are also likely to prevail on their claim that OMB Defendants' withholding of funds violates the APA's prohibition against agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2). Under the APA, an agency must engage in "reasoned decisionmaking" and "articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 52 (1983).

Here, OMB Defendants "*provided no explanation whatsoever*" for their decision to withhold significant amounts of AmeriCorps funds. *See Pol'y & Rsch., LLC v. U.S. Dep't of Health*

& *Hum. Servs.*, 313 F. Supp. 3d 62, 83 (D.D.C. 2018) (K.B. Jackson, J.) (emphasis in original).

Because the agency "acted in violation of its statutory duty to articulate some basis for its

decision," OMB Defendants' secretive withholding of funds is illegal and should be enjoined.  *See*

*HLI Lordship Indus. v. Comm. for Purchase from the Blind*, 791 F.2d 1136, 1141 (4th Cir. 1986).

Nor did OMB Defendants provide any advance notice whatsoever that they were executing

a major change in policy.  As the Supreme Court recently reiterated, "[t]he change-in-position

doctrine" prevents agencies from "mislead[ing] regulated entities."  *FDA v. Wages & White Lion*

*Inv'ts*, __ U.S. __, 145 S. Ct. 898, 917 (2025).  "Under that doctrine, '[a]gencies are free to change

their existing policies as long as they provide a reasoned explanation for the change,' 'display

awareness that [they are] changing position,' and 'consider serious reliance interests.'" *Id*. (quoting

*Encino Motorcars v. Navarro*, 579 U.S. 211, 221–22 (2016)).  Here, Plaintiffs are unaware of a

single instance in which AmeriCorps funding has been withheld due to OMB's failure to apportion,

let alone withheld indefinitely.  *See supra* note 4.  Nevertheless, OMB Defendants covertly

withheld millions in funding for AmeriCorps programs without providing notice or any

explanation for the sudden change in position.

Similarly, Plaintiff States and their service organizations have obvious reliance interests in

planning and budgeting programs based on Congressional appropriations.  Suddenly withholding

millions of dollars of funding to State Commissions, Seniors programs, and AmeriCorps programs

funded with competitive grants obviously threatens the viability of those programs and negatively

impacts the populations they serve.  Yet OMB Defendants have shown no indication that they

considered any of these reliance interests, much less weighed them against competing policy

concerns (if any), or considered any alternatives (such as honoring existing program commitments

and reserving any drastic policy changes for future programs).  *Accord Encino Motorcars*, 579

U.S. at 224 ("In light of the serious reliance interests at stake, the Department's conclusory statements do not suffice to explain its decision.").

In sum, OMB Defendants failed to engage in any "reasoned decisionmaking" whatsoever, *see Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359, 374 (1998), and their withholding of AmeriCorps funds is arbitrary and capricious.

   4.  *Plaintiffs Are Likely to Show that OMB Defendants Unlawfully Withheld and/or Unreasonably Delayed Agency Action*

Plaintiffs States also are likely to succeed in their request that the Court "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  To prevail on a claim under 5 U.S.C. § 706(1), a plaintiff must show that the action in question is "a discrete agency action that it is required to take," and that the agency failed to take, or unreasonably delayed in taking, the action.  *SUWA*, 542 U.S. at 64.

Plaintiffs are likely to succeed in showing that OMB has unlawfully withheld action.  As explained above, none of the limited mechanisms under the Antideficiency Act for OMB Defendants to delay the release of an appropriation apply, and so OMB was required to fully apportion and release AmeriCorps funds.  OMB was required to complete this apportionment in writing by April 14, 2025. 31 U.S.C. § 1513(b)(1) & (2)(B).  This is a "discrete agency action that [OMB] is required to take."  *SUWA*, 542 U.S. at 64.  Because the statutory deadline has long since elapsed, OMB Defendants have "unlawfully withheld" this action, and Plaintiffs are entitled to an order compelling them to act. 5 U.S.C. § 706(1); *South Carolina v. United States*, 907 F.3d 742, 755 (4th Cir. 2018) (failure to act "by the statutory deadline thus constitute[s] an unlawfully withheld agency action within the meaning of § 706(1)").

In addition, OMB's delay in releasing AmeriCorps funds due to policy objections—which,

as explained above, constitutes an unlawful "reserve" that violates the Antideficiency Act, 31 U.S.C. § 1512(c)(1)—constitutes "unreasonable delay" under the APA.  5 U.S.C. § 706(1).  To assess whether delay is "unreasonable," courts draw "helpful guidance" from the factors identified by the D.C. Circuit in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*").  *Gonzalez v. Cuccinelli*, 985 F.3d 357, 375 (4th Cir. 2021).  The *TRAC* factors are:  (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) a "timetable" provided by Congress "may supply content for this rule of reason"; (3) "delays . . . are less tolerable when human health and welfare are at stake"; (4) "the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority"; (5) "the court should also take into account the nature and extent of the interests prejudiced by delay"; and (6) "the court need not find any impropriety lurking behind agency lassitude."  *Gonzalez*, 985 F.3d at 375 (quoting *TRAC*, 750 F.2d at 80).

Each of these factors weighs in favor of Plaintiffs.  First, OMB Defendants' timeline is not "governed by a rule of reason."  *See TRAC*, 750 F.2d at 80.  OMB Defendants have not given any indication of when they intend to release funds and instead appear to be withholding funds in defiance of governing appropriations and AmeriCorps' own grantmaking.

Second, OMB Defendants are thwarting Congress's intended "timetable" by refusing to release funds so late in the fiscal year.  *See TRAC*, 750 F.2d at 80.  Congress required that appropriations be apportioned promptly—"not later than . . . 30 days after the date of enactment of the law by which the appropriation is made available," 31 U.S.C. § 1513(b)(2)(B)—to ensure that annual appropriations could be used before they expire.

Third, the programs at stake are not private or commercial, but are social programs in the public interest that "implicate health and welfare" of vulnerable populations such as foster youth,

low-income students, veterans, and more. *See Gonzalez*, 985 F.3d at 375.

Fourth, apportionment is largely a ministerial duty: "The vast majority of apportionments are submitted by agencies and approved by OMB using OMB's secure, web-based apportionment system." OMB Circular No. A-11 § 120.16, at 120-11 (2024), https://www.whitehouse.gov/wp-content/uploads/2018/06/a11.pdf. Releasing these funds as AmeriCorps has requested would not be time-consuming and can have no appreciable impact on OMB Defendants' "activities of a higher or competing priority." *TRAC*, 750 F.2d at 80.

Fifth, OMB Defendants' delay has injured Plaintiff States, affected service organizations, AmeriCorps members, and the general public, by preventing them from effectively preparing for the upcoming service year. Each additional day of delay makes it more impracticable for Plaintiffs to plan and recruit for programs scheduled to begin in August or September.

Finally, while the Court need not find "impropriety lurking behind" delay, *TRAC*, 750 F.2d at 80, neither should the Court ignore it when the impropriety is plain to see: OMB Defendants are using their ministerial role in the management of appropriated funds to circumvent Congressional will, not to mention this Court's injunction, and have unilaterally made significant changes to AmeriCorps without notice and comment. Plaintiffs are likely to show that OMB Defendants' withholding of funds is unlawful and/or unreasonable, and the Court should order the funds to be released immediately.

## B. Plaintiffs Are Likely to Show That OMB Defendants Violated the Separation of Powers

OMB Defendants' attempt to withhold millions in AmeriCorps funding also violates the separation of powers. "[T]he separation of powers doctrine prohibits each branch of government from 'intrud[ing] upon the central prerogatives of another.'" *United States v. Moussaoui*, 382 F.3d

24

453, 469 (4th Cir. 2004) (quoting *Loving v. United States*, 517 U.S. 748, 757 (1996)).

Under the framework of Justice Robert Jackson's opinion in *Youngstown Sheet & Tube Co. v. Sawyer*, OMB's decision to withhold AmeriCorps funding is contrary to the express will of Congress, and so the President's authority is at its "lowest ebb."  343 U.S. 579, 637 (1952) (R. Jackson, J., concurring).  Governing appropriations law requires that the $975 million appropriated by Congress to "carry out" national service activities actually be expended for that purpose.  *See* 2024 Appropriations Act, 138 Stat. 694 (continued by 2025 Appropriations Act, 139 Stat. 11). "When Congress appropriates funds to the executive branch, the President, unless otherwise authorized to withhold such amounts, must prudently obligate them."  No. B-329739, *supra*, at 1.

Here, OMB Defendants have not properly exercised the "strictly circumscribed authority to temporarily withhold funds from obligation," so their actions are contrary to the express will of Congress.  *See id.*  Congress may, if it chooses, merely "impose a statutory cap" by appropriating funds "'not to exceed' a particular amount" *Thompson v. Cherokee Nation of Okla.*, 334 F.3d 1075, 1084–85 (Fed. Cir. 2003), *aff'd and remanded sub nom. Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631 (2005), which means that "the agency is not required to spend the entire amount."  II *GAO Redbook* (3d ed.) at 6-28; *cf. Clinton v. City of New York*, 524 U.S. 417, 446 (1998) (First Congress's appropriation of "'sum[s] not exceeding' specified amounts" gave "the President . . . wide discretion with respect to both the amounts to be spent and how the money would be allocated among different functions").  Here, however, Congress did not employ any such permissive language.  *See also Train v. City of New York*, 420 U.S. 35, 44 (1975) (holding, based on a reading of the entire statute, that appropriation "authorizing 'not to exceed' $5 billion" nevertheless "requir[ed] the full allotment of the $5 billion among the States").

Moreover, the President holds no "'exclusive' and 'conclusive'" constitutional authority

that would allow OMB Defendants to overcome the will of Congress.  *Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (citation omitted).  To the contrary, "Congress's control over federal expenditures is 'absolute.'"  *FLRA*, 665 F.3d at 1348 (citation omitted).  "Nothing in Article II of the Constitution provides the Executive with any independent authority to spend, or withhold, federal funds that Congress has appropriated."  *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 639 (E.D. Pa. 2017).  Thus, "[a]bsent congressional authorization"—which has not been requested let alone given—"the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals."  *City & County of San Francisco*, 897 F.3d at 1235.

In refusing to distribute appropriations enacted into law by Congress, OMB Defendants effectively have arrogated to themselves a line-item veto power, claiming authority for the Executive to pick and choose which otherwise-binding appropriations laws will be effectuated. Yet the Supreme Court held decades ago that a statute delegating that exact authority to the President was unconstitutional.  In *Clinton v. City of New York*, 524 U.S. 417 (1998), the Court concluded that the Line-Item Veto Act of 1996—which allowed the President to "cancel in whole . . . any dollar amount of discretionary budget authority" so long as doing so would "reduce the Federal budget deficit," *id*. at 435—violated the separation of powers because it "authorize[d] the President himself to effect the repeal of laws, for his own policy reasons, without observing the procedures set out in Article I, § 7" of the Constitution (bicameralism and presentment).  *Id.* at 445.  If "Congress cannot alter the procedures set out in Article I, § 7, without amending the Constitution," then OMB Defendants cannot alter them either.  *See id.* at 446.

Indeed, courts have correctly enjoined similar attempts by this administration to withhold funds because doing so violates the separation of powers.  *See, e.g., Rhode Island v. Trump*, No. 1:25-CV-128-JJM-LDA, 2025 WL 1303868, at *15 (D.R.I. May 6, 2025) (defendants likely

violated separation of powers because "the Executive is usurping Congress's . . . power of the purse, by disregarding congressional appropriations"); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 441 (D. Md. 2025) (similar). This Court should conclude the same and hold that OMB Defendants likely violated the separation of powers by indefinitely withholding AmeriCorps appropriations.

## II.    Plaintiff States are Irreparably Harmed by OMB's Actions

Defendants' actions also are causing irreparable injuries to Plaintiffs, which are directly traceable to Defendants' unlawful conduct and will be redressed only by the requested injunctive and declaratory relief, including relief while this case proceeds. *See HIAS, Inc.*, 985 F.3d at 318. Irreparable harm is shown when "remedies available at law, such as monetary damages, are inadequate," *Wudi Indus. (Shanghai) Co. v. Wong*, 143 F.4th 250, 260 (4th Cir. 2025), and "the harm . . . cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (citation and quotation marks omitted). Here, by withholding FY 2025 AmeriCorps funds, OMB Defendants will cause the reduction or termination of numerous AmeriCorps programs operating in Plaintiff States, many of which are operated directly by Plaintiff States or their instrumentalities. Thus, the OMB Defendants' actions are causing some of the same harms this Court previously enjoined. *See* ECF 148.

### A.    Withholding of Funds for Competitive Grants

The Plaintiff States are irreparably harmed by OMB's withholding funds that Congress appropriated to AmeriCorps for Fiscal Year 2025 and that were approved by AmeriCorps either as National Direct Funding "pending the release of FY2025 appropriated dollars" or as competitive grants "pending the release of FY 25 appropriated dollars." OMB's ongoing withholding of appropriated funds—particularly without disclosing it is doing so—constitutes irreparable harm. *Accord CREW*, 2025 WL 2025114, at *18 (finding that irreparable injury from denial of

information concerning apportionment "is further supported by the fact that there are ongoing, imminent concerns of potential Executive Branch withholding or overspending.").

Given OMB Defendants' steadfast refusal to explain the status of these funds, Plaintiff States cannot determine whether any portion of the Congressionally appropriated FY 2025 funds will ever be released. Moreover, given OMB Defendants' explicit intent to impound funds, many Plaintiff States and their programs must presume that the funding awarded will never materialize, resulting in significant irreparable harm in the form of service cuts and terminations. *See, e.g.*, *Washington v. Trump*, 768 F. Supp. 3d 1239, 1279 (W.D. Wash. 2025) (finding irreparable harm from funding cuts that led to research program closures and staff terminations).

To take just a few examples, in Massachusetts, programs funded "pending release" of FY 2025 appropriated dollars were compelled to seek a reduced amount of formula funding instead, resulting in "reduced funding for [these] programs as well as many other programs originally included in [the] formula funding allocation." McGuinness Decl. (2d) (Mass.) ¶¶ 13(b)(iii), 22. In Delaware, "two-thirds of the formula allocation would need to be spent on programs that had been expected to receive competitive grants" resulting in a "significant reduction in overall funding." Sullivan Decl. (2d) (Del.) ¶ 22. And in New York, two programs conditionally funded with competitive funds would likely receive a "reduced formula award" and the State Commission was accordingly "forced to reduce funding levels for other formula applicants." Tailleur Decl. (N.Y.) ¶ 13(b)(ii)--(iv); *see also* Moua Decl. (2d) (Cal.) ¶ 14(b)(i) (California Commission forced to reconcile "over $30 million in unfunded requests within a formula allocation of only $16 million"); Trent Decl. (2d) (Mich.) ¶ 13(b)(ii) (unless competitive funding is released, City Year Detroit and Michigan State University College Advising Corps would have to seek reduced formula funding, resulting in "fewer members, and [] decreased services"); Clark Decl. (2d)

(Md.) ¶¶ 3, 7, 9, 13 (ASTAR at Frostburg State University was compelled to seek smaller award of formula funding, which will support only 75% of services that could have been provided).[15]

Other programs, such as City Year Denver—which provides mentors and "mental health navigators" for K-12 students—opted to risk accepting the competitive grant notwithstanding the condition, due to the significantly reduced financial support available under the State's formula subgrant.  Kelly Decl. (2d) (Colo.) ¶ 13(c)(iii)–(iv).  Accordingly, City Year Denver "continues to wait in limbo" for the release of its competitive grant award, and if such money is not distributed the "scale and timeline" of its programming will likely be cut.  *Id.* ¶¶ 13(c)(v)–(vi).  Similarly, Maine Conservation Corps—the largest AmeriCorps program operating solely in Maine, which focuses on critical environmental stewardship—accepted a competitive grant from AmeriCorps funded "pending release of FY 2025 appropriated dollars."  Gleixner-Hayat Decl. (Me.) ¶¶ 8(b), 19.  If OMB Defendants do not release that funding, then Maine Conservation Corps "would need to cut all AmeriCorps-funded services to Maine communities and reduce its overall operations by roughly 50%." *Id.* ¶ 19; *see also* Johnson Decl. (2d) (N.C.) ¶ 11(c)(ix) (three programs providing college advising to needy students are awaiting competitive grant funds, and if such funds are not released one program will be discontinued, and others will reduce capacity).

The delay and uncertainty caused by OMB Defendants' actions has also caused irreparable harm, by preventing programs from adequately and timely preparing for the upcoming service year, many of which are keyed around the fall and the beginning of the academic year.  *See, e.g.*, Kelly Decl. (2d) (Colo.) ¶ 13; Moua Decl. (2d) (Cal.) ¶¶ 15, 27; Sullivan Decl. (2d) (Del.) ¶ 41 (many programs in Delaware are being forced to push back start dates and enroll members for 900-

---

[15]  Because so many AmeriCorps programs have been affected by Defendants' actions, the examples in this briefing necessarily constitute only a representative selection.

hour positions instead of 1,200 hour positions, resulting in a 25% reduction in services to be delivered); Darrow Decl. (R.I.) ¶ 11(b)(iii) (while "wait[ing] . . . for release of appropriated funds from OMB," Woonsocket Neighborhood Development Corporation "has not begun to recruit new AmeriCorps members and services delivered to the community will be further delayed"). Thus, as with AmeriCorps' termination of grants and programs in April 2025, this significant alteration of funding, effected without notice to the affected programs "irreparably disrupts service delivery for the present grant cycle. . ." in a way that cannot be remedied through final judgment at a later time, *see* ECF 148 at 77, and which has downstream impacts to programs and the AmeriCorps members who serve them.

Across Plaintiff States, these "issues have already created significant uncertainty for [States'] national service programs, staff, and partners—disrupting planning, enrollment, and continuity of services." *E.g.*, Litchfield Decl. (2d) (Ariz.) ¶¶ 22, 24–25; *see also* Moua Decl. (2d) (Cal.) ¶ 27; Kelly Decl. (2d) (Colo.) ¶ 32; Bringardner Decl. (2d) (Ky.) ¶ 28; McGuiness Decl. (2d) (Mass.) ¶ 26; Trent Decl. (2d) (Mich.) ¶ 26; Tailleur Decl. (N.Y.) ¶ 27; Anderson Decl. (2d) (Pa.) ¶ 25; Darrow Decl. (2d) (R.I.) ¶ 26 (all same). Such closures, delays, and disruptions are causing significant, irreparable harm to AmeriCorps programs in Plaintiff States. *See* ECF 148 at 70–71 (finding irreparable harm where grant terminations caused AmeriCorps-funded programs to cease or significantly curtail operations).

### B. Withholding of Funds for Seniors Programs

OMB Defendants also are irreparably harming Plaintiff States by withholding funding intended for AmeriCorps Foster Grandparent and Senior Companion Programs, many of which are operated directly by Plaintiff States. In both types of programs, low-income seniors provide support for individuals in need. In Foster Grandparent Programs, seniors serve as mentors for K–

12 students, while in Senior Companion Programs, volunteers support other seniors in need of assistance and companionship. The Foster Grandparent Program in particular, has a rich history dating back to the 1960s, when President John F. Kennedy urged the establishment of the National Senior Corps as part of an important speech on aging, which decried the loneliness, isolation, and lack of connection felt by many seniors in this country. *See* Amador Decl. (Haw.) ¶¶ 5–8 (detailing the six-decades-long history of the Foster Grandparent Program).

To take one example of the harms caused by OMB's actions, California's Foster Grandparent Program (FGP)—run by its Department of Developmental Services (DDS)—enables low-income "Senior Volunteers [to] work directly with special-needs children and young adults in community K-12 schools, transition programs, preschools, Head Start programs, and acute care facilities." Hornberger Decl. (Cal.) ¶ 9. Supported by a stipend of just four dollars an hour, volunteers assist teachers, "provide small group activities for children," and help "children with disabilities who need one-on-one support." *Id*. ¶¶ 9, 12. The program provides significant benefits to the students served, including improved "school readiness, academic performance, engagement, [and] social-emotional skills," and to the senior volunteers as well, improving their "physical and mental health," and reducing "anxiety, depression, and loneliness." *Id*. ¶ 13.

AmeriCorps initially notified California on June 12, 2025, that the renewal application for its State-run Foster Grandparent program was approved for approximately $1.35 million effective July 1. *Id*. ¶ 15. "[F]or the first time," though, "the approval stated that the award was pending release of appropriated funds." *Id*. Over a month later, California "ha[s] not received the formal notice of grant award (NOGA), which would allow [DDS to] perform work under the grant and access the funds." *Id*. On June 25, the Acting Director of AmeriCorps Seniors told California's Seniors program, for the first time, that its application "would be 'held' through September 30

pending 'release of appropriations.'"  *Id.* ¶ 16.  Since then, California "ha[s] been unable to obtain any guidance or further communication on when, if ever, these funds will be distributed."  *Id.* Although California obtained a 90-day no-cost extension from AmeriCorps to use remaining FY 2024 funds—which will likely allow the program to continue through the end of September— unless the FY 2025 funds are promptly released, California's "decades-long program . . . will be in jeopardy" and unable to continue in its current form.  *Id.* ¶¶ 18–22.

The termination of California's Foster Grandparent Program would eliminate the critical services senior volunteers provide to address unmet needs in communities across California, including in "community schools, Head Start centers, acute care facilities, and adult day programs."  Special needs children, for instance, "receive services that are provided in-kind by FGP volunteers at no cost to themselves or their families, reducing DDS's burden."  *Id.* ¶ 17.  The termination of these services would cause irreparable harm by increasing the burden on California's State agencies to fill the void.  "This 'diversion of resources away from . . .core missions' to gap-fill in the absence of AmeriCorps funding is irreparable harm."  ECF 148 at p. 75, (quoting *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021)).  Indeed, California could not "fully replicate" the program on its own because any State-provided stipends and benefits would be counted as income for purposes of volunteers' federal benefits such as SSI, whereas benefits provided by AmeriCorps are exempted.  *Id*. at ¶ 22.  As a result, many current volunteers could not serve in a non-AmeriCorps program without placing their public benefits at risk.  *Id*.

Other Plaintiffs States face similar harms.  States that run Foster Grandparent Programs themselves, such as New Jersey and Delaware, also will be forced to terminate those decades-old programs unless they receive FY 2025 funding by September 30.  *E.g.*, Madden Decl. (2d) (N.J.) ¶¶ 9–10; Carney Decl. (Del.)  ¶ 23; Amador Decl. (Haw.) ¶ 20.  States that benefit from Seniors

32

programs operated by nonprofits likewise will be harmed by the loss of those programs' services.[16]

*See, e.g.*, Trent Decl. (2d) (Mich.) ¶ 23 (ten total Michigan Seniors programs have been affected, causing programs to await engagement with volunteers until funding is released); Bauer Decl. (2d) (Or.) ¶ 29 (several Oregon senior programs "are in program shutdown mode" and have "paused service" for "120 senior clients" and "approximately 240 children from vulnerable populations with mentoring and tutoring supports"); Darrow Decl. (2d) (R.I.) ¶¶ 20, 22 (two Foster Grandparent Programs in Rhode Island will see services cut after September 1, "eliminating the support provided to child care and pre-school centers to help vulnerable children thrive"); Gleixner-Hayat Decl. (Me.) ¶¶ 16–17 (funds for Senior Companion program in Maine being withheld). And the low-income senior volunteers at such programs, deprived of their modest stipends and "struggling to afford basic needs such as food, gas, and utilities," will likely turn to State assistance as a substitute. *See* Bauer Decl. (2d) (Or.) ¶ 27; Carney Decl. (Del.) ¶ 27.

The loss of these AmeriCorps programs and the members who served them amounts to irreparable harm. As this Court has recognized, "AmeriCorps members are not fungible. They have certain expertise and community ties and thus are not interchangeable with other personnel who may be able to step in and serve. In fact, AmeriCorps members are prohibited by law from "displac[ing]" employees or other volunteers at the organizations where they serve, making them

---

[16] Public reporting also indicates that many Seniors programs in Plaintiff States already have been forced to pause operations due to lack of funds. *E.g.*, Leanna Wells, *Northern Cambria Daycare says goodbye to Foster Grandparent program*, WTAJ (June 30, 2025), https://www.wtaj.com/news/local-news/northern-cambriadaycare-says-goodbye-to-foster-grandparent-program/ (Pennsylvania); Michael Benny, *Syracuse Foster Grandparent program, which was a lifeline for the lonely, shuts down*, CNY Central (July 1, 2025), https://cnycentral.com/news/local/foster-grandparent-program-put-on-pause-over-funding-peaceinc-says-office-of-management-budget-syracuse-city-school-district-head-start (New York).

a unique resource to state service programs. *See id.* § 12637(b)(1)." *See* ECF 148 at 71.  OMB Defendants' actions in withholding AmeriCorps Seniors Program are accordingly inflicting, or will imminently inflict, irreparable harm on Plaintiff States.

### C.  Withholding of Funds for CIF Grants

Plaintiff States are also irreparably harmed by the withholding of Commission Investment Fund grants. Each State Commission is eligible to apply for and administer two types of grants directly: a Commission Support Grant (CSG) and a Commission Investment Fund (CIF) grant. Kelly Decl. (2d) (Colo.) ¶ 14.  Relevant here, CIF awards support service member training efforts and technical assistance.  According to guidance provided by AmeriCorps, CIF award notifications were expected to be "awarded no later than June 20, 2025," with a performance period beginning July 1, 2025.  *Id.* ¶ 22.  Instead, OMB is withholding such funds, causing further irreparable harm.

For example, Colorado's State Commission uses its CIF grant to support commission staffing and staff development in priority performance areas, training events, and collaborative activities.  Kelly Decl. (2d) (Colo.) ¶ 16.  "If FY25 CIF funding is not awarded, Serve Colorado will lose critical resources that support training, technical assistance, and capacity-building efforts for AmeriCorps programs statewide."  *Id.* ¶ 26.  "This would significantly limit our ability to provide high-quality support to subgrantees, deliver statewide member training events, and implement performance and compliance improvement initiatives."  *Id.*  "Serve Colorado has already been forced to forgo re-hiring for departing staff due to budgetary constraints [caused by the withholding] of CIF funding.  Without CIF, the overall effectiveness and sustainability of national service in Colorado would be at risk."  *Id.*

The situation is similar in the other Plaintiff States.  Sullivan Decl. (2d) (Del.) ¶¶ 29, 40 (forced to delay hiring both a program officer and fiscal consultant, responsible for "financial

34

compliance and oversight"); Anderson Decl. (2d) (Pa.) ¶ 21 ("PennSERVE has already been forced to freeze hiring for open staff positions due to ongoing uncertainty around federal funding, including the lack of available CIF funds."); McGuinness Decl. (2d) (Mass.) ¶¶ 21, 25 (cannot re-hire for two staff positions due to the lack of CIF funding, forced to cancel training events); Blissett Decl. (2d) (Ill.) ¶ 30 (similar); Nair Decl. (2d) (N.M.) ¶ 21 ("forced to forgo posting for a recently opened staff position"); Lucier Decl. (2d) (Conn.) ¶ 22 (state "will be forced to eliminate key staff positions" unless CIF funding is awarded as anticipated); Bringardner Decl. (2d) (Ky.) ¶ 22 ("[A]ll training activities are funded through CIF," and loss of funds will "significantly limit" state support); Trent Decl. (2d) (Mich.) ¶ 25; Moua Decl. (2d) (Cal.) ¶ 23; Johnson Decl. (2d) (N.C.) ¶ 19; Tailleur Decl. (N.Y.) ¶ 25; Bauer Decl. (2d) (Or.) ¶ 22; Lorenz Decl. (2d) (Md.) ¶ 21. Such harms are irreparable in and of themselves. *City & County of San Francisco v. USCIS*, 408 F. Supp. 3d 1057, 1123 (N.D. Cal. 2019) (irreparable harm may consist of "burdens on . . . ongoing operations" for public entities, including administrative costs caused by changes in federal policy).

### D.  Long-Term Harm to State AmeriCorps Programs

In addition, Plaintiff States will continue to suffer irreparable injury to the reputation of their AmeriCorps programs and operations, which in turn will reduce the vital services provided in Plaintiff States.  In the earlier round of briefing in this matter, Plaintiff States explained that the mass-termination of numerous AmeriCorps programs would undermine trust in service programs in Plaintiff States, causing diminished recruitment and loss of programs altogether.  Pls. Mem. at 20-21, ECF 5-1.  Defendants argued that such harms "depend on an attenuated chain of possibilities."  Defs.' Resp. at 27, ECF 106.  Unfortunately, however, the continuing attacks on AmeriCorps have made that reputational harm a reality:  Confidence in AmeriCorps has been shaken so much that many programs in Plaintiff States have ceased operations or turned away from

AmeriCorps as a reliable source of support.  OMB Defendants' actions are only compounding this harm.  *See HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) ("ero[sion]" of "community connections" . . . would be significant and irreparable in the absence of an injunction").

To take just one example, in Massachusetts a full *eight* existing AmeriCorps programs declined to seek AmeriCorps support for the next service year.  McGuinness Decl. (2d) (Mass.) ¶ 23.  Among other critical services, these programs tutored Boston public school students in writing, built and maintained nature trails, and provided job and language services for immigrants and refugees.  *Id*.  These longstanding and vital organizations will now terminate their AmeriCorps programs, due to the funding uncertainty caused by Defendants.  *Id*.  ¶¶ 23–24.

Tragically, by continually disrupting federal support for public service, Defendants have caused numerous service programs to cease AmeriCorps activities across Plaintiff States.  *See, e.g.*, Trent Decl. (2d) (Mich.) ¶ 24 ("several applicants" withdrew from the next service year due to ongoing uncertainty, including three that "operated AmeriCorps programs for over a decade"); Moua Decl. (2d) (Cal.) ¶ 15 ("[A]n unprecedented 11 organizations that have operated for six years or more have elected to withdraw their applications" and "[t]wo of the five successful recompete applicants have opted to decline due to the funding uncertainty"); Almond Decl. (2d) (Wash.) ¶ 22 ("11 of our Serve Washington programs determined that AmeriCorps is no longer a positive fit for their work"); Johnson Decl. (2d) (N.C.) ¶ 11(c)(v); Bauer Decl. (2d) (Or.) ¶ 12(b)(i); Darrow Decl. (2d) (R.I.) ¶ 11(b)(ii); Lorenz Decl. (2d) (Md.) ¶ 12(b)(v).  Just as this Court previously found, Plaintiff States "will suffer irreparable harm from the closure of these AmeriCorps programs." Mem. Op., ECF 148, at 70.

While some programs may try and locate alternative sources of funding, *see* Lorenz Decl. (2d) (Md.) ¶ 12(b)(ix); Almond Decl. (2d) (Wash.) ¶ 13(b), for many others the loss of support

from AmeriCorps will lead to a reduction or complete termination of services in Plaintiff States. For instance, due to uncertainty about its award "Funded pending release of FY 2025 appropriated dollars," Jumpstart for Young Children "chose to withdraw its AmeriCorps competitive funding application and proceed without federal support . . . resulting in the discontinuation of its programming in Connecticut."  Lucier Decl. (2d) (Conn.) ¶ 12(b)(iii); McGuinness Decl. (2d) (Mass.) ¶ 13(b)(iv) (Jumpstart for Young Children also discontinued its AmeriCorps program in Massachusetts).    In Oregon, the University of Oregon's Resource Assistance for Rural Environments (RARE) "ended their program altogether, closing a 30+ year program that provided rural communities across the state with vital capacity-building services."  Bauer Decl. (2d) (Or.) ¶ 12(a)(ii).  In Washington, "AmeriCorps grant terminations and associated funding impacts resulted in the loss of a program's financial sponsor and the non-profit had to shut down future operations." Almond Decl. (2d) (Wash.) ¶ 22.  And in North Carolina, one of the State's "longest-running AmeriCorps programs"—which "addressed homelessness . . . in the Greensboro metropolitan area"—"permanently discontinued all AmeriCorps operations as a result of the loss of funding."[17] Johnson Decl. (2d) (N.C.) ¶ 11(c)(viii); *see also* Moua Decl. (2d) (Cal.) ¶ 25 (programs no longer participating in AmeriCorps will cause loss of "tutoring and mentoring services, child abuse prevention services, [and] disaster services" among others).

Unless enjoined, OMB Defendants' unlawful withholding of AmeriCorps funds will only accelerate this downward spiral, in which arbitrary cuts throw valuable service programs into

---

[17]  In addition, as this Court already recognized, "[t]he States and subgrantees do not have the resources to offer AmeriCorps members the same benefits they received directly from AmeriCorps, such as the education benefit." Mem. Op., ECF 148, at 73.  Thus, any programs that successfully cobble together funding outside of AmeriCorps will not be able to operate at the same scale or with the same members that they could as AmeriCorps programs.

chaos, lead them to conclude that their participation in AmeriCorps is unsustainable, and culminate in a continued decline in AmeriCorps programs across Plaintiff States. *See, e.g.*, Lorenz Decl. (2d) (Md.) ¶ 22 ("Without court intervention, the continued withholding of funds will further undermine the stability of AmeriCorps support, threatening the future of public service in Maryland."); Moua Decl. (2d) (Cal.) ¶ 25 ("Further delays and uncertainty will have a similar impact on the remaining programs."); Litchfield Decl. (2d) (Ariz.) ¶ 27. A preliminary injunction would mitigate the damage caused by OMB Defendants and provide some measure of stability for Plaintiff States' AmeriCorps programs.

## III.  The Balance of Equities and the Public Interest Weigh in Plaintiffs' Favor

The final two factors—balance of the equities and weighing the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). As when the Court issued a Preliminary Injunction on June 5, *see* ECF 148, those factors overwhelmingly support the release of funds during the pendency of this case.

As detailed above, Plaintiffs are facing irreparable harms that will be felt across the States without court intervention. *See supra* Section II. By contrast, the only burden on Defendants is that they will be required to release funds that were appropriated by Congress, as the Constitution and the statutes governing OMB mandate. *See League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws . . . that govern their existence and operations."). Since the President signed AmeriCorps' appropriations into law on March 15, OMB Defendants have neither informed Congress of any proposal to defer these funds for a permissible purpose, nor formally proposed to rescind funds. *See* 31 U.S.C. §§ 683(a), 684(a), 1512(c). Whatever hypothetical interest the OMB Defendants have in requesting that Congress rescind the appropriation in the future, they have no

right to ignore existing law, which is the status quo. *See Lackey v. Stinnie*, 145 S. Ct. 659, 667 (2025) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.") (citation omitted).

Further, the Plaintiff States are not even asking for OMB to release funds to them, but to release funds to another federal agency to expend the money as it already deemed appropriate. *See, e.g.*, Status Conf. Tr. ECF 168, at 7 (Counsel for AmeriCorps: "AmeriCorps—the agency has decided to fund everything with the FY 2025 appropriated funds. They have requested full funding."); *id*. at 13 (Counsel for AmeriCorps: "AmeriCorps has requested full funding.").

This Court cogently recognized the balance of equities in enjoining AmeriCorps' initial wave of program terminations:

> If, at the end of this litigation, the government is vindicated and cannot recover the funds that Congress appropriated for national service, the funds will have been spent on improving the lives of everyday Americans: veterans, people with substance use disorder, people with disabilities, children with learning differences, indigenous communities, people impacted by natural disasters, and people trying to survive below the poverty line. Any harm the defendants might face if the agency actions are enjoined pales in comparison to the concrete harms that the States and the communities served by AmeriCorps programs have suffered and will continue to suffer. The balance of the equities and the public interest heavily favors preliminary injunctive relief.

ECF 148 at 81. That conclusion is just as true here.

## IV.    The Court Should Enjoin the Withholding of AmeriCorps Funds

Based on the foregoing violations and harms, Plaintiff States respectfully request that the Court enter a preliminary injunction that enjoins Defendants from unlawfully withholding AmeriCorps funds intended for programs in Plaintiff States.

This requested injunction is narrowly tailored to provide complete relief for the specific harms suffered by Plaintiff States. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (injunction

"should be no more burdensome to the defendant than necessary to provide *complete relief* to the plaintiffs before the court") (emphasis added). In crafting equitable relief, courts must consider "what is necessary, what is fair, and what is workable." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (quotation omitted). Based on these principles, Plaintiff States have limited the requested relief, wherever workable, to remedy their harms suffered.

## CONCLUSION

For the foregoing reasons, Plaintiff States' motion should be granted, and the Court should issue the accompanying proposed order.

Dated: August 7, 2025                           Respectfully submitted,

**ANTHONY G. BROWN**                            **KATHLEEN JENNINGS**
ATTORNEY GENERAL OF MARYLAND                    ATTORNEY GENERAL OF DELAWARE

By: */s/ Keith M. Jamieson*                     By: */s/ Ian R. Liston*
Keith M. Jamieson (D. Md. Bar. No. 31543)       Ian R. Liston*
Virginia Williamson (D. Md. Bar. No. 31472)        *Director of Impact Litigation*
   *Assistant Attorneys General*                Vanessa L. Kassab*
Office of the Attorney General                     *Deputy Attorney General*
200 Saint Paul Place                            Delaware Department of Justice
Baltimore, Maryland 21202                       820 N. French Street
(410) 576-6960                                  Wilmington, DE 19801
kjamieson@oag.state.md.us                       (302) 683-8899
                                                Ian.Liston@delaware.gov

*Counsel for the State of Maryland*             *Counsel for the State of Delaware*


**ROB BONTA**                                   **PHILIP J. WEISER**
ATTORNEY GENERAL OF CALIFORNIA                  ATTORNEY GENERAL OF COLORADO

By: */s/ Ezra Kautz*                            By: */s/ Sarah H. Weiss*
Ezra Kautz*                                     David Moskowitz*
   *Deputy Attorney General*                       *Deputy Solicitor General*
Joel Marrero*                                   Sarah H. Weiss*
William H. Downer*                                 *Senior Assistant Attorney General*

40

*Supervising Deputy Attorneys General*
Brian Bilford*
  *Deputy Attorney General*
Michael L. Newman*
  *Senior Assistant Attorney General*
California Department of Justice
1300 I Street
Sacramento, CA  95814
(916) 210-6346
Joel.Marrero@doj.ca.gov
William.Downer@doj.ca.gov
Ezra.Kautz@doj.ca.gov
Brian.Bilford@doj.ca.gov
Michael.Newman@doj.ca.gov

*Counsel for the State of California*

**KRISTIN K. MAYES**
ATTORNEY GENERAL OF ARIZONA

By  */s/ Joshua A. Katz*
Joshua A. Katz*
  *Assistant Attorney General*
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Katz@azag.gov

*Counsel for the State of Arizona*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF
  COLUMBIA

By: */s/ Andrew C. Mendrala*
Andrew C. Mendrala*
  *Assistant Attorney General*
Public Advocacy Division
Office of the Attorney General for the District
  of Columbia
400 Sixth Street, NW
Washington, D.C. 20001

Kyle M. Holter*
Sam Wolter*
  *Assistant Attorneys General*
Colorado Office of the Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
sarah.weiss@coag.gov
kyle.holter@coag.gov
samuel.wolter@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
ATTORNEY GENERAL OF CONNECTICUT

By: */s/ Andrew Ammirati*
Andrew Ammirati*
  *Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5090
Andrew.Ammirati@ct.gov

*Counsel for the State of Connecticut*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
  *Solicitor General*
Hawaiʻi Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360

41

(202) 724-9726
Andrew.mendrala@dc.gov

*Counsel for the District of Columbia*

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

By: */s/ Abigail R. Durkin*
Abigail R. Durkin*
 *Assistant Attorney General II, Special*
 *Litigation Bureau*
Cara Hendrickson*
 *Assistant Chief Deputy Attorney General*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
Tel. (312) 814-3000
Abigail.Durkin@ilag.gov
Cara.Hendrickson@ilag.gov

*Counsel for the State of Illinois*

**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

By: */s/ Sarah A. Forster*
Sarah A. Forster*
 *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  (207) 626-8800
Fax:  (207) 287-3145
Sarah.Forster@maine.gov

*Counsel for the State of Maine*

david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**OFFICE OF THE GOVERNOR *ex rel.***
**ANDY BESHEAR**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
THE COMMONWEALTH OF KENTUCKY

By:  */s/ S. Travis Mayo*
S. Travis Mayo*
 *General Counsel*
Taylor Payne*
 *Chief Deputy General Counsel*
Laura C. Tipton*
 *Deputy General Counsel*
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

By: */s/ Katherine Dirks*
Katherine Dirks*
 *Chief State Trial Counsel*
Jonathan Green*
 *Division Chief*
Veronica Zhang*
 *Assistant Attorney General*
 *Non-Profit Organizations / Public Charities*
Massachusetts Office of the Attorney General
1 Ashburton Pl. Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

42

*Counsel for the Commonwealth of Massachusetts*

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

By: */s/ Neil Giovanatti*
Neil Giovanatti*
Alexus Ringstad*
   *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
RingstadA@michigan.gov

*Counsel for the People of the State of Michigan*

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

By: */s/ Liz Kramer*
Liz Kramer*
   *Solicitor General*
Minnesota Attorney General's Office
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us

*Counsel for the State of Minnesota*

**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
   *Solicitor General*
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**MATTHEW J. PLATKIN**
ATTORNEY GENERAL OF NEW JERSEY

*/s/ Jessica L. Palmer*
Jessica L. Palmer*
Lauren E. Van Driesen*
   *Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-4607
Jessica.Palmer@law.njoag.gov

*Counsel for the State of New Jersey*

**RAÚL TORREZ**
ATTORNEY GENERAL OF NEW MEXICO

By: */s/ James W. Grayson*
James W. Grayson*
   *Chief Deputy Attorney General*

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

By: */s/ Jessica Ranucci*
Jessica Ranucci*

43

New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM  87504-1508
(505) 490-4060
jgrayson@nmdoj.gov

*Counsel for the State of New Mexico*

*Special Counsel, Federal Initiatives*
Rabia Muqaddam*
  *Special Counsel for Federal Initiatives*
Office of the Attorney General
28 Liberty St.
New York, NY 10005
(929) 638-0447
Jessica.ranucci@ag.ny.gov
rabia.muqaddam@ag.ny.gov

*Counsel for the State of New York*

**JEFF JACKSON**
ATTORNEY GENERAL OF NORTH CAROLINA

**LAURA HOWARD**
CHIEF DEPUTY ATTORNEY GENERAL

By /s/ Daniel P. Mosteller
Daniel P. Mosteller*
  *Associate Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov

*Counsel for the State of North Carolina*

**DAN RAYFIELD**
ATTORNEY GENERAL OF OREGON

By: /s/ Coby Howell
Coby Howell*
  *Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880

Fax (971) 673-5000
coby.howell@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSH SHAPIRO**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
THE COMMONWEALTH OF PENNSYLVANIA

By: /s/ Kenneth L. Joel
Kenneth L. Joel*
  *Deputy General Counsel*
Benjamin Holt*
  *Chief Counsel*
  *Pennsylvania Department of Labor*
Melissa Murphy*
  *Senior Counsel*
  *Pennsylvania Department of Labor*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

By: /s/ Kyla Duffy
Kyla Duffy*
  *Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2809
kduffy@riag.ri.gov

*Counsel for the State of Rhode Island*

44

Governor's Office of General Counsel
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 649-8669
kennjoel@pa.gov

*Counsel for Governor Josh Shapiro*

**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT


By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
   *Solicitor General*
Office of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

**NICHOLAS W. BROWN**
ATTORNEY GENERAL OF WASHINGTON


By: */s/ Abby Kahl*
Abigail Kahl*
Andrew R.W. Hughes*
   *Assistant Attorneys General*
Office of the Attorney General
2425 Bristol Court SW
Second Floor
PO Box 40117
Olympia, WA 98504
360-534-4864
Abigail.Kahl@atg.wa.gov
Andrew.Hughes@atg.wa.gov

*Counsel for the State of Washington*

**JOSHUA L. KAUL**
ATTORNEY GENERAL OF WISCONSIN


By: */s/ Charlotte Gibson*
Charlotte Gibson*
   *Assistant Attorney General*
Wisconsin Department of Justice
P.O. Box 7857
Madison, WI 53707
(608) 957-5218 (phone)
(608) 294-2907 (fax)

*Counsel for the State of Wisconsin*

*\* Pro hac vice*

45